## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**VERA INSTITUTE OF JUSTICE**,
  34 35th Street, Suite 4-2A
  Brooklyn, NY 11232;

**CENTER FOR CHILDREN & YOUTH JUSTICE**,
  300 Elliott Avenue W, Suite 360
  Seattle, WA 98119;

**CHINESE FOR AFFIRMATIVE ACTION**,
  17 Walter U Lum Place, #19
  San Francisco, CA 94108;

**FORCE DETROIT**,
  1551 Rosa Parks Boulevard, Suite B,
  Detroit, MI 48216;

**HEALTH RESOURCES IN ACTION**,
  2 Boylston Street, 4th Floor
  Boston, MA 02116;

*Plaintiffs*, *on behalf of themselves and all others similarly situated,*

v.

**UNITED STATES DEPARTMENT OF JUSTICE**,
  950 Pennsylvania Avenue, NW
  Washington, DC 20530;

**PAMELA J. BONDI**, in her official capacity as
United States Attorney General,
  9950 Pennsylvania Avenue, NW
  Washington, DC 20530;

**OFFICE OF JUSTICE PROGRAMS**,
  810 7th St NW
  Washington, DC 20001;

**MAUREEN A. HENNEBERG**, in her official
capacity as Acting Head of the Office of Justice
Programs,
  810 7th St NW,
   Washington, DC 20001;

*Defendants.*

Case No. 1:25-cv-1643

## CLASS ACTION COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs bring this class action against the U.S. Department of Justice (DOJ); Pamela J. Bondi, in her official capacity as Attorney General of the United States; the Office of Justice Programs (OJP); and Maureen A. Henneberg, in her official capacity as Deputy Assistant Attorney General for Operations and Management and as the Acting Head of the Office of Justice Programs. Plaintiffs state and allege as follows:

## INTRODUCTION

1.      In April 2025, the Department of Justice's Office of Justice Programs abruptly and summarily terminated more than 370 multi-year cooperative agreements and grants awarding more than $820 million in essential funding.[1]

2.      With no prior notice, OJP sent a form email to Plaintiffs and other grantees, offering the same unsupported explanation that Plaintiffs' "awards no longer effectuate[] the program goals or agency priorities." OJP ordered the grantees to stop work immediately and informed them that they would be reimbursed only up to the date of the termination letter.

3.      The terminated grants cut across a broad swath of critical programs and have a successful track record of making our communities safer. These include grants addressing violence reduction and intervention, policing and prosecution, victims' services, juvenile justice and child protection, substance use and mental health treatment, corrections and reentry, justice system enhancements, research and evaluation, and other state- and local-level public safety functions. *See* Council on Crim. Justice, *DOJ Funding Update: A Deeper Look at the Cuts* (May 2025), https://counciloncj.org/doj-funding-update-a-deeper-look-at-the-cuts/    [https://perma.cc/94DS-W7A4].

---

[1] For ease of reference, the agreements at issue will be referred to as "grants," unless otherwise noted.

4.      Plaintiffs are non-profit organizations that were awarded federal grant funding.  They work to train and assist law enforcement, correctional facilities staff, prosecutors, and states and localities.  They work with vulnerable populations who have been victims of crime, including by providing free interpretation services that allow deaf and disabled victims of crime to communicate with law enforcement, and train law enforcement on identifying and serving individuals with disabilities who are victims of sex or labor trafficking.  They fund and work at the community level to successfully interrupt gun crime and gang violence for juveniles and adults, including those at the highest risk for gun violence, in cities across the country.  They fund and work in hospitals to provide lifesaving assistance for violently injured victims and their families, while also mitigating retaliation that may arise from the situation.

5.      As a direct result of OJP's unlawful termination of Plaintiffs' grants, services to many of these populations have abruptly ceased.  Staff have been laid off without meaningful alternatives for employment, and many more staff will soon be laid off without funding.

6.      OJP's abrupt and unlawful termination of Plaintiffs' grants had an immediate and irreparable impact on Plaintiff organizations, their staff, and the individuals and communities that they serve.  These terminations have led to an abrupt discontinuation of vital services to some of the most vulnerable in our communities, making individuals and the communities in which they live less safe.

7.      Absent a preliminary injunction, Plaintiffs will suffer irreparable harm—multi-year projects will terminate abruptly, specialized staff will be laid off, critical services will be withdrawn from communities facing some of the gravest safety concerns—all compounded by lasting damage to hard-earned reputational trust.

8.      OJP's termination of more than 370 multi-year grant awards with no notice and no reasoned explanation about why the grants were being terminated, is quintessential unlawful agency

2

action that violates the APA.  These terminations violate the Constitution and agency regulations, exceed OJP's lawful authority, and are arbitrary and capricious.  *See* 5 U.S.C. § 706(2)(A)–(C).

9.      OJP's abrupt termination of Plaintiffs' grants is unlawful and should be enjoined during the pendency of this litigation.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1331 because this action arises under federal law including the U.S. Constitution and the Administrative Procedure Act (APA), 5 U.S.C. §§ 551 *et seq.*

11.      The Court has authority to enter a declaratory judgment and to provide temporary, preliminary, and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure; the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202; the All Writs Act, 28 U.S.C. § 1651; and the Court's inherent equitable powers.  The Administrative Procedure Act further authorizes the Court to grant temporary and permanent relief from agency action.  5 U.S.C. §§ 705–706.

12.      Venue is proper under 28 U.S.C. §§ 1391(b) and (e) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.  Defendants are United States agencies and officers sued in their official capacities, and at least one Defendant resides in this district; and a substantial part of the events or omissions giving rise to the claim occurred in this district.

## PARTIES

**PLAINTIFFS**

13.      The Children and Youth Justice Center d/b/a Center for Children & Youth Justice (CCYJ) is a Washington State based nonprofit funded in 2006 by Washington State Supreme Court

3

Justice Bobbe J. Bridge (ret.) to create better lives for generations of children and youth by reforming the child welfare and juvenile justice systems.

14.    Chinese for Affirmative Action d/b/a Stop AAPI Hate is a U.S.-based non-partisan Civil Rights coalition dedicated to ending racism and discrimination against Asian Americans and Pacific Islanders (AAPIs).

15.    FORCE (Faithfully Organizing for Community Empowerment) Detroit is a community violence intervention (CVI) organization dedicated to building a safer, freer Detroit, Michigan.

