# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| VERA INSTITUTE OF JUSTICE, et al., | |
| *Plaintiffs, on behalf of themselves and all others similarly situated,* | |
| v. | |
| UNITED STATES DEPARTMENT OF JUSTICE, | |
| PAMELA J. BONDI, in her official capacity as United States Attorney General, | Case No. 1:25-cv-1643 |
| OFFICE OF JUSTICE PROGRAMS, | |
| MAUREEN A. HENNEBERG, in her official capacity as Acting Head of the Office of Justice Programs, | |
| *Defendants.* | |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 3

    I.   Factual Background ......................................................................................... 3

        A. Plaintiffs' Missions ............................................................................... 4

        B. OJP Unlawfully Terminates Plaintiffs' Grants and Cooperative
        Agreements ............................................................................................. 5

        C. OJP's Termination of Plaintiffs' Funds is Causing Plaintiffs and Those
        They Serve Significant and Irreparable Harm. ....................................... 6

    II.  Regulatory Background ................................................................................ 12

LEGAL STANDARD .................................................................................................. 13

ARGUMENT ............................................................................................................... 14

    I.   Plaintiffs Are Likely to Succeed on the Merits ........................................... 14

        A. OJP's *En Masse* Grant Terminations Violate the Administrative
        Procedure Act. ...................................................................................... 14

    II.  OJP's Terminations of Plaintiffs' Grants Violates the Constitution. ........... 22

        A. OJP's terminations of Plaintiffs' grants without notice violates their
        procedural due process rights. ............................................................... 22

        B. OJP's Implementation of 2 CFR § 200.340(a)(4) to Terminate
        Plaintiffs' Grants is Void for Vagueness as Applied to Plaintiffs. ........... 24

        C. OJP violated the separation of powers, the Spending and
        Appropriations Clauses, and the Take Care Clause. ............................... 26

    III. This Court has Jurisdiction Over all of Plaintiffs' Claims ........................... 28

        A. Plaintiffs seek relief other than money damages. ................................. 29

        B. The Tucker Act does not impliedly forbid Plaintiffs from seeking relief
        in the district court. ............................................................................... 30

    IV. Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief. ............... 36

    V.  The Balance of Equities and Public Interest Weigh Heavily in Plaintiffs'
        Favor .............................................................................................................. 39

    VI. The Court Should Not Require a Bond ........................................................ 40

CONCLUSION ............................................................................................................ 40

# TABLE OF AUTHORITIES

Page(s)

## CASES

*112 Genesee St., LLC v. United States*, No. 25-1373 (Fed. Cir. Mar. 14, 2025)............................32

*Aids Vaccine Advoc. Coal. v. U.S. Dep't of State*, No. 1:25-cv-00400, 2025 WL
    752378 (D.D.C. Mar. 10, 2025) ....................................................................... 29, 38

*Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, No. 1:25-cv-00702, 2025 WL
    833917 (D. Md. Mar. 17, 2025) ...........................................................20, 21, 38

*Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, No. 1:25-cv-00702, 2025 WL
    863319 (D. Md. Mar. 19, 2025) ...................................................................34

*Am. Bar. Ass'n v. DOJ*, No. 1:25-cv-01263, 2025 WL 1388891 (D.D.C. May 14,
    2025) ................................................................................................ 34, 35

*Am. Near E. Refugee Aid v. USAID*, 703 F. Supp. 3d 126 (D.D.C. 2023) .......................... 31, 33

*Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564 (1972) .................................................22

*Bennett v. Spear*, 520 U.S. 154 (1997)...................................................................................14

*Bowen v. Massachusetts*, 487 U.S. 879 (1988) ........................................................ 29, 30, 35

*C.G.B. v. Wolf*, 464 F. Supp. 3d 174 (D.D.C. 2020).........................................................39

*Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716 (D.C. Cir. 2022) .........................................13

*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006) ..............................37

*Chi. Women in Trades v. Trump*, No. 1:25-cv-02005, 2025 WL 1114466 (N.D. Ill.
    Apr. 14, 2025)...................................................................................................36

*City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018) ................................. 23, 27

*City of Houston v. HUD*, 24 F.3d 1421 (D.C. Cir. 1994)............................................................. 30, 38

*Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985)................................................24

*Climate United Fund v. Citibank, N.A.*, No. 1:25-cv-00698, 2025 WL 1131412
    (D.D.C. Apr. 16, 2025) ................................................................ 34, 35, 36, 37, 38

*Clinton v. City of New York*, 524 U.S. 417 (1998) ...........................................................28

*Cmty. Legal Servs. in East Palo Alto v. HHS*, No. 3:25-cv-02847, 2025 WL 973318
    (N.D. Cal. Apr. 1, 2025) .......................................................................................40

*Cnty. of Santa Clara v. Trump*, 275 F. Supp. 3d 1196 (N.D. Cal. 2017)..........................................22

*Coates v. City of Cincinnati*, 402 U.S. 611 (1971) ..........................................................................25

*Colorado v. HHS*, No. 1:25-cv-00121, 2025 WL 1017775 (D.R.I. Apr. 5, 2025) ......................40

*Com. Drapery Contractors, Inc. v. United States*, 133 F.3d 1 (D.C. Cir. 1998) .................................23

*Costa v. Bazron*, 456 F. Supp. 3d 126 (D.D.C. 2020) ........................................................................39

*Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099 (D.C. Cir. 2022) .................................................33

*Dep't of Educ. v. California*, 145 S. Ct. 966 (2025) ...........................................................................36

*Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339 (D.C. Cir. 2012) ........................................26

*DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1 (2020)......................................................................21

*DSE, Inc. v. United States*, 169 F.3d 21 (D.C. Cir. 1999) ..................................................................40

*Esparraguera v. Dep't of the Army*, 101 F.4th 28 (D.C. Cir. 2024)...................................................22

*FCC v. Fox Television Stations, Inc.*, 567 U.S. 239 (2012)................................................................25

*FCC v. Prometheus Radio Project*, 592 U.S. 414 (2021)....................................................................19

*Fuller v. Winter*, 538 F. Supp. 2d 179 (D.D.C. 2008)........................................................................15

*Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)......................................................................25

*Holmes v. United States*, 657 F.3d 1303 (Fed. Cir. 2011) .................................................................32

*In re Aiken County*, 725 F.3d 225 (D.C. Cir. 2013) ................................................................... 27, 28

*Kendall v. United States*, 37 U.S. (12 Pet.) 524 (1838)......................................................................27

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) .................................. 36, 37

*Lummi Tribe of the Lummi Rsrv. v. United States*, 870 F.3d 1313 (Fed. Cir. 2017)............ 30, 32, 33

*Maine Cmty. Health Options v. United States*, 590 U.S. 296 (2020)....................................................35

*Maine v. USDA*, No. 1:25-cv-00131, 2025 WL 1088946 (D. Me. Apr. 11, 2025)....................36

*Md. Dep't of Hum. Res. v. HHS*, 763 F.2d 1441 (D.C. Cir. 1985)..................................................34

*Megapulse, Inc. v. Lewis*, 672 F.2d 959 (D.C. Cir. 1982) .................................................................33

*Michigan v. EPA*, 576 U.S. 743 (2015)................................................................................... 19, 21

*Middle E. Broad. Networks, Inc., v. United States*, No. 25-5150, 2025 WL 1378735
(D.C. Cir. May 7, 2025) ......................................................................................... 36

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29 (1983) ................... 19, 22

*Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167 (D.D.C. 1971) ......................................... 40

*Nat'l Air Traffic Controllers Ass'n v. United States*, 160 F.3d 714 (Fed. Cir. 1998) ...................... 32

*Nat'l Council of Nonprofits v. OMB*, No. 1:25-cv-00239, 2025 WL 368852 (D.D.C.
Feb. 3, 2025) ......................................................................................................... 37

*Nat'l Council of Nonprofits v. OMB*, No. 1:25-cv-00239, 2025 WL 597959 (D.D.C.
Feb. 25,
2025) ........................................................................................................................
14, 40

*Nat'l Env't Dev. Assoc.'s Clean Air Project v. EPA*, 752 F.3d 999 (D.C. Cir. 2014) ..................... 15

*Nat'l R.R. Passenger Corp. (Amtrak) v. Sublease Int. Obtained Pursuant to an Assignment
and Assumption of Leasehold Int. Made as of Jan. 25, 2007*, No. 1:22-cv-01043,
2024 WL 3443596 (D.D.C. July 15, 2024) ......................................................... 13

*NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31 (D.C. Cir. 2015) ...................................... 23

*New York v. Trump*, No. 1:25-cv-00039, 2025 WL 1098966 (D.R.I. Apr. 14, 2025) ................. 36

*New York v. Trump*, No. 1:25-cv-00039, 2025 WL 357368 (D.R.I. Jan. 31, 2025) .................... 27

*Nken v. Holder*, 556 U.S. 418 (2009) ............................................................................................. 39

*Northern Mariana Islands v. United States*, 686 F. Supp. 2d 7 (D.D.C. 2009) ......................... 24, 40

*Ohio v. EPA*, 603 U.S. 279 (2024) ................................................................................................. 19

*Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148 (D.D.C. 2017) ................................................. 39

*P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492 (D.D.C. 2020) ............................ 40

*Perry Cap. LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017) .................................................... 30, 33

*PFLAG, Inc. v. Trump*, No. 8:25-cv-00337, 2025 WL 510050 (D. Md. Feb. 14,
2025) ................................................................................................................. 27, 28

*Pol'y & Rsch., LLC v. HHS*, 313 F. Supp. 3d 62 (D.D.C. 2018) ................................................. 20

*Pollack v. Hogan*, 703 F.3d 117 (D.D.C. 2012) ............................................................................. 29

*Reeve Aleutian Airways, Inc. v. United States*, 982 F.2d 594 (D.C. Cir. 1993) ............................. 23

*RFE/RL, Inc. v. Lake*, No. 1:25-cv-00799, 2025 WL 900481 (D.D.C. Mar. 25, 2025) ........................................................................................................................
15, 20, 21, 40

*Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d 1338 (Fed. Cir. 2008) ...............................32

*Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180 (D.C. Cir. 1992)................................26

*Sedita v. United States*, 763 F. Supp. 3d 63 (D.D.C. 2025)................................29

*Sierra Club v. USDA, Rural Utils. Serv.*, 841 F. Supp. 2d 349 (D.D.C. 2012)............................37

*Smith v. Goguen*, 415 U.S. 566 (1974) ................................25

*Spirit Airlines, Inc. v. Dep't of Transp.*, 997 F.3d 1247 (D.C. Cir. 2021) ........................21

*Sustainability Inst. v. Trump*, No. 2:25-cv-02152 (D.S.C. April 9, 2024)........................36

*Timpinaro v. SEC*, 2 F.3d 453 (D.C. Cir. 1993) ................................25

*Tootle v. Sec'y of the Navy*, 446 F.3d 167 (D.C. Cir. 2006)........................ 31, 33

*Train v. City of New York*, 420 U.S. 35 (1975)................................27

*Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598 (D.C. Cir. 1992)...... 30, 33, 35

*Turner v. U.S. Agency for Global Media*, 502 F. Supp. 3d 333 (D.D.C. 2020) ..............................39

*U.S. Telecom Ass'n v. FCC*, 825 F.3d 674 (D.C. Cir. 2016) ................................25

*United States v. J & E Salvage Co.*, 55 F.3d 985 (4th Cir. 1995) ....................................34

*United States v. James Daniel Good Real Prop.*, 510 U.S. 43 (1993)....................................24

*United States v. King*, 395 U.S. 1 (1969) ................................32

*United States v. Williams*, 553 U.S. 285 (2008)................................25

*Whole Foods Market Grp., Inc. v. Wical Ltd P'Ship*, 288 F. Supp. 3d 176 (D.D.C. 2016) ................................38

*Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025) ....................36

*Williams v. Roth*, No. 8:21-cv-02135, 2022 WL 4134316 (D. Md. Sept. 12, 2022) ..................34

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008)................................13

*Woonasquatucket River Watershed Council v. USDA*, No. 1:25-cv-00097, 2025 WL 1116157 (D.R.I. Apr. 15, 2025) ................................ 15, 34, 35, 36, 40

*Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ..........................................26

