**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| VERA INSTITUTE OF JUSTICE, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | Civil Action No. 1:25-CV-01643-APM |
| U.S. DEPARTMENT OF JUSTICE, *et al.*, ) | |
| ) | |
| Defendants. ) | |
| ) | |
| ) | |
| ) | |

**<u>DEFENDANTS' MOTION TO DISMISS AND MEMORANDUM IN OPPOSITION
TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>**

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

BACKGROUND ........................................................................................................ 3

LEGAL STANDARD ................................................................................................. 6

ARGUMENT ............................................................................................................. 7

I.    Plaintiffs Are Not Likely To Succeed on the Merits And The Case Should Be
      Dismissed ........................................................................................................ 7

      A.    The Court Lacks Jurisdiction Under the APA To Compel The Government
            To Pay Money Under A Contract ........................................................... 7

            1.    The source of Plaintiffs' right to funding is the grant agreements .............. 9

            2.    Plaintiffs seek a remedy which sounds in contract ................................... 11

            3.    Plaintiffs Cannot Evade *Department of Education* .................................... 12

            4.    Plaintiffs' counterarguments fail. .............................................................. 14

      B.    Plaintiffs' Constitutional Claims Fail On The Merits ........................................... 17

            1.    Plaintiffs' Fifth Amendment claims (Counts I & II) fail ........................... 18

            2.    Plaintiffs' claim that the terminations violated the separation of
                  powers and Spending, Appropriations, and Take Care Clauses
                  (Count IV) fails .................................................................................. 21

            3.    Plaintiffs' "ultra vires" claim (Count III) fails ........................................ 25

      C.    Plaintiffs' APA Claims Are Unreviewable For Independent Threshold
            Reasons And Fail On The Merits ........................................................... 26

            1.    Plaintiffs have other adequate remedies available to them ....................... 27

            2.    Grant funding decisions are committed to agency discretion by law ....... 28

            3.    The terminations are not contrary to OMB guidance .............................. 30

            4.    The terminations were not arbitrary and capricious. ............................... 32

II.   Plaintiffs Fail To Show Irreparable Harm Absent An Injunction ........................................ 33

III.  The Balance of Equities and Public Interest Disfavor Injunctive Relief ........................... 37

IV.    Any Relief Should Be Limited In Scope ........................................................................... 39

CONCLUSION........................................................................................................................ 41

# TABLE OF AUTHORITIES

**CASES**

*AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State,*
   No. 25-cv-402, 2025 WL 752378 (D.D.C. Mar. 10, 2025)................................. 37, 38

*Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.,*
   840 F. Supp. 2d 327 (D.D.C. 2012) ........................................................ 35

*Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.,*
   357 F.3d 62 (D.C. Cir. 2004) .............................................................. 8, 9

*Alphapointe v. Dep't of Veterans Affairs,*
   475 F. Supp. 3d 1 (D.D.C. 2020) ............................................................ 9

*Alvin v. Suzuki,*
   227 F.3d 107 (3d Cir.2000) ................................................................. 20

*Am. Library Ass'n v. Sonderling,*
   No. 25-cv-1050, 2025 WL 1615771 (D.D.C. June 6, 2025).................................. 13

*Am. Ass'n of Colleges For Teacher Educ. v. McMahon,*
   No. 25-1281, 2025 WL 1232337 (4th Cir. Apr. 10, 2025)................................... 13

*Am. Meat Inst. v. USDA,*
   968 F. Supp. 2d 38 (D.D.C. 2013), *aff'd*, 746 F.3d 1065 (D.C. Cir. 2014) ............. 35

*Am. Mfrs. Mut. Ins. Co. v. Sullivan,*
   526 U.S. 40 (1999)......................................................................... 18

*Am. Oversight v. U.S. Dep't of Veterans Affs.,*
   498 F. Supp. 3d 145 (D.D.C. 2020) .......................................................... 6

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009)......................................................................... 7

*Bd. of Governors of the Fed. Rsrv. Sys. v. MCorp Fin., Inc.,*
   502 U.S. 32 (1991)......................................................................... 25

*Boarhog LLC v. United States,*
   129 Fed. Cl. 130 (2016) .................................................................... 27

*Bowen v. Massachusetts,*
   487 U.S. 879 (1988)........................................................................ 27

*California v. U.S. Dep't of Educ.,*
   -- F. Supp. 3d --, 2025 WL 760825 (D. Mass. Mar. 10, 2025)................................ 12

iii

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ................................................ 34

*Church v. Biden*,
    573 F. Supp. 3d 118 (D.D.C. 2021) ........................................ 34

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ................................................................ 33

*Clinton v. Jones*,
    520 U.S. 681 (1997) ................................................................ 24

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
    38 F.4th 1099 (D.C. Cir. 2022) .............................. 8, 9, 11, 28

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332 (2006) .................................................................. 8

*Dallas Safari Club v. Bernhardt*,
    453 F. Supp. 3d 391 (D.D.C. 2020) .................................. 36, 37

*Dalton v. Specter*,
    511 U.S. 462 (1994) ................................................................ 25

*D'Andrea Bros. LLC v. United States*,
    96 Fed. Cl. 205 (Fed. Cl. 2010) ............................................. 16

*Department of Education v. California*,
    604 U.S. ---, 145 S. Ct. 966 (2025) .................................. *passim*

*Dep't of Com. v. New York*,
    588 U.S. 752 (2019) ................................................................ 33

*Diaz v. Neighbors Consejo*,
    77 F. Supp. 3d 227 (D.D.C. 2015) ........................................... 7

*English v. District of Columbia*,
    815 F. Supp. 2d 254 (D.D.C.2011) ........................................ 20

*FCC v. Prometheus Radio Project*,
    592 U.S. 414 (2021) ................................................................ 32

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) ................................................................ 24

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ................................................................ 28

*Franklin-Mason v. Mabus,*
   742 F.3d 1051 (D.C. Cir. 2014) ........................................................................................ 8

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
   561 U.S. 477 (2010) ........................................................................................................ 24

*Fund for Animals v. Frizzell,*
   530 F.2d 982 (D.C. Cir. 1975) ........................................................................................ 37

*Garcia v. Vilsak,*
   563 F.3d 519 (D.C. Cir. 2009) ........................................................................................ 27

*Gill v. Whitford,*
   585 U.S. 48 (2018) .......................................................................................................... 39

*Grayned v. City of Rockford,*
   408 U.S. 104 (1972) ........................................................................................................ 20

*Greater New Orleans Hous. Action Ctr. v. U.S. Dep't of Hous. & Urb. Dev.,*
   639 F.3d 1078 (D.C. Cir. 2011) ........................................................................................ 7

*Great-West Life & Annuity Ins. Co. v. Knudson,*
   534 U.S. 204 (2002) ............................................................................................. 8, 12, 17

*Gulf Grp. Gen. Enters. Co. W.L.L. v. United States,*
   114 Fed. Cl. 258 (2013) .................................................................................................. 27

*Haaland v. Brackeen,*
   599 U.S. 255 (2023) ................................................................................................. 24, 38

*Hanson v. District of Columbia,*
   120 F.4th 223 (D.C. Cir. 2024), *cert. denied*, 2025 WL 1603612 (U.S. June 6, 2025) ............. 7

*Heckler v. Chaney,*
   470 U.S. 821 (1985) ........................................................................................................ 29

*Hein v. Freedom From Religion Found, Inc.,*
   551 U.S. 587 (2007) ........................................................................................................ 29

*Hettinga v. United States,*
   677 F.3d 471 (D.C. Cir. 2012) ................................................................................... 7, 18

*Hi-Tech Pharmacal Co. v. FDA,*
   587 F. Supp. 2d 1 (D.D.C. 2008) ................................................................................... 34

*Holmes v. United States,*
   657 F.3d 1303 (Fed. Cir. 2011) ...................................................................................... 15

*Humana of S.C., Inc. v. Califano,*
  590 F.2d 1070 (D.C .Cir. 1978) ............................................................ 21

*In re Aiken County,*
  725 F.3d 255 (D.C. Cir. 2013) ........................................................ 22, 23

*Ingersoll-Rand Co. v. United States,*
  780 F.2d 74 (D.C. Cir. 1985) ...................................................... 9, 11, 26

*Jenkins v. Howard Univ.,*
  123 F.4th 1343 (D.C. Cir. 2024) ............................................................ 8

*Jones & Assocs., Inc. v. District of Columbia,*
  797 F. Supp. 2d 129 (D.D.C. 2011) ...................................................... 18

*Keepseagle v. Vilsack,*
  815 F.3d 28 (D.C. Cir. 2016) ................................................................. 6

*Kidwell v. Dep't of Army, Bd. for Corr. of Mil. Recs.,*
  56 F.3d 279 (D.C. Cir. 1995) ............................................................... 28

*Laffey v. Northwest Airlines, Inc.,*
  567 F.2d 429 (D.C. Cir. 1976) ............................................................. 20

*Lance v. Coffman,*
  549 U.S. 437 (2007).............................................................................. 24

*Lincoln v. Vigil,*
  508 U.S. 182 (1993)................................................................... 28, 29, 30

*Madsen v. Women's Health Ctr., Inc.,*
  512 U.S. 753 (1994).............................................................................. 39

*Marine Mammal Conservancy v. Dep't of Agriculture,*
  134 F.3d 409 (D.C. Cir. 1998) ......................................................... 20, 21

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
  567 U.S. 209 (2012)................................................................................ 8

*McGee v. United States,*
  402 U.S. 479 (1971).............................................................................. 20

*Megapulse, Inc. v. Lewis,*
  672 F.2d 959 (D.C. Cir. 1982) ...................................................... *passim*

*Morrison v. Olson,*
  487 U.S. 654 (1988).............................................................................. 24

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ................................................................. 32

*N. Am. Butterly Ass'n v. Wolf*,
    977 F.3d 1244 (D.C. Cir. 2020) ............................................. 26

*National Endowment for the Arts v. Finley*,
    524 U.S. 569 (1998) .......................................................... 19, 20

*Nat'l Urb. League v. Trump*,
    No. 25-cv-471, 2025 WL 1275613 (D.D.C. May 2, 2025) ................... 19

*Nat'l Treasury Emps. Union v. Trump*,
    No. 25-5157, 2025 WL 1441563 n.4 (D.C. Cir. May 16, 2025) ........... 39

*Neb. Dep't of Health & Hum. Servs. v. Dep't of Health & Hum. Servs.*,
    435 F.3d 326 (D.C. Cir. 2006) ............................................. 39

*New Mexico v. Musk*,
    ---F. Supp. 3d---, 2025 WL 520583 (D.D.C. Feb. 18, 2025) ............. 34

*New Vision Photography Program, Inc. v. District of Columbia*,
    54 F. Supp. 3d 12 (D.D.C. 2014) ....................................... 18, 19, 21

*Nken v. Holder*,
    556 U.S. 418 (2009) ......................................................... 40

*Northrop Grumman Corp. v. United States*,
    46 Fed. Cl. 622 (Fed. Cl. 2000) .......................................... 20

*Off. of Pers. Mgmt. v. Richmond*,
    496 U.S. 414 (1990) ........................................................ 21, 22

*Open Top Sightseeing USA v. Mr. Sightseeing, LLC*,
    48 F. Supp. 3d 87 (D.D.C. 2014) ........................................ 37

*Perry Cap. LLC v. Mnuchin*,
    864 F.3d 591 (D.C. Cir. 2017) ........................................... 9, 27

*Premoh v. City of Cincinnati*,
    No. 15-cv-265, 2016 WL 451357 (S.D. Ohio Feb. 4, 2016) ............. 38

*Printz v. United States*,
    521 U.S. 898 (1997) ........................................................ 24

*Quiman, S.A. de C.V. v. United States*,
    No. 98-5036, 1999 WL 44182 (Fed. Cir. Jan. 21, 1999) ............. 14, 15

*Randolph–Sheppard Vendors of Am. v. Weinberger,*
  795 F.2d 90 (D.C. Cir. 1986) ................................................................ 21

*Rick's Mushroom Service, Inc. v. United States,*
  521 F.3d 1338 (Fed. Cir. 2008) ........................................................... 16

*Safari Club Int'l v. Jewell,*
  47 F. Supp. 3d 29 (D.D.C. 2014), *appeal dismissed,*
  2014 WL 5838221 (D.C. Cir. Nov. 7, 2014) ........................................ 35

*San Antonio Hous. Auth. v. United States,*
  143 Fed. Cl. 425 (Fed. Cl. 2019) .................................................... 16, 17

*San Juan City Coll. v. United States,*
  391 F.3d 1357 (Fed. Cir. 2004) ........................................................... 15

