**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **VERA INSTITUTE OF JUSTICE, et al.** | **Case No.: 1:25-cv-1643** |
| *Plaintiffs, on behalf of themselves and all others similarly situated,* | |
| **v.** | **Honorable Amit P. Mehta** |
| **U.S. DEPARTMENT OF JUSTICE, et al.** | |
| *Defendants.* | |

---

**BRIEF OF *AMICI CURIAE* LOCAL GOVERNMENTS,
LOCAL GOVERNMENT OFFICIALS, AND PROSECUTING ATTORNEYS
IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

---

Katherine Courtney
PUBLIC RIGHTS PROJECT
490 43rd Street, Unit #115
Oakland, CA 94609
Phone: (510) 738-6788
katiec@publicrightsproject.org

*Counsel for Amici Curiae*

# TABLE OF CONTENTS

STATEMENT OF INTEREST ................................................................................1

ARGUMENT ........................................................................................................2

I.   OJC'S DECISION TO CUT FUNDING *EN MASSE*, WITHOUT
     NOTICE, OR SOUND RATIONALE IS CONTRARY TO CLEARLY
     ESTABLISHED LAW .....................................................................................3

II.  OJP FAILED TO ACCOUNT FOR PLAINTIFFS' AND *AMICI*'S
     SUBSTANTIAL RELIANCE INTERESTS ....................................................4

III. COURT INTERVENTION IS NECESSARY TO PROTECT
     AGAINST IMMEDIATE AND SIGNIFICANT HARMS TO AMICI,
     OUR COMMUNITIES AND RESIDENTS, AND THE PUBLIC
     INTEREST .......................................................................................................8

     A)  Community Safety and Violence Intervention. ..........................................8

     B)  Law Enforcement and Prosecution ..........................................................11

     C)  Victim and Survivor Services ..................................................................15

     D)  Corrections and Reentry ..........................................................................16

     E)  Research and Data Collection. .................................................................17

CONCLUSION ...................................................................................................18

APPENDIX A–List of *Amici Curiae* ..................................................................21

# TABLE OF AUTHORITIES

**CASES**

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
  591 U.S. 1 (2020) ...................................................................................6

*Encino Motorcars, LLC v. Navarro*,
  579 U.S. 211 (2016) ...............................................................................4

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ............................................................................3, 5

*Sec. & Exch. Comm'n v. Chenery Corp.*,
  332 U.S. 194 (1947) ................................................................................4

*Smiley v. Citibank*,
  517 U.S. 742 (1996) ................................................................................4

*Winter v. Nat. Def. Res. Council, Inc.*,
  555 U.S. 7 (2008) ....................................................................................8

**REGULATIONS**

2 C.F.R. § 200.340(a)(4) ...........................................................................4

**OTHER AUTHORITIES**

ACTIVATING CHANGE ..........................................................................15, 16

Akua Amaning & Allie Preston, *The Trump Administration's
  Unprecedented Cuts to DOJ Grants Undermine Public Safety,* CENTER
  FOR AM. PROGRESS (May 5, 2025) ...........................................................16, 18

Amy L. Solomon, *Former Ass't AG: Local Nonprofit Workers Are Public
  Safety Heroes Too*, NEWSWEEK (May 29, 2025)..............................................6

Assoc. of Prosecuting Attorneys, *About APA* ..........................................12

Baynard Woods, *Trump DOJ Eliminates Funding From Baltimore
  Violence Interruption Efforts*, BALTIMORE BEAT (May 14, 2025)..............11

Bipartisan Safer Communities Act, Pub. L. No. 117-159, § 13401, 136
  Stat. 1313, 1339 (2022) .........................................................................10

Bobby Brier, *DOJ cancels grants, forcing cuts to N.J. violence
  intervention programs*, NJ.COM (May 1, 2025) ...........................................9, 10

Center for Am. Progress, *Community Violence Intervention Success Stories* (May 2, 2024) ........................................................................9

Council on Criminal Justice, *Fig. 1: DOJ Funding Update: A Deeper Look at the Cuts* (May 2025) ................................................... passim

Jail to Jobs, *About Us*, https://www.jailtojobs.com/about-us/ (last visited June 6, 2025). ......................................................................17

Johns Hopkins, Bloomberg School of Public Health, Ctr. for Gun Violence Solutions, *Community Violence Intervention* ...................................11

Nat'l District Attorneys Assoc., *About NDAA* .......................................................12

National Policing Institute's Rural Violent Crime Reduction Initiative, *About RCVRI* .......................................................................14

Patrick Sharkey, et al., *Community and the Crime Decline: The Causal Effect of Local Nonprofits on Violent Crime*, Am. Sociological Rev., vol. 82(6) (Oct. 25, 2017) ....................................................7

Peter Currier, *DOJ cancels $2M in grants to UTEC mid-cycle*, THE LOWELL SUN (Apr. 24, 2025) ........................................................17

Rebekah Barber, *Without DOJ Funding, Community Violence Intervention Programs Face Uncertainty*, NONPROFIT QUARTERLY (Apr. 25, 2025)10, 13, 14