16.    Health Resources in Action (HRiA) is a Massachusetts based non-profit organization working to improve and reimagine public health, with a vision of healthy people thriving in equitable and just communities.

17.    Vera Institute of Justice (Vera) is a New York based non-profit, with a national footprint, working to advance safety and justice.

**DEFENDANTS**

18.    Defendant DOJ is a federal agency headquartered in Washington, D.C.

19.    Defendant Pamela J. Bondi is the Attorney General of the United States.  She is sued in her official capacity.

20.    Defendant OJP is an agency of the federal government and a subordinate agency of DOJ headquartered in Washington, D.C.

21.    Defendant Maureen A. Henneberg is the Deputy Assistant Attorney General for Operations and Management and the Acting Head of the Office of Justice Programs.  She is sued in her official capacity.

## REGULATIONS GOVERNING DOJ GRANTS

22.     Detailed regulations govern DOJ's administration of federal grant funding, including those grants administered by OJP, and specify the grounds on which such grants may be terminated. These regulations stem from Office of Management and Budget (OMB) Uniform Guidance for Federal Financial Assistance, codified at 2 C.F.R. part 200, which OMB promulgated pursuant to its authority to "establish government wide financial management policies for executive agencies," 31 U.S.C. §§ 503(a), 504.   The OMB Uniform Guidance generally requires federal agencies to "implement" OMB's guidance "in codified regulations." 2 C.F.R. § 200.106. DOJ has followed that instruction by issuing its own regulation adopting the OMB Uniform Guidance. 2 C.F.R. § 2800.101.

23.     Under these regulations specific to grant termination, OJP may terminate grants only under certain circumstances and pursuant to specific procedures.  The regulations do not provide unfettered discretion for OJP to terminate grants; they instead allow for the termination of grants in three circumstances: (1) "if the recipient or subrecipient fails to comply with the terms and conditions of the Federal award"; (2) "with the consent of the recipient or subrecipient, in which case the two parties must agree upon the termination conditions"; and (3) "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." *Id.* § 200.340(a).

24.     Under Section 200.340(a)(4), OJP may terminate a grant based on agency priorities only if the terms and conditions of the award clearly and unambiguously specify that a grant can be terminated on those grounds.  Additionally, a termination must be made on an award-by-award basis, and OJP must rely on "specific evidence" to demonstrate that "an award" no longer effectuates a program goal or agency priorities. Section 200.340(a)(4) does not authorize OJP to base a termination on a post-award "change" in agency priorities.  Rather, OJP is allowed to terminate a grant under that

5

provision only where specific evidence demonstrates that "an award" no longer serves the agency priorities or program goal, as articulated when the grant was awarded.

## FACTUAL ALLEGATIONS

### I.  OJP's Grants Awards Supporting Plaintiffs' Community Violence Intervention Programs

25.    OJP, established by the Justice Assistance Act of 1984, is the largest grantmaking component of DOJ.[2]  Among its activities is providing financial support through grant awards to organizations implementing crime control and prevention strategies, and crime victim services.[3]

26.    OJP's granted various awards to each of the Plaintiffs to fund Plaintiffs' work to create safer communities.  Plaintiffs' grant programs address a broad swath of community violence intervention and prevention projects, including initiatives designed to improve policing and prosecution, victims' services, juvenile justice and child protection, substance use and mental health treatment, corrections and reentry, justice system enhancements, research and evaluation, and other state- and local-level public safety functions.  Plaintiffs' OJP awards also helped provide financial support for partner programs, community organizations, subgrantees, local government agencies and municipalities, and contractors to also engage in violence reduction and intervention work.

### Center for Children & Youth Justice (CCYJ)

27.    As the only organization solely committed to reforming the juvenile justice and child welfare systems in Washington State, CCYJ's approach is rooted in listening to those most impacted—children, young adults, and families—by failures of these systems, leading to the development, coordination, and implementation of reforms designed to support children and youth, stabilize

---

[2] U.S. Dep't of Just., Org., Mission & Functions Manual, Office of Justice Programs, https://perma.cc/D8PK-T9KZ.
[3] Amy L. Solomon, *I worked for this office under the DOJ. Trump's cuts will make you less safe.*, USA Today (May 2, 2025), https://perma.cc/HV4S-VM7L.

families, and strengthen communities.  CCYJ accomplishes its mission by partnering with local and state government, law enforcement, courts, schools, and coalitions with similar goals, and community-based organizations to test and implement reforms and by piloting best practices, facilitating collaboration among stakeholders, providing training and technical assistance, and advocating for data-driven and youth centered solutions.

28.    CCYJ was awarded $6 million dollars in grant funding from OJP pursuant to a grant agreement, 15PBJA-22-GG-04749-MUMU (CCYJ Award 1), and a cooperative agreement, 15PBJA-23-GK-05198-CVIP (CCYJ Award 2).  Funding from both of CCYJ's awards were critical to advancing CCYJ's mission to reform child welfare and juvenile justice systems in Washington State.

29.    CCYJ Award 1 provided funding for CCYJ's "Enhancement of the Leadership, Intervention & Change (LINC) Group Violence Prevention and Intervention in King County, Washington" project.  The project supported CCYJ's regional adaptation and implementation of the Office of Juvenile Justice and Delinquency Prevention, Comprehensive Gang Model (CGM) to address violence prevention and intervention in Washington state's most populous and diverse county. The LINC program serves youth and young adults who are involved with, or at risk of involvement with gangs and/or violence.  Within the LINC program, CCYJ is a lead agency and plays a key role in implementing the CGM in King County, Washington, providing fiscal management, administrative support, direct service coordination, training and data collection and analysis.  CCYJ, through the CCYJ Award 1 funding, directly supports up to 200 youth and young adults' participation in the LINC program.

30.    Under the CCYJ Award 2, CCYJ accepted a cooperative agreement award supporting capacity building and training for five community-based organizations (CBOs) in King County, Washington.  These CBOs provide community violence intervention (CVI) services to youth and young adults at highest risk of victimization or perpetration of gun violence in King County,

Washington. CCYJ intended to provide significant developmental support to these CBOs to sustain and enhance their administration and operations and to support sustainability of their CVI strategies. CCYJ developed and granted subawards to these CBOs, hired staff dedicated to the project, and committed significant time and resources to develop comprehensive capacity building assessments and tools.