*Zinermon v. Burch*, 494 U.S. 113 (1990) .......................................................................24

## STATUTES

2 U.S.C. §§ 682 *et seq.* ..............................................................................................26

28 U.S.C. § 1491 ......................................................................................................30

31 U.S.C. § 503 .......................................................................................................12

31 U.S.C. § 504 .......................................................................................................12

5 U.S.C. § 702 .........................................................................................................29

5 U.S.C. § 704 .........................................................................................................14

5 U.S.C. § 705 .........................................................................................................14

5 U.S.C. § 706 ...................................................................................... 2, 14, 15, 18, 19

Pub. L. No. 118-42, 138 Stat. 25 (Mar. 9, 2024) ............................................................28

Pub. L. No. 93-344, 88 Stat. 297 (July 12, 1974) ..........................................................26

Pub. L. No. 97-258, 96 Stat. 929 (Sept. 13, 1982) .........................................................26

## OTHER AUTHORITIES

Perry Stein et al., *DOJ Cancels grants for gun-violence and addiction prevention, victim advocacy*, Wall St. J. (Apr. 23, 2025), https://perma.cc/DG66-ZZCP ............................23

*Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools*, 1 Op. O.L.C. Supp. 303 (1969) ................................................................27

Steven Hough, Dep't of Just., Office of Legis. Affs, Letter to Charles E. Grassley (May 9, 2025), https://perma.cc/EAS7-XAHM............................................................38

The Federalist No. 58 (James Madison) (Clinton Rossiter ed., 1961) ................................26

U.S. Dep't of Justice, DOJ Grants Financial Guide, https://perma.cc/TT35-JMSF (last updated Oct. 2024) ................................................................................12

## REGULATIONS

2 C.F.R. § 200.106 .............................................................................................. 12, 26

2 C.F.R. § 200.340 ............................................................ 12, 13, 15, 16, 17, 19, 25

2 C.F.R. § 2800.101 ...................................................................................................12

Guidance for Federal Financial Assistance, 89 Fed. Reg. 30046 (Apr. 22, 2024)........ 12, 13, 16

Guidance for Grants and Agreements, 85 Fed. Reg. 49506 (Aug. 13, 2020).............. 13, 16, 18

Uniform Administrative Requirements, Cost Principles, and Audit Requirements
    for Federal Awards, 78 Fed. Reg. 78590 (Dec. 26, 2013)................................16

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. V. ...............................................................................................22

U.S. Const. art. I .......................................................................................................26

U.S. Const. art. II ......................................................................................................28

## INTRODUCTION

In April 2025, the Department of Justice's Office of Justice Programs abruptly and summarily terminated 373 multi-year grant and cooperative agreements awarding more than $820 million in essential funding.[1]  With no prior notice, OJP sent a form email to Plaintiffs and other grantees, offering the same unsupported explanation that Plaintiffs' "awards no longer effectuate[] the program goals or agency priorities."  OJP ordered the grantees to stop work immediately and informed them that they would be reimbursed only up to the date of the termination letter.

Plaintiffs are non-profit organizations that were awarded federal grant funding.  They work to train and assist law enforcement, correctional facilities staff, prosecutors, and states and localities. They work with vulnerable populations who have been victims of crime, including by providing free interpretation services that allow Deaf and disabled victims of crime to communicate with law enforcement, and by training law enforcement to and serve individuals with disabilities who are victims of sex or labor trafficking.  They fund and work on the frontlines to successfully interrupt gun crime and gang violence for juveniles and adults, including those at the highest risk for gun violence, in cities across the country.  They fund and work in hospitals to provide lifesaving assistance for violently injured victims and their families, while also mitigating retaliation that may arise from the situation. As a direct result of OJP's unlawful termination of these grants, services to many of these populations have abruptly ceased.  Staff have been laid off without meaningful alternatives for employment, and many more staff will soon be laid off without grant funding.  In some places, members of the communities they serve *will* lose their lives because of the disruption in critical services caused by OJP's unlawful termination of Plaintiffs' grants.

The termination of Plaintiffs' grants had an immediate and irreparable impact on Plaintiff organizations, their staff, their partners, and the individuals and communities that they serve.  These terminations have led to an abrupt discontinuation of vital services to some of the most vulnerable in our communities making individuals, law enforcement, victims of crime, and the communities in

---

[1] For ease of reference, the agreements at issue will be referred to as "grants," unless otherwise noted.

which they live less safe.  Absent a preliminary injunction, Plaintiffs will suffer irreparable harm—multi-year projects will terminate abruptly, specialized staff will be laid off, critical services will be withdrawn from communities facing some of the gravest safety concerns—all compounded by lasting damage to hard-earned reputational trust.

OJP's *en masse* and unreasoned terminations of over $800 million in grant funding is quintessential unlawful agency action that violates the APA.  These terminations violate the Constitution, agency regulations, exceed OJP's lawful authority, and are arbitrary and capricious.  *See* 5 U.S.C. § 706(2)(A)–(C).  OJP's termination of Plaintiffs' grants is unlawful and should be enjoined during the pendency of this litigation.

OJP's termination of Plaintiffs' grants based on 2 C.F.R. § 200.340(a)(4) is contrary to law and violates the Administrative Procedure Act (APA).  OJP did not provide clear and unambiguous notice that it could terminate awards based on a failure to effectuate agency priorities, which it is required to do under its regulations.  Nor is OJP permitted to terminate a grant based on a "change" in agency priorities.  To do so would render restrictions on agencies' terminations of grants meaningless, and it would give OJP and any other executive branch agency the ability to terminate any grant award by simply invoking a change in agency priorities.  To interpret grant termination regulations in this manner would impermissibly allow an agency to sweep aside millions or billions of dollars and raises a host of constitutional issues.  But it is clear that one of the purposes of Section 200.340 was to ensure that "agencies are not able to terminate grants arbitrarily," 85 Fed. Reg. 49506, 49509 (Aug. 13, 2020), to guard against the very sort of arbitrary and unlawful grant terminations that OJP has attempted to carry out in this case.  Because DOJ's regulations do not permit this sort of termination, OJP's terminations of Plaintiffs' grants must be set aside as contrary to law.

OJP's terminations are unlawful for another reason.  Under the APA, grantees are entitled to reasoned decisionmaking before the government terminates millions of dollars in vital grant funding with no notice.  OJP's *en masse* termination of more than 365 grants, on the same day, using the same

cursory and unspecific rationale, represents nearly every hallmark of arbitrary and capricious agency action.

OJP's terminations also violate the Constitution and are *ultra vires*. OJP violated Plaintiffs' Due Process rights when it terminated their grants without allowing Plaintiffs a reasonable opportunity to object to the terminations, and its reliance on 2 C.F.R. § 200.340(a)(4) is void for vagueness. OJP's refusal to spend funds that Congress appropriated also violates the separation of powers, the Take Care Clause, and the Appropriations and Spending Clauses of the Constitution. Although Defendants may have discretion in allocating appropriated funds, they do not have the discretion to refuse to spend more than $800 million dollars of appropriated funding without seeking congressional approval.

Plaintiffs respectfully request that the Court grant Plaintiffs' motion and preliminarily enjoin OJP's terminations of Plaintiffs' grants.

## BACKGROUND

### I.    Factual Background

In April 2025, the Department of Justice's Office of Justice Programs abruptly and summarily terminated an estimated 373 multi-year grants—worth more than approximately $820 million dollars over the grant period. Compl. ¶ 1. With no prior notice, OJP sent a form email to Plaintiffs and other grantees, offering the same unsupported explanation that "awards no longer effectuate[] the program goals or agency priorities." Compl. ¶ 2. OJP ordered the grantees to stop work immediately and informed them that they would be reimbursed only up to the date of the termination letter. *Id.*

The terminated grants cut across a broad swath of critical programs that have a successful track record of making our communities safer. These include grants addressing violence reduction and intervention, policing and prosecution, victims' services, juvenile justice and child protection, substance use and mental health treatment, corrections and reentry, justice system enhancements, research and evaluation, and other state- and local-level public safety functions. *Id.* at ¶ 3.

### A. Plaintiffs' Missions

### i. Children and Youth Justice Center d/b/a Center for Children & Youth Justice (CCYJ)

The Center for Children & Youth Justice (CCYJ), based in Washington State, was founded in 2006 by Washington State Supreme Court Justice Bobbe J. Bridge (ret.). Ex. A, Declaration of Rachel Sottile ¶ 5. CCYJ's mission is to create better lives for generations of children and youth by reforming the child welfare and juvenile justice systems. *Id.* As the only organization solely committed to reforming these systems in Washington State, CCYJ's approach is rooted in listening to those most impacted—children, young adults, and families—by failures of these systems, leading to the development, coordination, and implementation of reforms designed to support children and youth, stabilize families, and strengthen communities. *Id.*

### ii. Stop AAPI Hate

Stop AAPI Hate is a U.S.-based non-partisan civil rights coalition dedicated to ending racism and discrimination against Asian Americans and Pacific Islanders (AAPIs). Ex. B, Declaration of Cynthia Choi ¶ 5. Stop AAPI Hate was founded in March 2020, in response to the alarming increase in acts of hate against the AAPI community during the COVID-19 pandemic, by three 501(c)(3) organizations: Chinese for Affirmative Action (CAA), AAPI Equity Alliance, and San Francisco State University (Asian American Studies Department), with CAA as the lead fiscal agency. *Id.* Since its founding, Stop AAPI Hate has become the nation's largest reporting center for tracking anti-AAPI hate acts and provides critical support to victims of hate around the country. Choi Decl. ¶ 6.

### iii. FORCE (Faithfully Organizing for Community Empowerment) Detroit

FORCE (Faithfully Organizing for Community Empowerment) Detroit is a community violence intervention (CVI) organization dedicated to building a safer, freer Detroit, Michigan. Ex. C, Declaration of Dujuan Kennedy ¶ 3. Founded in 2015, FORCE Detroit works to steward, incubate, and provide financial support to grassroots organizations and activists committed to alternatives to community safety that minimize criminalization. *Id.* As part of this work, FORCE Detroit's approach includes three core components: direct services to people impacted by violence,

advocacy and public education, and training and technical assistance for emerging CVI leaders. Kennedy Decl. ¶ 4.

### iv.  Health Resources in Action (HRiA)

Health Resources in Action (HRiA) is a Massachusetts-based non-profit organization with a national footprint working to improve and reimagine public health.  Ex. D, Declaration of Steven Ridini ¶ 5.   HRiA works towards its vision of healthy people thriving in equitable and just communities.  *Id.*  With more than 300 staff members across the country, HRiA partners with individuals, organizations, and communities to transform the practices, policies, and systems that improve health and advance racial equity.  *Id.*  For over two decades, HRiA has worked in communities across the country to plan and launch CVI strategies that cultivate and strengthen a comprehensive and collaborative CVI ecosystem.  *Id.*

### v.  Vera Institute of Justice (Vera)

Vera Institute of Justice (Vera) is a New York-based non-profit with a national footprint.  Ex. E, Declaration of Nicholas Turner ¶ 4.  Founded in 1961, Vera is the oldest and among the largest organizations in the country working to advance safety and justice.  *Id.*  For over sixty years, Vera has worked in partnership with community and government leaders—including in law enforcement and corrections facilities—to address some of the most intractable problems in the criminal justice system. *Id.*  Vera's mission is to pilot, test, and scale innovations that prevent crime and address its drivers, increase accountability, and rely less on incarceration and more on the programs and services that help individuals, families, and communities to thrive.  *Id.*

### B.  OJP Unlawfully Terminates Plaintiffs' Grants and Cooperative Agreements

On April 4, 2025, Plaintiff Vera Institute of Justice received an email from OJP immediately terminating five grants, totaling more than $7 million, that it held with the federal government.  Turner Decl. ¶¶ 8-9.  On April 22, 2025, Plaintiffs Stop AAPI Hate, CCYJ, Force Detroit, and HRiA, received identical emails from OJP immediately terminating their grant funding, totaling more than 18.5 million dollars.  Choi Decl. ¶¶ 13, 19; Sottile Decl. ¶¶ 9-11; Kennedy Decl. ¶ 9; Ridini Decl. ¶¶ 11-12.  These

emails included the following boilerplate "explanation" as to why the grants were being immediately terminated:

> These awards are being terminated because they "no longer effectuate[] the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). The Department has changed its priorities with respect to discretionary grant funding to focus on, among other things, more directly supporting certain law enforcement operations, combatting violent crime, protecting American children, and supporting American victims of trafficking and sexual assault, and better coordinating law enforcement efforts at all levels of government. These awards demonstrate that they no longer effectuate Department priorities.