*Sanders v. United States,*
  252 F.3d 1329 (Fed. Cir. 2001) ........................................................... 15

*Solutions in Hometown Connections v. Noem,*
  No. 8:25-cv-885, 2025 WL 1103253 (D. Md. Apr. 14, 2025) ............... 13

*Spectrum Leasing Corp. v. United States,*
  764 F.2d 891 (D.C. Cir. 1985) ............................................... 10, 11, 28

*St. Bernard Parish Government v. United States,*
  134 Fed. Cl. 730 (Fed. Cl. 2017), *aff'd on other grounds,*
  916 F.3d 987 (Fed. Cir. 2019) ....................................................... 16, 17

*St. Croix Chippewa Indians of Wis. v. Kempthorne,*
  535 F. Supp. 2d 33 (D.D.C. 2008) ....................................................... 34

*Suburban Mortg. Assocs., Inc. v. Dep't of Hous. & Urb. Dev.,*
  480 F.3d 1116 (Fed. Cir. 2007) ........................................................... 18

*Sustainability Inst. v. Trump,*
  No. 25-1575, 2025 WL 1587100 (4th Cir. June 5, 2025) ................. 13, 17

*Train v. City of N.Y.,*
  420 U.S. 35 (1975) .............................................................................. 22

*Transohio Sav. Bank v. Dir., Off. of Thrift Supervision,*
  967 F.2d 598 (D.C. Cir. 1992) ............................................................. 11

*U.S. Conf. of Cath. Bishops v. U.S. Dep't of State,*
  --- F. Supp. 3d ---, 2025 WL 763738 (D.D.C. Mar. 11, 2025),
  *dismissed,* 2025 WL 1350103 (D.C. Cir. May 2, 2025) ......... 11, 13, 28, 37

*United States v. President & Fellows of Harvard Coll.*,
    323 F. Supp. 2d 151 (D. Mass. 2004) ................................................. 15

*United States v. Winstar Corp.*,
    518 U.S. 839 (1996) .............................................................................. 15

*Wallace v. Lynn,*
    507 F.2d 1186 (D.C. Cir. 1974) ........................................................... 20

*Widakuswara v. Lake*,
    No. 25-5150, 2025 WL 1288817 (D.C. Cir. May 3, 2025) ............... 13, 14

*Wilson v. Pena,*
    79 F.3d 154 (D.C. Cir. 1996) ............................................................... 20

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ................................................................................... 7

*Wis. Gas Co. v. Fed. Energy Regul. Co.*,
    758 F.2d 669 (D.C. Cir. 1985) ........................................................ 34, 35

## STATUTES

5 U.S.C. § 701 ................................................................................ 26, 28

5 U.S.C. § 702 .......................................................................................... 8

5 U.S.C. § 704 ................................................................................ 26, 27

5 U.S.C. § 706 ........................................................................................ 30

20 U.S.C. § 954 ...................................................................................... 19

28 U.S.C. § 530c .................................................................................... 29

28 U.S.C. § 1491 ................................................................................ 8, 16

34 U.S.C. § 20103 .................................................................................... 4

42 U.S.C. § 10134 .................................................................................. 23

Government Performance and Results Act,
    Pub. L. No 103-62, 107 Stat. 285 (1993) ............................................ 14

Bipartisan Safer Communities Act,
    Pub. L. No. 117-159, 136 Stat. 1313 (2022) .......................................... 4

Consolidated Appropriations Act, 2024,
    Pub. L. No. 118-42, 138 Stat. 25 ........................................................... 4

ix

## RULES

Fed. R. App. P. 8 ................................................................................................ 40

Fed. R. Civ. P. 12 ............................................................................................ 6, 7

Fed. R. Civ. P. 65 ............................................................................................. 39

## REGULATIONS

2 C.F.R. § 200.340 ................................................................................. *passim*

2 C.F.R. § 200.341 ............................................................................................ 33

2 C.F.R. § 2800.101 ...................................................................................... 4, 31

Guidance for Federal Financial Assistance,
    89 Fed. Reg. 30,046 (Apr. 22, 2024) ............................................... 30, 32

## UNITED STATES CONSTITUTION

U.S. Const. art. I, § 9 ....................................................................................... 21

U.S. Const. art. II, § 3 ................................................................................. 21, 24

## OTHER AUTHORITIES

2 Richard J. Pierce Jr., *Administrative Law Treatise* (5th ed. 2010) ............................................. 18

GAO, Principles of Federal Appropriations Law, ch. 5 (4th ed., 2016 rev.) ............................... 22

https://www.ojp.gov/about ............................................................................... 3

## INTRODUCTION

Plaintiffs accuse the Department of Justice (DOJ) of blindly terminating various grant agreements "en masse" so that it can avoid spending congressionally appropriated funds. These accusations are unfounded and wrong. Rather, DOJ in February 2025 began reviewing several thousand competitive, discretionary grants to assess whether those grants aligned with current agency priorities. Each grant was reviewed carefully and individually. At the end of this meticulous review process, DOJ decided to terminate 376 grant agreements—a small fraction of its more than 11,000 open awards. The funds allocated under those agreements are legally available until expended, and DOJ intends to re-obligate them for new projects that more directly advance agency priorities. In these circumstances, there is no legal basis for the Court to order DOJ to restore lawfully terminated grants and keep paying for programs that the Executive Branch views as inconsistent with the interests of the United States.

This suit seeks injunctive relief requiring the reinstatement of grant agreements between Plaintiffs and DOJ's Office of Justice Programs (OJP) (*i.e.*, specific performance). Though Plaintiffs invoke the Constitution, statutes, and regulations as ostensible bases for a claimed right to continue to access million of dollars in grants that DOJ has terminated, none of those authorities compels DOJ to make or maintain *these* grants to *these* Plaintiffs. At most, those authorities direct DOJ to re-obligate the funds for statutorily specified purposes, which DOJ has stated it will do. Plaintiffs' claims for relief are instead necessarily dependent on their assertion that the grant agreements provide a right to continued funding, and that the government's termination of those grants breached terms of their agreements. In short, this is just a run-of-the mill contract dispute between the government and private parties.

Because all of Plaintiff's claims stem from grant agreements with the government and seek relief that is quintessentially contractual, this suit belongs in the Court of Federal Claims. The Supreme Court's recent decision in *Department of Education v. California*, 604 U.S. ---, 145 S. Ct. 966 (2025) (per curiam), is controlling. In a case challenging the government's termination of federal grants, the Supreme Court held that "the Government [was] likely to succeed in showing

[that] the District Court lacked jurisdiction to order the payment of money under the [Administrative Procedure Act]" because the Tucker Act vests exclusive jurisdiction over such actions in the Court of Federal Claims. *Id.* at 968. This was no innovation; the D.C. Circuit has long recognized that district courts lack jurisdiction over claims against the government that are fundamentally contractual—even when such claims are dressed up in constitutional, statutory, or regulatory garb. *See, e.g.*, *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967 (D.C. Cir. 1982). Otherwise, the Tucker Act's jurisdictional limits could be easily evaded through a plaintiff's artful pleading.

Even if the Court could reach Plaintiffs' constitutional and APA claims, each claim fails on its own terms and should be dismissed.

*First*, Plaintiffs' procedural due process claim (Count I) fails because Plaintiffs had no constitutionally protected property interest in continued grant funding under the agreements. Government contracts do not create property interests protected by due process; rather, the process to which a plaintiff is due is a post-deprivation suit (here, in the Court of Federal Claims) for breach of contract.

*Second*, Plaintiffs' void-for-vagueness claim (Count II) lacks merit because the Supreme Court has squarely held that there is no constitutional guarantee of clarity in grant or contract criteria.

*Third*, Plaintiffs' claim that the terminations violated the separation of powers, Spending, Appropriations, and Take Care clauses (Count IV) is foreclosed by DOJ's representation that is will re-obligate remaining funds in a manner consistent with statutory and regulatory directives. Regardless, this claim suffers from several other independent flaws.

*Fourth*, Plaintiffs' "*ultra vires*" claim (Count III) must be dismissed because such a claim is precluded where there is a meaningful and adequate means of vindicating a plaintiff's rights— here, a contract action in the Court of Federal Claims.

*Fifth*, Plaintiffs' APA claims (Count V and VI) are unreviewable for two independent reasons: Plaintiffs have adequate alternative remedies available to them and, separately, decisions

2

to discontinue grant funding based on changed agency priorities are committed to agency discretion by law.

*Sixth*, the APA counts also fail on the merits. Plaintiffs' claim that the terminations were in violation of law and the Constitution (Count V) go nowhere because DOJ followed applicable regulations when exercising its contractual rights to terminate agreements that no longer advance agency priorities. And Plaintiffs' arbitrary and capricious claim (Count VI) lacks merit because DOJ terminated each grant after careful, individualized review, and it adequately explained its decisions in each termination notice.

*Last*, even if any of Plaintiffs' claims could survive dismissal, Plaintiffs have not established the remaining factors required for injunctive relief. Plaintiffs cannot show irreparable harm when they merely complain of financial harms that could be redressed if they succeed on a breach suit in the Court of Federal Claims. Moreover, their claims of irreparable injury are inconsistent with their unexplained decision to wait a month or more before seeking this Court's intervention, and their choice to thrust an emergency motion on this Court instead of proceeding through OJP's administrative appeal process. And the remaining factors tip in the government's favor, as the Supreme Court's recent grant of a stay in *Department of Education* establishes.

For these reasons, Plaintiffs' complaint should be dismissed in its entirety and their motion for preliminary injunction should be denied.

## BACKGROUND

### A.      OJP Grant Funding and Grant Agreements

OJP is the DOJ component that houses its criminal and juvenile justice-related science, statistics, and programmatic offices, and it is the largest grantmaking component of the Department. *See* https://www.ojp.gov/about. Among other ways, OJP advances DOJ's mission in part by making thousands of discretionary, competitive grant agreements (*i.e.*, contracts) with state and local law enforcement agencies, as well as with community-based and other non-governmental entities. *See* Decl. of Maureen A. Henneberg ¶ 4 (Exhibit 1).

Generally speaking, DOJ funds its OJP grant agreements through two sources. First,

substantial sums are appropriated directly to OJP through annual appropriations acts. *See, e.g.*, Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, 138 Stat. 25, 145 (appropriating OJP $2.47 billion for state and local law enforcement assistance); Bipartisan Safer Communities Act, Pub. L. No. 117-159, 136 Stat. 1313, 1339 (2022) (appropriating OJP $1.4 billion for same); Henneberg Decl. ¶ 17. These appropriations acts broadly dictate for what purposes OJP must use appropriated funds, earmarking sums for various purposes and initiatives. *See, e.g.*, 138 Stat. at 146 ("$10,000,000 is for a grant program for State and local law enforcement to provide officer training on responding to individuals with mental illness or disabilities"); 136 Stat. at 1339 ("$200,000,000 shall be for grants administered by [OJP component] Bureau of Justice Assistance for purposes authorized under the STOP School Violence Act of 2018"). Besides funds from annual appropriations, DOJ also awards grants using money permanently appropriated to OJP from the Crime Victims Fund. *See* 34 U.S.C. § 20103(c)(1)(A); Henneberg Decl. ¶17.

For discretionary grantmaking, appropriations acts generally do not prescribe the scope or format of particular grants or earmark funds for specific entities or localities. Rather, within the broad categories established by such acts, the Department has discretion to decide to what entities grants should be awarded, what programs should be funded, and what form those grant awards should take. *See* Henneberg Decl. ¶ 5. As relevant here, the Department regularly exercises that discretion through a competitive application process that identifies projects that are consistent with the law and the Department's priorities. *See id.*

The Department also has discretion to terminate grants agreements that no longer advance agency priorities. The Office of Management and Budget (OMB) Uniform Guidance for Federal Financial Assistance, which DOJ has adopted through its own regulation, *see* 2 C.F.R. § 2800.101, provides that an "award may be terminated in part or in its entirety . . . pursuant to the terms and conditions of the Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." *Id.* § 200.340(a)(4).