Sarah N. Lynch, *U.S. Justice Dept grant cuts valued at $811 million, people and records say*, REUTERS (Apr. 24, 2025) .....................................13, 16

The Council of State Governments Justice Center, *Sign Our Letter to Congress and DOJ to Help Restore DOJ Funding Cuts and Keep Our Communities Safe* ................................................................12, 13, 16

The Council of State Governments, *About Us* .......................................................12

The Council of State Governments, *Second Change Act Grant Program* ............16

*U.S. Dep't of Justice Grants Targeted for Termination*, REUTERS (Apr. 24. 2025)........................................................................12

U.S. Dep't of Justice, Bureau of Justice Assistance, *Fact Sheet, Edward Byrne Memorial Justice Assistance Grant Program* (Feb. 2022).....................13

U.S. Dep't of Justice, Off. of Justice Programs, Bureau of Justice Assistance, *The Role of Local Government in Community Safety* (Apr. 2001)........................................................................6

U.S. Dep't of Justice, Off. of Justice Programs, *Community Violence Intervention* (Mar. 22, 2024) .............................................................................10

U.S. Dep't of Justice, Off. of Legis. Aff., *Steven Hough Letter to the Honorable Charles E. Grassley* (Apr. 30, 2025) .................................................5

U.S. Dep't of Justice, *Project Safe Neighborhoods* ...............................................13

## STATEMENT OF INTEREST

*Amici* are local governments, local government officials, and prosecuting attorneys from across the nation representing 25 jurisdictions in 19 states. *Amici* write in strong support of Plaintiffs' motion for a preliminary injunction to enjoin as unlawful the Department of Justice's Office of Justice Programs' (OJP) April 2025 termination of Plaintiffs' grants. OJP's *en masse*, abrupt, and unreasoned decision to immediately terminate more than 370 multi-year grant and cooperative agreements awarding more than $820 million in essential funding will cause immense, immediate, and irreparable harms to *amici*—and the individuals and communities we serve.

*Amici* represent jurisdictions of varying sizes, demographics, and regions. Some *amici* are rural, some are urban—yet all *amici* have shared interest and responsibility in protecting the safety and general welfare of all our constituents and working to create safer communities. Some of *amici*'s communities are deeply impacted by crime; and all *amici* work to not only investigate and prosecute individual crimes, but to prevent violence before it occurs, support victims and their families, and meet the wider safety needs of our communities.

To state the obvious, funding is integral to protecting our residents, promoting public safety, and building community trust. *Amici* cannot do it all alone. We rely on various partners (including Plaintiffs and other non-profit organizations) that obtain federal grants to support our jurisdictions in order to implement crime control and prevention strategies and to deliver a wide range of vital public safety, violence prevention, and victim support services. The scope of this federal funding supports a wide range of issue areas—touching nearly every element of *amici*'s safety and justice systems.

Thus, at the local level, cutting support and funding for these long-standing partnerships would be catastrophic. Many of the terminated grants support programs that appear to be aligned

with OJP's stated goals for violence reduction, law enforcement efforts, victim services, child protection, and other public safety and justice functions. More specifically, these services include, among many others, maintaining correctional facilities, improving safety in prisons, updating law enforcement and emergency responses, providing invaluable support for victims of crime, and training and assisting law enforcement and police officers, correctional facilities staff, prosecutors, judges, and *amici*'s own staff on a variety of issues and services involving mental health, homelessness, substance use treatment, and gun and gang violence intervention.

If OJP's funding cuts are not enjoined, *amici*'s communities and residents will bear the brunt and suffer. It will disrupt crime control and prevention strategies that have been in place for decades, increase burdens on and risks to law enforcement, harm victims and their families, and make deterring and responding to crimes more difficult. *Amici* have spent many years working hand-in-hand with organizations like Plaintiffs, to develop effective strategies, which have been refined through collaboration and evidence-based practice. Research and experience demonstrate that *amici*'s partnership with Plaintiffs have made our communities safer. No sound reasoning can be provided to hacksaw these efforts. Abruptly stripping funding does not merely threaten the services provided by the individual Plaintiffs—it destabilizes the entire infrastructure that *amici* depend on to keep our communities and residents safe.

*Amici* accordingly have strong interests in the reinstatement of the grant awards. We write separately to discuss our reliance interests, our local impacts, and to illustrate the nationwide, immediate, and significant effects that the termination of Plaintiffs' grants will cause.

## ARGUMENT

*Amici* seek to protect their community members and their own interests by fully supporting Plaintiffs' legal arguments and request for an injunction. OJP's April 2025 decision to cut essential

funding—without notice, *en masse*, and without sound rationale—runs afoul of the U.S. Constitution, violates the Administrative Procedure Act (APA), and usurps powers exclusive to Congress through unilateral executive action. Because OJP's actions are contrary to law, this Court should not permit them to stand. *Amici* underscore the significant reliance interests and varied harms at stake here—which include essential services that prevent violence and crime, save lives, and aid victims and law enforcement efforts in our communities. For the reasons provided below, and those offered by Plaintiffs, judicial intervention is necessary.