### Stop AAPI Hate

31.     Stop AAPI Hate was founded in March 2020, in response to the alarming increase in acts of hate against the AAPI community during the COVID-19 pandemic, by three 501(c)(3) organizations: Chinese for Affirmative Action (CAA), AAPI Equity Alliance, and San Francisco State University (Asian American Studies Department), with CAA as the lead fiscal agency. Since its founding, Stop AAPI Hate has become the nation's largest reporting center for tracking anti-AAPI hate acts, and also provides critical support to victims of hate around the country. The organization's data and research center is also used by researchers, government agencies, and elected officials annually to help raise public awareness and advocate for policies that effectively address anti-AAPI hate. It has been cited by the U.S. Commission on Civil Rights, the California Commission on the State of Hate, in testimony before Congress, and before the United Nations. By helping government agencies, law enforcement, and community partners to understand where hate occurs, who is mostly commonly targeted, and what types of hate acts are most prevalent, Stop AAPI Hate improves public safety by allowing governments and communities to develop targeted strategies that protect people who need it most.

32.     Chinese for Affirmative Action, doing business as Stop AAPI Hate, was awarded $2 million dollars from OJP via a grant agreement, 15PBJA-24-GG-02840-ADVA (Stop AAPI Hate Award). Stop AAPI's Hate's grant award supported its "Stop AAPI Hate Community-Based Approaches to Prevent and Address Hate Crimes and/or Hate Incidents" program. The project

would develop a holistic, multi-disciplinary, trauma-informed, community-based approach to documenting AAPI hate incidents and provide crisis response, care, and healing to victims of hate. The key areas for activities outlined in the grant proposal included data and research on AAPI hate incidents in partnership with AAPI communities; policy advocacy to educate, inform, and provide technical assistance to prevent anti-AAPI hate; community care to partner with communities to center healing and improve crisis response including further work on a landscape analysis of existing resources and models; and public education & digital media to sustain public education and conversations on anti-AAPI hate and scapegoating. Stop AAPI Hate anticipated grant funding would be used to form a multidisciplinary team to develop community-based strategies for impacted individuals, and would include partnerships with AAPI/Black, Indigenous, and People of Color organizations, the expansion of community healing pilots, and increased awareness of AAPI hate incidents.

### FORCE Detroit

33.     Founded in 2015, FORCE Detroit is charged to steward, incubate, and provide financial support to grassroots organizations and activists committed to alternatives to community safety that minimize criminalization. FORCE Detroit's five organizational goals include: (1) building a system for peace by training and supporting CVI organizations—through grants, professional development, and mentoring, to strengthen community violence intervention statewide; (2) hosting events and actions that inform and engage the public around CVI strategies and identify solutions to gun violence; (3) building public-private partnerships to raise $150 million over 10 years to expand CVI and advocate for a Detroit Office of Neighborhood Safety; (4) growing public awareness of and engagement in violence interruption through targeted campaigns and events, such as CVI Advocacy Day, Get Out the Vote activities, and community listening sessions; and (5) strengthening infrastructure to support growth and position FORCE Detroit as a local and national CVI leader in

peacemaking. To reach those goals, FORCE Detroit's works to provide direct services to people impacted by violence; advocacy and public education, and training and technical assistance for emerging CVI leaders.

34.    FORCE Detroit was awarded approximately $2 million dollars in grant funding from OJP pursuant to a grant agreement, 15PBJA-24-GG-03109-CVIP (FORCE Detroit Award). The award supported FORCE Detroit's "Keepers CVI" initiative, a program to expand and enhance evidence-based and innovative practices that reduce and prevent gun violence in Detroit's Warrendale-Cody Rouge neighborhood, with youth and young adults living in areas with high rates of gun and other forms of violence. FORCE Detroit designed the "Keepers CVI" program to, among other things reduce fatal and non-fatal shootings, enhance opportunities for violence-impacted people to secure employment or start small businesses, increase access to culturally appropriate social services, and improve organizational capacity to deliver impactful, evidence-based programs. As a part of this program and through a carefully crafted service delivery model, FORCE Detroit employs violence interruption staff who perform critical work—from intake coordination and community-based data collection to guiding participants through interviews or showing up to support people and families at funerals. Grant funding from FORCE Detroit's award supported the salaries of FORCE Detroit's violence interruption staff. Award funding was also budgeted to contract with community partners—local coaches, mentors, licensed therapist, and trainers—to fulfill the award's project.

### Health Resources in Action (HRiA)

35.    With over 300 staff across the country, HRiA partners with individuals, organizations, and communities to transform the practices, policies, and systems that improve health and advance racial equity. For over two decades, HRiA has worked in communities across the country to plan and launch CVI strategies that cultivate and strengthen a comprehensive and collaborative CVI ecosystem. HRiA approaches violence as a public health issue; helping communities understand that violence

spreads like disease, violence is preventable, and community members have critical solutions to offer. Its staff, through partnerships with institutions and other organizations, work to strengthen the community violence intervention ecosystem.

36.     HRiA was awarded approximately $8.55 million dollars in grant funding from OJP pursuant to three grant agreements: 15PBJA-24-GK-04067-CVIP (HRiA Award 1), 15POVC-22-GK-00557-NONF (HRiA Award 2), and 15PBJA-23-GK-05187-CVIP (HRiA Award 3).  Each of the awards helped further HRiA's work to identify and engage people at the highest risk of violence, employ CVI workers who hold deep knowledge, credibility, and trust within communities, expand professional and educational opportunities for CVI workers and the organizations they work within, develop relationships with law enforcement and community, build partnerships between CVI organizations and cross-sector partners, and establish and strengthen hospital-based violence intervention programs.

37.     HRiA Award 1 provided funding for HRiA's efforts to expand professional and educational opportunities for community violence intervention workers and transform their work environments.  HRiA Award 2 funded tailored and comprehensive technical assistance (TA) and training for violence prevention professionals (VPPs) and hospital-based violence intervention programs.  VPPs reduce and mitigate retaliation after incidents of violence by serving as trusted individuals in hospitals who can speak and respond to victims of gun violence and community violence.  The TA project aimed to enhance services to victims by strengthening the infrastructure and quality of hospital-based programs, and VPP services.  HRiA Award 3 was intended to support small, grassroot CBOs engaged in CVI work.  HRiA selected five CBOs to receive subaward funding that would build their organizational capacities, and support training in intervention and outreach best practices.  Each of the five subrecipients are community-based violence prevention organizations that specifically serve youth and young adults.