Compl. ¶ 44.

No Plaintiffs have ever had a federal grant terminated, Compl. ¶ 45, and some Plaintiffs, like Vera and HRiA have been recipients of grant funding for decades under both Democratic and Republican administrations. Turner Decl. ¶ 7; Ridini Decl. ¶ 17. Indeed, to Plaintiffs' knowledge, OJP has never previously terminated grants because of a "change in agency priority," and prior to April, termination of OJP grants was exceedingly rare. Compl. ¶ 46.

### C. OJP's Termination of Plaintiffs' Funds is Causing Plaintiffs and Those They Serve Significant and Irreparable Harm.

Plaintiffs are non-profit organizations that serve thousands of individuals, law enforcement, prosecutors, cities, and states across the country through federal grant funding. They work to train and assist law enforcement, correctional facilities staff, prosecutors, and states and localities. They work with vulnerable populations who have been victims of crime, including Deaf and disabled victims of crime, and individuals with disabilities who are victims of sex or labor trafficking. They fund and work at the community level to successfully interrupt gun crime for juveniles and adults, including those at the highest risk for gun violence, in cities across the country. They fund and work in hospitals to provide lifesaving assistance for violently injured victims and their families, while also mitigating retaliation that may arise from the situation. As a direct result of OJP's unlawful termination of these grants, services to many of these populations have abruptly ceased.

OJP's abrupt and unlawful termination of Plaintiffs' grants had an immediate and irreparable impact on Plaintiff organizations, their staff, and the individuals and communities that they serve.

These terminations have led to an abrupt discontinuation of vital services to some of the most vulnerable in our communities, making individuals and the communities in which they live less safe.

Plaintiffs have built multi-year programs to carry out projects and provide critical services, and Plaintiffs reasonably expected to receive grant funding for the remainder of their grant terms.  With grant funding abruptly terminated, Plaintiffs will not be able to find alternate funding to sustain many of their projects, and most Plaintiffs have already been forced to lay off staff.  As a direct result of OJP's illegal terminations, individuals, victims of crime, law enforcement officers, correctional facilities, cities, and states will lose access to critical programs and services that have a successful track record in making our communities and prisons safer.  In some cases, the abrupt termination of those services will result in preventable deaths.  Absent a preliminary injunction, Plaintiffs will suffer irreparable harm—multi-year projects will terminate abruptly, specialized staff will be laid off, critical services will be withdrawn from communities facing some of the gravest safety concerns—all compounded by lasting damage to hard-earned reputational trust.

### i. OJP's terminations are causing substantial harms to Plaintiffs' programs, limiting life-saving services, and making communities less safe.

OJP's abrupt termination of grant funding is causing substantial harms to each of Plaintiffs' programs funded by the terminated grants.  All Plaintiffs have been forced to eliminate or severely restrict essential services provided under the grant.  And although some Plaintiffs have been able to reallocate funds from other projects to keep vital services afloat, these scarce funds must be taken from other important priorities and services.  Many Plaintiffs have entered into multi-year subcontract awards with other organizations, correctional facilities, and cities worth millions of dollars, leaving those partners without the resources for programs that they have spent significant time planning for and implementing.  These terminations have devastated Plaintiffs' ability to maintain programming, attract and retain qualified staff, or expand life-saving interventions urgently needed by the communities that they serve.

**HRiA.**  As a direct result of the termination of HRiA's grant funding, HRiA is no longer able to provide critical technical assistance to 23 hospital-based violence intervention programs, which

disrupts life-saving services and "in some cases, members in the community will lose their lives because of the disruption of services." Ridini Decl. ¶¶ 25, 18a. Numerous hospitals now lack assistance for their violence prevention professionals who provide invaluable support to victims and their families and mitigate retaliation from victims of gun violence when they leave the hospital. *Id.* at ¶ 18b. These programs allowed the medical staff to care for their patients while the program-funded staff manage the aftermath and safety risks. *Id.* at ¶ 33. Similarly, many of HRiA's subrecipients of grant funding are often the sole source of CVI work in their communities, and many have been forced to reduce or completely halt their work, which has had a devastating impact on the communities who rely on these organizations, including youth that are served by four out of five of the subrecipients. *Id.* at ¶¶ 18b–c, 42. At the individual level, this has left those at the highest risk for gun violence unsupported and susceptible to the environment they are in; people who were mid-transformation can lose momentum or backslide; and, people who were connecting with frontline workers may be more difficult to reach with gaps in services and supports. *Id.* at ¶ 27. This has resulted in immediate harm in neighborhoods that now lack grant-funded staff who are able to immediately intervene in active conflicts and retaliations, or to respond to flare ups in violence. *Id.* And at least 250 government, health care and philanthropy leaders, and frontline workers could lose the opportunity to attend HRiA's annual conference and learn best practices to respond to community violence because the grant funding supporting those individuals was terminated. *Id.* at ¶ 18e.

**Vera.** As a direct result of OJP's termination of Vera's grant awards, Deaf and hard-of-hearing victims of crimes lost access to free sign language interpretation services to allow those victims to communicate with law enforcement and victim services. Turner Decl. ¶¶ 15a, 19–23. This program has served more than 4,000 individuals, and Vera has been forced to turn away individuals who needed access to these essential services. *Id.* at ¶ 22. Vera also has no ability to further support the 872 victim services participants who completed language access training, nor can it support the 119 people who received one-on-one technical assistance on how to provide language access in their organizations for Deaf victims of crime. *Id.* Similarly, the needs of human trafficking survivors with disabilities will go

unmet after Vera was forced to abruptly cancel a training for 486 individuals (more than half of them in law enforcement) and dozens of law enforcement agencies to help law enforcement identify and serve the unique needs of this population and lessens law enforcement's ability. *Id.* at ¶ 48. The cities of Richmond, California, and Albuquerque, New Mexico, have lost more than $700,000 in subaward funding to modernize each city's 911 call systems and train civilian specialists to respond to mental and behavioral health crises and to prevent and intervene in violent crime, especially gun-related homicides and shootings. *Id.* at ¶ 25–30. Prosecutors in Arizona, Colorado, Massachusetts, North Carolina, and Virginia can no longer benefit from Vera's expanding diversion programs, which were designed to help prosecutors address the underlying drivers of criminal conduct in their communities and instead focus on prosecuting the most violent crime plaguing a community. *Id.* at ¶ 32–36. Because of the termination of Vera's grant funding, two state Department of Correction facilities withdrew from Vera's project to support data collection, policy development, training and monitoring for correctional facilities to increase safety in prisons. *Id.* at ¶¶ 42, 38–44.

**FORCE Detroit.** As a direct result of OJP's termination of its grant funding, FORCE Detroit has seen immediate breakdowns in a care ecosystem it painstakingly built, including crumbling of the backbone of its violence intervention work, which included daily, in-the-field support for 14-24 young adults who are most at risk of gun violence. Kennedy Decl. ¶ 16–19. The program funded by this grant has reduced fatal and non-fatal shootings, enhanced opportunities for violence-impacted people to secure employment or start small businesses, and provided critical communal support including showing up at funerals and coaching individuals through job interviews. *Id.* at ¶ 8. The termination of these grants has eliminated the resources needed to maintain a consistent presence in communities most impacted by violence and weakens the infrastructure it built to interrupt cycles of harm, with no viable replacement in sight. For FORCE Detroit, these terminations "abruptly removed trusted support systems for individuals at the highest risk of involvement in violence," including individuals who relied on them for "safety planning, relocation assistance, employment support, or therapy referrals." *Id.* at ¶ 20. This includes individuals like Carol, a single mother and dedicated nurse: "after

offering temporary shelter to a friend, Carol and her children became targets of escalating violence, culminating in the tragic shooting of her stepdaughter." *Id.* at ¶ 26. FORCE Detroit was able to assist Carol by covering her move-in expenses, facilitating her access to therapy services, and ultimately helping Carol and her family heal from the unimaginable tragedy they faced. *Id.* But without the terminated grant funds, FORCE Detroit "cannot sustain or continue providing crucial assistance to victims of violence in Detroit, as it did for Carol." *Id.* Moreover, FORCE Detroit cannot sustain long-term programming, attract and retain qualified staff, or expand life-saving interventions that its communities urgently need. *Id.* at ¶¶ 14d, 15.

**Stop AAPI Hate.** As a direct result of OJP's terminations of its grant funding, at least 40 victims of hate crimes will lose the opportunity to participate in Stop AAPI Hate's healing support programs. Choi Decl. ¶¶ 22b, 40. Stop AAPI hate will no longer be able to substantially assist communities who are dealing with the aftermath of large-scale incidents of hate and violence (like mass shootings), despite having played a critical role past incidents. *Id.* at 32–27. The organization has had to terminate: planned partnerships within the community to care and provide services for victims of hate crimes; policy and advocacy work promoting safer public transit systems; and renowned data collection and research on anti-AAPI hate and violence that has become a critical platform for victims and resource for policy makers, nationwide. Choi Decl. ¶¶ 22, 47, 54.

**CCYJ.** As a direct result of OJP's terminations, CCYJ has had to end a program that provided support to organizations implementing CVI strategies within their communities. Sottile Decl. ¶¶ 15a, 32–33. CCYJ also had to reduce funding for a critical program in King County, Washington, which annually serves an estimated 200 youth who are involved with, or at risk of involvement with, gangs and violence. *Id.* at ¶¶ 15, 21. As a result of OJP's grant termination, as many as 65 young people may no longer be able to access these services, including 13- to 24-year-olds who CCYJ knows are carrying guns or other weapons or self-identify as being in a gang. *Id.* at ¶ 26.

**ii. OJP's terminations have caused Plaintiffs to lay off staff, have imperiled future financial stability, and have caused deep reputational injuries.**

As a result of OJP's terminations, Plaintiffs have been forced to make or plan for staffing cuts. Some plaintiffs have already laid off employees in critical positions. Kennedy Decl. ¶ 18; Sottile Decl. ¶ 15a; Choi Decl. ¶ 22b. Three frontline FORCE Detroit employees, with significant expertise, meaningful ties to the community, and trusted relationships with high-risk program participants, were laid off; losing those roles meant losing critical functions like intake coordination, trauma support, community-based data collection, and losing those individuals who have built trust with some of the highest risk individuals in their communities. Kennedy Decl. ¶ 14b. Other Plaintiffs have had to diminish employee hours, which has limited Plaintiffs' ability to carry out their critical missions and violence intervention work. Turner Decl. ¶¶ 15f, 34; Sottile Decl. ¶ 15a; Ridini Decl. ¶ 18c-d; Choi Decl. ¶¶ 38-39. Other Plaintiffs, like HRiA, who funded staff salaries through the terminated grants, will face layoffs of up to 31 specialized staff members. Ridini Decl. ¶ 21. Stop AAPI Hate would have to layoff 20% of its employees within a year. Choi Decl. ¶ 22b. Moreover, the loss of these jobs has an outsized impact on the community-violence intervention community because, for many frontline workers, the income from these programs "are a vital source of economic stability," and benefits. Ridini Decl. ¶ 22. These "frontline workers prevent violence and save lives every day," and these terminations deeply undermine and, in some cases, completely eliminate their ability to do so. *Id.*

Additionally, OJP's sudden, unexplained termination of these grants have dealt a severe blow to reputations that Plaintiffs have painstakingly built over years in their communities. Choi Decl. ¶ 57-58; Ridini Decl. ¶¶ 20, 42; Kennedy Decl. ¶¶ 14b, 20–22. To take just one example, FORCE Detroit had to "inform a licensed trauma counselor who cleared space in their practice specifically for our participants that FORCE Detroit's funding had been terminated. Now that counselor faces a financial shortfall and a waiting list of participants they are unable help." Kennedy Decl. ¶ 22.