Grant recipients are on notice of this discretion. After being selected to enter a grant agreement, OJP sends an "Award Instrument" (*i.e.*, a letter) to the recipient that includes the

"Award Offer" and "Award Conditions." Decl. of Cynthia Choi at 21, Ex. 2, ECF No. 11-4 (illustrative award letter)[1]; *see* Henneberg Decl. ¶ 6. One condition is that "[t]he Uniform Administrative Requirements, Cost Principles, and Audit Requirements in 2 C.F.R. Part 200 . . . apply." ECF No. 11-4 at 26; *see* Henneberg Decl. ¶ 11. Another is that OJP may rely on "a condition incorporated by reference" to "tak[e] appropriate action," including suspending or terminating the award. ECF No. 11-4 at 25. Of course, like any contract, the "Award Offer" requires acceptance. *See* Henneberg Decl. ¶ 6. Each award instrument thus includes a section titled "Award Acceptance." *E.g.*, ECF No. 11-4 at 26. For a grant award to become effective, a legally authorized representative must electronically sign and accept the award offer through OJP's online grants management platform. *See* Henneberg Decl. ¶¶ 6, 12.

## B.    DOJ Terminated Grants That No Longer Advance Agency Priorities

DOJ and its components are committed to harnessing resources effectively and efficiently, and to using those resources to best accomplish agency priorities. Thus, in February 2025, Department leadership, in conjunction with OJP, began a careful review of open OJP grant awards to, consistent with its regulatory authority, determine if the award agreements align with and advance agency priorities—specifically, to directly support law enforcement operations, combat violent crime, protect American children, support American victims of trafficking and sexual assault, and enhance coordination among law enforcement at all levels of government. *See* Henneberg Decl. ¶ 18. At that time, there were more than 11,000 open OJP awards. *Id.*

The grant review process consisted of individualized consideration of whether, based on the grant's project description, the award advanced agency priorities as articulated by Department leadership over the course of the process. *See id.* Within a few weeks of the start of the review process, the number of awards under active focus by Department leadership had dropped to approximately 2,200. *See id.* By the end, the Department determined that 376 active OJP

---

[1] Unlike the other Plaintiffs, Plaintiff Center for Children and Youth Justice did not include the full award letters as exhibits. For completeness, Defendants have attached the full award letters as Defendants' exhibits 2 and 3.

discretionary grants no longer effectuated DOJ priorities.  *See id.* ¶ 19.  Those awards thus were terminated under 2 C.F.R. § 200.340(a)(4), and each terminated grant recipient was sent a notice explaining its decision, as well as the regulatory and contractual basis for termination.  *See id.* ¶¶ 19–20.  Each such recipient was provided a right to file an administrative appeal within 30 days contesting any "disputed factual, legal or other issues" and afforded an opportunity to seek a waiver of the 30-day deadline.  *E.g.*, ECF No. 11-4 at 41 (illustrative termination letter); Henneberg Decl. ¶ 22.

The termination notices were sent between April 4 and April 22.  *See* Henneberg Decl. ¶ 19.  On May 21, a group of five non-profit organizations that had grant agreements terminated by DOJ filed this suit.  *See* Compl., ECF No. 8.  None had filed an administrative appeal, nor had any sought a waiver of the deadline within which to file an appeal.  *See* Henneberg Dec. ¶ 23.  The next day, Plaintiffs moved for a preliminary injunction seeking relief from those terminations.  *See* Pls.' Mot. for Prelim. Inj., ECF No. 11; Pls.' Mem. in Supp. Of Their Mot. for a Prelim. Inj., ECF No. 11-1 (Mot.).  Plaintiffs also moved to certify a class of all entities in the United States who had a grant terminated by DOJ in April 2024 under 2 C.F.R. § 200.340(a)(4).  *See* Pls.' Mot. & Mem. of Law in Supp. of Mot. for Class Certification, ECF No. 10.

## LEGAL STANDARD

Federal courts "are courts of limited jurisdiction," and "[i]t is axiomatic that a court must have jurisdiction before it can hear any argument on the merits." *Keepseagle v. Vilsack*, 815 F.3d 28, 32, 36 (D.C. Cir. 2016) (citation omitted).  Federal Rule of Civil Procedure 12(b)(1) allows a defendant to move to dismiss a complaint for "lack of subject-matter jurisdiction."  Fed. R. Civ. P. 12(b)(1).  A "facial" challenge to a court's jurisdiction, like the one Defendants bring here, "contests the legal sufficiency of the jurisdictional allegations contained in the complaint." *Am. Oversight v. U.S. Dep't of Veterans Affs.*, 498 F. Supp. 3d 145, 152 (D.D.C. 2020). The court accepts such factual allegations as true and "construe[s] 'the complaint in the light most favorable to the non-moving party.'" *Id.* (citation omitted).  And if those allegations fail to establish that the

court has jurisdiction, "dismissal is required as a matter of law." *Diaz v. Neighbors Consejo*, 77 F. Supp. 3d 227, 229 (D.D.C. 2015); *see* Fed. R. Civ. P. 12(h)(3).

To withstand a motion to dismiss for failure to state a claim, *see* Fed. R. Civ. P. 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "[N]or must [a] court accept legal conclusions cast as factual allegations." *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012). Rather, a court must disregard "pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth" and determine whether the remaining "well-pleaded factual allegations . . . plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain a preliminary injunction, the moving party must make a "clear showing" that (1) it is "likely to succeed on the merits," (2) it is "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [the party's] favor," and (4) "issuing 'an injunction is in the public interest.'" *Hanson v. District of Columbia*, 120 F.4th 223, 231 (D.C. Cir. 2024) (citation omitted), *cert. denied*, 2025 WL 1603612 (U.S. June 6, 2025). That Plaintiffs are unlikely to succeed on the merits of their claims is sufficient on its own to deny their request for preliminary relief. *See Greater New Orleans Hous. Action Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*, 639 F.3d 1078, 1089 (D.C. Cir. 2011).

## ARGUMENT

I.    **Plaintiffs Are Not Likely To Succeed on the Merits And The Case Should Be Dismissed**

A.    **The Court Lacks Jurisdiction Under the APA To Compel The Government To Pay Money Under A Contract**

Plaintiffs' claims should be dismissed at the threshold because, as the Supreme Court recently confirmed, district courts lack jurisdiction under the APA "to enforce . . . contractual obligation[s] to pay money" against the federal government. *Dep't of Educ.*, 145 S. Ct. at 968

(quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)).  Rather, "the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'"  *Id.* at 968–69 (quoting 28 U.S.C. § 1491(a)(1)).  That jurisdictional principle applies with equal force to any such obligations created by the terminated grant agreements in this case.

"[T]he party asserting federal jurisdiction . . . has the burden of establishing it."  *Jenkins v. Howard Univ.*, 123 F.4th 1343, 1347 (D.C. Cir. 2024) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006)).  For a plaintiff "bring[ing] a claim against the United States," carrying that jurisdictional burden requires "identify[ing] an unequivocal waiver of sovereign immunity." *Franklin-Mason v. Mabus*, 742 F.3d 1051, 1054 (D.C. Cir. 2014).  Plaintiffs assert claims under the APA, *see* Compl. ¶¶ 116–34, which "provide[s] a limited waiver of sovereign immunity for claims against the United States 'seeking relief other than money damages' for persons 'adversely affected or aggrieved by agency action.'"  *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1105–06 (D.C. Cir. 2022) (quoting 5 U.S.C. § 702).  "But even for claims that are not for money damages, the APA confers no 'authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'" *Albrecht v. Comm. on Emp. Benefits of the Fed. Rsrv. Emp. Benefits Sys.*, 357 F.3d 62, 67 (D.C. Cir. 2004) (quoting 5 U.S.C. § 702).  This "important carveout" to the APA's sovereign immunity waiver "prevents plaintiffs from exploiting" that waiver "to evade limitations on suit contained in other statutes."  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 215 (2012).

Here, Plaintiffs' attempt to use the APA to compel the federal government to continue to provide funding under the terms of the terminated grant agreements is "impliedly forbid[den]," 5 U.S.C. § 702, by the Tucker Act, 28 U.S.C. § 1491(a)(1)—which provides for judicial review of "any express or implied contract with the United States," *Dep't of Educ.*, 145 S. Ct. at 968 (quoting 28 U.S.C. § 1491(a)(1)).  As the D.C. Circuit has explained, "the Tucker Act . . . 'impliedly forbid[s]' contract claims against the government from being brought in district court under . . .

the APA." *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 618–19 (D.C. Cir. 2017) (citing *Albrecht*, 357 F.3d at 67–68). Thus—regardless of how a claim is styled—a district court lacks jurisdiction over that claim if it "is in 'its essence' contractual." *Id.* at 619 (quoting *Megapulse*, 672 F.2d at 967).

That jurisdictional barrier exists for good reasons. It ensures that contract claims against the federal government are channeled into a court "that possesses expertise in questions of federal contracting law." *Alphapointe v. Dep't of Veterans Affairs*, 475 F. Supp. 3d 1, 11 (D.D.C. 2020); *see also, e.g.*, *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 78 (D.C. Cir. 1985). And it respects Congress's deliberate choice to limit the remedies available for such claims. *See Megapulse*, 672 F.2d at 971. Relevant here, a plaintiff "cannot maintain a contract action in either the district court or the Court of Claims seeking specific performance of a contract." *Id.*; *see Ingersoll-Rand* at 79–80.

Determining whether a claim "is 'at its essence' contractual"—and therefore falls outside of the APA's waiver of sovereign immunity—"depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)." *Crowley*, 38 F.4th at 1106 (quoting *Megapulse*, 672 F.2d at 968). Applying this two-pronged test here confirms that Plaintiffs' claims amount to the very sort of contractual claims for monetary relief against the federal government over which this Court lacks jurisdiction. Those claims are premised on contracts with the government, challenge the government's exercise of express contractual rights, and seek to compel the government to continue paying money under those contracts. This case thus belongs in the Court of Federal Claims.

### 1. The source of Plaintiffs' right to funding is the grant agreements

The source of rights underlying Plaintiffs' claims are their grant agreements. These agreements are prototypical contracts: they set out obligations that Plaintiffs must accept and fulfill in exchange for consideration from the government. ECF No. 11-4 at 21 ("Should you accept the award and then fail to comply with an award requirement, DOJ will pursue appropriate remedies for non-compliance, which may include termination of the award and/or a requirement to repay

award funds." (excerpt of illustrative award letter)); *see* Henneberg Decl. ¶¶ 6, 12.  And Plaintiffs'
claims are effectively based on an alleged right to continued funding under the various grant
agreements.  The theories of standing, relief, and irreparable harm that Plaintiffs assert hinge
entirely on contractual routing of future funding to them as provided for in the grant agreements.
*See, e.g.*, Mot. at 1 ("The termination of Plaintiffs' grants had an immediate and irreparable impact
on Plaintiff organizations"); *id.* at 2 (requesting relief enjoining "terminations of Plaintiffs'
grants"); *id.* at 23 (arguing they have a "protected property interest in their grant funding").  And
deciding whether DOJ breached those contracts by unlawfully terminating Plaintiffs' funding
under the Uniform Guidance points right back to the terms and conditions of each contract—as
Plaintiffs concede that "the Uniform Guidance [is] incorporated into the grants." *Id.* at 35.

Plaintiffs argue that "[t]he sources of the rights in this case are the Constitution, the [APA],
and the Uniform Guidance regulations" because they claim that the terminations violate those
laws. *Id.* at 34.  This is wrong.  None of those authorities in any way mandates that any funds be
allocated to Plaintiffs specifically.  Only the grant agreements could do that.  In short, the "ultimate
source of [Plaintiffs'] rights" is the grant agreements.  *Spectrum Leasing Corp. v. United States*,
764 F.2d 891, 895 (D.C. Cir. 1985).  Plaintiffs have no colorable claim to any future funding
whatsoever absent those contracts.

Plaintiffs' contrary position is untenable as a matter of law and logic.  Under Plaintiffs'
reasoning, all contract-related actions or terminations could be pleaded as statutory or
constitutional claims—not contract claims—and proceed in district court.  For example, Plaintiffs'
Fifth Amendment claim, which alleges they did not receive sufficient process before termination,
*see* Compl. ¶¶ 85–86, could seemingly be brought any time the government terminates a contract.
Such artful pleading is insufficient to evade the Tucker Act.  Accepting this view would create a
complete end-run around the exclusive jurisdiction of the Court of Federal Claims.  The Supreme
Court, like the D.C. Circuit before it, has unequivocally rejected such a maneuver as error.  *See*
*Dep't of Educ.*, 145 S. Ct. at 968–69; *Megapulse*, 672 F.2d at 967 & n.34 (explaining that

permitting APA review of contractual claims "would ultimately result in the demise of the Court of Claims").