I.    **OJC'S DECISION TO CUT FUNDING *EN MASSE*, WITHOUT NOTICE, OR SOUND RATIONALE IS CONTRARY TO CLEARLY ESTABLISHED LAW**

No unilateral executive act can overcome the Constitution and clearly established law. But OJP's actions attempt to do just that. As detailed by Plaintiffs, OJP violated several bedrock constitutional principles and its own regulations and the APA. The agency failed to provide clear and unambiguous notice (which it must also do under its own regulations), and it took substantial agency action without consideration of the significant reliance interests here, making it arbitrary and capricious.

Here, OJP offered no sound rationale explanation for its failure to consider the substantial reliance interests of Plaintiffs and other beneficiaries like *Amici*—except to assert that the grant awards "no longer effectuates the program goals or agency priorities." Supreme Court precedent makes clear that this failure is enough to invalidate the action. *See*, *e.g.*, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (when taking a significant action—like cutting funding to essential services—an agency must "display awareness that it is changing position" and "show that there are good reasons for the new policy.") Any explanation of the change must recognize that long-standing policies create reliance interests that need to be accounted for. *See Smiley v.*

*Citibank*, 517 U.S. 742 (1996); *see also Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) ("the Department gave little explanation for its decision to abandon its decades-old practice," *id.* at 218, and fell short of its duty to access reliance interests, *id.* at 222–23).

## II.    OJP FAILED TO ACCOUNT FOR PLAINTIFFS' AND *AMICI'S* SUBSTANTIAL RELIANCE INTERESTS

Plaintiffs are likely to succeed on the merits of their claims. OJP abruptly terminated 373 grants, totaling more than $820 million in lawfully appropriated funds, without sufficient or prior notice to Plaintiffs. No consideration of the consequences to Plaintiffs or to *amici* and the residents and communities they represent were considered. Nor was there any consultation with any local government partners that had relied on those grant awards to support the broad swath of critical public safety initiatives.

The only rationale for OJP's actions was a vague statement that Plaintiffs' "awards no longer effectuate [] the program goals or agency priorities." Compl. ¶ 2. This boilerplate assertion plainly fails to provide a reasoned explanation because it neither describes the facts underlying OJP's actions nor explains how such facts could warrant elimination of the over 370 grants at issue here. Instead, OJP simply quoted one line in a form letter with lifted language from an Office of Management and Budget regulation applicable to grant terminations, 2 C.F.R. § 200.340(a)(4). This vague and indecisive statement leaves Plaintiffs, and *amici* that depend on these organizations, with no choice but to "guess at the theory underlying the agency's action." *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196–97 (1947).

In addition, the author of the spreadsheet listing the grant awards targeted for termination, a DOGE staffer, apparently created the list without consulting any OJP program managers, many of whom learned of the terminations only *after* they were communicated to grantees. Compl. ¶ 48.

These program managers are supposed to oversee the implementation and administration of OJP-funded programs and initiatives. That these essential funds were terminated without their knowledge, that funding termination decisions were made by a single individual, and that they found out post-termination is arbitrary and capricious par excellence.

In any event, it is implausible for OJP to claim that the terminated grants no longer effectuate program goals or agency priorities. OJP reasoned that the funding terminations were issued to "non-governmental entities" as opposed to "states or local jurisdictions that directly serve our communities."[1] OJP further stated that the terminated funding would be reallocated to the Administration's priorities of "directly supporting law enforcement operations, combatting violent crime, protecting American children, supporting American victims of trafficking and sexual assault, and enhancing coordination among law enforcement at all levels of government."[2]

But this explanation not only overlooks the integrated role that Plaintiffs and similar organizations play in partnership with local governments—but its rationale fails on its face. Plaintiffs' terminated grants, in fact, directly support the goals stated by OJP and many of the programs actually do align with the Administration's stated priorities. Of particular salience here, OJP's explanation in its grant-revocation letters provides no indication that it considered the significant reliance interests of the Plaintiffs or *amici*. It is well-established that when an agency policy "has engendered serious reliance interests," those interests must be accounted for, and adequately addressed, when the agency subsequently changes course based on new priorities. *See FCC*, 556 U.S. at 515–16. Relevant reliance interests include those of third parties affected by the

---

[1] U.S. Dep't of Justice, Off. of Legis. Aff., *Steven Hough Letter to the Honorable Charles E. Grassley* (Apr. 30, 2025), https://www.grassley.senate.gov/imo/media/doc/doj_to_grassley_-_grants.pdf.

[2] *Id.*

change in policy, such as States and local governments. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 31–32 (2020).

OJP's action here implicates substantial reliance interests. Indeed, many aspects of municipal government benefit from robust collaboration with community and non-governmental organizations, and public safety is no exception. Public safety has been described as a "shared responsibility between police and communities."[3] *Amici* and local governments have long depended on Plaintiffs and other community based organizations to support a broad swath of public safety and law enforcement operations—recognizing that many effective responses to crime fall outside of the core competencies of public agencies. Without these partners, funded by OJP, *amici*'s jurisdictions are forced to stretch justice systems beyond their intended role, resulting in inefficiencies, higher costs and diminished outcomes. Any interruptions to this essential funding imperils the ability for *amici* to address community violence.