11

38.    HRiA has managed $92 million in federal grant awards and expenditures over the past decade.  It has received direct federal awards under 10 programs from three federal agencies and has served as a pass-through recipient of dozens of other federal programs.  Until January 2025, HRiA has never had a federal grant terminated.

**Vera Institute of Justice (Vera)**

39.    Founded in 1961, for over sixty years, Vera has worked in partnership with community and government leaders—including in law enforcement and corrections—to address some of the most intractable problems in the criminal justice system.  Vera's mission is to pilot, test, and scale innovations that prevent crime and address its drivers, increase accountability, and rely less on incarceration and more on the programs and services that help individuals, families, and communities to thrive.  To support its work, Vera has been awarded and successfully fulfilled numerous cooperative agreements and grants with OJP, including its subsidiary agencies, the Bureau of Justice Assistance (BJA), National Institute of Justice (NIJ), Office of Juvenile Justice Delinquency and Prevention (OJJDP), and Office for Victims of Crime (OVC), as well as DOJ agencies Community Oriented Policing Services (COPS) and the Office on Violence against Women (OVW), during both Republican and Democratic administration.

40.    Vera was awarded $7.25 million in grant funding from OJP via five cooperative agreements: 15POVC-21-GK-01096-NONF (Vera Award 1), 15PBJA-24-GK-02981-JAGP (Vera Award 2), 15PBJA-23-GK-05353-MUMU (Vera Award 3), and 15PBJA-23-GK-05375-SCAX (Vera Award 4), and 15POVC-21-GK-03261-HT (Vera Award 5).  Each award furthered Vera's work to transform the criminal justice system.

41.    Vera Award 1 funded free sign language interpretation service to Deaf crime victims.  Turner Decl. ¶ 19.   The interpretation services included specially trained, trauma-informed interpreters, allowing victim services providers to interact directly and effectively with Deaf survivors

12

in their community and to provide Deaf survivors with both short and long-term assistance.  Vera Award 2 provided funding for technical assistance to public safety agencies in the Community Service Departments in Albuquerque, New Mexico, and Richmond, California to improve response to behavioral and mental health-related 911 calls through subawards.  Vera Award 3 was designed to assist prosecutors in Arizona, Colorado, Massachusetts, North Carolina, and Virginia in their efforts to develop effective policies, practices, and programs to expand safety diversion in their jurisdictions. Vera Award 4 provided funding for help three state departments of corrections implement new restorative justice policies, implement trainings on restorative practices for staff, physically improving building, and gaining support for new approaches to prison safety.  Vera Award 5 supported assisting police agencies more effectively serve victims of sex and labor trafficking with disabilities through online training programs.

## II.    Plaintiffs' Grant Awards Were Suddenly Terminated without Specific or Individualized Explanations.

42.     On April 4, 2025, Plaintiff Vera Institute of Justice received an email from OJP immediately terminating five grants, totaling more than $7 million, that it held with the federal government.

43.     On April 22, 2025, Plaintiffs Stop AAPI Hate, CCYJ, FORCE Detroit, and HRiA received identical emails from OJP immediately terminating their grant funding, totaling more than $15 million dollars.

44.     OJP sent all Plaintiffs identical emails with the following boilerplate "explanation" as to why the grants were being immediately terminated:

> These awards are being terminated because they "no longer effectuate[] the program goals or agency priorities."  2 C.F.R. § 200.340(a)(4).  The Department has changed its priorities with respect to discretionary grant funding to focus on, among other things, more directly supporting certain law enforcement operations, combatting violent crime, protecting American children, and supporting American victims of trafficking and sexual assault, and better coordinating law enforcement efforts at all levels of

13

government.  These awards [This award] demonstrate that they [it] no longer effectuate Department priorities.

45.    None of the Plaintiffs has previously had a federal grant terminated, and many Plaintiffs, like CCYJ, Vera, and HRiA have been recipients of grant funding for many years under both Democratic and Republican administrations.

46.    To Plaintiffs' knowledge, OJP has never previously terminated grants because of a "change in agency priority," and prior to April, termination of OJP grants was exceedingly rare.

47.    OJP has provided no further explanation for the justification to the Plaintiffs for these grant award terminations.

48.    DOGE staffer Tarak Makecha—a former Tesla employee—is reportedly listed as the author of the spreadsheet listing the grant awards targeted for termination. He reportedly created this list without consulting the OJP program managers, many of whom learned of the terminations only after they were communicated to grantees.[4]

49.    Plaintiffs received no advance notice, prior to receiving the termination notices, and they were afforded no opportunity to respond to the purported basis for the terminations prior to them going into effect.  Instead, OJP offered Plaintiffs a 30-day appeal window, after termination; according to a statement by a DOJ official, funds would supposedly be restored "if direct impact to victims can be thoroughly established" by the grantees.[5]

50.    Plaintiffs immediately stopped receiving funds pursuant to these grant awards. Plaintiff CCYJ was locked out of the federal grant payment system after receiving the termination notice.  At least one Plaintiff, Vera, was locked out of the federal grant payment system a few days *before* receiving their termination notices.  And collectively Plaintiffs are owed thousands of dollars in

---

[4] Sarah N. Lynch and Peter Eisler, *DOGE staffer advised on cuts to Justice Dept grants, document and source say*, Reuters (Apr. 29, 2025), https://perma.cc/JM7M-CKDR.
[5] Ken Dilanian and Laura Strickler, Justice Department cutting grants that help crime victims, NBC News (Apr. 24, 2025), https://perma.cc/SJR3-3MLE.

outstanding expenses incurred before termination that need to be reimbursed: CCYJ has approximately $211,000 in known, unreimbursed expenses incurred prior to termination. Stop AAPI Hate currently has $127,557.29 in pre-termination expenses not yet submitted for reimbursement. FORCE Detroit has $4,845 in unpaid reimbursements through the termination date. HRiA is owed $93,870 at the time of termination. Vera has approximately $381,476 in unreimbursed expenses.

### III.    OJP's *en masse* termination of grant awards has caused, and will continue to cause, immediate and irreparable harm to Plaintiffs

51.    The abrupt termination of their grant awards caused immediate harm to each of the Plaintiffs' businesses and to the very programmatic operations prescribed by their awards. Frontline workers and dedicated employees have been terminated, laid off, and furloughed. And the hard-fought trust and reputation each Plaintiff has built within their community have been irreparably damaged as Plaintiffs are forced to cancel contracts, halt programs, terminate services, and turn away people who need support. Because all of the Plaintiffs' work focuses on some sort of community violence intervention, the Plaintiffs' absence in their communities and inability to provide services as a result of the loss of funding has dangerous, dire, and possibly deadly consequences.