II.     **Regulatory Background**

Detailed regulations govern DOJ's administration of federal grant funding, including those grants administered by OJP, and specify the grounds on which such grants may be terminated. These regulations stem from Office of Management and Budget (OMB) Uniform Guidance for Federal Financial Assistance, codified at 2 C.F.R. part 200, which OMB promulgated pursuant to its authority to "establish government wide financial management policies for executive agencies," 31 U.S.C. §§ 503(a), 504. The OMB Uniform Guidance generally requires federal agencies to "implement" OMB's guidance "in codified regulations." 2 C.F.R. § 200.106. DOJ has followed that instruction by issuing its own regulation adopting the OMB Uniform Guidance. 2 C.F.R. § 2800.101.

Under these regulations specific to grant termination, OJP may terminate grants only under certain circumstances and pursuant to specific procedures. The regulations do not provide unfettered discretion for OJP to terminate grants; they instead allow for the termination of grants in three circumstances: (1) "if the recipient or subrecipient fails to comply with the terms and conditions of the Federal award"; (2) "with the consent of the recipient or subrecipient, in which case the two parties must agree upon the termination conditions"; and (3) "pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." *Id.* § 200.340(a).

Under Section 200.340, terminating a grant because of agency priorities is a permissible basis for terminating a grant only if the terms and conditions of the award specify that as a ground for termination. Amendments to the Uniform Guidance that OMB adopted in April 2024 which apply to terminations after October 1, 2024, make this clear. *See* Guidance for Federal Financial Assistance, 89 Fed. Reg. 30046 (Apr. 22, 2024) (hereinafter "2024 OMB Guidance"); *see also* U.S. Dep't of Justice, DOJ Grants Financial Guide, https://perma.cc/TT35-JMSF (last updated Oct. 2024). Prior to those amendments, the guidance stated that an agency could terminate an award if it "no longer effectuates the program goals or agency priorities," without specifying that this ground for termination had to be stated in the award's terms and conditions. *See* Guidance for Grants and Agreements, 85 Fed. Reg.

49506, 49559 (Aug. 13, 2020) (hereinafter "2020 OMB Guidance").  To increase transparency for award recipients, OMB revised the guidance to make clear that an agency could terminate a grant for failure to effectuate "program goals or agency priorities" only if the terms and conditions of the award so provide.  2024 OMB Guidance at 30089 (stating that terminations based on agency priorities were still permitted "[p]rovided that the language is included in the terms and condition of the award").  As OMB explained, this ensures that agencies "clearly and unambiguously communicate termination conditions in the terms and conditions of the award." 2 C.F.R. §200.340(b).  Indeed, even before that most recent amendment, the Uniform Guidance already required grantor agencies to "clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award." *Id.*; *see also* 2020 OMB Guidance at 49560.

None of the conditions in Plaintiffs' terminated awards provide that the award could be terminated based on a grant's failure to effectuate agency priorities.

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Courts in this Circuit apply a "sliding scale" approach, wherein "a strong showing on one factor could make up for a weaker showing on another." *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022) (internal quotation marks omitted); *Nat'l R.R. Passenger Corp. (Amtrak) v. Sublease Int. Obtained Pursuant to an Assignment and Assumption of Leasehold Int. Made as of Jan. 25, 2007*, No. 1:22-cv-01043, 2024 WL 3443596, at *1 (D.D.C. July 15, 2024) (recognizing that district courts remain bound by sliding-scale precedent).

In this case, the Court has the authority to issue injunctions under Federal Rule of Civil Procedure 65, and under the APA, the Court "may 'issue all necessary and appropriate process to preserve status or rights pending conclusion of the review proceedings' when doing so is 'necessary to prevent irreparable injury.'" *Nat'l Council of Nonprofits v. OMB*, No. 1:25-cv-00239, 2025 WL 597959,

at *11 (D.D.C. Feb. 25, 2025) (quoting 5 U.S.C. § 705) (alteration omitted).  Thus, "[b]oth provisions [Fed. R. Civ. P. 65 and § 705] provide a mechanism for issuing injunctive relief and operate under the same four-factor test." *Id.*

## ARGUMENT

### I.    Plaintiffs Are Likely to Succeed on the Merits

Plaintiffs are likely to succeed on the merits.  OJP's terminations violate the APA because they are contrary to law, contrary to DOJ's regulations, and arbitrary and capricious.  These terminations also violate multiple constitutional provisions, including the Fifth Amendment Due Process Clause and the Spending and Appropriations Clauses, and the Take Care Clause.

### A.  OJP's *En Masse* Grant Terminations Violate the Administrative Procedure Act.

OJP's termination of approximately 373 grants awards totaling more than $800 million, with no notice and no reasoned explanation about why the grants were being terminated, is quintessential unlawful agency action that violates the APA.  These terminations violate the Constitution, agency regulations, exceed OJP's lawful authority, and are arbitrary and capricious.  *See* 5 U.S.C. § 706(2)(A)–(C).  Because Plaintiffs are likely to succeed on the merits of their APA claim, Defendants' grant terminations must be set aside under 5 U.S.C. § 706(2).

### iii.  OJP's termination of Plaintiffs' grants is final agency action.

OJP's *en masse* termination of Plaintiffs' grant awards constitutes final agency action and is subject to review under the APA.  5 U.S.C. § 704.  Agency action is final if it "mark[s] the 'consummation' of the agency's decisionmaking process," meaning that it is not "tentative" or "interlocutory," and determines "rights or obligations" or imposes "legal consequences."  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations omitted).  OJP's terminations of Plaintiffs' grants "mark[] the consummation" of OJP's decision-making process because they constitute a final decision by the agency terminating Plaintiffs' grants effective immediately.  This decision resulted in the immediate loss of funding to Plaintiffs.  *See, e.g., Nat'l Council of Nonprofits*, 2025 WL 597959, at *13 (holding that pause on funding constituted final agency action); *see also RFE/RL, Inc. v. Lake*, No. 1:25-cv-00799,

14

2025 WL 900481, at *3 (D.D.C. Mar. 25, 2025) (grant termination is "'final' agency action given the unambiguous language of the grant termination letter."). Moreover, these terminations impose "legal consequences" by requiring Plaintiffs to undertake closeout obligations, with the threat of enforcement actions if Plaintiffs fail to do so. Sottile Decl., Exs. 2, 4, 6; Choi Decl., Ex. 2; Kennedy Decl., Ex. 2; Ridini Decl., Exs. 2, 4, 6; Turner Decl., Ex. 6. *Woonasquatucket River Watershed Council v. USDA*, No. 1:25-cv-00097, 2025 WL 1116157, at *15 (D.R.I. Apr. 15, 2025) ("'[L]egal consequences' surely flow, given that grant recipients cannot access previously awarded funds.").

### iv. OJP's terminations of Plaintiffs' grants are contrary to law.

Plaintiffs are likely to succeed on their claim that OJP's terminations of Plaintiffs' grants were "not in accordance with law," 5 U.S.C. § 706(2)(A). An agency is "bound by its own regulations," *Nat'l Env't Dev. Assoc.'s Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (internal quotation marks omitted), and an agency's failure to follow them is "contrary to the law," *Fuller v. Winter*, 538 F. Supp. 2d 179, 191 (D.D.C. 2008). As relevant here, 2 C.F.R. § 200.340(a), as adopted by DOJ at 2 C.F.R. § 2800.101, sets forth the limited circumstances in which OJP may terminate a grant and the requirements for doing so.

OJP invoked 2 C.F.R. § 200.340(a)(4) as the basis for terminating Plaintiffs' grants. Under that provision, an award may be terminated only "pursuant to the *terms and conditions of the Federal award*, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). OJP's termination of Plaintiffs' grants based on Section 200.340(a)(4) is contrary to both text and regulatory history of that provision. *First*, OJP did not provide clear and unambiguous notice that it could terminate awards based on a failure to effectuate agency priorities, as is required. *Second*, Section 200.340(a)(4) does not allow OJP to terminate a grant based on a "change" in agency priorities. OJP's terminations of these grants is therefore contrary to law.

### a. Regulatory history of 200.340

Both current and former versions of the OMB regulations allowed an agency to terminate a grant if the grant "no longer accomplished the purpose for which the Federal award was made." 2 C.F.R. § 200.340(a)(3).[2] Under the previous Trump administration, in 2020, OMB added a provision authorizing termination "if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(2) (2020) (authorizing termination "to the greatest extent authorized by law, if an award no longer effectuates the program goals or agency priorities"). Section 200.340(b) also required that the agency must "clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award." *Id.* § 200.340(b); *see also* 2020 OMB Guidance at 49560. To "provide greater clarity on the policy for termination of awards," in 2024 OMB revised Section 200.340 to make clear that an agency could terminate a grant for failure to effectuate "program goals or agency priorities" only if specifically included in the terms and conditions of the award. 2024 OMB Guidance at 30089 (stating that terminations based on agency priorities would be permissible only if "the language is included in the terms and condition of the award"). As OMB explained, this amendment to Section 200.340 requires that agencies "clearly and unambiguously communicate termination conditions in the terms and conditions of the award." *Id.* Thus, as revised, if OJP wished to rely on Section 200.340(a)(4) as the basis for termination, OJP must have included a "clear and unambiguous" term and condition providing for termination where an award no longer effectuated the program goals or agency priorities. No such term or condition was included in any of Plaintiffs' awards. Sottile Decl.; Choi Decl.; Kennedy Decl.; Ridini Decl.; Turner Decl.

### b. OJP did not provide clear and unambiguous notice that it could terminate awards based on a failure to effectuate agency priorities.

OJP stated in Plaintiffs' termination notices that the "award documents provide notice of the applicability of the termination provisions in § 200.340," but Plaintiffs' award documents do not contain that language. Compl. ¶ 46. Nowhere in the award documents does OJP "clearly and

---

[2] That provision was issued for the first time in substantially similar form in 2013. *See* Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 78 Fed. Reg. 78590, 78590-01 (Dec. 26, 2013).

unambiguously" state that it could terminate the award because an award no longer effectuates program goals or agency priorities. To the contrary, the award documents include a number of different conditions that, if violated, could result in termination of the award, including for example prohibited conduct related to trafficking victims and a failure to comply with the terms of the award. Without a clear and unambiguous articulation of the agency's priorities in the award and notice that the grant can be terminated if the grantee's award no longer effectuated such priorities, OJP was not permitted to terminate the grants on the basis of "agency priorities." OJP's termination of Plaintiffs' grants on that basis is therefore contrary to DOJ's regulations.

### c. Section 200.340(a)(4) does not allow OJP to terminate a grant based on a "change" in agency priorities.

OJP's terminations are contrary to law for an additional and independent reason. Section 200.340(a)(4) allows OJP to terminate a grant if "*an award* no longer effectuates the program goals or agency priorities." Thus, OJP can rely on this provision only if the grantee's *individual award* no longer satisfies the agency's priorities as they were articulated when the grant was awarded. The language of Section 200.340(a)(4) does not refer to any "change" in agency priorities as a basis for termination. The most natural reading of that language, in context, is that it allows for terminations because of failures stemming from the grant recipient—*i.e.*, where the recipient can no longer effectuate the goals and priorities that motivated the award in the first place. OJP's interpretation that "agency priorities" includes agency priorities identified after the grant is awarded would render OMB and DOJ regulations regarding terminations meaningless, and it would give OJP and any other executive branch agency the ability to terminate any grant award by simply invoking a change in agency priorities.

Not only is OJP's interpretation contrary to the text of Section 200.340(a)(4), but it is also unsupported by OMB's Final Rule in 2020. OMB's explanation of the 2020 revision to the Uniform Guidance makes clear that an agency must rely on specific evidence to demonstrate that "an award" no longer serves a program goal or agency priorities that are articulated when the award was made. OMB provides two examples in which it would be appropriate to terminate an award under this provision: "[I]f additional evidence reveals that a specific award objective is ineffective at achieving

program goals, it may be in the government's interest to terminate the Federal award."  2020 OMB
Guidance at 49507.  The second example given is where "additional evidence may cause the Federal
awarding agency to significantly question the feasibility of the intended objective of the award, such
that it may be in the interest of the government to terminate the Federal award."  *Id.* at 49507–08.
Both examples are specific to the effectiveness or objective of the award, not to a change in program
goals or agency priorities.  There would be no need for "additional evidence" if an agency could simply
change its priorities and cancel all grants deemed out of step with those new priorities.