For this reason, *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598 (D.C. Cir. 1992), does not help Plaintiffs.  *See* Mot. at 35.  That case recognizes that the Tucker Act does not impliedly forbid a constitutional or statutory claim where the asserted constitutional or statutory right exists independently of a contract right.  *Transohio*, 967 F.2d at 610.  The problem for Plaintiffs, however, is that their statutory and constitutional claims are merely a repackaging of their contract claims; they have no statutory or constitutional right to the funding that pre-exists the execution of the grant agreements.  In this sense, this case is like *Spectrum Leasing* and *Ingersoll-Rand*, where the D.C. Circuit held that plaintiffs could not avoid the Tucker Act's limitations by simply describing their contract claims in constitutional or statutory terms. *Ingersoll-Rand*, 780 F.2d at 77–79; *Spectrum Leasing*, 764 F.2d at 894.

### 2.  Plaintiffs seek a remedy which sounds in contract

The relief Plaintiffs seek only confirms that their claims are essentially contractual in nature.  *See Crowley*, 38 F.4th at 1110 ("We turn next to 'the type of relief sought.'").  Indeed, courts have found this factor "dispositive."  *U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*, --- F. Supp. 3d ---, 2025 WL 763738, at *4–*8 (D.D.C. Mar. 11, 2025), *dismissed*, 2025 WL 1350103 (D.C. Cir. May 2, 2025).  In *Catholic Bishops*, for example, it was determinative that "[t]he nature of the relief the Conference seeks"—an "order [that] the Government . . . stop withholding the money due under the Cooperative Agreements"—"'sounds in contract.'"  *Id.* at *5.  So too here. Plaintiffs request "an injunction preventing OJP from implementing, maintaining, or giving effect to unlawful grant terminations"—*i.e.*, an order that the government keep paying money due under the agreements.  Mot. at 35.  In other words, "[s]tripped of its equitable flair," Plaintiffs "seek[] the classic contractual remedy of specific performance."  *Cath. Bishops*, 2025 WL 763738, at *5 (quoting *Spectrum Leasing*, 764 F.2d at 894).  And a request for an order that the government "must perform" on its contract "must be resolved by the Claims Court."  *Ingersoll-Rand*, 780 F.2d at 80.

11

### 3.    Plaintiffs Cannot Evade *Department of Education*

Any lingering doubts as to whether this Court has jurisdiction to hear Plaintiffs' contract-based claims have since been dispelled by the Supreme Court's recent order in *Department of Education v. California*, 145 S. Ct. 966 (2025) (per curiam).  In *Department of Education*, a district court had issued a TRO "enjoining the Government from terminating various education-related grants" and "requir[ing] the Government to pay out past-due grant obligations and to continue paying obligations as they accrue," *id.* at 968, after that court concluded, in relevant part, that the plaintiff grant recipients were likely to succeed on their claim that the government's termination decision was arbitrary and capricious under the APA.  *See California v. U.S. Dep't of Educ.*, -- F. Supp. 3d --, 2025 WL 760825, at *3 (D. Mass. Mar. 10, 2025).  The Supreme Court stayed the district court's TRO, however, after determining, among other things, that "the Government [was] likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." *Dep't of Educ.*, 145 S. Ct. at 968.  More specifically, the Supreme Court explained that "the APA's limited waiver of sovereign immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court [had] ordered." *Id.* (quoting *Great-West*, 534 U.S. at 212).  "Instead," according to the Supreme Court, "the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.*

*Department of Education* further underscores that this Court lacks jurisdiction over Plaintiffs' contract-based claims here.  Like the *Department of Education* plaintiffs, Plaintiffs seek relief from the termination of grant under which they received federal funding.  Like the *Department of Education* plaintiffs, Plaintiffs challenge that termination decision under the APA, including on the ground that the termination is arbitrary and capricious.  And like the district court in *Department of Education*, this Court too "lack[s] jurisdiction . . . under the APA" to compel Defendants "to pay money" under the grant agreements. *Dep't of Educ.*, 145 S. Ct. at 968.

This Court should accordingly dismiss Plaintiffs' claims for lack of jurisdiction, which would be consistent with what other courts have done in similar cases involving government grants

or contracts in accordance with the Supreme Court's reasoning in *Department of Education*. *See Sustainability Inst. v. Trump*, No. 25-1575, 2025 WL 1587100, at *1 (4th Cir. June 5, 2025) (staying injunction based on *Department of Education* where the grants "were awarded by federal executive agencies to specific grantees from a generalized fund"); *Am. Library Ass'n v. Sonderling*, No. 25-cv-1050, 2025 WL 1615771, at *5 (D.D.C. June 6, 2025) (after granting TRO, denying preliminary injunction where plaintiffs alleged grant terminations violated the APA, First Amendment, separation of powers, and *ultra vires* doctrine and noting *Department of Education* "cast[] doubt on district courts' jurisdiction to hear cases involving grant terminations"); *Cath. Bishops*, 2025 WL 763738, at *5 (denying a TRO motion after concluding that the court lacked the authority to "order the Government to pay money due on a contract"); *Cath. Bishops*, No. 25-5066 (D.C. Cir. Mar. 28, 2015) (per curiam) (denying a motion for injunction pending appeal); *Solutions in Hometown Connections v. Noem*, No. 8:25-cv-885, 2025 WL 1103253, at *8–*10 (D. Md. Apr. 14, 2025) (denying the plaintiffs' TRO motion challenging the termination of certain U.S. Citizenship and Immigration Services grants in light of the Supreme Court's *Department of Education* order and concluding that the plaintiffs' APA claims were "in essence contract claims against the United States for which the . . . Court of Federal Claims has exclusive jurisdiction"); Electronic Order, *Mass. Fair Hous. Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*, No. 3:25-cv-30041 (D. Mass Apr. 14, 2025), ECF No. 42 (dissolving a TRO after acknowledging that the *Department of Education* order is an "unmistakable directive that, for jurisdictional purposes, the proper forum for this case is the Court of Federal Claims"); *see also* Order, *Am. Ass'n of Colleges For Teacher Educ. v. McMahon*, No. 25-1281, 2025 WL 1232337, at *1 (4th Cir. Apr. 10, 2025) (staying a district court's preliminary injunction in a case involving education-related grants in light of the Supreme Court's *Department of Education* order).[2]

---

[2] In *Widakuswara v. Lake*, 2025 WL 1288817 (D.C. Cir. May 3, 2025) (per curiam), a D.C. Circuit motions panel relied on *Department of Education* to stay a preliminary injunction that required the federal government to restore grants to federally funded broadcast networks that the government had terminated. The *Widakuswara* panel explained in its stay order that the district court's injunction, "[w]hether phrased as a declaration that the agreements remain in force" or "an

####    4.    Plaintiffs' counterarguments fail.

Plaintiffs' make two other arguments against the Tucker Act's application. *See* Mot. at 31–33. Both fail.

*First*, Plaintiffs say the grant agreements are not contracts because the element of consideration is missing. That is, Plaintiffs contend that the agreements "do not confer direct and tangible benefits on the government." *Id.* at 31. This is wrong. The grant agreements' terms foreclose such a claim. For example, each recipient "must collect and maintain data that measure[s] the performance and effectiveness of [its] work," and provide that data to OJP. *E.g.*, ECF No. 11-4 at 27. As the agreements explain, this requirement "supports compliance with the Government Performance and Results Act (GPRA) and the GPRA Modernization Act of 2010," *id.*—which together work to improve government performance, effectiveness, and internal management. *See* Pub. L. No 103-62, § 2(b), 107 Stat. 285 (Aug. 3, 1993) (purposes of GPRA). Moreover, recipients must allow the government access to its facilities for "on-site monitoring." ECF No. 11-4 at 37.

The Federal Circuit has recognized that agreements conferring similar benefits—such as enabling the Department of Agriculture to inspect a company's facility—constitute contracts under the Tucker Act, notwithstanding that the contract "provided no direct monetary value to the United States." *Quiman, S.A. de C.V. v. United States*, No. 98-5036, 1999 WL 44182, at *2 (Fed. Cir. Jan.

---

order to pay the money committed by those agreements," amounted "in substance" to an order for "specific performance of the grant agreements"—a remedy that is "quintessentially contractual." *Id.* at *4. The panel accordingly concluded that because the plaintiffs' "claims of government nonpayment necessarily challenge[d]" the government's "performance under the grants," such claims "are squarely contract claims under the Tucker Act." *Id.* The en banc D.C. Circuit subsequently denied the government's stay motion. *See Widakuswara v. Lake*, No. 25-5150 (D.C. Cir. May 28, 2025). That action does not undermine Defendants' position here. In denying a stay, the en banc court considered whether the government made a "'strong showing' of a likelihood of success"; that standard is distinct from a finding of actual success or even a preliminary-injunction-stage finding that a *plaintiff* is likely to succeed. *Id.* at *1. The court also acknowledged that its order was necessarily preliminary and "of course does not constrain the ability of the panel that hears the government's appeals to reach any conclusion following full merits briefing and argument." *Id.*

21, 1999) (finding a cooperative agreement under which the Department of Agriculture would provide inspectors for certain facilities was not too indefinite to constitute an enforceable contract and should not fail for lack of consideration). In any event, broader policy aims achieved through grant agreements are sufficient consideration. *See United States v. President & Fellows of Harvard Coll.*, 323 F. Supp. 2d 151, 164 (D. Mass. 2004) ("[T]he Cooperative Agreements between Harvard and USAID constitute contracts to assist Russia in developing capital markets and foreign investments.").

*Second*, Plaintiffs claim that even if the agreements are contracts, the Court of Federal Claims has no jurisdiction because the contracts create no right to money damages. This is incorrect. As Plaintiffs concede, there is a "presumption that money damages are available" when a party breaches a contract. Mot. at 32 (quoting *Holmes v. United States*, 657 F.3d 1303, 1314 (Fed. Cir. 2011)). Government contracts are no exception. *See Sanders v. United States*, 252 F.3d 1329, 1334 (Fed. Cir. 2001) ("It is no doubt also true that in the area of government contracts, as with private agreements, there is a presumption in the civil context that a damages remedy will be available upon the breach of an agreement."). After all, "damages are always the default remedy for breach of contract." *United States v. Winstar Corp.*, 518 U.S. 839, 885 (1996) (plurality opinion). That hornbook principle applies to the agreements at issue here.

Plaintiffs argue the agreements fall into an exception to this rule because they are grants. They contend that "grant agreements [are] at issue here," and "when this type of agreement is involved," the Court of Federal Claims only has jurisdiction "if there is some affirmative indication that the agreement creates a right to money damages." Mot. at 32. That is not the law. "The fact that [a] contract covers government financial grants does not warrant a different standard. If the government has breached the Agreement, the [plaintiff] is entitled to seek whatever damages it is entitled to receive." *San Juan City Coll. v. United States*, 391 F.3d 1357, 1361 (Fed. Cir. 2004) (Court of Claims erred in concluding that damages were not available as a remedy for breach). Thus, "the Federal Circuit has routinely included in the category of agreements falling within the court's Tucker Act jurisdiction . . . [agreements] under various government grant programs."

15

*D'Andrea Bros. LLC v. United States*, 96 Fed. Cl. 205, 215 (Fed. Cl. 2010) (citing cases).  "In each of these cases the court found a right to money damages *even though the contract or grant was silent on the question*."[3]  *Id.* (emphasis added).

Plaintiffs assert that *Rick's Mushroom Service, Inc. v. United States*, 521 F.3d 1338 (Fed. Cir. 2008), and *St. Bernard Parish Government v. United States*, 134 Fed. Cl. 730 (Fed. Cl. 2017), *aff'd on other grounds*, 916 F.3d 987 (Fed. Cir. 2019), support their proposition that a presumption of money damages is not available under a grant agreement.  Not so.  In *Rick's*, the issue before the Federal Circuit "was whether appellant's cost-sharing, cooperative agreement with the government for implementing conservation practices in a facility for recycling of mushroom waste qualified as a 'procurement' contract for purposes of establishing jurisdiction under 28 U.S.C. § 1491(a)(2)."  *San Antonio Hous. Auth. v. United States*, 143 Fed. Cl. 425, 463 (Fed. Cl. 2019) (citing *Rick's*, 521 F.3d at 1343).