OJP itself, as far back as 2001, has recognized that "communities can no longer leave safety to only the criminal justice system" and highlighted the value of "local partnerships with key actors—the police, government agencies, community organizations, and residents—to develop safe, secure, and vibrant communities."[4] *Amici* understand that the effort to interrupt cycles of crime and violence in particular neighborhoods benefit enormously from collaboration with community organizations that know those neighborhoods best. But much crime stems directly or indirectly from deeper social problems, including untreated mental illness, housing insecurity,

---

[3] Amy L. Solomon, *Former Ass't AG: Local Nonprofit Workers Are Public Safety Heroes Too*, Newsweek (May 29, 2025), https://www.newsweek.com/former-assistant-ag-local-nonprofit-workers-are-public-safety-heroes-too-opinion-2078582.

[4] U.S. Dep't of Justice, Off. of Justice Programs, Bureau of Justice Assistance, *The Role of Local Government in Community Safety* (Apr. 2001), https://www.ojp.gov/pdffiles1/bja/184218.pdf.

addiction and poverty, none of which are within the core competency of local law enforcement or prosecutors. Bridging this disconnect demands a coordinated and well-resourced public response that includes community-based solutions, like those provided by Plaintiffs. In *amici*'s experience, Plaintiffs and other community based organizations that receive OJP funds provide immense benefits to *amici* and their communities and residents. And *amici*'s experience and the research shows that the partnership works. Since crime rates peaked in the early 1990s, community-based non-profits (like those whose funding was terminated here) have been a driving force behind the subsequent decline.[5]

Indeed, for decades, across administrations from both sides of the political aisle, *amici* have relied on the steady flow of federal funding to put those lessons into practice through close collaboration with community-based organizations, like Plaintiffs, to directly support law enforcement and prosecution efforts, combat violent crime, engage in community violence intervention, support and protect victims, and enhance law enforcement coordination. Many of the grants at issue here were long championed by bipartisan coalitions and slated as multi-year awards because continuity is the norm and key to success. That OJP stated that these were its goals— which are directly met by Plaintiffs' utilization of multi-year grants—which OJP then terminated, makes no sense, strips municipal governments of a vital resource, and threatens to undo years of progress. OJP is required to assess these significant reliance interests, and its failure to do so renders its April 2025 decision to terminate funds legally impermissible.

---

[5] Patrick Sharkey, et al., *Community and the Crime Decline: The Causal Effect of Local Nonprofits on Violent Crime*, Am. Sociological Rev., vol. 82(6) (Oct. 25, 2017), https://journals.sagepub.com/doi/abs/10.1177/0003122417736289 (longitudinal study concluding that between 1990 and 2012, local non-profit organizations had a measurable, causal impact on reducing violent crime, murders, and property crimes).

### III. COURT INTERVENTION IS NECESSARY TO PROTECT AGAINST IMMEDIATE AND SIGNIFICANT HARMS TO AMICI, OUR COMMUNITIES AND RESIDENTS, AND THE PUBLIC INTEREST

Allowing OJP to proceed with its abrupt and unlawful termination of Congressionally-appropriated funds, without notice to or consultation with the local government partners that had relied on those awards to support critical public safety initiatives, would irreparably harm *amici*, our communities and residents, and the public interest. *See Winter v. Nat. Def. Res. Council, Inc.*, 555 U.S. 7, 20 (2008). As set forth below, the impact of the funding cuts are significant and varied. *Amici* represent jurisdictions of diverse sizes, populations, and geographic regions, yet all face a substantial risk of serious direct and collateral harms—including greater risks to the public, more danger to law enforcement, and increased incidence of crime and violence—if an injunction is not granted. OJP's abrupt and unlawful cuts jeopardize programs that have provided support for violence reduction, policing and prosecution, victims' services, juvenile justice and child protection, substance use and mental health treatment, corrections and reentry, justice system enhancements, research and evaluation, and other state- and local- level public safety functions. And these cuts also unnecessarily risk wasting federal funds by terminating projects midway before their deliverables are fulfilled. Long invested and durable local public safety infrastructure that keeps residents and communities safe depends on the continuation of the funds at issue here.

**A) Community Safety and Violence Intervention.**

Evidence-based models for reducing violent crime, particularly community violence intervention strategies, were disproportionately affected by OJP's funding cuts. Despite these strategies having a long track record of proven effectiveness and success, OJP cut nearly $169 million in funding for community safety and violence reduction programs—the largest terminated

funded area.[6] Yet, research consistently shows that when properly implemented and funded, community violence intervention programs are among the most effective strategies for addressing community violence and encouraging people to pursue alternative avenues for resolving conflicts.[7]

Community violence intervention has proven particularly effective to reduce violence by targeting a small subset of residents most at risk of perpetrating or falling victim to gun violence and related harms. By engaging these individuals directly through credible messengers and trusted community figures who are trained and organized for that purpose, violence intervention can not only prevent individual crimes but can create a feedback loop that can drive down overall violence. These frontline workers are visible in neighborhoods before violence erupts and remain after the crime scene clears, interrupting cycles of harm and building trust in the municipality's response. This approach has consistently driven down violence in some of the nation's most affected communities. These programs have also been lauded for their impact in reducing gun violence, including statistically significant reductions in gunshot injuries and gun deaths.[8] In fact, community violence intervention programs have shown reductions in shootings by as much as 60 percent and reduced arrests for violent crimes by more than 70 percent.[9]

---

[6] Council on Criminal Justice, *Fig. 1: DOJ Funding Update: A Deeper Look at the Cuts* (May 2025), https://counciloncj.org/doj-funding-update-a-deeper-look-at-the-cuts/.