### Center for Children & Youth Justice (CCYJ)

52.    As a direct result of OJP's terminations, CCYJ has had to end a project to build organizational and administrative capacity of CBOs to support sustainability of their CVI strategies and to reduce funding for a  critical program in King, County, Washington, which serves up to 200 youth annually who are involved with, or at risk of involvement with, gangs and/or violence. As result of this grant termination, as many as 65 young people may no longer be able to access these services, including 13- through 24-year olds who CCYJ knows are carrying guns or other weapons and self-identify as being in a gang.

53.     CCYJ also was forced to terminate all of the subawards and contracts it granted under CCYJ Awards 1 and 2.  For CCYJ Award 2, CCYJ completely halted any related project activities, and laid off the dedicated staff it had hired to fulfill the project.

**Stop AAPI Hate**

54.     Stop AAPI Hate funded staff salaries through the terminated grants and therefore will likely have to laying off 20% of its employees within a year if its funds are not reinstated.

55.     As a direct result of OJP's termination of its grant funding, at least 40 victims of hate crimes will lose the opportunity to participate in Stop AAPI Hate's healing support programs.

56.     Stop AAPI hate will no longer be able to substantially assist communities who are dealing with the aftermath of large-scale incidents of hate and violence (like mass shootings), which they have played a critical role in doing in the past.

57.     The organization has had to terminate planned partnerships within the community to care and provide services for victims of hate crimes, policy and advocacy work promoting safer public transit systems, and it renowned data collection and research on anti-AAPI hate and violence that has become a critical platform for victims and resource for policy makers, nationwide.

**FORCE Detroit**

58.     Three frontline FORCE Detroit employees, with significant expertise, meaningful ties to the community, and trusted relationships with high-risk program participants, were laid off; losing those roles meant losing critical functions like intake coordination, trauma support, community-based data collection, and those who have built trust with some of the highest risk individuals.

59.     As a direct result of OJP's terminations of its grant funding, FORCE Detroit has seen immediate breakdowns in a care ecosystem it painstakingly built, including crumbling of the backbone of its violence intervention work, which included daily, in-the-field support for youth and young adults ages 14 through 24 who are most at risk of gun violence.

60.     The program funded by this grant has reduced fatal and non-fatal shootings, enhanced opportunities for violence-impacted people to secure employment or start small businesses, and provided critical communal support including showing up at funerals and coaching individuals through job interviews.  For individuals who rely on FORCE Detroit for safety planning, relocation assistance, employment support, or therapy referrals, this termination of funding is devasting.  This includes individuals like Carol, a single mother and dedicated nurse who, after offering temporary shelter to a friend, became the target of escalating violence, culminating in the tragic shooting of her stepdaughter.  FORCE Detroit was able to help Carol and her children by covering move-in expenses, helping her access therapy services, and ultimately helping Carol's family heal from the unimaginable tragedy they faced.  But without grant funds, FORCE Detroit cannot sustain or continue providing critical assistance to victims of violence in Detroit, as it did for Carol.

61.     The termination of these grants has eliminated the resources needed to maintain a consistent presence in communities most impacted by violence and weakens the infrastructure it built to interrupt cycles of harm, with no viable replacement in sight.  Without these funds, FORCE Detroit cannot sustain long-term programming, attract and retain qualified staff, or expand life-saving interventions that its communities urgently need.

**Health Resources in Action (HRiA)**

62.     HRiA funded staff salaries through the terminated grants and faces layoffs of up to 31 specialized staff members.

63.     As a direct result of the termination of HRiA's grant funding, HRiA is no longer able to provide critical, lifesaving assistance in 23 hospitals for violently injured individuals and their families, which could ultimately lead to loss of life.

64.     Numerous hospitals no longer have assistance for their violence prevention professionals who provide invaluable support to victims and their families and mitigate retaliation

from victims of gun and community violence when they leave the hospital. These programs allowed the medical staff to care for their patients while the program-funded staff manage the aftermath and safety risks.

65.    Similarly, many of HRiA's subrecipients of grant funding are often the sole source of CVI work in their communities, and many have been forced to reduce or completely halt their community -based violence prevention work, which has had a devastating impact on the communities who rely on these organizations, including youth that are served by the subrecipients.

66.    At the individual level, the grant award termination has left those at the highest risk for gun violence unsupported and susceptible to the environment they are in; people who were mid-transformation can lose momentum or backslide; and people who were connecting with frontline workers may be difficult to reach with gaps in services and supports. This has resulted in immediate harm in neighborhoods that now lack grant-funded staff who could immediately intervene in active conflicts and retaliations, or to respond to flare ups in violence.

67.    At least 250 government, health care and philanthropy leaders, and frontline workers could lose the opportunity to attend HRiA's annual conference and learn best practices to respond to community violence because the grant funding supporting those individuals was terminated.

**Vera Institute of Justice (Vera)**

68.    As a direct result of OJP's termination of Vera's grant awards, Deaf and hard-of-hearing victims of crimes lost access to free sign language interpretation services to allow those victims to communicate with law enforcement and victim services. This program has served more than 4,000 individuals, and Vera has been forced to turn away individuals who needed access to these essential services.

69.    The needs of human trafficking survivors with disabilities will go unmet after Vera was forced to abruptly cancel a training for more than 486 individuals (more than half in law enforcement)

and dozens of law enforcement agencies to help law enforcement identify and serve the unique needs of this population. Cancelling this training lessens law enforcement's ability to serve as a force multiplier for other officers in the future.

70.    The cities of Richmond, California and Albuquerque, New Mexico have lost more than $700,000 in subaward funding to modernize each city's 911 call systems and train civilian specialists to respond to mental and behavioral health crises and to prevent and intervene in violent crime, especially gun-related homicides and shootings.

71.    Prosecutors in Arizona, Colorado, Massachusetts, North Carolina, and Virginia can no longer benefit from Vera's expanding diversion programs, which were designed to help prosecutors address the underlying drivers of criminal conduct in their communities and instead focus on prosecuting the most violent crime plaguing a community.