To interpret Section 200.340(a)(4) in a manner that allows an agency to sweep aside millions
or billions of dollars in grants based solely on a post-hoc change in agency priorities would raise a host
of constitutional issues, *see* infra at II, would fail to provide grantees with notice of the conditions that
would trigger a termination of their grant, and would render the provision so vague as to permit the
arbitrary exercise of power.  But OMB was clear that one of the purposes of Section 200.340 was to
ensure that "agencies are not able to terminate grants arbitrarily," *id.* at 49509, to guard against the
very sort of mass, arbitrary, and ultimately unlawful grant terminations that OJP has attempted to
carry out in this case.

### v.  OJP's terminations are contrary to a constitutional right.

The APA prohibits agency action that is "contrary to constitutional right, power, privilege, or
immunity."  5 U.S.C. § 706(2)(A)–(C).  As applied to Plaintiff class, OJP's terminations raise a host of
constitutional violations, including a violation the Fifth Amendment; and a violation of the Separation
of Powers, Spending and Appropriations Clauses, and the Take Care Clause.  *See infra* at II.  Plaintiffs
are thus likely to succeed on their claim OJP's unconstitutional terminations also violate the APA.

### vi.  OJP's terminations of Plaintiffs' grants are arbitrary, capricious, and an abuse of agency discretion.

Plaintiffs are also likely to succeed on their claim that OJP's simultaneous, unreasoned
terminations of Plaintiffs' grants are arbitrary and capricious.  Under the APA, a court must "hold
unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law." 5 U.S.C. § 706(2)(A).  Under the APA, grantees are entitled to reasoned decisionmaking before the government terminates millions of dollars in vital grant funding with no notice.  OJP's *en masse* termination of an estimated 373 grants, on the same day, using the same cursory and unspecific rationale, represents nearly every hallmark of arbitrary and capricious agency action.

OJP's terminations are also arbitrary and capricious because the terminations are "not reasonable" nor "reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  When terminating a grant, OJP is required under the APA to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).  OJP's explanation cannot rely "on factors which Congress has not intended it to consider, entirely fail[] to consider an important aspect of the problem, offer[] an explanation for its decision that runs counter to the evidence before the agency, or [be] so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* at 43.  OJP's terminations are judged "only upon the grounds on which the agency acted," when it made the challenged decision, not based on post hoc rationalizations. *Michigan v. EPA*, 576 U.S. 743, 760 (2015).

OJP's mass termination of Plaintiffs' grants fails nearly all of these benchmarks of reasoned decisionmaking under the APA.  The emails included identical language and stated summarily, without analysis or individualized assessment as to each grant, that OJP determined that the awards "no longer effectuate[] the program goals and the Department's priorities."  The form email sent to all named Plaintiffs included this three-sentence "explanation" as to why OJP was suddenly terminating Plaintiffs' grants effective immediately:

> These awards are being terminated because they "no longer effectuate[] the program goals or agency priorities."  2 C.F.R. § 200.340(a)(4).  The Department has changed its priorities with respect to discretionary grant funding to focus on, among other things, more directly supporting certain law enforcement operations, combatting violent crime, protecting American children, and supporting American victims of trafficking and sexual assault, and better coordinating law enforcement efforts at all levels of

government.  These awards demonstrate that they no longer effectuate Department priorities.

OJP's terse, three-sentence rationale that the awards are being terminated because they no longer effectuate agency priorities "can scarcely be characterized as an explanation."  *RFE/RL, Inc.,* 2025 WL 900481, at \*3.  When terminating a grant, an agency must provide recipients with a "workable, sensible, or meaningful reason or basis for the termination of their awards."  *Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, No. 1:25-cv-00702, 2025 WL 833917, at \*21 (D. Md. Mar. 17, 2025).  OJP did not do so.

To begin, none of the termination notices include any discussion specific to the grantee; nor does any notice explain why the grant no longer serves the agency's priorities, as is required by DOJ's regulations.  Rather, OJP's email merely states that it wishes to "more directly" focus its funding and then asserts in a conclusory fashion that "these awards demonstrate that they no longer effectuate Department priorities."  OJP's explanation certainly does not provide a "workable, sensible, or meaningful basis for the termination" of the awards that would allow Plaintiffs to ascertain what elements of their program suddenly no longer support the priorities articulated in the termination email.  Nor does OJP explain how the "awards demonstrate" that they no longer effectuate Department priorities.  OJP's boilerplate explanation does not satisfy the sort of individualized, award-by-award analysis that relies on specific evidence to demonstrate that an award no longer serves a program goal or agency priorities.  *See also Pol'y & Rsch., LLC v. HHS*, 313 F. Supp. 3d 62, 72 (D.D.C. 2018) (Jackson, J.) ("It is also clear beyond cavil that an agency acts arbitrarily and capriciously if it acts in a manner that is contrary to its own regulations or a congressional statute").

Indeed, another court in this district recently found a similar "conclusory" reference to "agency priorities," "unsupported by any facts or reasoning," to be arbitrary and capricious.  *RFE/RL, Inc.*, 2025 WL 900481, at \*3 (concluding that "one line" explanation in grant termination letter "stating that 'the award no longer effectuates agency priorities'" was "not a 'satisfactory explanation' and offers no 'rational connection between the facts found and the choices made'").  At bottom, OJP's boilerplate assertion that Plaintiffs' grants are no longer consistent with agency priorities "is so broad

and vague as to be . . . devoid of import," *Am. Ass'n of Colls. for Tchr. Educ.*, 2025 WL 833917, at *21, and "can scarcely be characterized as an explanation," much less one that comports with the APA's requirement of reasoned decisionmaking. *RFE/RL, Inc.*, 2025 WL 900481, at *3. As a result, OJP's terminations are arbitrary and capricious.

Compounding the arbitrary and capricious violation, OJP's assertion that it could terminate a grant because of a change in agency priorities constitutes an unexplained and unreasonable change in longstanding principles regarding the interpretation of Section 200.340. "When an agency changes course," as OJP did here in asserting a sudden change in agency priorities, it must "consider the serious reliance interests" of stakeholders. *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (internal quotation marks and citations omitted). OJP "must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Id.*; *cf. Michigan*, 576 U.S. at 753 ("[R]easonable regulation ordinarily requires paying attention to the advantages and the disadvantages of agency decisions."). "It would be arbitrary and capricious to ignore such matters." *Id.* Additionally, OJP must "consider responsible alternatives to its chosen policy and to give a reasoned explanation for its rejection of such alternatives." *Spirit Airlines, Inc. v. Dep't of Transp.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021) (internal quotation marks omitted). "This principle goes to the heart of reasoned decisionmaking." *Id.*

All Plaintiffs relied on their understanding that OJP would fulfill its commitments and would not arbitrarily and unlawfully terminate their grant funding. Sottile Decl. ¶ 16; Choi Decl. ¶ 23; Kennedy Decl. ¶ 15; Ridini Decl. ¶ 19; Turner Decl. ¶ 16. They hired employees, developed relationships with community organizations and residents who depend on grant-enabled services, and entered into contracts with vendors. Some plaintiffs entered into multi-year subcontract awards with other organizations, correctional facilities, and cities worth millions of dollars, only to have to abruptly terminate those awards. Ridini Decl. ¶¶ 19, 52; Turner Decl. ¶¶ 15d, 27.

OJP did not mention, much less discuss, the grantees' reliance interests or the impact on their organizations in the termination emails. In so doing, OJP failed to "display [any] awareness that [they

are] changing position[s]," and certainly did not articulate "good reasons" for the shift.  *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (quotation marks omitted); *Fox Television Stations, Inc.*, 556 U.S. at 515–16 (when an agency departs from a prior policy, it ordinarily must "display awareness that it is changing position" and offer "a reasoned explanation" for doing so, particularly where regulated parties have relied on the old rule).  In doing so, OJP failed to consider the substantial reliance interests of Plaintiffs.  That failure is arbitrary and capricious and further indicates that OJP "entirely failed to consider an important aspect of the problem" in terminating the grants, namely, Plaintiffs' serious reliance interests and the devastating impacts from the sudden and unexplained termination of funding.  *State Farm*, 463 U.S. at 43.

Because OJP failed to engage in reasoned decisionmaking when it terminated Plaintiffs' grants, Plaintiffs are likely to succeed on their APA claim that the terminations are arbitrary, capricious, and an abuse of agency discretion.

## II.    OJP's Terminations of Plaintiffs' Grants Violates the Constitution.

### A.    OJP's terminations of Plaintiffs' grants without notice violates their procedural due process rights.

The Fifth Amendment guarantees that "no person shall . . . be deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  This Clause protects "property" interests where a person or entity has a "legitimate claim of entitlement" to something.  *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972).  A property interest may be created by "an independent source," such as other laws or regulations, "that secure certain benefits and that support claims of entitlement to those benefits."  *Id.*  Relevant here, this interest arises where governing law provides that the government may not terminate a benefit except for cause.  *Esparraguera v. Dep't of the Army*, 101 F.4th 28, 33 (D.C. Cir. 2024) ("a property interest exists" where benefit could be terminated "only for cause").

It is established that federal grantees "have a legitimate property interest in federal funds that Congress has already appropriated and that the [grantees] have accepted."  *Cnty. of Santa Clara v. Trump*, 275 F. Supp. 3d 1196, 1218 (N.D. Cal. 2017)*, aff'd in part, vacated in part, remanded sub nom. City & Cnty.*

of *San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018); *see NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 41 (D.C. Cir. 2015) (A person has a protected property interest if that "person would be entitled to receive the government benefit assuming she satisfied the preconditions to obtaining it" and "award of the benefit would follow from satisfaction of applicable eligibility criteria."); *Reeve Aleutian Airways, Inc. v. United States*, 982 F.2d 594, 598 (D.C. Cir. 1993) ("The government does not deny that some process is due because Reeve has a liberty interest in avoiding the damage to its reputation and business caused by a stigmatizing suspension."); *Com. Drapery Contractors, Inc. v. United States*, 133 F.3d 1, 6 (D.C. Cir. 1998) ("An agency may not impose even a temporary suspension without providing the "core requirements" of due process: adequate notice and a meaningful hearing.").   "[I]f the statute or implementing regulations place substantive limitations on official discretion to withhold award of the benefit upon satisfaction of the eligibility criteria, there is a legitimate claim of entitlement, as to which the Due Process Clause affords protection."  *NB ex rel. Peacock*, 794 F.3d at 41–42.

Such is the case with Plaintiffs' grant funding.  Plaintiffs have a constitutionally protected property interest in the funding they applied for, were awarded, and currently rely on, including to pay staff and continue services that benefit millions of people nationwide.   Some Plaintiffs have already been forced to furlough or lay off staff, Kennedy Decl. ¶ 14; Ridini Decl. ¶¶ 46, 51; Sottile Decl. ¶¶ 15, 17), and are cutting back essential services, harming relationships with their community beneficiaries–including those who depend on grantees for their physical safety.  Kennedy Decl. ¶ 15-26; Ridini Decl. ¶¶ 18, 25; Sottile Decl. ¶¶ 15, 26.  Some putative class members are at risk of shuttering entirely.[3]  The substantive and reputational harms they have already experienced are not only irreparable but reflect the sort of legitimate property interest that the Due Process Clause protects.

Because Plaintiffs have a protected property interest in their grant funding, they were entitled to due process before OJP summarily terminated it without prior notice.  Barring extraordinary circumstances, "the Constitution requires some kind of a hearing *before* the State deprives a person of

_____

[3] Perry Stein et al., *DOJ Cancels grants for gun-violence and addiction prevention, victim advocacy*, Wall St. J. (Apr. 23, 2025), https://perma.cc/DG66-ZZCP.

liberty or property." *Zinermon v. Burch*, 494 U.S. 113, 127 (1990) (emphasis added); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) ("[T]he root requirement of the Due Process Clause is that an individual be given an opportunity for a hearing before he is deprived of any significant protected interest.") (cleaned up); *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 62 (1993) (only in "extraordinary instances" may the government take real property without a pre-deprivation hearing).