The Federal Circuit "determined that the appellant's contract did not classify as a procurement contract and, therefore, there was no basis for jurisdiction under 28 U.S.C. § 1491*(a)(2)*."  *Id.* at 464 (citing *Rick's*, 521 F.3d at 1344) (emphasis added).  Thus, *Rick's* does not suggest that the grant agreements rest outside of the Court of Federal Claims' general grant of jurisdiction over contract claims against the government under 28 U.S.C. § 1491(a)(1).  *See id.*  As

---

[3] In a footnote, Plaintiffs assert that the government recently took the position in the Federal Circuit "that a party who has not received grant funds to which it was entitled can never recover money damages . . . because that 'would allow [it] to avoid the strings-attached nature of the award.'"  Mot. at 32 n.5 (quoting Opening Br. of Def.-Appellant at 30–33, *112 Genese St., LLC v. United States*, No. 25-1373 (Fed. Cir. Mar. 14, 2025), ECF No. 15).  This is wrong, and the suggestion that the government is attempting to have it both ways has no basis in reality.  In *112 Genese*, the plaintiffs were *never awarded any grants* because their applications were not processed before the fund was exhausted—and plaintiffs sought money damages equal to the amounts sought in their grant applications.  *See* Opening Br. at 5–9, *112 Genese St.*, No. 25-1373.  Plaintiffs here incorrectly assume that the correct measure of damages in the Court of Federal Claims would be the full amount of their grant awards—*i.e.*, specific performance—as that remedy is not available against the government.  *See Megapulse*, 672 F.2d at 971.  But if that remedy were available, Plaintiffs would of course still be obligated to comply with the terms and conditions of the grant agreements.

for the summary assertion in *St. Bernard Parish* that cooperative agreements are not afforded a presumption of money damages, *see* 134 Fed. Cl. at 735, other Courts of Federal Claims have appropriately rejected that reasoning as "not persuasive." *San Antonio Housing Auth.*, 143 Fed. Cl. at 462.[4]

***

Plaintiffs cannot evade the exclusive jurisdiction of the Tucker Act through artful pleading. *Department of Education* controls this case. The Supreme Court's instruction that "the APA's limited of waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what" Plaintiffs request here fully applies. 145 S. Ct. at 968 (quoting *Knudson*, 534 U.S. at 212). Indeed, the Fourth Circuit recently relied on *Department of Education* to stay a preliminary injunction granted to plaintiffs who alleged—as here—that "their grants were terminated or suspended in violation of the [APA], certain appropriations statutes, and the Constitution," concluding that the Government was likely to succeed in showing that the district court lacked subject matter jurisdiction under the Tucker Act. *Sustainability Inst.*, 2025 WL 1587100, at *1. The Court should dismiss and deny injunctive relief on this basis alone.

**B.    Plaintiffs' Constitutional Claims Fail On The Merits**

Even if this Court had jurisdiction to consider them, Plaintiffs' constitutional claims (Counts I–IV) lack merit.

---

[4] Several cases cited by Plaintiffs, even if correctly decided, provide no basis to depart from the Supreme Court's plain instruction in *Department of Education* that disputes over the termination of individual government grant agreements belong in the Court of Federal Claims. *See* 145 S. Ct. at 968–69. For example, the complaints in *Woonasquatucket River Watershed Council v. Department of Agriculture*, No. 1:25-cv-97 (D.R.I.) and *New York v. Trump*, No. 1:25-cv-39 (D.R.I.), did not concern the termination of individual contracts, but rather challenged executive orders or agency guidance that broadly affected the disbursement of appropriated federal funds. And the plaintiff in *American Bar Association v. Department of Justice*, No. 1:25-cv-1263 (D.D.C.) brought a First Amendment retaliation claim that involved a terminated contract—the allegations here implicate no similar freestanding right.

17

### 1.    Plaintiffs' Fifth Amendment claims (Counts I & II) fail

*First*, Plaintiffs' claim that DOJ violated their due process rights by terminating the grant agreements without notice, *see* Compl. ¶¶ 82–90, goes nowhere because Plaintiffs had no protected property interest in continued grant funding.  When deciding a due process challenge, "[t]he first inquiry . . . is whether the plaintiff has been deprived of a protected interest in 'property' or 'liberty.'"  *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999).  Without a "cognizable liberty or property interest," *Hettinga*, 677 F.3d at 480, a plaintiff cannot state a procedural due process claim against the government.

Plaintiffs incorrectly assert that they have a "protected property interest in their grant funding."  Compl. ¶¶ 85, 94.  The grant agreements are contracts, *see supra* at 9–11, and "[t]he Supreme Court 'has never held that government contracts . . . create property interests protected by due process.'"  *New Vision Photography Program, Inc. v. District of Columbia*, 54 F. Supp. 3d 12, 29 (D.D.C. 2014) (quoting 2 Richard J. Pierce Jr., *Administrative Law Treatise* 764 (5th ed. 2010)).  "Outside of the employment context, courts have resisted application of due-process principles to government contracts because '[w]ith scores of millions of government contracts in effect at any point in time, it is unimaginable that all government agencies would be required to provide a hearing before they take any action that is arguably inconsistent with a contract.'"  *Id.* (quoting Pierce, *supra*, at 764) (citing cases).

Instead, "a claim that a government agency has violated a party's right to due process by refusing performance under a contract is substantively indistinguishable from a breach of contract claim," and "[t]he process to which plaintiff is due . . . is a post-deprivation suit for breach of the contract."  *Suburban Mortg. Assocs., Inc. v. Dep't of Hous. & Urb. Dev.*, 480 F.3d 1116, 1128 (Fed. Cir. 2007).  Thus, because Plaintiffs "can seek review of these contracts . . . through a contract suit in" the Court of Federal claims, Plaintiffs' due process claim fails.  *Jones & Assocs., Inc. v. District of Columbia*, 797 F. Supp. 2d 129, 136 (D.D.C. 2011) (dismissing Fifth Amendment claim where plaintiffs could bring contract claims in a D.C. court).

Plaintiffs have not identified a single instance where a federal agency terminated a contract or grant pursuant to the agreement's terms, and a court found that termination violated constitutional procedural rights required by law.  To the contrary, courts in this District have rejected such claims.  *See Nat'l Urb. League v. Trump*, No. 25-cv-471, 2025 WL 1275613, at *17-19 (D.D.C. May 2, 2025) (denying due process claim challenging termination of contracts and grants related to diversity, equity, and inclusion); *New Vision Photography*, 54 F. Supp. 3d at 28–29 (denying procedural due process claim based on termination of Medicare provider contract).

*Second*, Plaintiffs' claim that the terminations are void for vagueness lacks merit.  Plaintiffs argue that DOJ's implementation of 2 C.F.R. § 200.340(a)(4) resulted in their grants being "terminat[ed] . . . in an unconstitutionally vague manner."  Mot. at 24; *see* Compl. ¶¶ 92–97.  But the Supreme Court has squarely held that there is no constitutional guarantee of clarity in grant or contract criteria, even if these criteria are set by statute or regulation.  In *National Endowment for the Arts v. Finley*, 524 U.S. 569 (1998), the Court rejected a vagueness challenge to the National Foundation on the Arts and Humanities Act, which provides that grants shall be awarded according to "artistic excellence and artistic merit . . ., taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public," 20 U.S.C. § 954(d)(1).  The Court recognized that these standards were "undeniably opaque," such that they would raise "substantial vagueness concerns" in the context of a "criminal statute or regulatory scheme."  *Finley*, 524 U.S. at 588.

In the context of competitive grants, however, the Court explained that this imprecision raised no such concerns.  That is because "when the Government is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe."  *Id.* at 589.  The challenged statute "merely add[ed] some imprecise consideration to an already subjective selection process," and neither these considerations nor the underlying selection process "impermissibly infring[ed] on First or Fifth Amendment rights."  *Id.* at 590.  A contrary conclusion would render unconstitutional "all Government programs awarding scholarships and grants on the basis of

19

subjective criteria such as 'excellence,'" which the Supreme Court declined to do. *Id.* at 589 (citation omitted).

Plaintiffs' assertion that the standard at issue here—whether a grant "no longer effectuates the program goals or agency priorities," 2 C.F.R. § 200.340(a)(4)—is unconstitutionally vague replicates the analysis that the Supreme Court rejected in *Finley*. A decision to terminate grants which "no longer effectuates the program goals or agency priorities," *id.*, creates no greater constitutional problem than a decision to terminate grants that are not "excellent"—and that is so even if, "as a practical matter," putative grantees "may conform . . . to what they believe to be the decisionmaking criteria in order to acquire funding." *Finley*, 524 U.S. at 589. So too with the government's "broad" "right to terminate a contract for convenience" under a termination for convenience clause. *Northrop Grumman Corp. v. United States*, 46 Fed. Cl. 622, 626 (Fed. Cl. 2000). That breadth has never been thought to create a vagueness problem, as private parties have no obligation to ascertain, or comply with, any standard that might affect the agency's own contracting decisions. *See Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) (void-for-vagueness doctrine derives from Fifth Amendment's requirement that *restrictions* on private conduct be sufficiently clear to give a person of "ordinary intelligence a reasonable opportunity to know what is prohibited").

Finally, Plaintiffs' due process claim is undermined by their failure to exhaust OJP's administrative appeal process. "If there is a process on the books that appears to provide due process, the plaintiff cannot skip that process and use the federal courts as a means to get back what he wants.'" *English v. District of Columbia,* 815 F. Supp. 2d 254, 267 (D.D.C.2011) (quoting *Alvin v. Suzuki,* 227 F.3d 107, 116 (3d Cir.2000)). The purpose of exhaustion is to narrow the issues for adjudication, *see Laffey v. Northwest Airlines, Inc.,* 567 F.2d 429, 472 n.325 (D.C. Cir. 1976), and to provide the agency an opportunity to resolve the matter internally, thereby avoiding burdening the courts with unnecessary claims, *see Wilson v. Pena,* 79 F.3d 154, 165 (D.C. Cir. 1996); *Wallace v. Lynn,* 507 F.2d 1186, 1190 (D.C. Cir. 1974) (citing *McGee v. United States,* 402 U.S. 479, 484 (1971)). The assertion of a constitutional right does not excuse exhaustion. *Marine*

*Mammal Conservancy v. Dep't of Agriculture,* 134 F.3d 409, 413 (D.C. Cir. 1998) (administrative appeals may not be bypassed merely because the litigant asserts a constitutional claim).

Here, Plaintiffs' have not shown how exhaustion should be excused because the administrative process is inadequate, *see Randolph–Sheppard Vendors of Am. v. Weinberger,* 795 F.2d 90, 107 (D.C. Cir. 1986), or would be futile, *see Humana of S.C., Inc. v. Califano,* 590 F.2d 1070, 1081 (D.C .Cir. 1978).  To the contrary, OJP has a long history of adjudicating administrative appeals, including issuing decisions to restore funding to grantees, and that review process is continuing for the terminated grants at issue here.  *See* Henneberg Decl. ¶¶ 14, 24–25.  Plaintiffs' decision to thrust an emergency motion on the Court before exhausting the administrative appeal process should be rejected.  *See New Vision Photography*, 54 F. Supp. 3d at 27 ("As an initial matter, it is hard for the Court to countenance an action for deprivation of procedural due process where New Vision has yet to even exhaust the process provided by the District.").

## 2.    Plaintiffs' claim that the terminations violated the separation of powers and Spending, Appropriations, and Take Care Clauses (Count IV) fails

The Appropriations Clause provides that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."  U.S. Const. art. I, § 9, cl. 7.  In other words, the Clause requires that "the payment of money from the Treasury must be authorized by a statute." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990).  At the same time, it is the President's duty to "take Care that the Laws be faithfully executed."  U.S. Const. art. II, § 3.

DOJ's actions comport with these constitutional principles.  As discussed, the statutory sources of funding at issue here merely appropriate lump sum funds to be used for certain general purposes; it leaves DOJ discretion in overseeing and managing the grant programs within the framework marked by those statutorily indicated purposes.  DOJ's decision to terminate Plaintiffs' grant agreements and re-obligate the funds in a manner consistent with the statutes' directives aligns with its duty to execute the law as Congress intended.

Relying solely on DOJ's decision to terminate Plaintiffs' grant agreements, Plaintiffs assert that Defendants have "'unilaterally refuse[d]' to spend money that Congress appropriated," and

have "simply pocket[ed] $800 million and walk[ed] away."  Mot. at 27, 28 (quoting *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013)).  This is incorrect.  The Department has represented that it will re-obligate funds in a manner that ensures grant funding is used to advance agency priorities.  Henneberg Decl. ¶ 26.  Thus, even assuming the appropriations laws at issue here require DOJ to obligate all appropriated funds and further requires any de-obligated funds to be re-obligated, DOJ intends to do so.  Further, the funds appropriated for the terminated grants are drawn from "no year" appropriations, meaning the funds will remain available indefinitely until expended, regardless of the fiscal year.  Heneberg Decl. ¶ 17; *see* GAO, Principles of Federal Appropriations Law, ch. 5, 5–6 (4th ed., 2016 rev.).  Consequently, Congress has not constrained DOJ's ability to spend these funds by any temporal limit that would cause the funds to expire or render them unavailable for a future award.  And given that DOJ maintains discretion in its selection of award recipients and overall effectuation of the agency's policy priorities, the agency's decision to terminate contracts it determined no longer advanced those priorities and re-obligate remaining funds in a manner consistent with the agency's policy priorities (within the framework set by the law) does not reveal an intent to "withhold congressionally-approved funding."  Mot. at 28.