[7] Center for Am. Progress, *Community Violence Intervention Success Stories* (May 2, 2024), https://www.americanprogress.org/article/community-violence-intervention-success-stories/#:~:text=CVI%20programs%20have%20reduced%20shootings,CVI%20success%20stories%20every%20day.

[8] Bobby Brier, *DOJ cancels grants, forcing cuts to N.J. violence intervention programs*, NJ.COM (May 1, 2025), https://www.nj.com/mosaic/2025/05/doj-cancels-grants-forcing-cuts-at-nj-violence-intervention-programs.html ("In 2024, 778 people suffered gunshot injuries in New Jersey, a drop of 16% from 2023, according to the governor's office. Additionally, 152 people died from gunshots last year, a 20% reduction from 2023.").

[9] *Community Violence Intervention Success Stories, supra* note 7.

Yet, OJP has made deep cuts to its own Community Violence Intervention and Prevention Initiative, the primary source of federal funding for community violence intervention models and programs. Indeed, the now-archived page of OJP's own website highlights, among other things, touts the many benefits of community violence intervention that prevents and disrupts violence and retaliation, and saves lives.[10] These programs, according to OJP, support "comprehensive, evidence-based violence intervention and prevention . . . based on partnerships among community residents, local government agencies, victim service providers, community-based organizations, law enforcement, hospitals, researchers and other community stakeholders."[11] Despite this explanation, and the fact that the Initiative is funded by annual appropriations and dollars authorized by the Bipartisan Safer Communities Act (which specified the allocation of $250 million for community violence intervention grants over a five-year period),[12] OJP slashed approximately half of the investments already made in these programs.[13]

With the termination of these funds, some community-based violence intervention programs across the country have ceased operations, and some have already ended or are planning to end services, including those that promote positive behavioral change, provide community support for residents, and reduce the likelihood of violence.[14] The Center for Gun Violence

---

[10] U.S. Dep't of Justice, Off. of Justice Programs, *Community Violence Intervention* (Mar. 22, 2024), https://www.ojp.gov/archive/topics/community-violence-intervention#0-0.

[11] *Id.*

[12] Bipartisan Safer Communities Act, Pub. L. No. 117-159, § 13401, 136 Stat. 1313, 1339 (2022).

[13] *See supra* note 6.

[14] *See, e.g.*, Brier, *supra* note 8 (describing community-based violence intervention programs in New Jersey shutting down); Rebekah Barber, *Without DOJ Funding, Community Violence Intervention Programs Face Uncertainty*, NONPROFIT QUARTERLY (Apr. 25, 2025), https://nonprofitquarterly.org/without-doj-funding-community-violence-intervention-programs-face-uncertainty/.

Solutions, for example, partnered with the City of Baltimore to execute Safe Streets, a community violence intervention program. The program successfully reduced homicides and nonfatal shootings by an average reduction of between 16 percent to 23 percent in some of Baltimore's most under-resourced neighborhoods.[15] Ironically in April 2025, when OJP abruptly cut funding for community violence intervention programs, Baltimore had recorded a historically low number of homicides, which were due, in part, to programs that OJP pulled grants from. OJP's immediate termination of funds has led organizations scrambling to limit the damage to their work, scale back staff, increase case loads for remaining workers, and have less capacity to service the community to "prevent the next incident of violence from happening."[16]

Finally, OJP's actions have caused layoffs at several affected organizations, which amount to "thousands of people… across the country," who were working to keep communities safe and serve individuals at high risk of violence.[17] Even the immediate restoration of terminated funds may not be sufficient to fully recoup the discontinuation of these vital services and person power that served some of the most vulnerable in *amici*'s communities.

### B) Law Enforcement and Prosecution.

OJP's funding cuts include $71.7 million to policing and prosecution programs, including those designed to provide technical assistance and specialized training to law enforcement, judges, and prosecutors, and to provide violent crime reduction resources, including advanced technology

---

[15] Johns Hopkins, Bloomberg School of Public Health, Ctr. for Gun Violence Solutions, *Community Violence Intervention*, https://publichealth.jhu.edu/center-for-gun-violence-solutions/solutions/community-violence-intervention (last visited June 6, 2025).

[16] Baynard Woods, *Trump DOJ Eliminates Funding From Baltimore Violence Interruption Efforts*, BALTIMORE BEAT (May 14, 2025), https://baltimorebeat.com/trump-doj-eliminates-funding-from-baltimore-violence-interruption-efforts/.