72.    Because of termination of grant funding, two state Department of Correction facilities withdrew from Vera's project to support data collection, policy development, training and monitoring for correctional facilities to increase safety in prisons.

## CLASS ACTION ALLEGATIONS

73.    Plaintiffs bring this action under Federal Rule of Civil Procedure 23(a), Rule 23(b)(1), and 23(b)(2) on behalf of themselves and all other entities similarly situated.

74.    Plaintiffs seek to represent the following class (the "Proposed Class"):

> All entities in the United States issued awards by the U.S. Department of Justice (DOJ) Office of Justice Programs, whose grants DOJ terminated in April 2025 pursuant to 2 C.F.R. § 200.340(a)(4).

75.    The Proposed Class is so numerous that joinder of all members is impracticable. *See* Fed. R. Civ. P. 23(a)(1).  Defendants terminated over 370 OJP awards given to organizations across the country.

19

76.    The Proposed Class's claims turn on common questions of fact or law that are capable of classwide resolution. *See* Fed. R. Civ. P. 23(a)(2). The legality of Defendants' mass terminations is a common question capable of resolution in one stroke.

77.    Plaintiffs' claims are typical of the claims of those of the Proposed Class as the whole. *See* Fed. R. Civ. P. 23(a)(3). Each class member's claim arises from the same course of events (Defendants' illegal award terminations) and each class member has experienced the same injury (the termination of their awards) if relief is denied.

78.    Plaintiffs will fairly and adequately represent the Proposed Class. *See* Fed. R. Civ. P. 23(a)(4). They are committed to seeking a declaration and injunction that will benefit all members of the Proposed Class equally, declaring their award terminations illegal and restoring those awards as they existed before the terminations. Plaintiffs are aware of their obligations as class representatives and willing to dedicate time and effort to pursue this matter on behalf of every member of the Proposed Class.

79.    Plaintiffs are represented by counsel with extensive experience in administrative law, constitutional law, and class actions and who are committed to zealously representing the Class. *See* Fed. R. Civ. P. 23(a)(4), 23(g).

80.    Defendants have acted or refused to act on grounds that apply generally to the Proposed Class, violating the APA in the same way as to all class members and subjecting all class members to the same unlawful terminations. Final injunctive relief and corresponding declaratory relief is therefore appropriate with respect to the Class as a whole. *See* Fed. R. Civ. P. 23(b)(2).

81.    Alternatively, declaratory relief is appropriate under Rule 23(b)(1)(A) because Defendants have engaged in an ongoing course of conduct that is illegal as to all members of the Proposed Class, and separate actions by individual class members would create a risk of inconsistent results. *See* Fed. R. Civ. P. 23(b)(1)(A).

**CLAIMS FOR RELIEF**

<u>Count I</u>

**U.S. Constitution – Fifth Amendment Due Process Clause
(Against Defendants Bondi and Henneberg)**

82.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

83.    The Fifth Amendment to the United States Constitution guarantees that no person shall be deprived of life, liberty, or property without due process of law.

84.    Plaintiffs have a constitutionally protected interest in the OJP funding they applied for, were awarded, and relied on.  Plaintiffs have expended significant resources to set up their programs in reliance on their grant awards.  Plaintiffs' interest in their grant awards is established and governed by the acceptance of their application by the federal government.  *See, e.g.*, *Cnty. of Santa Clara v. Trump*, 275 F. Supp. 3d 1196, 1218 (N.D. Cal. 2017), *aff'd in part*, *vacated in part*, *remanded sub nom*, *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018).

85.    Because Plaintiffs have a protected property interest in their grant funding, they were entitled to reasonable notice and due process before OJP summarily terminated their grant funding.

86.    Plaintiffs did not receive prior notice before OJP summarily terminated its grant terminations and ceased disbursing funds owed on them.  Nor were Plaintiffs provided a hearing or other opportunity to challenge the termination of the grants before OJP terminated them, including allowing Plaintiffs to contest the purported basis for the terminations.

87.    The terminations deprive Plaintiffs of their interest in their funding without the procedural due process rights to which they are entitled.  Plaintiffs have had their operations disrupted as a result, including reduction in services provided, furloughs of staff, and damage to relationships with community beneficiaries, with ongoing risks to their very existence.

88.    OJP's terminations therefore violate the Fifth Amendment Due Process Clause.

89.    OJP's terminations without sufficient due process must be declared unlawful.

21

90.     The Court should enter prospective injunctive relief to enjoin OJP from terminating Plaintiffs' grants without notice and a reasonable opportunity to object prior to deprivation of their protected interests in grant funding.

**Count II**

**U.S. Constitution – Fifth Amendment Due Process Clause—Void for Vagueness**
**(Against Defendants Bondi and Henneberg)**

91.     Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

92.     The Fifth Amendment to the United States Constitution guarantees that no person shall be deprived of life, liberty, or property without due process of law.  A fundamental aspect of due process is that government-imposed obligations must be stated with sufficient clarity to provide fair notice and prevent arbitrary enforcement.

93.     Government regulatory enforcement is void for vagueness if it (1) does not provide a person of ordinary intelligence fair notice of what is prohibited or (2) if it risks arbitrary application. *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972); *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012); *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 736 (D.C. Cir. 2016); *Timpinaro v. SEC*, 2 F.3d 453, 460 (D.C. Cir. 1993).  Open-ended regulatory terminology that allows for "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings" violate due process.  *United States v. Williams*, 553 U.S. 285, 306 (2008); *Coates v. City of Cincinnati*, 402 U.S. 611, 611–14 (1971); *Smith v. Goguen*, 415 U.S. 566, 573–77 (1974).

94.     Plaintiffs have a constitutionally protected interest in the OJP funding they applied for, were awarded, and relied on.

95.     OJP's application of 2 C.F.R. § 200.340(a)(4) to Plaintiffs is unconstitutionally vague and constitutes an arbitrary exercise of authority.  Plaintiffs' termination letters summarily assert that the relevant grant "no longer effectuates the program goals or agency priorities."  The words

"effectuate," "goals," and "priorities," at least, are not defined in the letters, law, or regulations, and are unconstitutionally vague.

96.    The termination also "explain[s]" some of those new priorities, but these newly-announced priorities are also not contained in any guidance, law, or regulation and were not included defined within Plaintiffs' award grant documents.