Plaintiffs were clearly not afforded sufficient process before their grant funding was cut. As detailed above, their grants were summarily terminated without any prior notice whatsoever, much less a hearing or other opportunity to make their case for retention of funds. The termination letters assert that Plaintiffs no longer conduct work that "aligns with agency priorities," but did not explain why that was the case, and did not provide grantees with the opportunity to contest the basis for that termination. And while the termination letters afford terminated grantees a post-deprivation opportunity for an administrative appeal, that is insufficient because grantees' funds are not being reinstated during the pendency of any appeals. All the while, grantees' operations and reputations are being damaged with each passing day, proving that the risk of erroneous deprivation is not only high but already occurring.

On the other side of the ledger, OJP would not be harmed by affording Plaintiffs meaningful process before canceling their grants midstream. Indeed, the executive branch has no authority to unilaterally cancel these grants in the first place, so cannot be harmed by being forced to obey the law. *Northern Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009) ("[t]he public interest is served when administrative agencies comply with their obligations"). Nor could Defendants make any argument to the contrary: every American presidential administration before this one has afforded federal grantees meaningful process before terminating them and harming their beneficiaries.

**B.  OJP's Implementation of 2 CFR § 200.340(a)(4) to Terminate Plaintiffs' Grants is Void for Vagueness as Applied to Plaintiffs.**

Defendants have also violated the Due Process Clause by terminating Plaintiffs' grants in an unconstitutionally vague manner. Government regulatory enforcement is void for vagueness if it (1) does not provide a person of ordinary intelligence fair notice of what is prohibited or (2) if it

arbitrary application. *Grayned v. City of Rockford*, 408 U.S. 104, 108–09 (1972); *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012); *U.S. Telecom Ass'n v. FCC*, 825 F.3d 674, 734 (D.C. Cir. 2016); *Timpinaro v. SEC*, 2 F.3d 453, 460 (D.C. Cir. 1993). Open-ended regulatory terminology that allows for "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings" violate due process in this way. *United States v. Williams*, 553 U.S. 285, 306 (2008); *Coates v. City of Cincinnati*, 402 U.S. 611, 611–14 (1971) (holding a regulation against "annoying" conduct unconstitutionally vague); *Smith v. Goguen*, 415 U.S. 566, 573–77 (1974) (holding a prohibition on treating the American flag "contemptuously" unconstitutionally vague).

Defendants' application of 2 C.F.R. § 200.340(a)(4) to Plaintiffs is unconstitutionally vague and constitutes an arbitrary exercise of authority. Plaintiffs' termination letters all summarily asserted that the relevant grant "no longer effectuates the program goals or agency priorities." OJP's use of Section 200.340(a)(4) to allow for the termination anytime it "changes" agency priorities invites the very sort of arbitrary terminations that are at issue in this case. If OJP—or any other agency—can change priorities, with no notice, and abruptly terminate millions or billions of dollars of grant funding on the basis of changed political priorities, then there would cease to be any stability or certainty associated with federal grant funding. OJP's open-ended and capacious interpretation would fail to provide prospective and actual grantees with any notice of the conditions upon which their grants could be terminated. OJP also failed to explain how Plaintiffs' work *fails* to effectuate the agency's stated priorities. Indeed, as detailed above and in the Complaint, these are precisely the goals of many of the putative class members. OJP's interpretation of 2 C.F.R. § 200.340(a)(4) is so vague and capacious that it is unconstitutional and void for vagueness.

Moreover, the words "effectuate," "goals," and "priorities," at least, are not defined in the letters, law, or regulations, and are the sorts of open-ended terms that courts have found unconstitutionally vague in the past. The termination letters went on to "explain" some of those new priorities, including "more directly supporting certain law enforcement operations, combatting violent crime, protecting American children, and supporting American victims of trafficking and sexual

assault, and better coordinating law enforcement efforts at all levels of government." But these newly announced priorities are also not contained in any guidance, law, or regulation and were not included defined within Plaintiffs' award grant documents. 2 C.F.R. § 200.106 (requiring federal agencies to "implement" OMB guidance "in codified regulations").

### C. OJP violated the separation of powers, the Spending and Appropriations Clauses, and the Take Care Clause.

Plaintiffs are also likely to succeed on the merits because Defendants' blanket refusal to spend appropriations violates constitutional provisions preserving the separation of powers by giving Congress—not the Executive—the "exclusive power" of the purse. *Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (quoting *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992)); *and see* The Federalist No. 58, at 359 (James Madison) (Clinton Rossiter ed., 1961)) (Congress' exclusive power of the purse is "a bulwark of the Constitution's separation of powers among the three branches of the National Government.").

The Executive Branch has no appropriations power. Its only powers "stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). The Constitution vested the power of the purse only in Congress, through the Spending Clause—first among Congress' enumerated power in Article I, Section 8—and the Appropriations Clause, which forbids the expenditure of federal funds except "in Consequence of Appropriations made by Law." U.S. Const., art. I, § 9, cl. 7. And Congress, in turn, specifically barred the Executive Branch from interfering in appropriations and spending. Responding to Nixonian overreach, it passed the Impoundment Control Act, which commands that appropriated funds "shall be made available for obligation" absent congressional recission. Pub. L. No. 93-344, 88 Stat. 297, 334 (July 12, 1974) (codified as amended at 2 U.S.C. §§ 682 *et seq.*). Later, it passed the Anti-Deficiency Act Amendments of 1982, prohibiting executive officers from holding appropriated funds in reserve. Pub. L. No. 97-258, 96 Stat. 929 (Sept. 13, 1982) (codified as amended in Title 31).

With no statutory or constitutional mandate, the Executive's authority around spending is at its "lowest ebb." *See Youngstown*, 343 U.S. at 637 (R. Jackson, J., concurring). The President cannot

spend money without Congress' blessing—and he cannot "unilaterally refuse" to spend money that Congress appropriated, either. *In re Aiken County*, 725 F.3d 225, 261 n. 1 (D.C. Cir. 2013). "Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *City & County of San Francisco*, 897 F.3d at 1235.

Everything from longstanding practice to persuasive new caselaw shows that Defendants' unilateral refusal to disburse congressional grant funding offends these bedrock constitutional principles. In 1838, the Supreme Court granted a writ of mandamus compelling an executive branch official to pay a congressionally mandated award that he had attempted to withhold. *Kendall v. United States*, 37 U.S. (12 Pet.) 524, 610 (1838). In 1969, then-DOJ lawyer William Rehnquist wrote an Office of Legal Counsel opinion explaining that "the suggestion that the President has a constitutional power to decline to spend appropriated funds … is supported by neither reason nor precedent." *Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools*, 1 Op. O.L.C. Supp. 303, 309 (1969). The future Chief Justice was hardly an outlier: just a few years later, the Supreme Court held that a statute providing that sums "authorized to be appropriated . . . *shall be allotted*" required the expenditure of the entire amount, leaving the Executive no discretion to reduce the amount of funding. *Train v. City of New York*, 420 U.S. 35, 42 (1975) (emphasis added).

Nothing has changed, in the Constitution or the caselaw. Just a few months ago, for instance, a federal court explained that the Executive Branch cannot simply substitute its preferences for the congressional mandate: "The Executive Branch has a duty to align federal spending and action with the will of the people as expressed through congressional appropriations, not through 'Presidential priorities.'" *New York v. Trump*, No. 1:25-cv-00039, 2025 WL 357368, at *2 (D.R.I. Jan. 31, 2025). The next month, in *PFLAG, Inc. v. Trump*, another court found that the Executive Branch "unconstitutionally intrude[d] upon the Congressional prerogative to control the public fisc" when it simply refused to spend appropriated grant funds rather than "ask Congress to rescind" them. No. 8:25-cv-00337, 2025 WL 510050, at *17 (D. Md. Feb. 14, 2025). So too here.

It matters not at all that Congress allocated these funds to be disbursed through a grantmaking process, rather than earmarking them to specific organizations. Congress may have given Defendants discretion in how to allocate the funds. It did not give Defendants the option of simply pocketing $800 million and walking away. To the contrary: Congress specifically instructed Defendants to seek congressional approval before diverting more than 5% of any DOJ funding tranche. Pub. L. No. 118-42, Div. C, Title II § 205, 138 Stat. 25, 153 (Mar. 9, 2024).

In appropriations as elsewhere, the president cannot make new law: he can only faithfully execute Congress' laws. *See* U.S. Const. art. II, § 3; *Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes."). As now-Justice Kavanaugh wrote for the D.C. Circuit: if the President wants to withhold congressionally-approved funding, he "must propose the rescission of funds, and Congress then may decide whether to approve a rescission bill." *In re Aiken Cnty.*, 725 F.3d at 261 n.1. The Executive Branch cannot, as it did here, "unilaterally amend[] or cancel[] federal appropriations." *PFLAG,* 2025 WL 510050, at *21. That violation of core constitutional principles calls for this Court's immediate preliminary intervention.

## III.    This Court has Jurisdiction Over all of Plaintiffs' Claims

In defending against other cases challenging grant terminations, the United States has argued that cases like this one resemble breach of contract claims for which the United States has waived its sovereign immunity only in the Court of Federal Claims. That is wrong on multiple fronts.

First, the government's jurisdictional objection does not apply to Plaintiffs' constitutional claims, as the government itself recognized in another recent case. *See Aids Vaccine Advoc. Coal. v. U.S. Dep't of State*, No. 1:25-cv-00400, 2025 WL 752378, at *7 n.6 (D.D.C. Mar. 10, 2025). The government's objection turns on the scope of the waiver of sovereign immunity in Section 702 of the APA. But the waiver of sovereign immunity in Section 702 is irrelevant to Plaintiffs' constitutional and *ultra vires* claims because unconstitutional action by a "federal officer 'is beyond the officer's powers and is, therefore, not the conduct of the sovereign'"—so no sovereign immunity attaches in

the first place. *Pollack v. Hogan*, 703 F.3d 117, 120 (D.D.C. 2012). Wholly apart from the scope of the waiver of sovereign immunity in Section 702 of the APA, "suits for specific relief against officers of the sovereign" allegedly acting unconstitutionally are not barred by sovereign immunity. *Id.*; *see also Sedita v. United States*, 763 F. Supp. 3d 63, 74 n.4 (D.D.C. 2025) (the *Larson* exception "continues to operate despite the APA," so "even if the APA waiver is inapplicable, the Federal Officers are stripped of official immunity").

Second, Section 702 of the APA does in fact waive the government's sovereign immunity in federal district court for all the claims in this case. That provision waives the government's immunity from claims against agencies and agency officials—and permits those claims to be brought in district court—so long as two requirements are met: (1) the claim "seek[s] relief other than money damages," and (2) no "other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U.S.C. § 702. Both requirements are satisfied here.

**A. Plaintiffs seek relief other than money damages.**

Plaintiffs request an order declaring that OJP's grant terminations are unlawful, setting the terminations aside, and imposing injunctive relief that would block OJP from implementing the terminations. It is true that this relief would require OJP to disburse grant money to Plaintiffs. But it is well established that "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988). Rather, "money damages" are amounts "given to the plaintiff to substitute for a suffered loss," such as "injury to [the plaintiff's] person, property, or reputation." *Id.* at 893, 895. They "could be far greater than the amount withheld pursuant to the agency policy." *Aids Vaccine Advoc. Coal.*, 2025 WL 752378, at *8 (D.D.C. Mar. 10, 2025).

"Money damages" are distinct from "specific remedies," which "are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled." *Bowen*, 487 U.S. at 895 (internal quotation marks omitted). A court gives the plaintiff the very thing to which it is entitled where it "orders a defendant to pay a sum owed out of a specific res"—such as a particular

appropriation. *City of Houston v. HUD*, 24 F.3d 1421, 1428 (D.C. Cir. 1994). Such an award "constitutes specific relief" available under Section 702 of the APA, not "money damages." *Id.* Likewise, when an order requires disbursement of funds subject to the terms and conditions of an agreement—as opposed to a "free and clear transfer of money"—that "strings-attached disbursement" is equitable relief, not money damages. *Lummi Tribe of the Lummi Rsrv. v. United States*, 870 F.3d 1313, 1318–19 (Fed. Cir. 2017).

Here, the full declaratory and injunctive relief sought would effectively require OJP to release money it has currently frozen, but that money would both come with strings attached (all the terms and conditions of the grant awards) and be "the very thing to which" Plaintiffs are entitled. Plaintiffs therefore seek relief "other than money damages," Section 702's first requirement is accordingly satisfied, and jurisdiction is proper in this Court.