Because the record is devoid of any evidence that DOJ has abandoned its statutory obligations, Plaintiffs' constitutional claims have no chance of success.  The limited cases involving successful Appropriations Clause challenges have involved attempts to spend funds not appropriated by Congress, *see Off. of Pers. Mgmt.*, 496 U.S. at 432, or a refusal to spend appropriated funds where the relevant statutes required that the funds be spent, *see Train v. City of N.Y.*, 420 U.S. 35, 42–45 (1975).  Neither of those circumstances exists here.  DOJ has not attempted to spend any funds not appropriated to it, and it has committed to obligate the funds appropriated to it in a manner consistent with the appropriations laws.

For these same reasons, Plaintiffs reliance on *In re Aiken County*, 725 F.3d 255 (D.C. Cir. 2013) (Kavanaugh, J.), is mistaken.  *Aiken County* involved the Nuclear Waste Policy Act, which provided that the Nuclear Regulatory Commission "shall consider" and "issue a final decision

approving or disapproving" the Department of Energy's license application for storing nuclear waste within three years of submission. *Id.* at 257–58 (quoting 42 U.S.C. § 10134(d)). Funds were also appropriated for the Commission to carry out its duty to consider the Department's licensing application. But rather than carry out its statutory obligations, the Commission, "by its own admission," refused to comply with the law and "simply shut down its review and consideration of the Department of Energy's license application." *Id.* at 258.

The D.C. Circuit concluded that the Nuclear Regulatory Commission's actions violated the separation of powers. *Id.* at 259–67. The Court reasoned that, "[u]nder Article II of the Constitution and relevant Supreme Court precedents, the President must follow statutory *mandates* so long as there is appropriated money available and the President has no constitutional objection to the statute." *Id.* at 259.

This case raises none of the concerns at issue in *Aiken County*. Unlike the Nuclear Regulatory Commission in *Aiken County*, DOJ has not refused to carry out its duties under any of the appropriations acts at issue here. To the contrary, as noted above, DOJ has represented that it intends to obligate the funds appropriated in a manner consistent with the law.

At minimum, Plaintiffs' constitutional claims cannot support the requested injunction. *Aiken County* itself illustrates that setting aside the termination decisions and requiring DOJ to maintain its contractual relationship with these particular Plaintiffs would not be the appropriate remedy for any constitutional claim. Rather, the only proper remedy would be an injunction requiring DOJ to re-obligate the grant funds and thereby continue the grantmaking process, not to re-institute Plaintiffs' grants. *In re Aiken Cnty.*, 725 F.3d at 267. Of course, such an injunction would be unnecessary (and unripe) because DOJ has already expressly committed to do exactly that. Under no circumstances, however, could the Constitution justify the injunction requested here—one that forces DOJ to proceed with these particular grant agreements with these particular

Plaintiffs, in the face of an agency determination that doing so would be contrary to agency priorities.[5]

In addition, Plaintiffs' claim under the Take Care Clause fails on its own merits. The Take Care Clause provides that the President "shall take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. But Plaintiffs have not sued the President, and the Take Care Clause provides no basis to review the actions of subordinate Executive Branch officials. The Clause speaks only to the President, not to his subordinates, and ensures that the President is principally responsible for the actions of the Executive Branch and directly accountable to the people through the political process. *See Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 492–93 (2010) ("It is *his* responsibility to take care that the laws be faithfully executed."); *id*. at 495–97; *see also Printz v. United States*, 521 U.S. 898, 922 (1997); *Morrison v. Olson*, 487 U.S. 654, 689-90 (1988); *Clinton v. Jones*, 520 U.S. 681, 712–13 (1997) (Breyer, J., concurring). A subordinate Executive officer cannot violate the President's duty to faithfully execute the laws. To the extent Plaintiffs seek to challenge actions by subordinate federal officials, they cannot do so through the Take Care Clause, but must do so, if at all, through the APA, which in this case presents separate insurmountable obstacles for Plaintiffs, as explained above.

In any event, Plaintiffs' asserted constitutional claims are simply statutory appropriations claims dressed up in constitutional language, and as the Supreme Court has confirmed, "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional'

---

[5] For this reason, it is doubtful that Plaintiffs have standing to pursue this claim at all. Because Plaintiffs' constitutional claims could not support an injunction requiring the Executive to contract with them specifically, they have failed to establish that the injuries in fact they assert are "'likely' to be 'redressed by judicial relief'" here. *Haaland v. Brackeen*, 599 U.S. 255, 292 (2023). Insofar as Plaintiffs claim that they are not seeking reinstatement of the terminated agreements and are instead merely asking the Court to require Defendants to comply with certain appropriations statutes, they lack standing to assert such an "undifferentiated, generalized grievance about the conduct of government." *Lance v. Coffman*, 549 U.S. 437, 442 (2007) (per curiam). Indeed, the Supreme Court has long held that "[a] citizen may not sure" in federal court "based only on an 'asserted right to have the Government act in accordance with law.'" *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) (citation omitted).

claims." *Dalton v. Specter*, 511 U.S. 462, 473 (1994).  In *Dalton*, the Supreme Court rejected the proposition that "whenever the President acts in excess of his statutory authority, he also violates the constitutional separation of powers doctrine." *Id*. at 471.  Not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Id*. at 472.  In reaching this conclusion, the Supreme Court carefully "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id*. (collecting cases).  The Constitution is implicated only if executive officers rely on it as "[t]he only basis of authority" or if the officers rely on an unconstitutional statute.  *Id*. at 473 & n.5. Because Plaintiffs' constitutional claims focus entirely on their contentions that OJP has not acted consistent with its statutory appropriations obligations, such claims are untenable under *Dalton*.

### 3.    Plaintiffs' "ultra vires" claim (Count III) fails

Plaintiffs' "*ultra vires*" challenge to Defendants' termination of their grant agreements fails at the threshold because there exists an alternative procedure for judicial review of it.  A non-statutory *ultra vires* claim will not be recognized if there is a "meaningful and adequate means of vindicating" plaintiffs' rights.  *Bd. of Governors of the Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991).  Here, for all the reasons that the Tucker Act precludes APA actions for claims that are in essence contractual, the Tucker Act also impliedly precludes a non-statutory equitable *ultra vires* action based on such claims.  Plaintiffs can seek relief from the Court of Federal Claims, which can adequately vindicate their asserted rights by awarding damages if they prevail.  Plaintiffs also seek review under the APA in this case.  Plainly, then, even on Plaintiffs' own view, the *ultra vires* cause of action is not the only one available to them.

That must be the law, or else the *Megapulse* test would be easily evaded.  On Plaintiffs' novel theory, every breach-of-government-contract claim could be reframed as an *ultra vires* action against the relevant executive official, and a plaintiff could then circumvent the Tucker Act's remedial and jurisdictional limits in every case.  In *Department of Education*, for example, the plaintiffs could have simply argued that the Secretary of Education acted ultra vires in terminating

their grants.  *See* 145 S. Ct. 966.  Or, in *Ingersoll-Rand*, the company could have just sued the Secretary of Defense for the *ultra vires* act of terminating its contract.  *See* 780 F.2d 74.  This is a transparent work around, and this Court should not bless it.

Regardless, Plaintiffs' *ultra vires* claim is meritless.  This claim is seemingly derivative of Plaintiffs' other constitutional claims, which fail as described above.  *See* Compl. ¶ 102 (alleging *ultra vires* action because "these terminations violate the Constitution's separation of powers, the Takings Clause, the Spending Appropriations Clauses; deprive Plaintiffs' [due process] [and] are void for vagueness; and have no basis in any law.").  Insofar as Plaintiffs' *ultra vires* claim is based on the appropriations statutes, Plaintiffs would have to show that the termination decisions "violated a specific prohibition in the statue that is clear and mandatory, was obviously beyond the terms of the statute, or was far outside the scope of the task Congress gave it."  *N. Am. Butterly Ass'n v. Wolf*, 977 F.3d 1244, 1263 (D.C. Cir. 2020) (citation omitted).  But, as explained already, nothing in any appropriation statute prohibited DOJ from terminating Plaintiffs' grant agreements, let alone in a "clear and mandatory" way.  *Id.*  Again, Plaintiffs are not funded through direct congressional appropriations but rather through grant agreements offered at DOJ's discretion, subject to those agreements' terms.  Their funding through broad appropriations does not inject statutory—let alone constitutional—dimensions into this contractual challenge to DOJ's execution of those agreements.

### C.    Plaintiffs' APA Claims Are Unreviewable For Independent Threshold Reasons And Fail On The Merits

Even if the Court were to conclude that it has subject-matter jurisdiction over Plaintiffs' APA claims (Counts V–VI), judicial review of the terminations are nonetheless unavailable under the APA for the separate threshold reasons that (1) Plaintiffs have "other adequate remed[ies]" available to them, 5 U.S.C. § 704, and (2) Defendants' decisions concerning the allotment and expenditure of its lump-sum funding constitute unreviewable agency action "committee to agency discretion by law," *id.* § 701(a)(2).  Moreover, even if the termination decisions were reviewable

under the APA, Plaintiffs have not shown that those decisions were (3) contrary to law or (4) arbitrary and capricious.

### 1.    Plaintiffs have other adequate remedies available to them

Notwithstanding the jurisdictional defects with Plaintiffs' contract-based APA claims, those claims fail for the independently sufficient reason that Plaintiffs have "other adequate remed[ies]" available to them to vindicate their asserted right to continued funding under the terminated grant agreements. *Id.* § 704.

APA review is limited to "final agency action for which there is no other adequate remedy in a court." *Id.* The APA's "adequate remedy" bar "makes it clear that Congress did not intend the general grant of review in the APA to duplicate existing procedures for review of agency action." *Bowen v. Massachusetts*, 487 U.S. 879, 902–03 (1988). As the D.C. Circuit has observed, "the alternative remedy need not provide relief identical to relief under the APA, so long as it offers relief of the 'same genre.'" *Garcia v. Vilsak*, 563 F.3d 519, 522 (D.C. Cir. 2009) (citation omitted). Thus, if there exists an alternative adequate remedy, a plaintiff lacks a cause of action under the APA. *See Perry Cap.*, 864 F.3d at 621.

Here, Plaintiffs challenge Defendants' exercise of their contractual termination right under 2 C.F.R. § 200.340(a)(4), which is "incorporated into" each grant at issue here, Mot. at 35, but Plaintiffs fail to clearly show why they lack an adequate remedy for such a contract-based claim in the Court of Federal Claims, which routinely adjudicates similar challenges to the lawfulness of such contract termination decisions. *See, e.g., Boarhog LLC v. United States*, 129 Fed. Cl. 130, 134–35 (2016) ("[The plaintiff] has not shown or alleged that [the defendant] committed bad faith or abused its discretion in terminating the contract for convenience."); *Gulf Grp. Gen. Enters. Co. W.L.L. v. United States*, 114 Fed. Cl. 258, 370 (2013) ("The termination for convenience . . . was within the contracting officer's discretion and, therefore . . . was not a breach of contract.").

Plaintiffs attempt to evade the jurisdictional consequences of their contract-based claims by contending that they are seeking prospective relief that the Court of Federal Claims ordinarily cannot grant. *See* Mot. at 35. But Plaintiffs cannot "bypass Tucker Act jurisdiction" simply by

"converting" through artful pleading what are essentially claims for monetary relief into ones "requesting injunctive relief or declaratory actions." *Kidwell* v. *Dep't of Army, Bd. for Corr. of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995); *see Crowley*, 38 F.4th at 1107. And in any event, the injunctive relief that Plaintiffs demand—which is essentially equivalent to specific performance of the terminated grant agreements—is not available in this Court either, and it thus cannot serve as a basis for avoiding the APA's "adequate remedy" bar. *See Megapulse*, 672 F.2d at 971; *Spectrum Leasing*, 764 F.2d at 893 n.2; *Cath. Bishops*, 2025 WL 763738, at *4 n.3.