[17] *Id.*

and enforcement equipment.[18] Organizations affected by OJP's cuts include the Association of

Prosecuting Attorneys, Inc. (which provides nationwide training to prosecutors' offices, elected,

appointed, and line prosecutors, justice system professionals, and community partners);[19] the

National District Attorneys Association (the oldest and largest national, non-partisan membership

association of state and local prosecutors),[20] the Council of State Governments, (the nation's only

nonpartisan organization serving all three branches of state elected and appointed officials),[21] and

the Prosecution Research Collaborative (which works in partnership with the nation's prosecutors

to support victims and improve public safety and trust).[22]

OJP also terminated federal funding that supports local law enforcement and state agencies

in implementing best practices and planning services to allow for the most impactful use of funding

that best suits their administration of justice. The Edward Byrne Memorial Justice Assistance

Grant (Byrne JAG) program, the leading source of federal justice system funding for states and

---

[18] *See supra* note 6.

[19] *See U.S. Dep't of Justice Grants Targeted for Termination*, REUTERS (Apr. 24. 2025),
https://www.reuters.com/data/us-department-justice-grants-targeted-termination-2025-04-24/;
*see also* Assoc. of Prosecuting Attorneys, *About APA*, https://www.apainc.org/about-apa/ (last
visited June 6, 2025).

[20] *See* Nat'l District Attorneys Assoc., *About NDAA*, https://ndaa.org/about/ (last visited June 6,
2025) (describing itself as "a national, non-partisan non-profit membership association that
provides training, technical assistance, and services to prosecutors around the country in support
of the prosecution profession. As the oldest and largest association of prosecutors in the country
with over 6,000 members, NDAA represents state and local prosecutors' offices from both urban
and rural districts, as well as large and small jurisdictions.").

[21] *See* The Council of State Governments, *About Us*, https://www.csg.org/about-us/ (last visited
June 6, 2025) (describing the organization's mission as "champion[ing] excellence in state
government" including "in policy areas directly related to issues of public safety and justice in
order to strengthen communities.").

[22] *See* The Council of State Governments Justice Center, *Sign Our Letter to Congress and DOJ
to Help Restore DOJ Funding Cuts and Keep Our Communities Safe*,
https://docs.google.com/forms/d/e/1FAIpQLSdx2FiawmcPxizqB7cRZoFnCDEi_slnVYwMptnz
cVwiLBKK6w/viewform (last visited June 6, 2025).

localities, allows flexibility for *amici* jurisdictions to strategically plan how they will fund a wide range of program areas, including law enforcement, prosecution, courts, corrections, substance use treatment, victim and witness initiatives, and more.[23] Its main purpose, aligns directly with OJP's purported goals, to combat violent crime, to better coordinate law enforcement efforts at all levels of government, and to provide support for victims of crime—and yet the program suffered funding cuts.[24]

Other examples abound. Project Safe Neighborhoods, a nationwide initiative launched to bring together federal, state, local, and tribal law enforcement officials, prosecutors, community leaders, and other stakeholders to work on solutions to local violent crime, has had its funding cut by OJP.[25] Activating Change had several grants terminated, including those providing training to law enforcement on investigating human trafficking involving people with disabilities.[26] Newark, New Jersey's Community-Based Public Safety Collective had been tasked with providing training and technical assistance to over 95 organizations, including community-based organizations, police departments, cities, counties, and states.[27] The Collective had worked closely with police in

---

[23] U.S. Dep't of Justice, Bureau of Justice Assistance, *Fact Sheet, Edward Byrne Memorial Justice Assistance Grant Program* (Feb. 2022), https://bja.ojp.gov/doc/archive_jag-fact-sheet-2-2022.pdf.

[24] *See supra* note 22.

[25] U.S. Dep't of Justice, *Project Safe Neighborhoods*, https://bja.ojp.gov/program/project-safe-neighborhoods-psn/overview (last updated Aug. 27, 2024).

[26] Sarah N. Lynch, *U.S. Justice Dept grant cuts valued at $811 million, people and records say*, Reuters (Apr. 24, 2025), https://www.reuters.com/world/us/us-justice-dept-grant-cuts-valued-811-million-people-familiar-say-2025-04-24/.

[27] *Barber,* supra note 14.

the community to increase safety and reduce crime. As a result of OJP's funding cuts, the Collective had to terminate work already in progress and has made plans to lay off key staff.[28]

OJP's funding cuts have already negatively impacted rural law enforcement agencies that are attempting to tackle violent crime. The National Policing Institute had provided funding and assistance to more than 30 rural jurisdictions supporting local police and district attorneys' efforts to reduce violent crime.[29] Until OJP defunded this multi-year effort, these programs had helped to implement violent crime reduction strategies, improve investigations, provide services to victims, and enhance collaboration between local stakeholders.[30] Specifically, the Initiative provided a wide range of resources to a diverse network of rural police departments and district attorneys' offices, including in Shawano, Wisconsin; Union County, Oregon; Vail, Colorado; and Jackson County, Iowa. Federal funds allowed these local agencies to upgrade technology and equipment, hire and deploy personnel, support victim services and crime prevention programming, and fill other gaps in policing resources.[31] Among other things, the now terminated funds went to increasing patrols in hot spot areas; dedicating a prosecuting attorney to sexual assault, intimate partner violence, and child abuse crimes; reduce violent crimes in tough and Spanish-speaking populations; and training to enhance officer responses.[32]

---

[28] *Id.*

[29] National Policing Institute's Rural Violent Crime Reduction Initiative, *About RCVRI*, https://ruralvcri.org/#about (last visited June 6, 2025) (noting that "The U.S. Department of Justice (DOJ), Office of Justice Programs (OJP), terminated this project effective April 22, 2025. While this termination concludes active work, NPI has decided—at its own expense—to ensure that the resources developed on this website for rural and small law enforcement agencies remain available to support rural law enforcement agencies.").