97.    As a result, OJP's terminations are unconstitutionally vague, violate the Fifth Amendment's Due Process Clause.

98.    OJP's terminations must be declared unlawful.

### Count III

### Equitable *Ultra Vires* Claim
### (Against Defendants Bondi and Henneberg)

99.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

100.    The equitable power of federal courts to enjoin "violations of federal law by federal officials," *Armstrong v. Exceptional Child Ctr.*, 575 U.S. 320, 326–27 (2015), includes cases in which a federal officer has acted unconstitutionally as well as cases in which the officer has acted "beyond th[e] limitations" set by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

101.    OJP, through its officials, may exercise only the authority conferred by statute.

102.    OJP lacked constitutional, statutory, and regulatory authority to issue or implement the *en masse* termination of the Plaintiffs' and putative class members' grant awards. As explained above, these terminations violate the Constitution's separation of powers, the Takings Clause, the Spending Appropriations Clauses; deprive Plaintiffs' and putative class members of their procedural Due Process rights; are void for vagueness; and have no basis in any law or other authority.

103.    OJP's terminations must be declared unlawful.

### Count IV

### Violation of Separation of Powers, Spending and Appropriations Clauses,

**and the Take Care Clause**
**(Against Defendants Bondi and Henneberg)**

104.    Plaintiffs reallege and incorporate by reference the allegations in each of the preceding paragraphs.

105.    Only Congress may appropriate federal money. U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause); U.S. Const. art. I, § 8, cl. 1 (Spending Clause).  And Congress passed laws forbidding the executive branch from interfering with its appropriations and spending powers.  The Impoundment Control Act commands that appropriated funds "shall be made available for obligation" absent congressional recission.  Pub. L. No. 93-344, 88 Stat. 297, 333 (July 12, 1974) (codified as amended at 2 U.S.C. §§ 682 *et seq.*).  The Anti-Deficiency Act Amendments of 1982 generally prohibit executive branch officers from holding appropriated funds in reserve.  Pub. L. No. 97-258, 96 Stat. 877, 929 (Sept. 13, 1982) (codified as amended in Title 31).

106.    Congress' exclusive power of the purse is "a bulwark of the Constitution's separation of powers among the three branches of the National Government."  *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) (Kavanaugh, J.).  Where Congress has legislated on point under express and exclusive constitutional authority, Congress' power is at its apex—and the executive branch's "power is at its lowest ebb."  *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

107.    When Congress appropriates money, the President's only role is to spend it consistent with the congressional command and purpose.  The Constitution "grants the power of the purse to Congress, not the President."  *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018).  An appropriation is a law like any other, and the President must "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3; *and see City & Cnty. of San Francisco*, 897 F.3d at 1234

("Because Congress's legislative power is inextricable from its spending power, the President's duty to enforce the laws necessarily extends to appropriations.").

108.    The Executive Branch has no power to amend or rescind appropriations that conflict with its priorities. *Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes."). Whatever "policy reason" he may have "for wanting to spend less than the full amount appropriate by Congress for a particular project or program," the President "does not have unilateral authority to refuse to spend the funds." *In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.).

109.    The federal government previously acknowledged that the President cannot withhold congressionally appropriated funding. William Rehnquist, before he took the bench, wrote in an Office of Legal Counsel opinion that "the suggestion that the President has a constitutional power to decline to spend appropriated funds … is supported by neither reason nor precedent." *Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools*, 1 Op. O.L.C. Supp. 303, 309 (1969). As late Chief Justice Rehnquist explained, that "the President disagree[s] with spending priorities established by Congress" cannot "justify his refusal to spend." *Id.* at 311.

110.    Again and again, over the course of years, Congress repeatedly allocated, and commanded Defendants to expend grant funds in defined tranches to improve justice systems across the country. And it unequivocally instructed the Executive Branch that there was precious little play in the joints, allowing the Department of Justice to repurpose only five percent of each tranche before returning to Congress for new instructions. Pub. L. No. 118-42, § 205, 138 Stat. 25, 153 (Mar. 9, 2024). Congress wanted Defendants to spend as much money as Congress allocated, for the purposes Congress chose.

111.    Defendants simply refused. To cite just one example: Congress told Defendant Office of Justice Programs to spend $250 million on "a community violence intervention and prevention

initiative." *See* Bipartisan Safer Communities Act, Pub. L. No. 117-159, 136 Stat. 1313, 1339 (June 25, 2022). OJP followed the congressional command, contracting with—among other organizations—Plaintiff Health Resources in Action to help break the cycle of violence in Boston's streets. Then Defendants decided, simply because their own policy priorities changed, to stop spending the money that Congress appropriated—and terminated HRiA's grant funding without warning. But Congress' command did not change, and Congress' command left Defendants no leeway to simply pocket the money.

112. In the end, Defendants withheld congressionally appropriated funding more than 370 times, to the tune of $820 million. This purposeful campaign of defiant refusal to spend congressional appropriations violates the constitutional separation of powers, which restrains the executive from interfering with Congress' exclusive powers; the Spending Clause and Appropriations Clause, which give Congress alone the power of the purse; and the Take Care Clause, which requires the President to follow the law. Federal courts have the equitable power to grant—and Plaintiffs have a non-statutory right of action to seek—injunctive relief for these "violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015).

113. As a result, OJP's refusal to spend funds that Congress has appropriated violates the separation of powers, the Take Care Clause, and the Appropriations and Spending Clauses.

114. OJP's terminations must be declared unlawful and in excess of its authority.

115. Defendants must be preliminarily and permanently enjoined from declining to spend the funds that Congress has appropriated for OJP grants.

## Count V

### Violation of the APA–Contrary to Law and Contrary to a Constitutional Right
### (Against All Defendants)

116. Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

117. An agency is "bound by its own regulations," *Nat'l Env't Dev. Assoc.'s Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (internal quotation marks omitted), and an agency's failure to follow them is "contrary to the law," *Fuller v. Winter*, 538 F. Supp. 2d 179, 191 (D.D.C. 2008).

118. OJP's *en masse* termination of Plaintiffs' grant awards is final agency action reviewable under 5 U.S.C. §§ 702 and 706.

119. OJP's stated authority and basis for terminating Plaintiffs' awards is because they "no longer effectuate[] the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). In the termination emails, OJP asserted that "the Department has changed its priorities" and that "these awards demonstrate that they no longer effectuate Department priorities."