## B. The Tucker Act does not impliedly forbid Plaintiffs from seeking relief in the district court.

Section 702's second requirement is also satisfied because, contrary to the government's contentions, the Tucker Act does not "impliedly forbid" this Court from considering Plaintiffs' claims.

The Tucker Act vests the Court of Federal Claims with jurisdiction over "express or implied contract[s] with the United States." 28 U.S.C. § 1491(a)(1). Under D.C. Circuit precedent, this grant of jurisdiction to the Court of Federal Claims "provid[es] the exclusive remedy for contract claims against the government" and therefore "impliedly forbids" district courts from considering such claims. *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992), *overruled in part on other grounds*, *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 620 (D.C. Cir. 2017).[4]

Here, the Tucker Act does not apply and therefore does not divest this Court of jurisdiction for two independent reasons. *First*, Plaintiffs' grant agreements are not the type of agreement that can

---

[4] There is reason to doubt this precedent because, as the Supreme Court pointed out, no "language in the Tucker Act" makes the Court of Federal Claims' jurisdiction over contract claims "exclusive." *Bowen*, 487 U.S. at 910 n.48. As the D.C. Circuit also recognized, there is a "strong case" that, in fact, "the Tucker Act should not be read to 'impliedly forbid'" district courts from considering "contract actions for specific relief." *Transohio*, 967 F.2d at 612. Plaintiffs reserve the right to seek reconsideration of this precedent in an appropriate forum.

give rise to Tucker Act jurisdiction. *Second*, even if the grant awards could be construed as contracts, Plaintiffs' claims are not contract claims.

> ### i.  Plaintiffs' grant agreements are not the type of "agreement" covered by the Tucker Act.

A federal district court cannot "be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims." *Tootle v. Sec'y of the Navy*, 446 F.3d 167, 176 (D.C. Cir. 2006); *accord Am. Near E. Refugee Aid v. USAID*, 703 F. Supp. 3d 126, 132 (D.D.C. 2023). After all, "[t]here cannot be exclusive jurisdiction under the Tucker Act if there is no jurisdiction under the Tucker Act." *Tootle*, 446 F.3d at 177. Here, the Court of Federal Claims has no jurisdiction under the Tucker Act to consider Plaintiffs' claims that OJP violated the Constitution and the APA, and that its actions were *ultra vires*, when it terminated Plaintiffs' grant awards: those awards, which are implemented through grant and cooperative agreements between OJP and Plaintiffs, are not the type of agreements that give rise to jurisdiction in the Court of Federal Claims.

First, the agreements are not contracts at all. "For the Court of Federal Claims to have jurisdiction, a contract must contain the four required elements of offer, acceptance, consideration, and proper government authority." *Am. Near E. Refugee Aid*, 703 F. Supp. 3d at 132 (citation and internal quotation marks omitted). The consideration must benefit the government in a "direct, tangible" way. *Id.* at 133. Grants and cooperative agreements like those at issue in this case do not confer direct and tangible benefits on the government. *See id.* at 134 ("[I]f benefits as amorphous as the advancement of U.S. foreign policy interests could constitute consideration, then every cooperative agreement would transform into a contract.").

Second, even if the grant agreements here qualified as contracts, they are not the type of contract over which the Court of Federal Claims has jurisdiction. For the Court of Federal Claims to have jurisdiction, a "contract" claim must be based on a contract that creates a right to money damages—and Plaintiffs' agreements create no such right. That is because the Court of Federal Claims has jurisdiction under the Tucker Act only if the plaintiff "present[s] a claim for 'actual, presently due money damages from the United States.'" *Nat'l Air Traffic Controllers Ass'n v. United States*, 160 F.3d

714, 716 (Fed. Cir. 1998) (quoting *United States v. King*, 395 U.S. 1, 3 (1969)).  And to do that—and thereby to come within the "jurisdictional reach" of the Court of Federal Claims—the plaintiff must identify a "source of substantive law" that is "money-mandating" in the sense that it "creates the right to money damages."  *Lummi Tribe*, 870 F.3d at 1317.

A contract can be such a money-mandating source—but not all contracts are.  *See, e.g., Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d 1338, 1343 (Fed. Cir. 2008) (holding that agreement there did "not provide a substantive right to recover money-damages" and that the Court of Federal Claims therefore lacked jurisdiction).  For ordinary contracts, there is a "presumption that money damages are available" because "damages are the default remedy for breach of contract."  *Holmes v. United States*, 657 F.3d 1303, 1314 (Fed. Cir. 2011) (internal quotation marks omitted).

But that presumption does not hold for all agreements.  Under the grant agreements at issue here, the recipient generally must use the awarded funds for a specified public purpose and subject to various conditions.  Moreover, cooperative agreements, by statute, are distinct from grants only in that they involve a *greater* degree of agency involvement; what holds for a cooperative agreement should be equally true for a grant.  Given the distinct features of these types of agreements, it is not fair to presume that money damages are available: money damages are a free-and-clear payment with no strings attached, so awarding them would circumvent the limitations of the agreement.[5]  Thus, when this type of agreement is involved, jurisdiction lies in the Court of Federal Claims only if there is some affirmative indication that the agreement creates a right to money damages.  *See St. Bernard*, 134 Fed. Cl. at 735.

Given these principles, Plaintiffs' grant agreements are not contracts that give rise to Tucker Act jurisdiction: they carry no presumption of a right to money damages.  The agreements provide money for Plaintiffs to carry out a public purpose and do not provide any "property or services for

---

[5] In fact, the federal government took the position in the Federal Circuit that a party who has not received grant funds to which it was entitled can never recover money damages—and that jurisdiction is not proper in the Court of Federal Claims—because that "would allow [it] to avoid the strings-attached nature of the award."  *See* Opening Br. of Def.-Appellant at 30–33, *112 Genesee St., LLC v. United States*, No. 25-1373 (Fed. Cir. Mar. 14, 2025), ECF No. 15.

the direct benefit or use" of the government, 31 U.S.C. § 6305. No provision of the agreements provides for money damages in the event of the government's breach. *See St. Bernard*, 134 Fed. Cl. at 735 (holding that cooperative agreement did not allow for money damages where no "specific provision in the agreement contemplat[ed] money damages for breach" by the federal agency). Nor is there any other basis to read the agreements as authorizing money damages in these circumstances. To the contrary, money damages would circumvent the many restrictions that the agreements impose on Plaintiffs' use of the funds, including the requirements that Plaintiffs use those funds for the public purposes for which they were intended. Because Plaintiffs' agreements cannot be read to create the "right to money damages" needed to fall within the Tucker Act's "jurisdictional reach," *Lummi Tribe*, 870 F.3d at 1317, "the Claims Court lacks jurisdiction, [and] the Tucker Act does not deprive this Court of jurisdiction." *Am. Near E. Refugee Aid*, 703 F. Supp. 3d at 134 (citing *Tootle*, 446 F.3d at 176).

### ii. Plaintiffs' claims are not contract claims.

Even if Plaintiffs' grant awards were the type of agreement that could give rise to jurisdiction in the Court of Federal Claims under the Tucker Act, Plaintiffs' claims would still not be subject to the Tucker Act because they are statutory and constitutional claims, not contract claims.

While the Tucker Act provides the Court of Federal Claims with exclusive jurisdiction over "contract claims against the government," the fact that a contract is involved is not enough to make a claim a "contract claim." *Transohio*, 967 F.2d at 609; *see, e.g.*, *Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099, 1107 (D.C. Cir. 2022) ("explicitly reject[ing] the broad notion that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act" (internal quotation marks omitted)). The question is whether the claims "are founded only on a contract, or whether they stem from a statute or the Constitution." *Transohio*, 967 F.2d at 609 (emphasis added). Whether a claim "at its essence" is contractual turns on (1) "the source of the rights" underlying the claims, and (2) "the type of relief sought (or appropriate)." *Perry Cap. LLC*, 864 F.3d at 619 (quoting *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982)). Both prongs make

clear that the Tucker Act does not apply here because Plaintiffs' claims are not contractual in nature and that this Court therefore has jurisdiction.

Courts determine the "source of the rights" at issue by reading the complaint with "an eye toward 'the true nature of the action.'" *Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, No. 1:25-cv-00702, 2025 WL 863319, at *3 (D. Md. Mar. 19, 2025) (quoting *Williams v. Roth*, No. 8:21-cv-02135, 2022 WL 4134316, at *5 (D. Md. Sept. 12, 2022)). The sources of the rights in this case are the Constitution, the Administrative Procedure Act, and the Uniform Guidance regulations. The question is not whether a contract is the source of the relationship between the parties. *See, e.g.*, *United States v. J & E Salvage Co.*, 55 F.3d 985, 988 (4th Cir. 1995). The question is whether the legal claims require the court to analyze contract terms under contract law, *see id.*, or instead to "examin[e] the federal regulations and federal statute[s] governing Plaintiffs' grant awards." *Climate United Fund v. Citibank, N.A.*, No. 1:25-cv-00698, 2025 WL 1131412, at *9 (D.D.C. Apr. 16, 2025); *Woonasquatucket*, 2025 WL 1116157, at *13

Here, Plaintiffs challenge OJP's termination of their grants as unconstitutional, *ultra vires*, contrary to law, and insufficiently explained and reasoned. Resolution of these claims will require this Court to "address clear regulatory and statutory questions" regarding OJP's termination of the grants and, ultimately, whether OJP violated the APA and the Constitution. *Id.* at *9. Plaintiffs' "claims arise under a federal grant program and turn on the interpretation of statutes and regulations rather than on the interpretation of an agreement negotiated by the parties," so the Tucker Act does not apply. *Md. Dep't of Hum. Res. v. HHS*, 763 F.2d 1441, 1449 (D.C. Cir. 1985); *see also Woonasquatucket*, 2025 WL 1116157, at *13 (finding district court jurisdiction was proper because Plaintiffs' claims "'turn[ed] on federal statute and regulations put in place by Congress' and the agencies."); *Am. Bar Ass'n v. DOJ*, No. 1:25-cv-01263, 2025 WL 1388891, at *5 (D.D.C. May 14, 2025) ("Because the source of the right underlying the ABA's First Amendment retaliation claim is the Constitution, not the cooperative agreements, its claim is not essentially a contract action.").

That regulations—here, the Uniform Guidance—are incorporated into the grants does not turn Plaintiffs' claims into contract claims. District courts cannot be divested of jurisdiction—and their ability to grant equitable relief—under the Constitution, APA, or any other statute whenever a grant incorporates that legal authority. If that were true, "the government might creatively contract their way out of judicial reviewability of its actions, shielding itself by virtue of its 'contractual relationship' with a party. That cannot be, and is not, what Congress envisioned for judicial review under the APA. Nor is it the law." *Climate United Fund*, 2025 WL 1131412, at *12.

The type of relief Plaintiffs' request—prospective, equitable relief—also suggests that this is not a contract case. Plaintiffs do not seek the ordinary contractual relief of money damages here. Nor would such relief be "appropriate"; Plaintiffs are not owed specific, calculated sums "designed to compensate for completed labors," *Maine Cmty. Health Options v. United States,* 590 U.S. 296, 327 (2020) (quoting *Bowen*, 487 U.S. at 904-05, 904 n.39). Plaintiffs have already received (or will receive) compensation for their completed labors. Instead, what Plaintiffs seek is an injunction preventing OJP from implementing, maintaining, or giving effect to unlawful grant terminations. *See Woonasquatucket*, 2025 WL 1116157, at *14 ("The Nonprofits' primary purpose in bringing their claims is to seek equitable, not monetary, relief. They do not bring claims for past pecuniary harms. Rather, like the plaintiffs in *Bowen* and *Massachusetts*, 'their claims are to preserve their ongoing and prospective' agreements with the Government. And the various harms the Nonprofits identified correspond to that relief."). And while this relief may resemble an order requiring specific performance, D.C. Circuit precedent makes clear "that a federal district court may accept jurisdiction over a *statutory or constitutional* claim for injunctive relief even where the relief sought is an order forcing the government to obey the terms of a contract—that is, specific performance." *Transohio*, 967 F.2d at 610 (emphasis added). Here, the basis for the relief is Plaintiffs' statutory and constitutional rights, not their grant agreements, so they may pursue their claims in district court even if some of the relief sought looks like specific performance. *See Am. Bar. Ass'n v. DOJ*, 2025 WL 1388891, at *6 ("That the specific

35

relief sought here—preventing the government from terminating the contract for retaliatory reasons—may result in a monetary payout does not convert it into a claim for money damages.").