## 2.  Grant funding decisions are committed to agency discretion by law

Plaintiffs' challenge to the grant terminations fails for a separate reason: such a decision concerning how to allocate and expend federal funding is "committed to agency discretion by law" and is thus not subject to APA review. 5 U.S.C. § 701(a)(2). In *Lincoln v. Vigil*, the Supreme Court underscored that the APA, by its own terms, "preclude[s] judicial review of certain categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion.'" 508 U.S. 182, 191 (1993) (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 817 (1992)). *Lincoln* then held that an agency's "allocation of funds from a lump-sum appropriation" is one such "administrative decision traditionally regarded as committed to agency discretion," given that "the very point of a lump-sum appropriation," the Court explained, "is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id.* at 192. The Court thus concluded that the Indian Health Service's decision to discontinue a program that was (1) funded through the agency's yearly lump-sum appropriations from Congress (2) but not otherwise mandated or prescribed by statute was "committed to the [agency's] discretion" and thus "unreviewable" under the APA. *Id.* at 193–94.

That same principle squarely applies to DOJ discretionary grant funding. The terminated grant awards are not prescribed by any federal statute or regulation, either in terms of amounts or in terms of who the recipients are. Nor has OJP received funding through targeted appropriations that require expenditures on Plaintiffs' specific programs. "[T]he appropriations Acts for the

relevant period do not so much as mention the" terminated awards. *Id.* Instead, the terminated grant awards were paid for from OJP's general, lump-sum appropriations. The appropriations statutes gave DOJ broad discretion to decide when and how to obligate funds consistent with agency priorities. "These appropriations did not expressly authorize, direct, or even mention the expenditures of which [Plaintiffs] complain." *Hein v. Freedom From Religion Found, Inc.*, 551 U.S. 587, 605 (2007). Instead, "[the] expenditures resulted from executive discretion, not congressional action." *Id.* The appropriations statutes thus provide no standards "against which to judge the agency's exercise of discretion" in choosing how best to spend that money to advance agency priorities. *Heckler v. Chaney*, 470 U.S. 821, 830 (1985). The broad statutory mandates demonstrate that they authorized DOJ to "meet its statutory responsibilities in what it sees as the most effective or desirable way." *Lincoln*, 508 U.S. at 192–93 (stating that agencies must have "flexibility" to make "necessary adjustments for 'unforeseen developments' and 'changing requirements'" when deciding how to spend lump sum appropriations (citation omitted)); *see also* 28 U.S.C. § 530c(a) ("Except to the extent provided otherwise by law, the activities of [DOJ] (including any bureau, office, board, division, commission, subdivision, unit, or other compartment thereof) may, in the reasonable discretion of the Attorney General, be carried out through any means . . ..").

As *Lincoln* made clear, DOJ's "allocation of funds" from those lump-sum appropriations to various programs and priorities "requires 'a complicated balance of a number of factors,'" including whether the agency's "'resources are best spent' on one program or another" and "whether a particular program 'best fits the agency's overall policies.'" 508 U.S. at 193 (quoting *Heckler*, 470 U.S. at 831). For discretionary grant awards that are funded entirely out of such lump-sum appropriations, any decisions regarding how much funding to allocate to a particular grant recipient within the statutory framework— or whether to offer the recipient a grant award at all—are committed entirely to DOJ's discretion. *See id.* at 193–94. And that discretion includes the authority to terminate grants that no longer advance agency priorities. *See infra* at 30–31. "Agency priorities"—and the determination of whether a given grant agreement is in accord with

those priorities—is something uniquely within the expertise of the agency itself. Thus, DOJ's "decision to discontinue" funding for Plaintiffs' initiatives is "accordingly unreviewable under § 701(a)(2)" of the APA. *Lincoln*, 508 U.S. at 193.

>          3.       The terminations are not contrary to OMB guidance

Even if Plaintiffs' APA claims were reviewable, Plaintiffs have not shown that OJP's terminations were "not in accordance with law." 5 U.S.C. § 706(2)(A).

*First*, Plaintiffs argue the terminations were illegal because DOJ did not provide Plaintiffs with notice that it could terminate awards based on a failure to effectuate agency priorities. Mot. at 16–17. Specifically, Plaintiffs assert that, under the 2024 revised OMB guidance, each award was required to "clearly and unambiguously *state*" that it could be terminated on the basis of agency priorities. *Id.* (emphasis added). Not so. All that 2 C.F.R. § 200.340 requires is that an agency "clearly and unambiguously *specify*" all termination provisions in the terms and conditions of the award. *Id.* § 200.340(b) (emphasis added). And Plaintiffs' award letters plainly specify that "[t]he Uniform Administrative Requirements, Cost Principles, and Audit Requirements in 2 C.F.R. Part 200, as adopted and supplemented by DOJ in 2 C.F.R. Part 2800 . . . apply to this award from OJP." ECF No. 11-4 at 26; *see* Henneberg Decl. ¶ 11. Moreover, to eliminate any doubt, each award letter earlier specifies that "[f]ailure to comply with one or more award requirements— [including] *a condition incorporated by reference below*—may result in OJP taking appropriate action," including that "OJP may . . . terminate the award." ECF No. 11-4 at 25 (emphasis added). Indeed, Plaintiffs concede that the Uniform Guidance is "incorporated into the grants." Mot. at 35. In these circumstances, Plaintiffs cannot complain that they were not sufficiently put on notice of the applicability of 2 C.F.R. § 200.340(a)(4).

Regardless, the revised guidance is largely inapplicable here. All of the grant awards whose termination is challenged here were *made* prior to October 1, 2024, which is the effective date of OMB's 2024 revisions to 2 C.F.R. Part 200. *See* 89 Fed. Reg. 30,046, 30,046 (Apr. 22, 2024) ("Federal agencies may elect to apply the final guidance to Federal awards *issued* prior to October 1, 2024, but they are not required to do so." (emphasis added)). Of those awards, only one

(15PBJA-23-05375-SCAX, made to the Vera Institute of Justice) was supplemented by way of a continuation award made on October 30, 2024. Thus, only that award is subject to OMB's 2024 revisions to 2 C.F.R. Part 200. For all the other award agreements, the relevant regulation is 2 C.F.R. § 200.340(b) as in effect before October 1, 2024, which provided that an agency "should clearly and unambiguously specify termination provisions applicable to each Federal award, *in applicable regulations or in the award*, consistent with this section." *Id.* (Aug. 14, 2020); *cf.* 2 C.F.R. § 200.340(b) (Oct. 1, 2024) (agency "must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award"). And there is no doubt that DOJ, by explicitly adopting OMB's guidance through its own rule, *see* 2 C.F.R. § 2800.101, has specified that the termination provision at § 200.340(a)(4) is applicable to its awards—even without considering Plaintiffs' concession that the award agreements "incorporate[]" that guidance explicitly. Mot. at 35.

*Second*, Plaintiffs contend the terminations are contrary to law because 2 C.F.R. § 200.340(a)(4)[6] requires an award's efficacy to be judged against an agency's priorities "as they were articulated when the grant was awarded." Mot. at 17. In other words, Plaintiffs contend that § 200.340(a)(4) does not allow for terminations based on a change in agency priorities. This artificial limitation on § 200.340(a)(4) defies common sense and is inconsistent with the plain language of the regulation, which contemplates termination if an award "*no longer* effectuates the program goals or agency priorities." *Id.* (emphasis added). Of course, one reason why an award may "no longer" advance an agency's priorities is that those priorities have changed. Nothing about that language suggests that an agency's priorities should be treated as trapped in amber. Such a fiction is contrary to reality and the principle that agencies are democratically accountable.

Moreover, OMB's proposed revisions to the 2020 Uniform Guidance show that the language in § 200.340(a)(4) has always been understood to contemplate grant termination due a change in agency priorities. OMB initially proposed removing the prior version of

---

[6] Prior to October 1, 2024, this language was in § 200.340(a)(2).

§ 200.340(a)(4)—with several commentators supporting "its removal [because it] would prevent agencies from terminating high-performing projects based on shifting agency priorities." Guidance for Federal Financial Assistance, 89 Fed. Reg. 30,046, 30,089 (Apr. 22, 2024). But other commentators asked OMB to reinstate the prior version because "it was important for [agencies] to *maintain the ability for unilateral termination based on changes in program goals or agency priorities*." *Id.* (emphasis added). OMB ultimately reversed course, reinstating the prior version and explaining that the "revised termination provision at section 200.340 continues to allow Federal agencies . . . to terminate an award in the circumstances described . . . in the prior version of the guidance." *Id.* This forecloses Plaintiffs' atextual gloss on § 200.340(a)(4).

### 4. The terminations were not arbitrary and capricious.

Even if APA review were available, Defendants' actions are fully consistent with their obligations under that statute.

DOJ's termination decisions were both "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). As for the decisions themselves, Plaintiffs' assertion that the grants were terminated "*en masse*," Mot. at 19, is simply wrong. Rather, each grant was terminated only after a thorough and careful individualized review process. In an iterative process with OJP, Department leadership assessed whether, based on each grant's project description, the award continued to effectuate agency priorities as articulated by Department leadership throughout the process. *See* Henneberg Decl. ¶¶ 18–19. Indeed, far from any sort of mass termination, after meticulous review, DOJ terminated only a small number—and a tiny fraction—of OJP's open grant awards. *See id.* Further, each terminated grant recipient was given an opportunity to file an administrative appeal to contest "any disputed factual, legal or other issues." *See id.* ¶ 22; *e.g.*, ECF No. 11-4 at 41. And DOJ has already sustained several appeals and restored funding, underscoring DOJ's commitment to individualized decision-making. *See* Henneberg Decl. ¶ 25.

Moreover, DOJ gave "a satisfactory explanation" for each termination. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc.   v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In

accordance with its obligations under 2 C.F.R. § 200.341(a)(4), a Notice of Termination was sent to each terminated grant recipient detailing its reasons for termination. *See* Henneberg Decl. ¶¶ 19–20. In each, OJP explained that the award was being terminated under 2 C.F.R. § 200.340(a)(4) because it "no longer effectuates the program goals or agency priorities." *E.g.*, ECF No 11-4 at 41; *see* Henneberg Decl. ¶ 20. The notice further explained that the Department "had changed it priorities with respect to discretionary grant funding to focus on, among other things, more directly supporting certain law enforcement operations, combatting violent crime, protecting American children, and supporting American victims of trafficking and sexual assault, and better coordinating law enforcement efforts at all levels of government." *E.g.*, ECF No. 11-4 at 41; *see* Henneberg Decl. ¶ 20.

These explanations are more than sufficient under the APA's deferential standard of review. DOJ's reasoning shows its termination decisions "w[ere] based on a consideration of the relevant factors," and the explanations suggest no "clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). Although Plaintiffs complain that DOJ sent the same explanation to each terminated grant recipient, that simply shows DOJ's consistency in its asserted policy priorities. Relatedly, that the agency waited for its deliberative process to conclude before sending most of the termination letters on the same day says nothing about the quality of the agency's decision-making, and Plaintiffs' suggestion to the contrary is belied by the evidence.

Plaintiffs have given no sound basis to second-guess DOJ's conclusions, and to disregard its reasonable rationale would "represent[] a substantial intrusion into the working of another branch of Government" that the Supreme Court has cautioned should normally be avoided. *Dep't of Com. v. New York*, 588 U.S. 752, 781 (2019) (citation omitted). Plaintiffs' arbitrary and capricious claim therefore lacks merit.

## II.  Plaintiffs Fail To Show Irreparable Harm Absent An Injunction

In addition to a lack of success on the merits, Plaintiffs also are not entitled to a preliminary injunction because they cannot establish that they will be irreparably harmed before final judgment absent a preliminary injunction. To show irreparable harm, Plaintiffs must meet a "high standard"

and show that they face injuries that are "certain, great, actual, and imminent," *Hi-Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 1, 11 (D.D.C. 2008), and "beyond remediation.," *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm." *Id.* at 297–98 (quoting *Wis. Gas Co. v. Fed. Energy Regul. Co.*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

As the government has explained, this case is about funding. Plaintiffs' irreparable harm arguments largely focus on interim harms they will experience based on a lack of funding— exploring and drawing on other funding sources, considering staff layoffs, and shutting down or suspending certain programs. *See* Mot. at 36–38. But Plaintiffs do not suggest they will have to shutter their businesses permanently, and the law is clear that recoverable financial losses that do not "threaten[] the very existence of the movant's business" are not irreparable harm. [7] *Wis. Gas Co.*, 758 F.2d at 674; *see Corp. for Pub. Broad. v. Fed. Emergency Mgmt. Agency*, No. 25-cv-740 (D.D.C.), ECF No. 17, at 12–13 (Mar. 18, 2025) (transcript of oral ruling) (denying temporary

---

[7] Plaintiffs' hyperbolic and speculative assertion that "individuals may lose their lives" absent continued funding of their programs should be disregarded. Mot. at 39. When assessing irreparable harm, the claimed injury must be "certain," and "actual not theoretical." *Wis. Gas Co.*, 758 F.2d at 674. Indeed, "the threatened injury must be of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm, because injunctions are not intended to prevent injuries neither extant nor presently threatened, but only merely feared." *St. Croix Chippewa Indians of Wis. v. Kempthorne*, 535 F. Supp. 2d 33, 36 (D.D.C. 2008) (citation omitted). Furthermore, the irreparable harms pled must be harms *to the Plaintiffs*; Plaintiffs may not rely on alleged harms to third parties in requesting a preliminary injunction. "[H]arm that might befall unnamed third parties does not satisfy the irreparable harm requirement in the context of emergency injunctive relief, which must instead be connected specifically to the parties before the Court." *New Mexico v. Musk*, -- F. Supp. 3d ---, 2025 WL 520583, at *4 (D.D.C. Feb. 18, 2025) (quoting *Church v. Biden*, 573 F. Supp. 3d 118, 146 (D.D.C. 2021)). Thus, in *State v. Musk*, although the Court noted that "[t]erminating thousands of federal employees may cause extreme harm to the individual employees, and potentially the institution writ large," *id*. at *4, the Court held that it could not consider alleged harm to parties not before the Court on a request for emergency injunctive relief. *See id*.

restraining order, finding plaintiff grant recipient whose funds were frozen did not establish irreparable harm, because plaintiff did not show that it "faces an imminent risk of shutdown absent reimbursement" and having to lay off employees "is the type of 'economic loss' that typically 'does not, in and of itself, constitute irreparable harm'").