[30] *Id.*

[31] *Id.* at Rural Violent Crime Reduction Initiative, one-pager.

[32] *Id.*

The decision to terminate grants that aid in law enforcement and prosecution runs directly afoul of OJP's own stated goals and impedes, rather than advances, work to combat crimes and support law enforcement. The funding cuts at issue jeopardize *amici*'s ability to effectively support law enforcement in their efforts to address crime and violence in our jurisdictions.

### C) Victim and Survivor Services.

OJP's terminations also include the elimination of approximately $50 million in critical support for victims and survivors of crime.[33] The list of cuts include grants to the National Criminal Justice Association, the National Association for Victims of Crime, and the National Crime Victim Law Institute—all of which work to "increas[e] options and expand[] access for victims of crime."[34] As a direct result of OJP's decision, the National Center for Victims of Crime reportedly shut down, then was able to restore after public backlash, a national hotline that had served tens of thousands of crime survivors in the last decade.[35] Among other rescinded grants are those that funded victim service providers in New York, Oklahoma, Georgia, Illinois and California, which provided direct services for survivors of human trafficking and specialized technical assistance for providers serving victims with disabilities and individuals who are deaf or hard of hearing.[36]

Some of the affected organizations, like Activating Change, provide highly specialized services that traditional responders lack. Specifically, Activating Change supports the deaf and hard of hearing, including survivors of sexual assault.[37] Law enforcement agencies across the country have therefore come to rely on Activating Change both for direct victim services and for

---

[33] *See supra* note 6.

[34] *Id.*

[35] *Id.*

[36] *Id.*

[37] ACTIVATING CHANGE, https://www.activatingchange.org/.

critical training, including real-time communication resources to ensure effective engagement in the field.[38] The organization reportedly lost 40 percent of its budget as a result of OJP's cuts.[39] Other organizations that provide legal services and representation for victims and those that support child victims of abuse had their services suspended by OJP's cuts.[40]

### D) Corrections and Reentry.

OJP cut $76.7 million of grants supporting corrections, community supervision, and reentry programming.[41] Cuts to correctional funding and grants that attempt to improve reentry outcomes jeopardize *amici*'s efforts to keep correctional facilities, staff, and prisoners safe and reduce recidivism. Notably, the Second Chance Act, which supports state, local, and Tribal governments and non-profit organizations to improve outcomes for people returning from local jails and juvenile facilities had its funds cut by OJP, which since 2009 had awarded more than 1000 grants across 49 states,[42] with more than 60 percent of participants achieving positive outcomes in accessing housing, employment, and substance use treatment after release.[43]

---

[38] *Id.*; *See also supra* note 26.

[39] Akua Amaning & Allie Preston, *The Trump Administration's Unprecedented Cuts to DOJ Grants Undermine Public Safety,* CENTER FOR AM. PROGRESS (May 5, 2025), https://www.americanprogress.org/article/the-trump-administrations-unprecedented-cuts-to-doj-grants-undermine-public-safety/.

[40] *Id.*

[41] *See supra* note 6.

[42] The Council of State Governments, *Second Change Act Grant Program*, https://csgjusticecenter.org/projects/second-chance-act-grant-program/.

[43] *See supra* note 22.

Indeed, jurisdictions across the country have partnered with non-profit organizations to share in the many challenges and resources needed to support people's successful reentry post-release, and have found similar success. In Lowell, Lawrence, and Haverhill, Massachusetts, for example, non-profits like UTEC worked for decades to interrupt violence and improve prison reentry outcomes—especially for young people overcoming poverty and gang violence. Together with other community based organizations, law enforcement, and correctional facilities, UTEC served as a key partner to prevent violence and in supporting young people most at risk.[44] Loss of UTEC's grant has already threatened critical services and the sustained investment in community-based approaches to gun violence, which has been proved to be highly effective.[45] Similarly, in Leander, Texas, the city had partnered with Jail to Jobs, a community-based program with a proven record of reducing recidivism among youthful offenders.[46] After completing the program, youth recidivism rates dropped to less than 15% from 75%.[47]

**E) Research and Data Collection.**

*Amici* also rely on the research and data collection funded by OJP's National Institute of Justice (NIJ) to fill critical gaps in understanding what public safety strategies are working and why. But OJP cut nearly $64 million in funding designed to research a broad range of public safety and justice topics, including, among other things, preventing acts of violent domestic extremism, improving hate crime reporting and response, and boosting law enforcement retention and

---

[44] Peter Currier, *DOJ cancels $2M in grants to UTEC mid-cycle*, THE LOWELL SUN (Apr. 24, 2025), https://utecinc.org/wp-content/uploads/2025/05/Lowell-Sun-DOJ-Cancels-2M-in-Grants-to-UTEC-Mid-Cycle-4.24.25.pdf.