120. OJP's terminations were contrary to Section 200.340(a)(4) because OJP is permitted to terminate an award based on agency priorities only if that basis for termination was specifically permitted by the terms and conditions of the award. OJP did not "clearly and unambiguously" state in Plaintiffs' award documents that it could terminate an award because an award no longer effectuates program goals or agency priorities. Without an articulation of those priorities in the award and clear notice that the grant can be terminated on that basis, OJP was not permitted to terminate the grants on the basis of "agency priorities."

121. OJP's terminations were further contrary to Section 200.340(a)(4) because a termination must be on an award-by-award basis, and OJP must rely on "specific evidence" to demonstrate that "an award" no longer serves a program goal or agency priorities. OJP's terminations were predicated on a change in agency priorities, but Section 200.340(a)(4) does not allow OJP to terminate a grant based on a "change" to an agency's priorities. Moreover, OJP did not provide or rely on specific evidence that Plaintiffs' awards should be terminated because they no longer effectuated the goals and priorities that motivated the award in the first place.

122.    Because Section 200.340(a)(4) does not authorize OJP's terminations of Plaintiffs' grants, those terminations are "not in accordance with law," 5 U.S.C. § 706(2)(A).

123.    OJP's terminations on the basis of Section 200.340(a)(4) must be declared unlawful, including its interpretation that 2 C.F.R. § 200.340(a)(4) allows OJP to terminate a grant based on a "change" in agency priorities.

124.    OJP's terminations must be vacated and "set aside" under 5 U.S.C. § 706(2)(B).

125.    Plaintiffs' request that this Court enter preliminary and permanent injunctive relief enjoining OJP's from terminating grants on the basis of a "change" in agency priorities.

### Count VI

### APA –Arbitrary, Capricious, and an Abuse of Agency Discretion.
### (Against All Defendants)

126.    Plaintiffs re-allege and incorporate by reference all preceding paragraphs.

127.    OJP's *en masse* termination of Plaintiffs' grant awards is final agency action reviewable under 5 U.S.C. §§ 702 and 706.

128.    Under the APA, the Court shall "hold unlawful and set aside agency action" that is "arbitrary [and] capricious."  5 U.S.C. § 706(2)(A).

129.    "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Agency action violates this requirement if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

130.    OJP's terminations are arbitrary and capricious because they are "not reasonable" nor "reasonably explained."  *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *Prometheus Radio Project*, 592

U.S. at 423).  The termination notices sent to all named Plaintiffs included identical, three-sentence boilerplate explanations for the basis of the termination.  They included no discussion specific to an individual grant, nor did they explain why any individual grant no longer served the agency's changed priorities.

131.    OJP's terminations also failed to take into consideration the reliance interests of Plaintiffs and other stakeholders, including the populations they serve.

132.    OJP's termination of Plaintiffs' grants constitutes an "abuse of discretion," under the APA as applied to this class of Plaintiffs.

133.    OJP's terminations must be declared arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

134.    OJP's terminations must be vacated and "set aside" under 5 U.S.C. § 706(2)(B).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

(A) Declare unlawful, vacate, and set aside OJP's decision to conduct an *en masse* termination of the putative class members' grants;

(B) Declare unlawful, vacate, set aside Defendants' terminations of the putative class members' grants;

(C) Declare that OJP's terminations violate the Fifth Amendment's Due Process Clause;

(D) Declare that OJP's terminations violate the separation of powers, the Take Care Clause, and the Appropriations and Spending Clauses;

(E) Declare that OJP's terminations on the basis of Section 200.340(a)(4) are unlawful, including its interpretation that 2 C.F.R. § 200.340(a)(4) allows OJP to terminate a grant based on a "change" in agency priorities;

(F) Declare that OJP's terminations are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(G) Preliminarily and permanently enjoin Defendants, their agents, and all persons acting in concert or participation with Defendants from enforcing, implementing, maintaining, or giving effect to the terminations of putative class members' grants, including through the enforcement of closeout obligations;

(H) Preliminarily and permanently enjoin Defendants, their agents, and all persons acting in concert or participation with Defendants from re-obligating the funds used to support putative class members' terminated grants;

(I) Preliminarily and permanently enjoin Defendants, their agents, and all persons acting in concert or participation from terminating Plaintiffs' grants without notice and a reasonable opportunity to object prior to deprivation of their protected interests in grant funding;

(J) Preliminarily and permanently enjoin Defendants, their agents, and all persons acting in concert or participation with Defendants from declining to spend the funds that Congress has appropriated for OJP grants;

(K) Preliminarily and permanently enjoin Defendants, their agents, and all persons acting in concert or participation with Defendants from terminating grants under 2 C.F.R. § 200.340(a)(4) on the basis of a "change" in agency priorities;

(L) Stay the termination of the grants pursuant to 5 U.S.C. § 705;

(M) Enter judgment in favor of Plaintiffs;

(N) Enter an order in the exercise of the Court's equitable powers that directs Defendants to take all steps necessary to ensure that OJP disburses funds to Plaintiffs in the customary manner and in customary timeframes;

(O) Require Defendants to submit status reports every 30days after the date of the entry of the Court's order to ensure prompt and complete compliance with the Court's directive;

(P) Award Plaintiffs their costs, reasonable attorney fees, and other disbursements as appropriate; and

(Q) Grant such other and further relief as the Court may deem just and proper.

Dated: May 21, 2025                    Respectfully submitted,


                                       LISA NEWMAN*
                                       JENNIFER FOUNTAIN CONNOLLY (D.C. BAR NO. 1019148)
                                       BRIAN NETTER (D.C. BAR NO. 979362)
                                       CORTNEY ROBINSON (D.C. BAR NO. 1656074)
                                       SOMIL TRIVEDI (D.C. BAR NO. 1617967)
                                       SKYE L. PERRYMAN (D.C. BAR NO. 984573)
                                       DEMOCRACY FORWARD FOUNDATION
                                       P.O. Box 34553
                                       Washington, D.C. 20043
                                       (202) 448-9090
                                       lnewman@democracyforward.org

                                       *Counsel for Plaintiffs*

                                       **Pro hac vice* motion pending

                                       JOSHUA PERRY*
                                       JOSHUA STANTON (D.C. BAR NO. 90010653)
                                       E. DANYA PERRY*
                                       PERRY LAW
                                       445 Park Avenue, 7th Floor
                                       New York, NY 10022
                                       (212) 251-2619
                                       jperry@danyaperrylaw.com

                                       *Counsel for Plaintiffs*

                                       *Request for admission pending

32