      **iii. The emergency stay order in *California v. Department of Education* does not compel a different result.**

The Supreme Court's four-paragraph, *per curiam* order in *Department of Education v. California*, 145 S. Ct. 966 (2025) does not compel a different result. The Court in that case had no occasion to consider whether the grant agreements there were the type of contract that can give rise to Tucker Act jurisdiction because no party raised that issue. Whatever precedential force a one-paragraph discussion in an emergency order issued without full briefing or a hearing might otherwise have, it cannot control issues that were not presented to the Court.

The tide of post-*California* case law agrees that constitutional or statutory challenges to agency actions belong in federal district court, and not the Court of Federal Claims. *See Widakuswara v. Lake*, No. 1:25-CV-1015-RCL, 2025 WL 1166400, at *9-10 (D.D.C. Apr. 22, 2025);[6] *Climate United Fund*, 2025 WL 1131412, at *9–12; *Woonasquatucket*, 2025 WL 1116157, at *12–15; *Chi. Women in Trades v. Trump*, No. 1:25-cv-02005, 2025 WL 1114466, at *8–10 (N.D. Ill. Apr. 14, 2025); *New York v. Trump*, No. 1:25-cv-00039, 2025 WL 1098966, at *1–3 (D.R.I. Apr. 14, 2025); *Maine v. USDA*, No. 1:25-cv-00131, 2025 WL 1088946, at *14-15 (D. Me. Apr. 11, 2025); Order, *Sustainability Inst. v. Trump*, No. 2:25-cv-02152 (D.S.C. April 9, 2024), ECF No. 52; *Am. Bar. Ass'n v. DOJ*, No. 1:25-cv-01263, 2025 WL 1388891, at *5 (D.D.C. May 14, 2025).

## IV.    Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief.

Plaintiffs can establish irreparable harm by demonstrating that OJP's terminations have caused harm that is "'certain and great,' 'actual and not theoretical,' and so 'imminen[t] that there is a clear and present need for equitable relief to prevent irreparable harm.'" *League of Women Voters of U.S. v.*

---

[6] A three-judge panel of the D.C. Circuit stayed this decision. *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *1 (D.C. Cir. May 3, 2025). The D.C. Circuit, sitting *en banc*, thereafter administratively stayed the three-judge panel decision in order to give the court opportunity to consider petitions for rehearing *en banc. See Middle E. Broad. Networks, Inc., v. United States*, No. 25-5150, 2025 WL 1378735, at *1 (D.C. Cir. May 7, 2025).

*Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (alteration in original) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)).  Plaintiffs can also establish irreparable harm by demonstrating that OJP's terminations "unquestionably make it more difficult for the [Plaintiffs] to accomplish their primary mission." *League of Women Voters of U.S.*, 838 F.3d at 9.  In the grant context, irreparable harm is established where the immediate termination of grants would affect the existence of programs and the livelihoods of individuals within those programs.  *Nat'l Council of Nonprofits v. OMB*, No. 1:25-cv-00239, 2025 WL 368852, at *13 (D.D.C. Feb. 3, 2025) (finding irreparable harm to plaintiffs where programs "may simply disappear" and others would have been forced to shutter programs just to make payroll) (citation and internal quotation marks omitted).

Plaintiffs have amply established substantial and irreparable harm.  The loss of grant funding has and will continue to "have devastating effects" on Plaintiffs' projects and programs and "imminent harm is unavoidable."  *Climate United Fund*, 2025 WL 1131412, at *12, 17.  All Plaintiffs have been forced to eliminate or severely restrict critical, often life-saving services in their communities that were funded by terminated grants.  Ridini Decl. ¶¶ 25, 18a–b, 42; Kennedy Decl. ¶ 15.  This has had "devastating" impacts on the communities that Plaintiffs serve who rely on these services.  Ridini Decl. ¶ 42.  The harm from these terminations is not "theoretical" to the communities Plaintiffs serve. Kennedy Decl. ¶ 16.  "[I]n 23 hospitals across the country, individuals who directly benefitted from these intervention programs in the hospital are no longer going to have life-saving assistance, and in some cases, members in the community will lose their lives because of the disruption of services." Ridini Decl. ¶ 25.  Without a reinstatement of funding, many of these programs will have to be eliminated altogether. Sottile Decl. ¶ 18.  These terminations have devastated Plaintiffs' ability to carry out their mission, maintain programming, attract and retain qualified staff, and expand life-saving interventions urgently needed by the communities that they serve.  Ridini Decl. ¶ 52; Kennedy Decl. ¶ 26; Choi Decl. ¶¶ 25–27.  *See Sierra Club v. USDA, Rural Utils. Serv.*, 841 F. Supp. 2d 349, 358 (D.D.C. 2012) (Threats to public health establish irreparable harm.).  And although some Plaintiffs have been

able to reallocate funds from other projects to keep vital services afloat, these scarce funds must be taken from other important priorities and services.  Kennedy Decl. ¶ 12; Turner Decl. ¶ 28.

Plaintiffs have already been "forced to terminate staff."  *Am. Ass'n of Colls. for Tchr. Educ.*, 2025 WL 833917, at *23.  Kennedy Decl. ¶ 18; Sottile Decl. ¶ 15a; Choi Decl. ¶ 22b.  And Plaintiffs will be forced to lay off more staff members if their funding is not reinstated, some of whom "rely on such funding for their livelihoods."  *Am. Ass'n of Colls. for Tchr. Educ.*, 2025 WL 833917, at *23.

OJP's sudden, unexplained terminations have also severely eroded Plaintiffs' reputations and "relationship with longstanding partners," *AIDS Vaccine Advoc. Coal.*, 2025 WL 752378, at *19, that have been painstakingly built over years in their communities, and have eroded Plaintiffs' "goodwill, reputation, and relationships with employees, partners, subcontractors," *id.* at *3 n.2; *see also Whole Foods Market Grp., Inc. v. Wical Ltd P'Ship*, 288 F. Supp. 3d 176, 190 (D.D.C. 2016) (discussing harm to "reputation in the community—harm that cannot be reversed").

Finally, Plaintiffs will continue to suffer harms that cannot be fully rectified, and absent preliminary injunctive relief, the funding to which Plaintiffs are entitled may become unrecoverable if and when OJP reallocates appropriated funds to other recipients.  Indeed, OJP has told a member of Congress that "[t]he Department is committed to swiftly closing out the balance of the terminated grants and reallocating available funds through new grants."  *See* Steven Hough, Dep't of Just., Office of Legis. Affs, Letter to Sen. Charles E. Grassley (May 9, 2025), https://perma.cc/EAS7-XAHM. "[I]n cases involving government expenditures, 'once the relevant funds have been obligated, a court cannot reach them in order to award relief.'"  *Climate United Fund*, 2025 WL 1131412, at *17 (quoting *City of Houston*, 24 F.3d at 1426–27); *cf. id.* ("Any transfer, re-allocation, or re-obligation of these funds would be an irreparable loss—one that threatens the very existence of Plaintiffs' businesses.").  In order to prevent irreparable loss as a result of reallocation that Defendants have already publicly committed to, Plaintiffs request preliminary injunctive relief.

**V.    The Balance of Equities and Public Interest Weigh Heavily in Plaintiffs' Favor.**

The balance of equities and public interest prongs merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "It is well established that the Government cannot suffer harm from an injunction that merely ends an unlawful practice." *C.G.B. v. Wolf*, 464 F. Supp. 3d 174, 218 (D.D.C. 2020) (quotation marks and citations omitted). Likewise, "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148, 179 (D.D.C. 2017) (quotation marks and citation omitted). "To the contrary, there is a substantial public interest in having governmental agencies abide by the federal laws—such as the APA, as well as regulations … that govern their existence and operations." *Id.* (internal quotation marks and citations omitted). That is especially true where, as here, constitutional rights are at stake. The Constitution "is the ultimate expression of the public interest," so "government actions in contravention of the Constitution are always contrary to the public interest." *Turner v. U.S. Agency for Global Media*, 502 F. Supp. 3d 333, 386 (D.D.C. 2020) (cleaned up); *see also, e.g., Costa v. Bazron*, 456 F. Supp. 3d 126, 137 (D.D.C. 2020) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights." (internal quotation marks and citation omitted)). Thus, for the same reasons that Plaintiffs are likely to succeed on the merits, equity and the public interest require relief.

Granting preliminary relief is in the public interest because it will preserve vital services for communities most in need. This includes services for disabled victims of crime presently being turned away from vital resources to allow them to communicate with law enforcement, violence intervention programs in hospitals around the country to help severely wounded individuals and reduce the risk of retaliation upon discharge from the hospital; the provision of resources and necessary care to AAPI victims of hate crimes and violence; programs to serve young people at the highest risk of gun and gang violence that have successfully reduced fatal and non-fatal shootings. Without reinstatement of unlawfully terminated funding, individuals will not be able to access these services, individuals may lose their lives, and the public as a whole will be less safe.

Given the real and immediate harm that the public faces as a result of OJP's terminations, the equities and public interest strongly favor preliminary relief. On the other side of the ledger, the burden of an injunction on OJP would be minimal. In the context of the APA, "[t]he public interest is served when administrative agencies comply with their obligations." *Northern Mariana Islands*, 686 F. Supp. 2d at 21. An injunction would require nothing more.

## VI.    The Court Should Not Require a Bond

Federal Rule of Civil Procedure 65(c) "vest[s] broad discretion in the district court" to require bonds, *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999), including "to require no bond at all," *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020) (internal quotation marks omitted). A bond "is not necessary where requiring [one] would have the effect of denying the plaintiffs their right to judicial review of administrative action." *Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971) (collecting cases).

In enjoining unlawful funding terminations, courts in this district and across the country have declined to require plaintiffs to post bond. *See, e.g.*, *RFE/RL, Inc.*, 2025 WL 900481; *Nat'l Council of Nonprofits*, 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025); *Colorado v. HHS*, No. 1:25-cv-00121, 2025 WL 1017775, at *6 (D.R.I. Apr. 5, 2025); *Cmty. Legal Servs. in East Palo Alto v. HHS*, No. 3:25-cv-02847, 2025 WL 973318, at *4 (N.D. Cal. Apr. 1, 2025). As one such court recently held, "[i]n a case where the Government is alleged to have unlawfully withheld [large sums] of previously committed funds to countless recipients, it would defy logic—and contravene the very basis of this opinion—to hold Plaintiffs hostage for the resulting harm." *Nat'l Council of Nonprofits*, 2025 WL 597959, at *19; *see also Woonasquatucket*, 2025 WL 1116157, at *24. Plaintiffs' thus request that the Court not require a bond.

## <u>CONCLUSION</u>

For these reasons, the Court should grant Plaintiffs' motion and preliminarily enjoin OJP's terminations of Plaintiffs' grants and any actions to implement or enforce the terminations.

Dated: May 22, 2025          Respectfully submitted,

*/s/ Lisa Newman*
LISA NEWMAN*
JENNIFER FOUNTAIN CONNOLLY (D.C. BAR NO. 1019148)
CORTNEY ROBINSON (D.C. BAR NO. 1656074)
SOMIL TRIVEDI (D.C. BAR NO. 1617967)
BRIAN D. NETTER (D.C. BAR NO. 979362)
SKYE L. PERRYMAN (D.C. BAR NO. 984573)
DEMOCRACY FORWARD FOUNDATION
P.O. Box 34553
Washington, D.C. 20043
(202) 448-9090
lnewman@democracyforward.org

JOSHUA PERRY*
JOSHUA STANTON (D.C. Bar No. 90010653)
E. DANYA PERRY*
PERRY LAW
445 Park Avenue, 7th Floor
New York, NY 10022
(212) 251-2619
jperry@danyaperrylaw.com

*Counsel for Plaintiffs*

*Admission *pro hac vice* pending