Nor do Plaintiffs' claimed reputational injuries show irreparable harm.  "The loss of business opportunities, market share, and customer goodwill are typically considered to be economic harms"—and thus recoverable. *Air Transp. Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012).  Further, the alleged harm must "directly result from the action which the movant seeks to enjoin." *Wis. Gas Co.*, 758 F.2d at 674.  Thus, when a harm is "based on independent market variables such as how [a company's] customers and/or retailer consumers might react," that harm does not flow directly from the challenged action.  *Am. Meat Inst. v. USDA*, 968 F. Supp. 2d 38, 81 (D.D.C. 2013), *aff'd*, 746 F.3d 1065 (D.C. Cir. 2014); *see Safari Club Int'l v. Jewell*, 47 F. Supp. 3d 29, 37 (D.D.C. 2014), *appeal dismissed*, 2014 WL 5838221 (D.C. Cir. Nov. 7, 2014).

Moreover, because recovery against the government on improperly terminated contracts is available in appropriate actions in the Court of Federal Claims, this is not an instance in which sovereign immunity leaves government funds unrecoverable.  In *Department of Education*, the Supreme Court held it was appropriate to stay a temporary restraining order enjoining the government from terminating various education-related grants, reasoning that "if [the grantees] ultimately prevail, they can recover any wrongfully withheld funds through suit in an appropriate forum."  145 S. Ct. at 969.  The same rationale applies to this case.  Nor will funds become unrecoverable through reallocation of the terminated grant funds to other recipients.  Defendants represent that they will not re-obligate any of the funds for the 357 terminated grants at issue in this case until this Court resolves Plaintiffs' motion for preliminary injunction.  *See* Henneberg Decl. ¶ 26.  Relatedly, the funds appropriated for the terminated grants all are drawn from "no year" appropriations, meaning the funds will remain available indefinitely until expended, regardless of the fiscal year. *See id.* ¶ 17.  Taken together, this means there is no risk that the funds

at issue in this case will be provided to another grantee or expire during the Court's consideration of Plaintiff's claims.

Plaintiffs' assertions of irreparable injury are also undermined by the fact that OJP has established a procedure for Plaintiffs to obtain reimbursement for qualified expenses that they incurred before the grant termination took effect. Plaintiffs currently have the ability to submit qualifying claims for reimbursement, and OJP will take reasonable and appropriate steps to review those claims and remit payment for any qualified expenses. *See* Henneberg Decl. ¶ 16. While the grant termination applies prospectively, it does not prevent Plaintiffs from receiving the money they are due for the qualifying expenses incurred before the termination. *See id.* And to the extent Plaintiffs believe their grants were terminated in error, OJP has provided an administrative appeal process to address any such objections, but Plaintiffs failed to utilize that process. *See id.* ¶¶ 22–23.

Further undercutting Plaintiffs' claim of irreparable harm is their unexplained delay in seeking a preliminary injunction. Though Plaintiffs' grants were terminated between April 4 and April 22, they did not move for injunctive relief in this Court until May 22—meaning Plaintiffs chose to wait 47 days from the first termination notice at issue and 30 days from the last to seek a preliminary injunction. On that basis alone, Plaintiffs' motion for preliminary injunction should denied.

As this Court has recognized, "[a]n unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm." *Dallas Safari Club v. Bernhardt*, 453 F. Supp. 3d 391, 403 (D.D.C. 2020) (Mehta, J.) (citation omitted). For example, the D.C. Circuit has held that a 44-day delay in moving for injunctive relief "was 'inexcusable,' and 'bolstered' the 'conclusion that an injunction should not issue,' particularly where"—as here—the movant "had knowledge of the pending nature of the alleged irreparable harm." *Id.* (quoting *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975)); *see also Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014) (holding that delay of 36 days before filing for preliminary injunctive relief was "dilatory

action" that failed to clear the high bar needed to show entitlement to relief).  Plaintiffs' decision to wait a month or more before seeking extraordinary relief in this Court thus further weighs against issuing a preliminary injunction in this case.

## III.    The Balance of Equities and Public Interest Disfavor Injunctive Relief

The Supreme Court's decision in *Department of Education* underscores why the remaining injunction factors tip in Defendants' favor.  As that order noted, the harm Defendants would face if the Court were to reinstate the grant award contracts pending final resolution of the case—which is what Plaintiffs effectively demand—would be irreparable given that Defendants would be "unlikely to recover the grant funds once they are disbursed."  145 S. Ct. at 969.  The public also has an interest in the judiciary respecting the Executive Branch's ability to lawfully direct and guide agencies' spending decisions, and, in particular, ensuring that tax dollars are allocated to grant programs that most effectively advance the priorities of the Department of Justice.

Moreover, equity weighs against granting injunctive relief because it is unnecessary given Defendants' commitment to re-obligate the terminated funds.  The scope of injunctive relief that the Court can grant here is limited by separation of powers principles.  Even where jurisdiction is proper, a court cannot "specifically order" the federal government "to continue to contract" with specific parties, as such relief would undermine the "Executive discretion" that "both the Constitution and Congress's laws have traditionally afforded" with respect to "how to spend" appropriated funds "within the constraints set by Congress."  *AIDS Vaccine Advoc. Coal. v. U.S. Dep't of State*, No. 25-cv-402, 2025 WL 752378, at *23 (D.D.C. Mar. 10, 2025).  "The relief" that Plaintiffs request—namely, "reinstatement of contracts terminated by the Government"—is "beyond the power of this Court."  *Cath. Bishops*, 2025 WL 763738, at *7.  Thus, this Court could, at most, order Defendants to "make available for obligation the full amount of funds" that DOJ would otherwise have disbursed under the terminated grant awards, *AIDS Vaccine Advoc. Coal.*, 2025 WL 752378, at *23 (citation omitted)—and leave decisions as to how, when, and to whom

to disburse those funds to Defendants' discretion.  But because Defendants have already committed to re-obligating the terminated grant funds, any such injunction would be unnecessary here.[8]

The equities also weigh against injunctive relief given Plaintiffs' decision to forgo the administrative appeals process available to them.  *See Premoh v. City of Cincinnati*, No. 15-cv-265, 2016 WL 451357, at *4 (S.D. Ohio Feb. 4, 2016) (equities tipped in favor of denying a preliminary injunction given "the availability of a remedy in the form of an administrative appeal").  DOJ gave Plaintiffs a chance to raise "any disputed factual, legal, or other issues" in an administrative appeal.  ECF No. 11-4 at 41 (illustrative termination letter); Henneberg Decl. ¶ 22.  And because the termination letters outlined DOJ's current policy priorities, Plaintiffs could have meaningfully explained why their grant programs aligned with those priorities.  Indeed, numerous terminated grant recipients have done so, and DOJ has already sustained several appeals and restored funding.  *See* Henneberg Decl. ¶¶ 24–25.  In these circumstances, where Plaintiffs have chosen to leapfrog the appeals process—which could have obviated any basis for this Court's intervention—the equities tip against the extraordinary remedy of injunctive relief.

Last, Plaintiffs' assertion that "the public as a whole will be less safe" without an injunction that ensures continued funding of *their* particular programs, Mot. at 39, ignores that the funds at issue here will (following resolution of Plaintiffs' claims) be awarded to programs that, within the applicable statutory framework, the Department has determined "more directly support[] certain law enforcement operations, combat[] violent crime, protect[] American children, and support[] American victims of trafficking and sexual assault, and better coordinate[] law enforcement efforts at all levels of government."  ECF No. 11-4 at 41.  And it is the Department—not Plaintiffs or this Court—that is best positioned to determine how best to address complicated and evolving public

---

[8] In any event, such relief would not result in the restoration of funding to Plaintiffs, thereby creating an Article III standing problem because the various funding-related injuries that Plaintiffs allege would go unredressed.  *See Haaland v. Brackeen*, 599 U.S. 255, 292 (2023) (stating that a plaintiff must show that the "injury is likely to be redressed by judicial relief") (citation omitted).

safety issues nationwide, and the better coordination of law enforcement efforts at all levels of government.

## IV.    Any Relief Should Be Limited In Scope

If this Court decides to grant injunctive relief, it is well settled that such relief "must be narrowly tailored to remedy the specific harm shown," *Neb. Dep't of Health & Hum. Servs. v. Dep't of Health & Hum. Servs.*, 435 F.3d 326, 330 (D.C. Cir. 2006) (citation omitted), and "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted). In light of these principles, any injunctive relief the Court grants should be limited in several respects.

*First*, because class certification should be denied, any relief should be limited to Plaintiffs alone—and, even then, only to those Plaintiffs that have clearly shown that they face imminent irreparable harm in the absence of such relief. "The Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it." *Gill v. Whitford*, 585 U.S. 48, 72 (2018). Absent class certification, Plaintiffs thus cannot seek relief on behalf of terminated grant recipients who are not parties to this suit.

*Second*, the Court must order security with any preliminary injunction. Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunction "*only* if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c) (emphasis added). The D.C. Circuit has recently "clarif[ied] that injunction bonds are generally required." *Nat'l Treasury Emps. Union v. Trump*, No. 25-5157, 2025 WL 1441563, at *3 n.4 (D.C. Cir. May 16, 2025) (per curiam). Should the Court issue an injunction at this preliminary stage requiring Defendants to continue to pay Plaintiffs millions of dollars under the terminated grants, Defendants request that Plaintiffs post a bond in the amount of the unobligated award funds that they expect to obtain under the grant agreements prior to final judgment in this case. *See Dep't of Educ.*, 145 S. Ct. at 969 (discussing the harm the government would face from the continued disbursement of terminated grant funds and noting that "the District Court declined to impose bond").

*Last*, if the Court decides to grant preliminary injunctive relief, it should stay any such injunction pending any appeal authorized by the Solicitor General.  *See* Fed. R. App. P. 8(a).  For the reasons explained above, Defendants have, at a minimum, satisfied the requirements for a stay of any injunction pending appeal.  *See Nken v. Holder*, 556 U.S. 418, 434 (2009) (describing the standard for obtaining such a stay and noting the "substantial overlap" between that standard and "the factors governing preliminary injunctions"); *Dep't of Educ.*, 145 S. Ct. at 969 (staying a preliminary injunction that required the government to pay funds that it would be "unlikely to recover" once disbursed).

**CONCLUSION**

For the reasons set forth above, the Court should deny Plaintiffs' motion for a preliminary injunction, dismiss Plaintiffs' complaint, and enter judgment in Defendants' favor. A proposed order is attached.

DATED: June 9, 2025                                        Respectfully submitted,

                                                           YAAKOV M. ROTH
                                                           Acting Assistant Attorney General

                                                           ANDREW I. WARDEN
                                                           Assistant Director
                                                           Federal Programs Branch

                                                           */s/ John Bailey*
                                                           John Bailey
                                                           Ohio Bar No. 10460
                                                           Counsel
                                                           United States Department of Justice
                                                           Civil Division
                                                           950 Constitution Ave. NW
                                                           Washington, DC 20005
                                                           Phone: (202) 514-6993
                                                           Email: john.bailey@usdoj.gov

                                                           *Counsel for Defendants*