[45] *Id.*

[46] Jail to Jobs, *About Us*, https://www.jailtojobs.com/about-us/ (last visited June 6, 2025).

[47] *Id.*

staffing.[48] Obtaining accurate, timely and comparable criminal justice data remains a persistent challenge across federal, state and local law enforcement agencies, which often collect and report crime statistics independently, often using differing methodologies or timeframes. OJP's termination of grants that support much needed research and data will only set back effective and evidence-based approaches to public safety in *amici*'s communities.

***

*Amici* and other cities, municipalities, and prosecuting attorneys across the nation will suffer immediate and significant direct and indirect harms because of OJP's arbitrary and unlawful termination decisions. The examples above are but a sampling of actual and anticipated impacts. Given the breadth and urgency of the resulting harms that would undermine public safety, diminish public trust, and potential for an increase in violence across the nation, court intervention is necessary.

## CONCLUSION

Under long-standing constitutional principles and other clearly established legal precedents, Plaintiffs' grants were unlawfully terminated. Without an injunction from this court, *Amici*'s communities will suffer irreparable harm and injury. For the reasons above and for the reasons provided by Plaintiffs, *Amici* respectfully request that the Court grant Plaintiffs' motion for a preliminary injunction.

---

[48] *Supra* note 39.

Respectfully submitted,


*/s/ Katherine Courtney*
Katherine Courtney
PUBLIC RIGHTS PROJECT
490 43rd Street, Unit #115
Oakland, CA 94609
katiec@publicrightsproject.org

*Counsel for Amici Curiae*


Dated: June 6, 2025

## ADDITIONAL COUNSEL

EBONY M. THOMPSON
City Solicitor
Baltimore City Department of Law
100 North Holliday Street
Baltimore, MD 21202
*Attorney for the City of Baltimore, Maryland*

MARY B. RICHARDSON-LOWRY
Corporation Counsel of the City of Chicago
121 North LaSalle Street, Room 600
Chicago, IL 60602
*Attorney for the City of Chicago, Illinois*

CHRISTIAN D. MENEFEE
Harris County Attorney's Office
1019 Congress Street
Houston, TX 77002
*Attorney for Harris County, Texas*

LEESA MANION
Prosecuting Attorney
Chinook Building
401 Fifth Avenue, Suite 800
Seattle, WA 98104
*Prosecuting Attorney for Martin Luther King, Jr. County, Washington*

KRISTYN ANDERSON
City Attorney
City Hall, Room 210
350 S. Fifth Street
Minneapolis, MN 55415
*Attorney for the City of Minneapolis, Minnesota*

JOHN P. MARKOVS
Montgomery County Attorney
101 Monroe Street, 3rd Floor
Rockville, MD 20850
*Attorney for Montgomery County, Maryland*

MURIEL GOODE-TRUFANT
Corporation Counsel
100 Church Street
New York, NY 10007
*Counsel for the City of New York, New York*

SUSANA ALCALA WOOD
City Attorney
915 I Street, Fourth Floor
Sacramento, CA 95814
*Attorney for City of Sacramento, California*

DOUGLAS T. SLOAN
City Attorney
1685 Main Street, Room 310
Santa Monica, CA 90401
*Attorney for the City of Santa Monica, California*

**APPENDIX A–List of *Amici Curiae***

**Local Governments**

City of Baltimore, Maryland

City of Chicago, Illinois

Harris County, Texas

King County, Washington

City of Minneapolis, Minnesota

Montgomery County, Maryland

City of Newark, New Jersey

City of New York, New York

City of Sacramento, California

City of Santa Monica, California

**Local Government Leaders**

John Clark
*Mayor, Town of Ridgway, Colorado*

Kara Davis
*District Attorney, Wasco County, Oregon*

Matt Ellis
*District Attorney, City of Hood River, Oregon*

Ramin Fatehi
*Commonwealth's Attorney, City of Norfolk, Virginia*

Delia Garza
*County Attorney, Travis County, Texas*

Jose Garza
*District Attorney, Travis County, Texas*

Sarah George
*State's Attorney, Chittenden County, Vermont*

Jeff Getting
*Prosecuting Attorney, Kalamazoo County, Michigan*

Melesa Johnson
*Elected Prosecutor, Jackson County, Missouri*

Lawrence Krasner
*District Attorney, City of Philadelphia, Pennsylvania*

Quinton D. Lucas
*Mayor, City of Kansas City, Missouri*

Ryan Mears
*Prosecutor, Marion County, Indiana*

Steve Mulroy
*District Attorney, County of Shelby, Tennessee*

Jeff Rosen
*District Attorney, Santa Clara County, California*

Eli Savit
*Prosecuting Attorney, Washtenaw County, Michigan*

Eric Sparr
*District Attorney, Winnebago County, Wisconsin*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 6, 2025, I electronically filed the original of this motion with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent to all attorneys of record by operations of the Court's electronic filing system.


DATE: June 6, 2025                          */s/ Katherine Courtney*
                                            Katherine Courtney