## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

VERA INSTITUTE OF JUSTICE, on behalf of themselves and others similarly situated, et al.,

*Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF JUSTICE, et al.,

*Defendants.*

Case No. 1:25-cv-1643-APM

## PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION AND RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

**INTRODUCTION** ...................................................................................................1

**ARGUMENT** ....................................................................................................... 4

    I.   Plaintiffs Are Likely to Succeed on the Merits ..................................................4

        A. OJP's en masse grant terminations violate the Administrative Procedure Act.........4

    II.  OJP's Terminations of Plaintiffs' Grants Violates the Constitution...........................19

        A. OJP's terminations of Plaintiffs' grants without notice violates their procedural Due Process rights. ........................................................................................19

        B. OJP's Implementation of 2 CFR § 200.340(a)(4) to Terminate Plaintiffs' Grants is Void for Vagueness as Applied to Plaintiffs. ...................................................21

        C. Exhaustion of administrative remedies is not required. ..............................................22

        D. OJP violated the separation of powers, the Spending and Appropriations Clauses, and the Take Care Clause.........................................................................................23

        E. Defendants Bondi's and Henneberg's actions were ultra vires ................................26

    III. This Court has Jurisdiction Over all of Plaintiffs' Claims...............................27

        A. The Court has jurisdiction over Plaintiffs' APA claims, which are not contractual and do not seek money damages. ........................................................................28

        B. The Court has jurisdiction over Plaintiffs' constitutional claims, which do not require any waiver of sovereign immunity. ......................................................33

        C. The Court of Federal Claims lacks jurisdiction because Plaintiffs' grants are not contracts, and do not create a right to money damages...............................................34

    IV. Plaintiffs have already suffered and Will Continue to Suffer Irreparable Harm Absent Injunctive Relief. ...............................................................................................35

    V.   The balance of equities and public interest weigh heavily in plaintiffs' favor. ............40

    VI. The Court should neither require a bond nor stay its decision pending appeal.........44

    **CONCLUSION**...................................................................................................... 45

# TABLE OF AUTHORITIES

Page(s)

*Abbott Labs. v. Gardner*, 387 U.S. 136 (1967) ...................................................................27

*AIDS Vaccine Advoc. Coal. v. of State*, 145 S. Ct. 753 (2025) ...........................................7

*AIDS Vaccine Advoc. Coal. v. Dep't of State*, 766 F. Supp. 3d 74 (D.D.C. 2025) ...........................7

*AIDS Vaccine Advoc. Coal. v. Dep't of State*, No. 25-5046, 2025 WL 621396 (D.C. Cir. Feb. 26, 2025) ...................................................................................................................7

*Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, No. 1:25-cv-00702, 2025 WL 833917 (D. Md. Mar. 17, 2025) .........................................................................................................12, 19, 36

*Am. Bar. Ass'n v. DOJ*, No. 1:25-cv-01263, 2025 WL 1388891 (D.D.C. May 14, 2025) .... 4, 36, 44

*Am. Near E. Refugee Aid v. USAID*, 703 F. Supp. 3d 126 (D.D.C. 2023) ...................................34

*Astra USA, Inc. v. Santa Clara Cnty.*, 563 U.S. 110 (2011) .............................................32

*Bd. of Governors of the Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32 (1991) .........................26, 27

*Bd. of Regents v. Roth*, 408 U.S. 564 (1972) ................................................................20, 22

*Biden v. Nebraska*, 600 U.S. 477 (2023) ......................................................................13

*Boarhog LLC v. United States*, 129 Fed. Cl. 130 (2016) ...................................................9

*Bowen v. Massachusetts*, 487 U.S. 879 (1988) .......................................................31, 32, 35

*California v. Dep't of Educ.*, No. 1:25-cv-10548, 2025 WL 76082 (D. Mass. Mar. 10, 2025) ......32

*Chamber of Com. v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996) ...............................................33

*Climate United Fund v. Citibank, N.A.*, No. 1:25-cv-00698, 2025 WL 1131412 (D.D.C. Apr. 16, 2025) ......................................................................................................15, 32, 36

*Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497 (N.D. Cal. 2017) ...................................24

*Colorado v. HHS*, No. 1:25-cv-00121, 2025 WL 1426226 (D.R.I. May 16, 2025) ..............36, 43

*Crowley Gov't Servs., Inc. v. GSA*, 38 F.4th 1099 (D.C. Cir. 2022) .......................................28, 30

*Dallas Safari Club v. Bernhardt*, 453 F. Supp. 3d 391 (D.D.C. 2020) ............................................39

*Dalton v. Specter*, 511 U.S. 462 (1994) .................................................................................................26

*Dep't of Com. v. New York*, 588 U.S. 752 (2019)......................................................................... 6, 19

*Dep't of Educ. v. California*, 145 S. Ct. 966 (2025) .............................................................................42

*Dep't of Educ. v. California*, No. 24A910, 2025 WL 945313 (U.S. Mar. 26, 2025) ....................30

*DSE, Inc. v. United States*, 169 F.3d 21 (D.C. Cir. 1999)....................................................................44

*English v. District of Columbia*, 717 F.3d 968 (D.C. Cir. 2013) ........................................................22

*English v. District of Columbia*, 815 F. Supp. 2d 254 (D.D.C. 2011) ........................................ 22, 23

*Esparraguera v. Dep't of the Army*, 101 F.4th 28 (D.C. Cir. 2024) ....................................................20

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) .................................................................18

*Fuller v. Winter*, 538 F. Supp. 2d 179 (D.D.C. 2008) ...........................................................................9

*Fund for Animals v. Frizzell*, 530 F.2d 982 (D.C. Cir. 1975) ............................................................39

*Gov't of Manitoba v. Bernhardt*, 923 F.3d 173 (D.C. Cir. 2019)........................................................28

*Gulf Grp. Gen. Enters. Co. W.L.L. v. United States*, 114 Fed. Cl. 258 (2013)..................................9

*Healthy Futures of Tex. v. HHS*, 315 F. Supp. 3d 339 (D.D.C. 2018)..................................................6

*In re Aiken Cnty.*, 725 F.3d 255 (D.C. Cir. 2013) ...............................................................................25

*Katz v. Cisneros*, 16 F.3d 1204 (Fed. Cir. 1994) ..................................................................................9

*Kidwell v. Dep't of Army, Bd. for Corr. of Mil. Recs.*, 56 F.3d 279 (D.C. Cir. 1995) .......................30

*Kisor v. Wilkie*, 588 U.S. 558 (2019).....................................................................................................13

*Laffey v. N.W. Airlines, Inc.*, 567 F.2d 429 (D.C. Cir. 1976) ............................................................23

*Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682 (1949) ............................................... 26, 33

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016).........................................36

*Lincoln v. Vigil*, 508 U.S. 182 (1993)............................................................................................... 4, 6

*Loc. 342, Long Island Pub. Serv. Emps., UMD, ILA, AFL-CIO v. Town Bd. of Huntington*, 31 F.3d 1191 (2d Cir. 1994) ................................................................................................................20

*Lummi Tribe Rsrv. v. United States*, 870 F.3d 1313 (Fed. Cir. 2017) ..............................................31

*Maine Cmty. Health Options v. United States*, 590 U.S. 296 (2020) .....................................................34

*Marine Mammal Conservancy, Inc. v. USDA*, 134 F.3d 409 (D.C. Cir. 1998) ...............................23

*Maryland v. Corp. for Nat'l & Cmty. Serv.*, No. 1:25-cv-01363, 2025 WL 1585051 (D. Md. June 5, 2025) ...........................................................................................................31, 32, 43

*Megapulse, Inc. v. Lewis,* 672 F.2d 959 (D.C. Cir. 1982) .............................................. 27, 28, 31, 33

*Metro. Transp. Auth. v. Duffy,* No. 1:25-cv-01413, 2025 WL 1513369 (S.D.N.Y. May 28, 2025) .......................................................................................................... 5, 12, 13, 15

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29 (1983) ..........................18

*Multicultural Media, Telecom & Internet Council v. FCC*, 873 F.3d 932 (D.C. Cir. 2017) ...............7

*N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244 (D.C. Cir. 2020) ....................................................27

*Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167 (D.D.C. 1971) .........................................45

*Nat'l Air Traffic Controllers Ass'n. v. United States*, 160 F.3d 714 (Fed. Cir. 1998).......................34

*Nat'l Council of Nonprofits v. OMB*, No. 1:25-cv-00239, 2025 WL 368852 (D.D.C. Feb. 3, 2025) .........................................................................................................................................36

*Nat'l Council of Nonprofits v. OMB*, No. 1:25-cv-00239, 2025 WL 597959 (D.D.C. Feb. 25, 2025) ...........................................................................................................43, 44, 45

*Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569 (1998) .....................................................21, 22

*Nat'l Env't Dev. Assn's Clean Air Project v. EPA*, 752 F.3d 999 (D.C. Cir. 2014) ..........................9

*Nat'l Treasury Emps. Union v. Trump*, No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025) ..........................................................................................................................44

*Nat'l Urb. League v. Trump*, No. 1:25-cv-00471, 2025 WL 1275613 (D.D.C. May 2, 2025) ....20, 21

*NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31 (D.C. Cir. 2015) .......................................20

*New York v. McMahon*, No. 1:25-cv-10601, 2025 WL 1463009 (D. Mass. May 22, 2025)........25

*Northrop Grumman Corp. v. United States*, 46 Fed. Cl. 622 (Fed. Cl. 2000) ...................................22

*Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87 (D.D.C. 2014..................39

*Oztimurlenk v. United States*, 162 Fed. Cl. 658 (2022) ........................................................8

*P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492 (D.D.C. 2020)..............................44

*Perry Cap. LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017) ....................................................28, 33

*PFLAG, Inc. v. Trump*, No. 8:25-cv-00337, 2025 WL 685124 (D. Md. Mar. 4, 2025).......24, 25

*Pol'y Rsch., LLC v. HHS*, 313 F. Supp. 3d 62 (D.D.C. 2018) .................................................6, 19

*Pollack v. Hogan*, 703 F.3d 117 (D.C. Cir. 2012) .............................................................33

*Quiman, S.A. de C.V. v. United States,* No. 98-5036, 1999 WL 44182 (Fed. Cir. Jan 21, 1999) 34

*S. Educ. Found. v. Dep't of Educ.*, No. 1:25-cv-01079, 2025 WL 1453047 (D.D.C. May 21, 2025)............................................................................................ 7, 44

*S.F. A.I.D.S. Found. v. Trump*, No. 4:25-cv-018241, 2025 WL 1621636 (N.D. Cal. June 9, 2025)............................................................................................44

*Schneider v. Kissinger*, 412 F.3d 190 (D.C. Cir. 2005) ......................................................28

*Serv. v. Dulles*, 354 U.S. 363 (1957) ........................................................................6

*Sierra Club v. USDA, Rural Utils. Serv.*, 841 F. Supp. 2d 349 (D.D.C. 2012) ..............................36

*Telemaque v. United States*, 82 Fed. Cl. 624 (2008) .........................................................8

*Tourus Recs., Inc. v. DEA*, 259 F.3d 731 (D.C. Cir. 2001) ............................................18

*U.S. Conf. of Cath. Bishops v. Dep't of State*, No. 1:25-cv-00465, 2025 WL 763738 (D.D.C. Mar. 11, 2025) ...................................................................................32

*U.S. Conf. of Cath. Bishops v. Dep't of State*, No. 25-5066, 2025 WL 1350103 (D.C. Cir. May 2, 2025)............................................................................................32

*United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954) ........................................6

*United States v. King*, 395 U.S. 1 (1969)...................................................................34

*United States v. President & Fellows of Harvard Coll.*, 323 F. Supp. 2d 151 (D. Mass. 2004) ........34

*Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025)..........27, 33, 42

*Widakuswara v. Lake,* No. 25-5144, 2025 WL 1521355 (D.C. Cir. May 28, 2025) ....................28

*Wilson v. Pena*, 79 F.3d 154 (D.C. Cir. 1996) ...................................................................23

*Woonasquatucket River Watershed Council v. USDA*, No. 1:25-cv-00097, 2025 WL 1116157
    (D.R.I. Apr. 15, 2025) ...................................................................... 6, 36

## STATUTES

31 U.S.C. § 6305................................................................................................................34

Bipartisan Safer Communities Act, Pub. L. No. 117-159, 136 Stat. 1313 (June 25, 2022) .......23

## OTHER AUTHORITIES

Brandon Roberts & Vernal Coleman,
    *Inside the AI Prompts DOGE Used to "Munch" Contracts Related to Veterans' Health*,
    ProPublica (June 6, 2025), https://perma.cc/9XA5-B8MZ.........................................18

U.S. Dep't of Justice, *DOJ Grants Financial Guide*, https://perma.cc/TT35-JMSF (last
    updated Oct. 2024).....................................................................................10

## RULES AND REGULATIONS

2 C.F.R. § 200.339.............................................................................................. 5, 21

2 C.F.R. § 200.340........................................................... 1, 5, 8, 9, 10, 11, 13, 14, 21, 22

2 C.F.R. § 200.341............................................................................................5

2 C.F.R. § 200.344.............................................................................................35

Fed. R. Civ. P. 12 .......................................................................................... 23, 28

Guidance for Federal Financial Assistance, 89 Fed. Reg. 30046 (Apr. 22, 2024).. 6, 10, 11, 12,
    14, 15

Guidance for Grants and Agreements, 85 Fed. Reg. 49559 (Aug. 13, 2020) ....................10, 14

**<u>INTRODUCTION</u>**

When the Department of Justice's Office of Justice Programs abruptly terminated 376 grants, worth more than 800 million dollars, it did so by sending grantees identical, unreasoned notices stating that their grants no longer effectuated changed agency priorities. Plaintiffs are likely to succeed on the merits of each of their claims under the APA and the Constitution.

OJP's grant terminations violate the Administrative Procedure Act. OJP's terminations of Plaintiffs' grants—and OJP's interpretation espoused in those terminations—are contrary to law. OJP's interpretation of 2 C.F.R. § 200.340 as allowing the termination of nearly a billion dollars in grant funding based on a post-hoc change in agency priorities is as broad as it is novel. It is also unlawful. Prior to 2025, this interpretation of Section 200.340 had never been adopted by any agency or court as a permissible reading of the termination provision. This Court should not be the first. OJP's terminations are also arbitrary and capricious. OJP's identical, cursory, and unreasoned terminations of 376 grants represent nearly every hallmark of arbitrary and capricious agency action. OJP claims that its process prior to termination was individualized and meticulous, and it therefore need not supply further detail when it terminated more than 800 million dollars in grant funding. But OJP is required under the APA to translate its review process into a reasoned explanation. It did not do so. As relief for these APA claims, Plaintiffs seek a preliminary injunction preventing OJP from implementing, maintaining, or giving effect to its unlawful grant terminations, as well as an injunction against OJP's unlawful interpretation of Section 200.340.

In addition, Defendants are likely to succeed on their constitutional claims. As it relates to Plaintiffs' claims under the Due Process Clause, the government does not dispute that OJP terminated Plaintiffs' grants without pre-deprivation notice, a hearing, or any process whatsoever. Nor does the government dispute that OJP's capacious interpretation of Section 200.340 to Plaintiffs' grants effectively would allow OJP to terminate *any* grant on the basis *any* subjective criteria—the very definition of an unconstitutionally vague standard. Concerning Plaintiffs' separation of powers, the Spending and Appropriations Clauses, and Take Care Clause claims, the Executive has no authority

to terminate duly appropriated grants authorized by Congress.  Terminating the grants at issue in this case without the imprimatur of Congress was therefore unconstitutional.  Moreover, because the terminations were made without statutory or legislative authorization, they were also *ultra vires*.

None of the doctrines the government invokes imposes an obstacle to preliminary relief.  *First*, the termination of grant funding does not fall within the very narrow category of agency actions that courts have traditionally considered unreviewable under the APA.  *Second*, Plaintiffs' claims cannot adequately or fully be remedied in the Court of Federal Claims for the same reasons that jurisdiction isn't available under the Tucker Act.  *Third*, administrative exhaustion is not required by any statute or regulation and does not present a bar to seeking relief from this Court.

The Tucker Act does not divest this Court of jurisdiction. Throughout its brief, OJP characterizes the relief Plaintiffs are seeking as "continued funding" that can be remedied by seeking money damages in the Court of Federal Claims.  This framing conveniently elides critical declaratory and injunctive relief that Plaintiffs have sought in this lawsuit including that related to: OJP's unlawful interpretation of Section 200.340; its apparent belief that it can provide an unspecific and identical rationale when terminating 376 grants without running afoul of arbitrary and capricious review under the APA; and its failure to provide Plaintiffs with Due Process prior to terminating their grants. Plaintiffs' claims, and their requests for declaratory and preliminary and permanent injunctive relief, confirm that this is not a breach of contract case that belongs in the Court of Federal Claims.

As uncontroverted record evidence shows, absent a preliminary injunction, Plaintiffs will be irreparably harmed.  This includes harms that courts have deemed to be irreparable in funding-termination cases, including laying off staff, the elimination of critical and life-saving programming central to Plaintiffs' missions, reputational harms, and other harms that have had devastating impacts on the safety of individuals and communities across the country.  *See* Pls.' Mem. in Supp. of Mot. for Prelim Inj. ("PI Mem.") at 7-11, 36-38 (Dkt. 11-1).  Plaintiffs' declarations also demonstrate that many of the harms that are a direct result of OJP's terminations are not "recoverable financial losses" that can be remedied through "appropriate actions in the Court of Federal Claims."  Defs.' Mot. to Dismiss

& Mem. in Opp'n to Pls.' Mot. for Prelim. Inj. ("PI Opp'n") at 34, 35 (Dkt. 26).  The Court of Federal Claims can provide no retrospective recompense to Deaf victims of crime who "Vera has been forced to turn away" and who have been unable to access sign-language interpretive services to communicate with police because the funding for this interpretive program was abruptly terminated.  Turner Decl. ¶ 22 (Dkt. 11-7).  It provides no remedy to victims of gun violence and their families in 23 hospitals who no longer have access to vital services in the hospital to prevent a further escalation of violence and loss of life because those services have been eliminated.  Ridini Decl. ¶¶ 18a, 25 (Dkt. 11-6).  It cannot remedy the ongoing harm in neighborhoods that lack grant-funded staff who are able to immediately intervene in active conflicts and retaliations, or to respond to flare ups in violence.  *Id.* ¶ 27.  It provides no remedy to the 65 youth in Washington State most at risk for gun or gang violence who cannot be served, Sottile Decl. ¶ 26 (Dkt. 11-3), or the 40 AAPI individuals who have been victims of hate crimes and unable to access counseling and support, Choi Decl. ¶¶ 22b, 40 (Dkt. 11-4).  It provides no remedy for terminations that prompted the layoff of "violence interrupters" which "abruptly removed trusted support systems for individuals at the highest risk of involvement in violence," including individuals who relied on Plaintiffs for "safety planning, relocation assistance, employment support, or therapy referrals."  Kennedy Decl. ¶ 20 (Dkt. 11-5).  Plaintiff organizations will continue to suffer irreparable harm if the grant terminations are not reversed; but that does not erase or completely remedy the irreparable harms that these organizations and their communities have suffered in the time since their grants were terminated.  Delaying relief until "final judgment," will cause immeasurable harm and loss of life in neighborhoods across the country.  For this reason, the balance of the equities and the public interest decidedly weigh in favor of granting injunctive relief.

This Court should grant Plaintiffs' motion for a preliminary injunction and deny Defendant's motion to dismiss.

## ARGUMENT

### I.    Plaintiffs Are Likely to Succeed on the Merits.

Plaintiffs have a strong likelihood of success on the merits. Although Plaintiffs bring multiple claims, they "need only show a likelihood of success on one [claim] to obtain preliminary relief, provided the other preliminary-injunction factors are satisfied." *Am. Bar. Ass'n v. DOJ,* No. 1:25-cv-01263, 2025 WL 1388891, at *4 (D.D.C. May 14, 2025) ("*ABA*").

### A.  OJP's *en masse* grant terminations violate the Administrative Procedure Act.

#### i.  OJP's *en masse* termination of Plaintiffs' grants is final agency action, and termination of grant funding is not committed to agency discretion under law.

Defendants do not contest that OJP's *en masse* termination of Plaintiffs' grants is final agency action. Instead, OJP argues that its decision to terminate Plaintiffs' funding is unreviewable because it is committed to agency discretion and thus not subject to review under the APA. PI Opp'n at 28-30. To begin, OJP's argument that termination decisions are so inherently discretionary that they are unreviewable cannot be squared with its argument that the Court of Federal Claims "routinely adjudicates similar challenges to the lawfulness of such contract termination decisions." *Id.* at 27 (citing cases that involved claims that an agency acted arbitrarily and capriciously). If the Court of Federal Claims is able to "routinely" adjudicate termination decisions, and determine whether an agency acted arbitrarily and capriciously, then such decisions are not unreviewable decisions committed to agency discretion, and this Court can and should determine whether OJP's terminations violate the Administrative Procedure Act.

Regardless, OJP's argument—which pertains only to the APA claims and not the constitutional claims—fails. The narrow agency-discretion exception to judicial review under the APA applies only (1) "in those rare circumstances" where "a court would have no meaningful standard against which to judge the agency's exercise of discretion," or (2) in "certain categories of administrative decisions that courts traditionally have regarded as committed to agency discretion." *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993) (citation modified). Neither exception applies. An agency's decision to terminate grants mid-cycle is subject to legal restrictions, set forth in detailed regulations

in the Uniform Guidance, that courts can and do apply.  And OJP points to nothing to suggest that grant termination decisions fall within the very narrow category of agency actions that courts have traditionally considered unreviewable.

OJP argues that agency grant funding is "discretionary," and that the grant awards at issue here "are not prescribed by any federal statute or regulation."  PI Opp'n at 28.  But Plaintiffs do not challenge a decision whether to *award* a grant; they challenge a decision to *terminate* grants that had already been awarded, which implicates entirely different considerations.  Even if an agency might have some discretion to decide to whom, and in what amounts, to award grants, it does not follow, as OJP appears to suggest, that it may cut off those grants midstream without any justification or explanation that courts may review.  Even if applicants for grants may have no expectancy in receiving any award in the future, an organization that has been competitively awarded a grant, has hired staff to perform the work called for the grant, and is in the middle of performing it is in a very different situation.  *See Metro. Transp. Auth. v. Duffy,* No. 1:25-cv-01413, 2025 WL 1513369, at *27 (S.D.N.Y. May 28, 2025) ("Capital projects invariably involve substantial investment of time and resources. To build a highway or building, plans must be made, employees must be hired, supplies must be purchased, and monies must be raised.").  Indeed, the regulations recognize this distinction by limiting the situations in which a grant may be terminated, 2 C.F.R. § 200.340, and specifying the procedures that an agency must follow prior to and after terminating a grant, *see, e.g., id.* § 200.339 (setting forth remedies for noncompliance); *id.* § 200.341 (notification requirements); *id.* § 200.342 (appeal procedures).

In part to ensure fairness to grantees and to guard against the arbitrary cancellation of grants, OMB's regulations specify the legal ways in which OJP can terminate the grants at issue.  PI Mem. at 12-13.  Pursuant to those regulations, DOJ can terminate a grant in only three circumstances: (1) "if the recipient or subrecipient fails to comply with the terms and conditions of the Federal award"; (2) "with the consent of the recipient or subrecipient, in which case the two parties must agree upon the termination conditions"; and (as relevant here) (3) "pursuant to the terms and conditions of the

Federal award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a).  Section 200.340(a)(4) is a permissible basis for terminating a grant only if the terms and conditions of the award specify that as a ground for termination.  PI Mem. at 12-13; Guidance for Federal Financial Assistance, 89 Fed. Reg. 30046, 30089 (Apr. 22, 2024) ("2024 OMB Guidance") (stating that terminations based on agency priorities were permitted "[p]rovided that the language is included in the terms and condition of the award").

Under bedrock principles of administrative law, DOJ is bound by its own regulations, even if it was not compelled to issue them in the first instance.  *See Service v. Dulles*, 354 U.S. 363, 386 (1957); *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267-68 (1954).  And these regulations not only cabin its actions but also provide this Court with meaningful standards for evaluating those actions, making them subject to judicial review.  *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019); *Pol'y & Rsch., LLC v. HHS*, 313 F. Supp. 3d 62, 76-78 (D.D.C. 2018) (Jackson, J.).  As the court concluded in *Policy & Research*, regulations that "expressly address—and limit—the agency's discretion to 'terminate' monetary awards" "provide meaningful standards for a court to employ when reviewing agency decisions under the APA."  313 F. Supp. 3 at 76.  Thus, when an agency's termination provisions apply, as they do here, OJP's decision to terminate Plaintiffs' grants is not one that is committed to agency discretion by law.  *Id.* at 76-78; *Healthy Futures of Tex. v. HHS*, 315 F. Supp. 3d 339, 341 (D.D.C. 2018) (Jackson, J.).

Nor does OJP's termination of Plaintiffs' grants fall into a category of decision-making traditionally left to agency discretion.  Although an agency's allocation of funds may in some circumstances be committed to agency discretion, *see Lincoln*, 508 U.S. at 192, Plaintiffs are not asking the Court to review OJP's initial allocation of funding.  Instead, Plaintiffs are seeking review of OJP's unlawful termination of their grants.  Even if the decision to award grants in the first instance may implicate some agency discretion, *cf. id.* at 192-93, construing and applying regulatory *termination* provisions "involve the type of legal analysis that courts routinely perform," and does not constitute unreviewable agency discretion.  *Pol'y & Rsch.*, 313 F. Supp. 3d at 83; *see also Woonasquatucket River*

*Watershed Council v. USDA*, No. 1:25-cv-00097, 2025 WL 1116157, at *16 (D.R.I. Apr. 15, 2025) ("because the funds at issue here were already awarded . . . more obligations apply," and distinguishing government termination of funding from the unreviewable agency decision relating to "appropriated but not-yet-awarded funds"). Accordingly, OJP's actions here are not committed to agency discretion and are subject to judicial review.

OJP asserts—without any citation of authority—that its "discretion includes the authority to terminate grants that no longer advance agency priorities," and therefore such decisions are ones that "are committed entirely to DOJ's discretion." PI Opp'n at 29-30. This is contrary to a host of recent cases reviewing agencies' terminations of funding on the merits. *See, e.g., S. Educ. Found. v. Dep't of Educ.*, No. 1:25-cv-01079, 2025 WL 1453047, at *1 (D.D.C. May 21, 2025) (education grants); *AIDS Vaccine Advoc. Coal. v. Dep't of State*, 766 F. Supp. 3d 74, 83 (D.D.C. 2025) (USAID grants), *appeal dismissed,* No. 25-5046, 2025 WL 621396 (D.C. Cir. Feb. 26, 2025), *stay denied*, 145 S. Ct. 753 (2025). OJP points to no court that has accepted the argument that an agency may displace judicial review simply by asserting that it is making termination decisions on a discretionary basis. Where, as here, regulatory provisions provide a standard by which to judge OJP's decision, APA review is available.

Finally, Plaintiffs have not, for purposes of their preliminary injunction motion, challenged whether the terminated grants are "in accord with [OJP's] priorities," which would equate to a substantive challenge to the underlying factual basis for terminations. PI Opp'n at 29-30; *see also Multicultural Media, Telecom & Internet Council v. FCC*, 873 F.3d 932, 936 (D.C. Cir. 2017) (Kavanaugh, J.) ("In arbitrary and capricious cases, we distinguish substantive unreasonableness claims from lack-of-reasoned-explanation claims."). Instead, Plaintiffs have argued that, regardless of the substance of its shifting priorities, OJP's terminations are *ultra vires*, violate its regulations, the APA, and the Constitution.

### ii. No other adequate remedies are available.

OJP insists that APA review is unavailable because Plaintiffs' claims can adequately be remedied in the Court of Federal Claims. For the same reasons that jurisdiction isn't available under

the Tucker Act, *see infra* Section III, OJP's argument that the Court of Federal Claims can provide Plaintiffs with an adequate remedy fails.

The lynchpin of OJP's argument is that Plaintiffs' claims fail because Plaintiffs can "vindicate their asserted right to continued funding under the terminated grant agreements" in the CFC.  PI Opp'n at 27.  But OJP's framing of Plaintiffs' relief as seeking only "continued funding" conveniently elides critical declaratory and injunctive relief that Plaintiffs have sought in this lawsuit including that related to: OJP's unlawful and atextual interpretation of Section 200.340; its apparent belief that it can provide an unspecific and identical rationale for terminating 376 grants without running afoul of arbitrary and capricious review under the APA; its violations of the Due Process Clause, the separation of powers, the Takings Clause, and the Appropriation and Spending Clauses.

OJP does not contend that Plaintiffs' constitutional, *ultra vires*, and APA claims can be addressed by the Court of Federal Claims or that the Court of Federal Claims can issue the declaratory and injunctive relief sought in this lawsuit to remedy those claims.  The government has correctly conceded that the Tucker Act does not apply to constitutional and *ultra vires* claims, and therefore the Court of Federal Claims would not be an adequate alternate remedy for those claims.  *See Aids Vaccine Advoc. Coal. v. Dep't of State*, No. 1:25-cv-00400, 2025 WL 752378, at *7 n.6 (D.D.C. Mar. 10, 2025); *see also Telemaque v. United States*, 82 Fed. Cl. 624, 626 (2008).  Additionally, because the Court of Federal Claims has limited powers to order injunctive or declaratory relief, class actions seeking that relief are not permitted in the Court of Federal Claims.  "Because the relief available in this court is generally confined to individual money claims against the United States, the situations justifying the use of a class action are correspondingly narrower than those addressed in FRCP 23."  Rules of the United States Court of Federal Claims at 38 (Section "Rules Committee Notes, 2002 Revision"), archived at https://perma.cc/TB73-AJH5 (as amended through Aug. 3, 2015).  "Thus, the court's rule does not accommodate, *inter alia*, the factual situations redressable through declaratory and injunctive relief contemplated under FRCP 23(b)(1) and (b)(2)." *Id.; see also Oztimurlenk v. United States*, 162 Fed. Cl. 658, 671-72 (2022).  In a similar vein, the Court of Federal Claims cannot adjudicate the lawfulness of

an agency's action that will affect a future, ongoing relationship between parties. *Katz v. Cisneros*, 16 F.3d 1204, 1209 (Fed. Cir. 1994).

It appears that the government's response is simply that Plaintiffs have engaged in "artful pleading," in bringing APA, constitutional, and *ultra vires* claims. But it is the nature of OJP's terminations—including its identical and unspecific rationale across 376 terminations relying on an unlawful interpretation of Section 200.340—that has prompted Plaintiffs' suit for classwide relief and necessitated these claims. This case is quite unlike the two breach of contract cases OJP relies on to support its proposition that the CFC "routinely adjudicates similar challenges to the lawfulness of such contract termination decisions." PI Opp'n at 27 (citing *Boarhog LLC v. United States*, 129 Fed. Cl. 130, 134–35 (2016) and *Gulf Grp. Gen. Enters. Co. W.L.L. v. United States*, 114 Fed. Cl. 258, 370 (2013)). Neither case involved a class action nor claims under the APA and the Constitution; rather, they were cases brought under the Contract Dispute Act alleging a garden variety breach of contract claim challenging the underlying substantive basis for the government's termination of their contract.

### iii. OJP's terminations of Plaintiffs' grants based on a change in agency priorities is contrary to law.

Plaintiffs are likely to succeed on their claim that OJP's terminations of Plaintiffs' grants were "not in accordance with law," 5 U.S.C. § 706(2)(A). An agency is "bound by its own regulations," *Nat'l Env't Dev. Assn's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (internal quotation marks omitted), and an agency's failure to follow them is "contrary to the law," *Fuller v. Winter*, 538 F. Supp. 2d 179, 191 (D.D.C. 2008).

OJP's terminations of Plaintiffs' grants based on a post-hoc "change" in agency priorities is inconsistent with Section 200.340 in two ways. *First*, Section 200.340(a)(4) does not allow OJP to terminate a grant based on a post-hoc change in agency priorities. OJP's interpretation of the termination provision is counter to the text and purpose of Section 200.340(a)(4), and its novel interpretation has, prior to 2025, never been adopted by any agency or court as a permissible reading of the termination provision. This Court should not be the first to bless it. Second, and relatedly, Section 200.340(b) requires that OJP "clearly and unambiguously specify all termination provisions"

in the terms and conditions of an award, including that an award may be terminated if it no longer effectuates the program goals or agency priorities.  2 C.F.R. § 200.340(b).  OJP did not do so and therefore was not permitted to rely on subsection (a)(4) as a basis for termination of Plaintiffs' grants.

To begin, OJP mistakenly contends that the 2020 version of the termination provision of the regulation is applicable to this dispute, 2 C.F.R. § 200.340 (2020).[1]  PI Opp'n at 30-31 ("For all the other award agreements, the relevant regulation is 2 C.F.R. § 200.340(b) as in effect before October 1, 2024."); *see also* Guidance for Grants and Agreements, 85 Fed. Reg. 49559, 49560 (Aug. 13, 2020) ("2020 OMB Guidance").  That is both incorrect and inconsistent with OJP's termination notices.  OJP's purported basis for its termination of 376 grants was Section 200.340(a)(4), a subsection that did not exist prior to the changes in the 2024 Rule, which demonstrates that OJP was relying on the 2024 Rule when it terminated the grants.  That is because DOJ applied the 2024 termination provision to any "Federal awards *active* on or after October 1, 2024," with respect to actions after that date.  *See* U.S. Dep't of Justice, *DOJ Grants Financial Guide*, https://perma.cc/TT35-JMSF (last updated Oct. 2024) (emphasis added); *see also* 2024 OMB Guidance, 89 Fed. Reg. at 30046 ("Federal agencies may elect to apply the final guidance to Federal awards issued prior to October 1, 2024").  Because DOJ elected to make the 2024 Rule retroactively applicable to awards active on or after October 1, 2024, DOJ was required to comply with Section 200.340(a)(4) when it terminated Plaintiffs' awards.  There is no dispute that Plaintiffs' awards were active as of or after that date, and therefore the 2024 termination provision applies to all awards in this dispute.  OJP's argument that its terminations were not contrary to law because, in its view, it complied with the inapplicable 2020 termination provision is therefore irrelevant and inconsistent with its application of the 2024 Rule in terminating Plaintiffs' grants.  *See* PI Opp'n at 31 ("[T]here is no doubt that DOJ, by explicitly adopting OMB's guidance through its own rule … has specified that the termination provision at § 200.340(a)(4) is applicable to its awards.").

---

[1] For ease of the Court's reference, Plaintiffs have attached as Exhibit A, a document that includes the relevant excerpted text from the regulations.

*First*, Section 200.340(a)(4) does not allow OJP to terminate a grant based on a "change" in agency priorities.  Rather, Section 200.340(a)(4) allows OJP to terminate a grant if "an award no longer effectuates the program goals or agency priorities."  2 C.F.R. § 200.340(a)(4).  A "change" in agency priorities does not trigger the boundless authority to cancel any and all grants; as Plaintiffs argued, Section 200.340(a)(4) allows for terminations because of failures stemming from the grant recipient— such as where the recipient can no longer effectuate the goals and priorities that motivated the award in the first place.  PI Mem. at 17-18.  This reading comports with the text of the regulation, OMB's exemplars of specific instances in which termination would be appropriate under this provision in the 2020 Rule, OMB's explanation for changes to the termination provision in 2024, and the fact that no agency has previously interpreted Section 200.340 in this manner prior to 2025.

OJP contends that this argument "is inconsistent with the plain language of the regulation."  PI Opp'n at 31.  In OJP's view, "one reason why an award may 'no longer' advance an agency's priorities is that those priorities have changed."  *Id.*  This interpretation ignores that the word "change" is nowhere to be found in the text.  Lacking a textual basis that an agency can rely on post-hoc changes to its priorities to terminate an award, OJP invokes individual comments to assert that "the language in § 200.340(a)(4) has always been understood to contemplate grant termination due a change in agency priorities."  *Id.*  But these comments do not lead to the conclusion OJP wishes.  OMB explained in the 2024 Rule that it "proposed to remove language that allows a Federal agency or pass-through entity to terminate an award 'if an award no longer effectuates the program goals or agency priorities.'"  2024 OMB Guidance, 89 Fed. Reg. at 30089.  The reason for this change?  It was not, as OJP asserts, because the provision had always allowed an agency to suddenly change its priorities and terminate a grant on that basis.  Rather, in OMB's view, removing this provision, was "intended to remove unnecessary language" because the proposed changes to the termination provision still allowed an agency to terminate an award "according to the terms and conditions of the award."  *Id.* at 30089; *see* Exhibit A (proposed language changes to Section 200.340(a) in 2023).  As OMB explained, an "agency

could specify the conditions upon which an award could be terminated" "including, for example, when an award no longer effectuates the program goals or agency priorities." *Id.*

This proposed removal elicited several comments. PI Opp'n at 32. OMB ultimately decided to include subsection (a)(4) in its current form not for the reason that OJP states—because it has always been understood to allow for termination due to a change in agency priorities, but because OMB believed that the language "provides greater clarity" to grantees about when an award can be terminated "by underscoring the need for agencies and pass-through entities to clearly and unambiguously communicate termination conditions in the terms and conditions of the award." 2024 OMB Guidance, 89 Fed. Reg. at 30089. As explained in Plaintiffs' motion and reiterated below, OJP separately failed to comply with Section 200.340(b)'s requirement that OJP clearly and unambiguously provide grantees with notice that an award may be terminated if an award no longer effectuates the program goals or agency priorities.

Moreover, OJP's proffered interpretation and its briefing wholly fail to grapple with the examples listed in the 2020 Rule, which demonstrate that an agency must rely on specific evidence to demonstrate that "an award" no longer serves a program goal or agency priorities that are articulated when the award was made. PI Mot. at 17-18. There would be no need for an agency to rely on "additional evidence" if an agency could simply change its priorities and cancel all grants deemed out of step with those new priorities.

Every court that has reached the merits of this administration's expansive interpretation of Section 200.340 has rejected it. *See, e.g.*, *Metro. Transp. Auth.*, 2025 WL 1513369, at *28 ("Defendants' reading of Section 200.340(a)(4), which would undermine the security of all federal awards, is at odds with the plain meaning of its text"). Indeed, as courts have noted, prior to 2025, no agency had ever terminated a grant under Section 200.340 on the grounds that an agency "changed" its priorities. *Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, No. 1:25-cv-00702, 2025 WL 833917, at *19 (D. Md. Mar. 17, 2025). Although OJP points to 25 appeals taken between 2017 and present, Henneberg Decl. ¶ 14 (Dkt. 26-1), they have not pointed to a single instance in which OJP (or any other agency) previously

terminated a grant based on the retroactive application of new priorities. *See Kisor v. Wilkie*, 588 U.S. 558, 579 (2019) (courts should not defer to an agency's new interpretation of a regulation if it creates unfair surprise or upsets reliance interests). This novel exercise of authority and lack of historical practice of interpreting Section 200.340 to allow for a post-hoc change in agency priorities greatly undercuts OJP's argument that the termination provision has "always" been understood in this manner. *See Biden v. Nebraska*, 600 U.S. 477, 501 (2023) ("Secretary has never previously claimed powers of this magnitude" and noting Secretary's invocation of a newfound authority was "inconsistent" with "past practice").

Courts have recognized the obvious danger of allowing an agency to interpret the termination provision in manner that would allow it to collectively award grants worth millions or billions of dollars over several years, and then retroactively change its priorities mid-stream and terminate grants with no advance notice. *See, e.g.*, *Metro. Transp. Auth.*, 2025 WL 1513369, at *29. As one court aptly noted, the termination provisions "and the security of contract they provide, would be rendered virtually illusory if, in the absence of some contractually agreed upon basis for termination, an agency could at any time terminate an award based upon some open-ended and unspecified change in the agency's priorities or its goals." *Id.* Unfortunately, the harms present in this case amply demonstrate the instability and chaos prompted by such an interpretation and that will undoubtedly continue if OJP's interpretation is blessed by this Court.

*Second*, the termination provision requires that OJP "clearly and unambiguously specify all termination provisions and conditions of the Federal award," 2 C.F.R. § 200.340(b), and subsection (a)(4) likewise requires that an agency must include in "the terms and conditions" notice that an award may be terminated if it no longer effectuates agency priorities. There is no dispute that all of Plaintiffs' award letters include language that "[t]he Uniform Administrative Requirements, Cost Principles, and Audit Requirements in 2 C.F.R. Part 200, as adopted and supplemented by DOJ in 2 C.F.R. Part 2800 . . . apply to this award from OJP." PI Opp'n at 30 (quoting Choi Decl. ¶ 26). It is OJP's contention, however, that its incorporation by reference of the entirety of Part 200 into the award

13

provides "clear and unambiguous notice" of the terms upon which an award can be terminated. *See* PI Opp'n at 30 ("Plaintiffs cannot complain that they were not sufficiently put on notice of the applicability of 2 C.F.R. § 200.340(a)(4)."). Incorporation by reference of more than 280 pages of federal regulations is not a reasonable interpretation of Section 200.340(b)'s "clear and unambiguous" notice requirement. Plaintiffs are likely to succeed on the merits of their claim that OJP's failure to clearly and unambiguously specify in the terms and conditions that Plaintiffs' grants could be terminated because they no longer effectuate agency priorities therefore renders its terminations contrary to law.

Prior to this administration's aggressive interpretation of when "an award no longer effectuates the program goals and agency priorities," no agency, including OJP, had ever interpreted Section 200.340 to allow for a termination based on an agency's "change" in its priorities—much less terminated a grant on this basis. It is no surprise, then, that OJP did not include this as a basis for termination in the award's terms and conditions, and OJP has pointed to no standard or special conditions (maintained on OJP's website) that provided grantees with notice of such a condition. But OJP's atextual and expansive interpretation of what constitutes clear and unambiguous notice is incorrect: it is both contrary to OMB's removal of language that an agency could satisfy its obligation to articulate termination conditions applicable to each award by dint of those requirements being "in applicable regulations," and it is inconsistent with the purposes espoused by OMB in changing the 2024 Rule to make clear that termination conditions had to be clearly spelled out in an award.

In the 2024 Rule, OMB removed language that might have allowed an agency to rely on "applicable regulations" as providing clear and unambiguous notice of the circumstances in which a grant may be terminated, which only underscores that OJP could not permissibly incorporate the entirety of Part 200 by reference and satisfy Section 200.340. *Compare* 2020 OMB Guidance, 85 Fed. Reg. at 49560 ("A Federal awarding agency should clearly and unambiguously specify termination provisions applicable to each Federal award, *in applicable regulations* or in the award, consistent with this section.") (emphasis added), *with* 2024 OMB Guidance, 89 Fed. Reg. at 30169 ("The Federal agency

or pass-through entity must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award.").  An agency is not permitted to rely on the existence of regulations as providing notice of the basis for terminating a grant; rather an agency "may" include "a" term or condition "if an award no longer effectuates the program goals or agency priorities."  2024 OMB Guidance, 89 Fed. Reg. at 30089.  Given OMB's changes to the text of subsection (b) and its explanation of those changes in the 2024 Rule, OJP's incorporation by reference of the entirety of Part 200 does not satisfy the requirement that an agency "clearly and unambiguously" communicate termination conditions, or that such incorporation by reference could conceivably be considered "a" term, *i.e.*, a specific term and condition of the award, that clearly and unambiguously provides a grantee with notice of the circumstances in which its grant could be terminated.  *See Metro. Transp. Auth.*, 2025 WL 1513369, at *27 ("The federal government can reserve to itself the right to terminate an award and to deprive the award recipient of the value of that investment, but to do so it must set forth the terms and conditions upon which it will terminate the award when the award is granted and before the investment is made.").

OMB's explanation of the changes to Section 200.340(b) clearly relay that the changes to the termination provision were intended to require that agencies clearly and unambiguously specify the terms under which a grant could be terminated.  OJP did not do so.  Its incorporation by reference of the entirety of Part 200 does not satisfy Section 200.340's clear and unambiguous notice requirements, and it did not put Plaintiffs on notice that an award could be terminated based on subsection (a)(4).  OJP's failure to include a specific condition that grants could be terminated on this basis and its subsequent termination on that basis is therefore contrary to law.  Every court that has considered the government's contrary interpretation has rejected it.  *See, e.g., Climate United Fund v. Citibank, N.A.*, No. 1:25-cv-00698, 2025 WL 1131412, at *16 (D.D.C. Apr. 16, 2025) ("*Climate United Fund II*") (holding that Section 200.340's plain language states that the agency "can only terminate a federal award on this basis pursuant to the terms and conditions of the federal award"); *Metro. Transp. Auth.*, 2025 WL 1513369, at *28 ("Section 200.340 does not create a default ability by the federal government to

terminate an award over the award recipient's objection, whenever an agency determines its priorities have changed. It requires a change in agency priorities to be set forth as a term and condition if the agency wishes to reserve to itself the right to rescind the award based on a change in priority.").

Plaintiffs are thus likely to succeed on the merits of their APA claim that OJP's interpretations of Section 200.340 are contrary to law. Given the federal government's apparent pervasive use of Section 200.340(a)(4) to unlawfully terminate grants as being inconsistent with changed agency priorities and OJP's interpretation of this provision, Plaintiffs ask that this Court preliminarily enjoin defendants (1) interpretation that it can terminate "grants under 2 C.F.R. § 200.340(a)(4) on the basis of a 'change' in agency priorities," Compl. ¶ 30; and (2) "from enforcing, implementing, maintaining, or giving effect to the terminations of putative class members' grants, including through the enforcement of closeout obligations," *id.*

### iv. OJP's terminations of Plaintiffs' grants are arbitrary, capricious, and an abuse of agency discretion.

Plaintiffs are also likely to succeed on their claim that OJP's identical, cursory, and unreasoned terminations of 376 grants represent nearly every hallmark of arbitrary and capricious agency action. OJP's defense of this claim ignores the vast bulk of Plaintiffs' arguments, PI Mem. 18-22, including that (1) the terminations did not include any explanation specific to each individual grantee or explain why each award no longer "directly" served OJP's purported changed priorities; (2) that the agency did not consider or explain in any of the termination notices the serious reliance interests impacted by OJP's sudden change in agency priorities; and (3) that the agency did not consider alternatives to abruptly terminating funding or give a reasoned explanation for its rejection of such alternatives. OJP's failure to address these arguments is dispositive of Plaintiffs' arbitrary and capricious claim, and on this claim alone the Court could conclude that Plaintiffs are likely to succeed on the merits of at least one of their claims.

OJP musters two lukewarm but ultimately unpersuasive defenses: (1) that OJP undertook an "individualized" review process, PI Opp'n at 32, and (2) that its identical "explanation to each terminated grant recipient" does not amount to a failure to provide a reasoned and individualized

explanation but rather "shows DOJ's consistency in its asserted policy priorities." *Id.* at 33. In OJP's view, "these explanations are more than sufficient" under the APA. *Id.* That makes a mockery of reasoned and reasonably explained agency decisions that are specific to each individual grantee and that also consider and articulate the significant reliance interests at stake by the agency's purported change in policy priorities.

OJP asserts in its opposition that its review was "meticulous" and that "each grant was terminated only after a thorough and careful individualized review process." *Id.* at 32 (citing Henneberg Decl. ¶¶ 18-19). Not a whiff of this purportedly individualized and meticulous review can be gleaned from the explanation OJP provided to Plaintiffs in the termination notices.[2] It also does not dispel the allegation in Plaintiffs' Complaint that "DOGE staffer Tarak Makecha—a former Tesla employee—is reportedly listed as the author of the spreadsheet listing the grant awards targeted for termination" and that Makecha "reportedly created this list without consulting the OJP program managers, many of whom learned of the terminations only after they were communicated to grantees." Compl. ¶ 48. To the contrary, Henneberg's explanation of the "iterative process," "the Department" undertook to terminate Plaintiffs' grants is striking in its use of passive voice, including that "OJP *was directed* to terminate 376" awards. Henneberg Decl. ¶¶ 18-19 (emphasis added). The declaration does not identify who directed OJP to terminate the awards; nor does it state that any individual within OJP made the determination to terminate Plaintiffs' grants. The declaration suggests the opposite: that OJP was directed to terminate, and then later reinstate certain grants: "*pursuant to such direction*, between April 4 and April 22, OJP terminated such award and sent notice of the termination to each pertinent party." *Id.* ¶ 19 (emphasis added). Indeed, the declaration's persistent use of passive voice raises questions about whether the "iterative process" used to "determine whether [the grants] furthered current department priorities," *id.* ¶ 18, was a task carried out by persons outside OJP,

---

[2] Plaintiffs note that OJP did not attach any agency documents to support its assertion that its process for reviewing the challenged grant terminations was individualized, including any of the underlying agency documents that might provide credible evidence of its statement that OJP undertook an individualized review of Plaintiffs' grants or that might provide either individualized or specific reason for OJP's terminations.

without input from those within OJP, including whether the grants "directly" carried out the priorities OJP listed in the termination letters. OJP's review was so apparently so "meticulous," PI Opp'n at 32, that "within a few days" of the terminations "*OJP was directed* to rescind" certain terminations, Henneberg Decl. ¶ 21 (emphasis added).[3] Ultimately, whether the review was, in fact, individualized or meticulous is irrelevant to Plaintiffs' arbitrary and capricious claim for purposes of resolving the preliminary injunction motion. OJP is required under the APA to translate its review process into a reasoned explanation. It did not do so.

A "fundamental" requirement of administrative law is that an agency "set forth" the "reasons" for its decision. *Tourus Recs., Inc. v. DEA*, 259 F.3d 731, 737 (D.C. Cir. 2001) (citation modified). An agency may not depart from a prior policy without providing "good reasons for the new policy" and showing "that the new policy is permissible under the statute." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). "It is not that further justification is demanded by the mere fact of policy change"—formal or informal, *cf.* PI Opp'n at 33—"but that a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy," *Fox Television Stations*, 556 U.S. at 515-16.

OJP admits that each notice was identical, Henneberg Decl. ¶ 20, and did not include any explanation specific to the terminated grantee or any discussion of the significant reliance interests at stake. OJP does not respond to or dispute Plaintiffs' argument that it entirely failed to consider reliance interests when terminating Plaintiffs' grants, PI Mem. at 20-22, and that it failed to consider "responsible alternatives to its chosen policy" and failed "to give a reasoned explanation for its rejection of such alternatives," PI Mem. at 21.[4] OJP's statement in a "declaration" that its review was

---

[3] A recent ProPublica article reveals that a DOGE staffer used AI to discern whether certain VA contracts "directly" supported certain policy areas to determine whether a contract should be cancelled, resulting in significant errors. *See* Brandon Roberts & Vernal Coleman, *Inside the AI Prompts DOGE Used to "Munch" Contracts Related to Veterans' Health*, ProPublica (June 6, 2025), https://perma.cc/9XA5-B8MZ.

[4] Reliance interests are just one of a number of important issues that OJP "entirely failed to consider." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). It also, for example, failed to weigh whether Plaintiffs' projects could be adjusted, rather than defunded altogether, to comply with OJP's new "priorities."

individualized "fails to remedy that the Termination Letter evinces no individualized consideration of Grant Recipient awards." *Am. Ass'n of Colls. for Tchr. Educ.*, 2025 WL 833917, at *22. Every court to have considered the merits of similar boilerplate terminations has concluded that such explanations do not survive arbitrary and capricious review, cases that OJP does not address or distinguish, *see* PI Mem. at 20-21 (citing cases).

Finally, whether DOJ was consistent across its asserted policy priorities, PI Opp'n at 33, does not absolve OJP from providing a reasonable explanation as to why each grant award no longer "directly" served such policies, a discussion of the alternatives, and a discussion of the reliance interests at stake from OJP's termination of grants based on its "change" in policy priorities. Any suggestion that OJP's terminations are reasoned and individualized is "incongruent with what the record reveals about the agency's . . . decisionmaking process." *Dep't of Com.*, 588 U.S. at 785; *see also Pol'y & Rsch.*, 313 F. Supp. 3d at 83 (agency violated APA in failing to "undertake the kind of reasoned analysis of potential causes [for cutting project short] that the APA and its own regulations require"). Because OJP failed to engage in reasoned decisionmaking when it terminated Plaintiffs' grants, Plaintiffs are likely to succeed on the merits of their APA claim that the terminations are arbitrary and capricious.

## II.    OJP's Terminations of Plaintiffs' Grants Violates the Constitution.

### A.    OJP's terminations of Plaintiffs' grants without notice violates their procedural Due Process rights.

With respect to Plaintiffs' Fifth Amendment Due Process claim, Defendants do not contest that OJP terminated Plaintiffs' grants without pre-deprivation notice, a hearing, or any process whatsoever. Instead, Defendants argue that Count I fails because Plaintiffs do not have a protected property interest in their federal grant funding. PI Opp'n at 18-19. For several reasons, Defendants are mistaken.

*First*, the government's entire argument incorrectly assumes that this case is a garden-variety breach of contract case. *Id.* at 18. ("The grant agreements are contracts . . . and "[t]he Supreme Court 'has never held that government contracts . . . create property interests protected by due process.'")

(citation modified). But as explained below, the agreements at issue are not contracts, and Plaintiffs' claims are not contract claims. *See infra* Section III.

*Second*, even if the agreements were contracts, they would still create a property interest protected by the Fifth Amendment. *See, e.g., Loc. 342, Long Island Pub. Serv. Emps., UMD, ILA, AFL-CIO v. Town Bd. of Huntington*, 31 F.3d 1191, 1194 (2d Cir. 1994) (summarizing "what is necessary to elevate a mere contract right to the level of a protectible entitlement") (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)). For instance, courts have held that a property interest may be created by "an independent source," such as other laws or regulations, "that secure certain benefits and that support claims of entitlement to those benefits." *Roth*, 408 U.S. at 577. This interest can arise where the governing law specifies that the government may not terminate a benefit except "for cause," *see Esparraguera v. Dep't of the Army*, 101 F.4th 28, 33 (D.C. Cir. 2024), or where the "implementing regulations place substantive limitations on official discretion to withhold award of the benefit upon satisfaction of the eligibility criteria," *see NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 41 n.15 (D.C. Cir. 2015). In moving for a preliminary injunction in this case, Plaintiffs demonstrated that 2 C.F.R. § 200.340(a)—the governing regulation specific to grant terminations—places substantive limitations on OJP's discretion to terminate the grants at issue. *See* PI Mem. at 12 (citing the provisions in 2 C.F.R. § 200.340(a)). Therefore, even if the agreements at issue are contracts—which they are not—the governing regulation is exactly the type of "independent source" that courts have held elevate a mere contract to the level of a protectible entitlement. *Roth*, 408 U.S. at 577.

*Third*, the government's assertion that OJP terminated the agreements at issue pursuant to their "terms" is incorrect. PI Opp'n at 30-31. As has already been shown, OJP's terminations were contrary to the regulatory scheme governing such terminations. *See, e.g.*, PI Mem. at 15-16.

*Fourth,* OJP's reliance on *National Urban League v. Trump*, No. 1:25-cv-00471, 2025 WL 1275613 (D.D.C. May 2, 2025) supports Plaintiffs and not the government. *See* PI Opp'n at 19. In explaining why there was no constitutionally protected interest in the terminated contracts and grants, the court in that case stressed that the plaintiffs had "barely contend[ed] that they … have a protected property

interest." *Nat'l Urb. League*, 2025 WL 1275613, at *18.  The court also underscored that Plaintiffs had even failed to "identify a single grant or contract that purportedly supplie[d]" the property interest. *Id.* at *15.  In short, because the plaintiffs failed to explain how the terminations would implicate property or liberty interests for them or anyone else, the court treated the terminations as simple contract breaches.  *Id.* at *17.  Here, by contrast, Plaintiffs not only identify the specific grants that were terminated, but also demonstrate the various ways in which the terminations have severely implicated their property interests.  *See, e.g.*, PI Mem. at 23 (describing Plaintiffs' reliance on the funding they were awarded and relied on).

*Finally*, Plaintiffs note that typically, prior to termination, an agency is required to work with a grantee to bring them back into compliance.  *See* 2 C.F.R. § 200.399.  Only if an agency "determines that noncompliance cannot be remedied by imposing specific conditions," can the agency take steps to temporarily withhold or terminate funds.  *Id.*  OJP's failure to provide Plaintiffs with any opportunity to explain why the awards did comply with the administration's changed priorities or attempt to work with Plaintiffs only further underscores the unprecedented nature of OJP's terminations and the manner in which they violate both constitutional and regulatory presumptions of notice prior to termination.  Because Plaintiffs have shown that they have a protected property interest in the agreements, they have shown a likelihood of success on the merits that OJP violated Plaintiffs' procedural Due Process rights.

### B.  OJP's Implementation of 2 CFR § 200.340(a)(4) to Terminate Plaintiffs' Grants is Void for Vagueness as Applied to Plaintiffs.

In their papers, Defendants do not—and cannot—refute that OJP's use of Section 200.340(a)(4), as applied to Plaintiffs' grants, would effectively allow "any other agency" to "change priorities, with no notice, and abruptly terminate millions or billions of dollars of grant funding on the basis of changed political priorities."  PI Mem. at 25.  Instead, in arguing that Plaintiffs' void-for-vagueness claim fails, the government hitches the entirety of its argument to a single case.

But Defendants' reliance on *National Endowment for the Arts v. Finley*, 524 U.S. 569 (1998) is misplaced.  PI Opp'n at 19-20.  In *Finley*, the question before the Court was whether a prospective

grantee had a constitutional interest in an award that had not yet been conferred.  524 U.S. at 588.  In that case, unsurprisingly, the Court held that any deprivation pursuant to the First and Fifth Amendments could not possibly be "severe."  *Id.*  Thus, the Court held that it would be illogical for a statute enumerating the criteria for those grants—which used "undeniably opaque" language—could not be void for vagueness.  *Id.*  Here, by contrast, Plaintiffs challenge the *termination* of an award that has already been allocated—not the selection criteria for a future award that *could* be awarded.  *See* Section I.A.i *supra*, explaining this distinction in more detail.  As the Supreme Court has made clear, "procedural protection of property is a safeguard of the security of interests that a person *has already acquired* in specific benefits."  *Roth*, 408 U.S. at 576.  Thus, because the case at bar concerns a decision to terminate grants and not a decision to award grants, *Finley* does not apply.

Apparently acknowledging that *Finley* is inapt, the government cites a case from the Court of Federal Claims that concerns the *termination* of an agreement.  *See* PI Opp'n at 31.  But *Northrop Grumman Corp. v. United States*, 46 Fed. Cl. 622 (Fed. Cl. 2000) is even more off base.  In *Northrop*, the Court of Federal Claims considered whether the government "acted in bad faith" in terminating a contract pursuant to a clause called a "Termination for Convenience Clause."  However, none of the agreements at issue in this case contain such a clause, and Section 200.340 likewise does not allow for termination on that basis.  In addition, no Constitutional claims were at issue in *Northrop*.  Therefore, the analysis in *Northrop* has no bearing on the claims at issue in this case.  Plaintiffs have thus demonstrated a likelihood of success on the merits of their void for vagueness claims.

### C.  Exhaustion of administrative remedies is not required.

As a last ditch effort, OJP argues that Plaintiffs' Fifth Amendment claims fail because Plaintiffs did not exhaust OJP's administrative appeal process.  But Plaintiffs are not required to exhaust administrative remedies prior to bringing suit.  A plaintiff must exhaust its administrative remedies when bringing a procedural due process claim only when "an established administrative framework" is "required" by law to be "utilize[d] in order to seek relief."  *English v. District of Columbia*, 815 F. Supp. 2d 254, 260 (D.D.C. 2011), *aff'd*, 717 F.3d 968 (D.C. Cir. 2013).  No such "established administrative

framework" is "required" to be utilized by grantees under 2 C.F.R. § 200.342.  Although DOJ "must comply with any requirements for hearings, appeals, or other administrative proceedings" under the regulation, no such mandatory requirement applies to affected grantees (such as Plaintiffs) who choose not to proceed with an administrative appeal.  Notably, the cases cited by Defendants in their brief in support of an exhaustion requirement all appear to be cases concerning laws that do mandate exhaustion—with the exception of *English*, which found that exhaustion was *not* required as a result of the law not separately mandating exhaustion. *See, e.g.*, *Wilson v. Pena*, 79 F.3d 154 (D.C. Cir. 1996) (a Title VII case requiring exhaustion through the EEOC); *Laffey v. N.W. Airlines, Inc.*, 567 F.2d 429 (D.C. Cir. 1976) (same); *Marine Mammal Conservancy, Inc. v. USDA*, 134 F.3d 409, 410 (D.C. Cir. 1998) (case under the Administrative Orders Review Act, which specifically requires a "final order" of the agency prior to judicial review).  Finally, because Plaintiffs' grants would otherwise remain terminated pending administrative review, for the reasons stated in Section IV, *infra*, irreparable injury would result unless judicial review is permitted.

### D.  OJP violated the separation of powers, the Spending and Appropriations Clauses, and the Take Care Clause.

Defendants meekly attempt to sidestep their constitutional obligations by asserting that the terminations were permissible because they intend at some unspecified date and in some unspecified way to "re-obligate funds in a manner that ensures grant funding is used to advance agency priorities." PI Opp'n at 22.  That misses the mark.[5]  Once OJP awarded the grants pursuant to congressional mandate to advance articulated legislative goals (*e.g.*, a "community violence intervention and prevention initiative," Compl. ¶ 111 (quoting Bipartisan Safer Communities Act, Pub. L. No. 117-159, 136 Stat. 1313, 1339 (June 25, 2022)), Defendants lacked authority under the Spending and Appropriations Clauses to terminate such grants unless otherwise authorized by Congress.  And without such authority, these terminations were and are unconstitutional.

---

[5] To the extent Defendants are moving to dismiss the constitutional claim under Federal Rule of Civil Procedure 12(b)(6)—which is far from clear in their brief—whether the funds are going to be re-obligated is a factual question conflicting with the allegations in the Complaint, which is that Defendants are going to "simply pocket the money." ¶ 111.

Nowhere is this more evident than OJP's termination of grants for community violence intervention (CVI) programs, for which federal funding is the primary source. Amicus Br. of Loc. Gov'ts at 10 (Dkt. 30). Despite the fact that CVI is "funded by annual appropriations and dollars authorized by the Bipartisan Safer Communities Act (which specified the allocation of $250 million for community violence intervention grants over a five-year period), OJP slashed approximately half of the investments already made in these programs." *Id.*

In this regard, *PFLAG, Inc. v. Trump* is instructive. No. 8:25-cv-00337, 2025 WL 685124 (D. Md. Mar. 4, 2025). *PFLAG* concerned discretionary grants issued by, among other agencies, the Health Resources and Services Administration, pursuant to an appropriation by Congress. *Id.* at *3. The President issued Executive Orders that purported to withhold federal funds to grant-recipients unless they complied with certain additional conditions contained in the Executive Orders. *Id.* Although HRSA had discretion in the initial award of grants and selection of grantees, the court noted that discretion did not give the President the unilateral power to apply its own post hoc set of requirements on receipt of federal funds by grant recipients. *Id.* at *14-18. To do so, the court held, was "a clear violation of the Constitution as attempts by the Executive Branch to place new conditions on federal funds are improper attempts to wield Congress's exclusive spending power and is a violation of the Constitution's separation of powers principles." *Id.* at *15 (citation modified) (quoting *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 531 (N.D. Cal. 2017)).

Defendants' actions in this case are more extreme than the unconstitutional actions taken in *PFLAG*. This case concerns not just a threat to withhold funding (as occurred in *PFLAG*), but actual termination of grant funding. In other words, if withholding funds appropriated pursuant to a discretionary grant authorized by Congress is unconstitutional, *a fortiori* terminating such grants without congressional approval is likewise unconstitutional. OJP's boilerplate assertion stating that the awards are being terminated because they "no longer effectuate[] the program goals or agency priorities" does not change the analysis. As it concerns spending of duly appropriated funds, the Executive has no authority to determine that compliance with congressional aims is no longer

24

departmental priority even if purportedly authorized by a federal rule because "Article II does not authorize the President to terminate federal grants authorized by Congress." *PFLAG,* 2025 WL 685124, at *14.

OJP's interpretation of *Aiken County* does not change the analysis. Defendants confidently—yet incorrectly—cite *Aiken County* for the proposition that "the only proper remedy would be an injunction requiring DOJ to re-obligate the grant funds and thereby continue the grantmaking process, not to re-institute Plaintiffs' grants." PI Opp'n at 23 (citing *In re Aiken Cnty.*, 725 F.3d 255, 267 (D.C. Cir. 2013)). Not so. *Aiken County* instead ruled that the "the Nuclear Regulatory Commission [was required to] promptly continue with the legally mandated licensing process." 725 F.3d at 267. Here, OJP must "continue with the legally mandated" grant process—namely, fulfilling their constitutional requirement to fund grantees already selected to effectuate Congress' expressed legislative goals rather than to withhold such funds for unarticulated reasons that have nothing to do with the policy goals articulated by Congress.

OJP's argument concerning the Take Care Clause is, if anything, even more deficient. According to Defendants, they did not violate the Take Care Clause because a "subordinate Executive officer cannot violate" the Take Care Clause. PI Opp'n at 35. That is a gross and dangerous misstatement of the law. The District of Massachusetts recently explained the erroneous nature of this novel constitutional interpretation:

> The Supreme Court in *Myers* [*v. United States*, 272 U.S. 52, 117 (1926)] recognized that "the President alone and unaided could not execute the laws. He must execute them by the assistance of subordinates. This view has since been repeatedly affirmed by this court." *Myers*, 272 U.S. at 117; *Aiken Cnty.*, 725 F.3d at 259 ("[T]he Executive must abide by statutory mandates and prohibitions. Those basic constitutional principles apply to the President and subordinate executive agencies"). If Defendants were correct that the Take Care clause only applies to the President, a President could evade Article II review by simply delegating the task to subordinates.

*New York v. McMahon*, No. 1:25-cv-10601, 2025 WL 1463009, at *22 n.15 (D. Mass. May 22, 2025). As in *McMahon*, this Court should deny Defendants' novel attempt to narrow the Take Care Clause to a single individual.

OJP's final argument concerning the constitutional violations alleged in the Complaint should similarly be brushed aside. Defendants argue that "Plaintiffs' asserted constitutional claims are simply statutory appropriations claims dressed up in constitutional language." PI Opp'n at 24. In OJP's view, apparently, a claim that the Executive has failed to spend duly appropriately federal funds, or to take care the laws are faithfully executed, is merely a statutory question. That is another novel argument completely unsupported by case law. The case that Defendants cite in support of this argument, *Dalton v. Specter*, 511 U.S. 462, 473 (1994), is entirely inapposite. *Dalton* held that allegations that "the President has exceeded his statutory authority are not 'constitutional' claims." *Id.* But the Complaint alleges more than "the President has exceeded his statutory authority": it alleges that Defendants have violated several specific provisions of the Constitution. Plaintiffs have not "dressed up" their claims in "constitutional language," as OJP argues. Instead, Defendants have created a straw man by mischaracterizing the serious constitutional violations alleged in the Complaint as statutory violations. But their say so—albeit done with some conviction—does not make it true. That argument, too, should be rejected by this Court.

### E. Defendants Bondi's and Henneberg's actions were *ultra vires*

As alleged in the Complaint, "OJP lacked constitutional, statutory, and regulatory authority to issue or implement the *en masse* termination of the Plaintiffs' and putative class members' grant awards." Compl. ¶ 102. Consequently, Plaintiffs have sufficiently alleged a cause of action—and shown a likelihood of success on the merits—for Defendants having acted "beyond th[e] limitations" set by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

Defendants' arguments to the contrary are unpersuasive for several reasons. *First*, Defendants misconstrue *Board of Governors of the Federal Reserve System v. MCorp Fin., Inc.*, 502 U.S. 32 (1991). *MCorp* did not hold that a "meaningful and adequate" alternative to immediate judicial review precludes an *ultra vires* claim. *Id.* at 43. Instead, the court held that such an alternative *and* "clear and convincing evidence of a contrary legislative intent" to restrict judicial review divests a court of jurisdiction. *Id.*

at 44 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 141 (1967)).  Defendants do not even attempt to argue—presumably because they cannot—that the latter necessary factor is present here.

*Second*, Defendants unconvincingly rehash their Tucker Act arguments to argue against the propriety of the *ultra vires* claim.  As noted in Section III *infra*, the Tucker Act does not bar Plaintiffs' claims.  For analogous reasons, the Tucker Act also does not affect the *ultra vires* claim.

*Third*, Defendants are incorrect that the import of the *ultra vires* claim in this action would mean that "every breach-of-government-contract claim could be reframed as an ultra vires action."  PI Opp'n at 25.  As noted in Section III, *infra*, Plaintiffs have not brought a breach of contract claim and therefore would have no such effect.  Likewise, the *Megapulse* test would not be "easily evaded."  *Id.* Where—as here—the claims are not breach-of-government-contract claims, the claim does not create any kind of end-run around *Megapulse, Inc. v. Lewis,* 672 F.2d 959 (D.C. Cir. 1982).

*Finally*, *North American Butterfly Association v. Wolf* is also of no help to Defendants.  977 F.3d 1244 (D.C. Cir. 2020).  In that case, the D.C. Circuit held that an officer's action is *ultra vires* if the action "violated 'a specific prohibition in the statute that is clear and mandatory,' was 'obviously beyond the terms of the statute,' or was 'far outside the scope of the task that Congress gave it."  *Id.* at 1263 (citation omitted).  Defendants state that there is no allegation of a violation of a prohibition that was "clear and mandatory," PI Opp'n at 26, but then entirely fail to address the two alternatives in that case.  The Complaint does allege that OJP's actions were "obviously beyond the terms of the statute" and "far outside the scope of the task that Congress gave it."  *See* Compl. ¶¶ 99-102.  *North American Butterfly* thus supports Plaintiffs' *ultra vires* claim, and none of Defendants' arguments credibly suggest otherwise.

## III.    This Court has Jurisdiction Over all of Plaintiffs' Claims.

In determining whether the Tucker Act divests this Court of jurisdiction, the critical question is whether Plaintiffs' claims turn on "interpretations of statutes and regulations rather than the terms of an agreement negotiated by the parties."  *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *12 (D.C. Cir. May 3, 2025), *reconsideration en banc denied*, No. 25-5144, 2025 WL 1556440 (D.C. Cir.

May 22, 2025), & *on reconsideration en banc*, No. 25-5144, 2025 WL 1521355 (D.C. Cir. May 28, 2025) (Pillard, J., dissenting).  To answer this question, courts consider the source of rights upon which plaintiffs "base[] [their] claims" as well as the relief sought.  *Perry Cap. LLC v. Mnuchin*, 864 F.3d. 591, 619 (D.C. Cir. 2017).  OJP's conclusion—that Plaintiffs' claims should lie with the Court of Federal Claims, PI Opp'n at 8—is erroneous.  Both the relief Plaintiffs seek and the source of their claims squarely point to jurisdiction in this Court.  PI Mem. at 29-31.  Additionally, because Plaintiffs' grants are not contracts and do not create a right to money damages, Plaintiffs' claims are not contract claims, and the Court of Federal Claims has no jurisdiction to adjudicate Plaintiffs' claims.[6] PI Mem. at 34-35.

### A. The Court has jurisdiction over Plaintiffs' APA claims, which are not contractual and do not seek money damages.

"This court retains the power to make rational distinctions between actions sounding genuinely in contract and those based on truly independent legal grounds."  *Megapulse*, 672 F.2d at 969-70.  Where, as here, "determining whether the [defendants] infringed [plaintiffs'] rights as alleged in the complaint requires primarily an examination of the statutes the [defendants] ha[ve] purportedly violated, not of [plaintiff's] contract with [defendants]," the district court has jurisdiction over the case.  *Crowley Gov't Servs., Inc. v. GSA,* 38 F.4th 1099, 1108-09 (D.C. Cir. 2022).  As Plaintiffs explained at length in the PI motion, the Tucker Act does not divest this Court of jurisdiction over its claims because they are not contract claims.  PI Mem. at 28-36.

---

[6] Although Defendants do articulate an argument (albeit not a meritorious one as explained above) as it concerns their motion to dismiss for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1), they do nothing of the sort as it concerns their passing reference to their motion under Fed. R. Civ. P. 12(b)(6).  Indeed, the only argument concerning failure to state a claim appears on the eighteenth page of Defendants' brief and pertains only to Plaintiffs' procedural due process claim.  That argument is addressed *supra*.  As it concerns Plaintiffs' other claims, however, Defendants entirely fail to even attempt any argument or analysis concerning failure to state a claim, and therefore forfeit that argument.  *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 179 (D.C. Cir. 2019) ("A party forfeits an argument by mentioning it only 'in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.'") (quoting *Schneider v. Kissinger*, 412 F.3d 190, 200 n.1 (D.C. Cir. 2005)).

Conflating the source of the *relationship* between the parties (the grant agreements), with the *source* of Plaintiffs' rights (the APA, Constitution, and federal law), OJP contends that "Plaintiffs' claims amount to the very sort of contractual claims for monetary relief against the federal government" because Plaintiffs' claims "are premised on contracts with the government, challenge the government's exercise of express contractual rights, and seek to compel the government to continue paying money under those contracts." PI Opp'n at 9. But OJP can sustain this conclusion only by omitting or otherwise ignoring in its analysis the critical requests for relief sought in this lawsuit. *See id.* at 10 ("Plaintiffs' claims are effectively based on an alleged right to continued funding under the various grant agreements."). This includes several questions of law, with corresponding requests for declaratory and injunctive relief, that have nothing at all to do with "compel[ling] the government to continue to paying money under those contracts." *Id.* at 9.

As the discussion of the merits reveals, Plaintiffs are deeply concerned with OJP's novel and expansive interpretation of Section 200.340, as (1) allowing a termination of a grant based on an agency's post-hoc "change" in priorities, and (2) whether incorporation by reference of the entirety of Part 200 satisfies 200.340(b)'s requirement that OJP provide grantees with clear and unambiguous notice that it may terminate a grant on the basis that "a grant no longer effectuates agency priorities." These are both questions of law under the APA—whether OJP has properly interpreted Section 200.340's termination requirements—the answer to which does not in any meaningful sense depend on the underlying contracts. Whether an agency has properly interpreted a regulation is a bread-and-butter question under the APA that district courts confront every day and certainly have the jurisdiction and competency to resolve. Plaintiffs' relief, too, aligns with relief typically sought in an APA case. Plaintiffs have asked that this Court to "[d]eclare that OJP's terminations on the basis of Section 200.340(a)(4) are unlawful, including its interpretation that 2 C.F.R. § 200.340(a)(4) allows OJP to terminate a grant based on a "change" in agency priorities," Compl., Prayer for Relief (E), and to "[p]reliminarily and permanently enjoin Defendants, their agents, and all persons acting in concert or participation with Defendants from terminating grants under 2 C.F.R. § 200.340(a)(4) on the basis of

a "change" in agency priorities." Compl., Prayer for Relief (K). Similarly, Plaintiffs assert that OJP's identical, boilerplate explanation terminating 376 grants is neither reasonable, nor reasonably explained. OJP contends that its explanation satisfies the APA and that it need supply no further detail when terminating more than 800 million dollars in grant funding, and so Plaintiffs seek related declaratory and injunctive relief. Plaintiffs also have requested prospective injunctive relief that would "enjoin OJP from terminating Plaintiffs' grants without notice and a reasonable opportunity to object prior to deprivation of their protected interests in grant funding." Compl. ¶ 90.

There is independent value to Plaintiffs in prospective relief making clear that OJP may not, consistent with the APA or the Due Process Clause, terminate grants without including any individualized discussion of the grants it is terminating or a discussion of grantees' reliance interests. This relief is all the more important given the government's unprecedented use of Section 200.340(a)(4) across a wide variety of agencies to abruptly terminate grant funding for hundreds or thousands of grants with little to no reasoning and without providing grantees with any pre-deprivation notice and an opportunity to object.

Thus, Plaintiffs' APA claims seek "non-monetary relief that has 'considerable value' independent of any future potential for monetary relief," by seeking prospective declaratory and injunctive relief to invalidate and enjoin OJP's interpretation of Section 200.340 and prospective relief that would prevent OJP from terminating grants without pre-deprivation notice and on the threadbare basis present here. *See Kidwell v. Dep't of Army, Bd. for Corr. of Mil. Recs.*, 56 F.3d 279, 284 (D.C. Cir. 1995); *see also Crowley*, 38 F.4th at 1107-08. This relief is not "negligible in comparison with the potential monetary recovery," and as such, Plaintiffs' *ultra vires*, APA, and Constitutional "claims do not fall within the Tucker Act." *Kidwell,* 56 F.3d at 284.

This conclusion aligns with the government recent, and correct, argument to the Supreme Court that "APA suits do not 'claim a breach of contract' … such claims instead rest on statutory or constitutional theories independent of the contract terms." Application to Vacate Order, *Dep't of Educ. v. California*, No. 24A910, 2025 WL 945313, at *14 (U.S. Mar. 26, 2025). And in *Colorado v. HHS*, a

district court in Rhode Island preliminarily enjoined an agency's termination of grant funding holding that it had jurisdiction because the case "concerns the process the Government undertook when terminating the funding based on the end of the pandemic," something that it could determine by reviewing "the governing federal statute and regulations." Mem. and Order on Prelim. Inj. at 19, No. 1:25-cv-00121 (D.R.I. May 16, 2025), Dkt. 84. There, as here, Plaintiffs "assert[ed] constitutional claims alongside [their] APA claims," which made the source of their rights "even clearer." *Id.* at 18.

Defendants are, of course, correct that Plaintiffs have sought "an injunction preventing OJP from implementing, maintaining, or giving effect to unlawful grant terminations," PI Opp'n at 11, and OJP spends the majority of its brief collapsing Plaintiffs' claims into ones that, in its view, only seek "to compel the government to continue paying money" under the grant agreements. But it makes no difference here that Plaintiffs' requested relief may, in part, result in reinstatement of grant funding. The Supreme Court in *Bowen* (a case Defendants conveniently ignore) establishes that "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988); *see also* PI Mem. at 30, citing *Lummi Tribe Rsrv. v. United States*, 870 F.3d 1313, 1318-19 (Fed. Cir. 2017). Precedent in the D.C. Circuit further compels this Court to "accept jurisdiction over a statutory or constitutional claim for injunctive relief [as Plaintiffs' request here] even where the relief sought is an order forcing the government to obey the term of a contract." *Transohio Sav. Bank v. Dir. Off. of Thrift Supervision*, 967 F.2d 598, 610 (D.C. Cir. 1992); *see* PI Mem at 35-36. "Since *Megapulse*, the District of Columbia Circuit has warned against a Tucker Act interpretation that is 'so broad as to deny a court jurisdiction to consider a claim that is validly based on grounds other than a contractual relationship with the government.'" *Maryland v. Corp. for Nat'l & Cmty. Serv.*, No. 1:25-cv-01363, 2025 WL 1585051, at *28 (D. Md. June 5, 2025) (States' request for declaratory and prospective injunctive relief were not contractual in nature and accordingly district court had jurisdiction over them) (citing *Megapulse,* 672 F.2d at 968). Defendants' reliance on the *Catholic Bishops* is inapposite. The Plaintiffs here are not asking the government to "keep paying up," *U.S. Conf. of Cath. Bishops v. Dep't of State*, No. 1:25-cv-

00465, 2025 WL 763738, at *5 (D.D.C. Mar. 11, 2025), *dismissed U.S. Conf. of Cath. Bishops v. Dep't of State*, No. 25-5066, 2025 WL 1350103 (D.C. Cir. May 2, 2025).  Plaintiffs instead have argued that OJP's terminations violate the APA, the Constitution, and federal law.  Resultingly, "[h]ere, as in *Bowen*, the essence of [Plaintiffs'] compliant and requested relief is equitable, not monetary."  *Corp. for Nat'l & Cmty. Serv.*, 2025 WL 1585051, at *25.

OJP also argues that because statutory provisions and regulations are incorporated into Plaintiffs' grant agreements, the agreements are the source of Plaintiffs' rights and transform Plaintiffs' APA claims into contract claims.  PI Opp'n at 10.  But "it would be quite extraordinary to consider Plaintiffs' claims to sound in breach of contract when they do not at all depend on whether the terms of particular awards were breached—they instead challenge whether the agency action here was unlawful, irrespective of any breach."  *Corp. for Nat'l & Cmty. Serv.,* 2025 WL 1585051 at *23 (quoting *Aids Vaccine Advoc. Coal.*, 2025 WL 752378, at *9.  The incorporation of law and regulations into an agreement alone cannot divest the district court of jurisdiction.  *See* PI Mem. at 35 (citing *Climate United Fund II*, 2025 WL 1131412, at 12 (warning that "the government might creatively contract their way out of judicial reviewability of its actions, shielding itself by virtue of its 'contractual relationship' with a party.")).  Further, the Supreme Court has held that the existence of contracts does not transform claims under a statutory scheme into contract claims.  *See Astra USA, Inc. v. Santa Clara Cnty.,* 563 U.S. 110, 118 (2011).  That case, along with the Supreme Court's analysis in *Bowen*, is not disturbed by *California v. Dep't of Educ.*, No. 1:25-cv-10548, 2025 WL 76082 (D. Mass. Mar. 10, 2025).  As one Court recently held:

> The *California* Court's stay order is not a ruling on the merits, even if it provides a window into the Supreme Court's view of the merits.  While lower courts certainly must respect Supreme Court stay orders issued on the Court's emergency docket, *California* did not overturn *Bowen*, and under *Bowen*, the [Plaintiffs] claims are not, at their essence, contract claims.

*Corp. for Nat'l & Cmty. Serv.*, 2025 WL 1585051, at *27 (citation modified).  Even post-*California*, the en banc decision in *Widakuswara* underscores that the Tucker Act does not divest this court of jurisdiction.  Citing to the reasoning in Judge Pillard's dissent, the en banc court found that "the

government has not made the requisite 'strong showing' of a likelihood of success on the merits of its appeals in these cases." *Widakuswara*, 2025 WL 1288817, at *6. As Judge Pillard reasoned, when assessing whether jurisdiction is proper under the Tucker Act "[w]hat matters is what the court must examine to resolve the case: If a plaintiff's claim depends on interpretations of statutes and regulations rather than the terms of an agreement negotiated by the parties the claim is not in essence contractual." *Id.* at *12. Because each of Plaintiffs' claims depend on the interpretation of either a regulation or constitutional provision, and do not depend on the terms of the grant agreements (which are undisputed), these claims are not contractual.

Finally, Defendants propose that because none of the authorities cited in Plaintiffs' claims "mandates that any funds be allocated to Plaintiffs specifically," the source of Plaintiffs' rights must lie in the grant agreements. PI Opp'n. at 10. Again, Defendants ask the wrong question. The question for jurisdictional purposes is whether Plaintiffs' "claims . . . stem from a statute or the Constitution," rather than from contract—not whether Plaintiffs have a statutory entitlement to funding. *See Transohio*, 967 F.2d at 609, overruled on other grounds by *Perry Cap.,* 864 F.3d at 619 (jurisdictional question is source upon which plaintiff "bases its claims"). And the D.C. Circuit in *Megapulse* has eliminated any doubt that a plaintiff's claims are not "disguised contract claims" when the plaintiff did "not claim a breach of contract" and its "position is ultimately based, not on breach of contract, but on an alleged . . . violation" of federal law. *Megapulse,* 672 F.2d at 969. So too here.

### B. The Court has jurisdiction over Plaintiffs' constitutional claims, which do not require any waiver of sovereign immunity.

The Court has jurisdiction over each of Plaintiffs' constitutional claims, and OJP does not make any argument to the contrary. Those claims, brought against only individual officials, do not hinge on any sovereign immunity waiver. *Pollack v. Hogan*, 703 F.3d 117, 121 (D.C. Cir. 2012). When an "'officer is not doing the business which the sovereign has empowered him to do,'" "there is no sovereign immunity to waive—it never attached in the first place." *Chamber of Com. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996) (quoting *Larson*, 337 U.S. at 689).

### C. The Court of Federal Claims lacks jurisdiction because Plaintiffs' grants are not contracts, and do not create a right to money damages.

A district court cannot be deprived of jurisdiction where no jurisdiction lies in the Court of Federal Claims under the Tucker Act. PI Mem. at 31. The Court of Federal Claims has jurisdiction under the Tucker Act if (1) there is a contract containing the four elements of offer, acceptance, consideration, and proper government authority, *id.*, and (2) if the plaintiffs "present a claim for 'actual, presently due money damages from the United States," *Nat'l Air Traffic Controllers Ass'n v. United States*, 160 F.3d 714, 716 (Fed. Cir. 1998) (quoting *United States v. King*, 395 U.S. 1, 3 (1969)). Neither condition exists here.

The Plaintiffs' grants are not contracts that give rise to Court of Federal Claims jurisdiction. They are agreements that fund Plaintiffs' ability to carry out a public purpose, not to provide "property or services for the direct benefit or use" for the government, 31 U.S.C. § 6305, and therefore provide no consideration to the Defendants. See PI Mem. at 32 (citing *Am. Near E. Refugee Aid v. USAID,* 703 F. Supp. 3d 126, 134 (D.D.C. 2023) (consideration must benefit the government in a "direct, tangible" way)). In the two cases OJP cites, the government received economic benefits from the contracts at issue. *See Quiman, S.A. de C.V. v. United States,* No. 98-5036, 1999 WL 44182, at *2 (Fed. Cir. Jan 21, 1999) ($15,000 deposit paid to the government and the establishment of plaintiff as a viable fetal bovine serum source provided sufficient consideration for the contract) and *United States v. President & Fellows of Harvard Coll.*, 323 F. Supp. 2d 151, 165 (D. Mass. 2004) ("The government undoubtedly sought to benefit economically and otherwise from the facilitation of Russia's transition to a market economy through privatization."). Here, the government does not claim similar economic benefits from Plaintiffs' grant activities.

Plaintiffs' grants also do not create a right to money damages as required for the Court of Federal Claims to have jurisdiction. As already explained, Plaintiffs do not have a claim for money damages. Nor could Plaintiffs receive money damages under the grants. PI Mem. at 32. Money damages are specific, calculated amounts "designed to compensate for completed labors." *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 327 (2020). As relief in this suit, Plaintiffs do not seek

compensation for work that was completed prior to the terminations because they are already entitled under 2 C.F.R. § 200.344 to receive reimbursement for expenses incurred until the date of termination. And according to the Defendants no other money damages are available to the Plaintiffs because "the full amount of their grant awards—*i.e.*, specific performance—as that remedy is not available against the government." PI Opp'n at 16 n.3. Defendants' arguments were squarely rejected in *Bowen*: "it is no answer to suggest" that relief equates to money damages when a party's interest is "in planning future programs" and seeking future reimbursements. 487 U.S. at 906. After all, "the Claims Court can neither grant equitable relief . . . nor act in any fashion so long as the Federal Government has not yet offset the disallowed amount from a future payment." *Id.* at 907. Justice Scalia's dissenting opinion agreed that the district court has jurisdiction when a grant recipient faces the "irreparable injury of either forgoing a reimbursable program or mistakenly expending . . . funds that will not be reimbursed." *Id.* at 926 (Scalia, J., dissenting).

IV.    **Plaintiffs have already suffered and Will Continue to Suffer Irreparable Harm Absent Injunctive Relief.**

Despite OJP's assertion that Plaintiffs "cannot establish that they will be irreparably harmed before final judgment absent a preliminary injunction," PI Opp'n at 34, Plaintiffs have submitted copious evidence of non-speculative and irreparable harm caused by OJP's abrupt termination of 376 grants. This includes harms that courts had deemed to be irreparable in funding-termination cases, such as laying off staff, the elimination of critical and life-saving programming central to Plaintiffs' mission, reputational harms, and other harms that have had devastating impacts on the safety of individuals and communities across the country. *See* PI Mem. at 7-11, 36-38.

Here, again, the government takes an oversimplified and flawed position that "this case is about funding" and attempts to downplay Plaintiffs' harms as merely a loss of funding that can easily be remedied through the payment of money. PI Opp'n at 34. OJP primarily argues that Plaintiffs have not demonstrated irreparable harm because "Plaintiffs do not suggest that they will have to shutter their businesses permanently," and therefore that they simply face "recoverable financial losses" but not irreparable harm. *Id.*

OJP's cramped understanding of irreparable harm is mistaken and cannot be squared with the many cases cited in Plaintiffs' brief that OJP ignores.  As those cases demonstrate, PI Mem. at 36-38, irreparable harm is not limited to the permanent shuttering of a business, and extends to terminations that:

- "unquestionably make it more difficult for the [Plaintiffs] to accomplish their primary mission," *League of Women Voters of U.S. v. Newby,* 838 F.3d 1, 9 (D.C. Cir. 2016);

- cause the shuttering of programs and affect the livelihoods of individuals within those programs, *Nat'l Council of Nonprofits v. OMB,* No. 1:25-cv-00239, 2025 WL 368852, at *13 (D.D.C. Feb. 3, 2025) ("*NCN I*");

- "have devastating effects" on plaintiffs' projects and programs, *Climate United Fund II,* 2025 WL 1131412, at *12, 17, including "delays" in critical projects, *Woonasquatucket,* 2025 WL 1116157, at *21;

- pose grave threats to public and community health, *Colorado v. HHS,* No. 1:25-cv-00121, 2025 WL 1426226, at *54 (D.R.I. May 16, 2025); *Sierra Club v. USDA, Rural Utils. Serv.,* 841 F. Supp. 2d 349, 368 (D.D.C. 2012);

- forced plaintiffs "to terminate staff," many of whom "rely on such funding for their livelihoods," *Am. Ass'n of Colls. for Tchr. Educ.,* 2025 WL 833917, at *23, and layoffs or threats of layoffs that threaten to jeopardize Plaintiffs' operations, *ABA,* 2025 WL 1388891, at *8;

- severely erode plaintiffs' reputations and "relationship with longstanding partners," that have been painstakingly built over years in their communities, *AIDS Vaccine Advoc. Coal.,* 2025 WL 752378, at *19.

Plaintiffs submitted ample—and uncontroverted—evidence of each of these types of harms, including the layoff of specialized staff that is presently jeopardizing their operations and services, the elimination of critical programs that serve victims and law enforcement alike, and deep harms to Plaintiffs' reputations in communities that were painstakingly built up over years and decades. Plaintiffs' declarations also demonstrate that many of the harms that are a direct result of OJP's terminations cannot be characterized as "recoverable financial losses," through "appropriate actions in the Court of Federal Claims."  PI Opp'n at 34, 35.

The Court of Federal Claims can provide no retrospective recompense to Deaf victims of crime who "Vera has been forced to turn away" and who have been unable to access sign-language

interpretive services to communicate with police because the funding for this interpretive program was abruptly terminated. Turner Decl. ¶ 22. It provides no remedy to victims of gun violence and their families in 23 hospitals who no longer have access to vital services in the hospital to prevent a further escalation of violence and loss of life because those services have been eliminated. Ridini Decl. ¶¶ 18a, 25. It cannot remedy the ongoing harm in neighborhoods that lack grant-funded staff who are able to immediately intervene in active conflicts and retaliations, or to respond to flare ups in violence. *Id.* ¶ 27. It provides no remedy to the 65 youth in Washington State most at risk for gun or gang violence who cannot be served, Sottile Decl. ¶ 26, or the 40 AAPI individuals who have been victims of hate crimes and unable to access counseling and support, Choi Decl. ¶¶ 22b, 40. It provides no remedy for terminations that prompted the layoff of "violence interrupters" which "abruptly removed trusted support systems for individuals at the highest risk of involvement in violence," including individuals who relied on Plaintiffs for "safety planning, relocation assistance, employment support, or therapy referrals." Kennedy Decl. ¶ 20. Plaintiff organizations will continue to suffer irreparable harm if the grant terminations are not reversed; but that does not erase or remedy the irreparable harms that these organizations and the communities have suffered in the time since their grants were terminated. Delaying relief until "final judgment," as OJP suggest, will cause immeasurable harm and loss of life in neighborhoods and communities across the country.

Multiple Plaintiffs attested that the termination of their funding and abrupt disruption of services will cause individuals to lose their lives. In a footnote, OJP dismisses these harms as "hyperbolic" and "speculative," third-party harms that do not constitute irreparable harm. PI Opp'n at 34 n.7. To be clear, this evidence is uncontroverted and OJP has no evidentiary basis to deride them as being hyperbolic or speculative. And in any event, Plaintiffs have presented credible evidence of a wide variety of irreparable harms that extend beyond loss of life.

And though the evidence presented in this case represents the harms of the five Plaintiff organizations out of the 219 recipients whose grants were terminated, Henneberg Decl. ¶ 19, putative class members are likewise being harmed because of OJP's terminations. As amici detail, there are

multiple putative class members who have been forced to shut down their businesses as the result of OJP's terminations of their grants, *see infra* Section V.  In the State of Washington, "the National CASA/GAL, an organization that supports court-appointed special advocates (CASAs) and Guardians ad Litems (GALs), had to suspend all services and support," leaving children without essential support to navigate the legal system.  Amicus Br. of Washington at 9 (Dkt. 20).  Likewise, because of OJP's terminations, "community-based violence intervention programs across the country have ceased operations."  Amicus Br. of Loc. Gov'ts at 10 (Dkt. 30).

The discussion of irreparable harms only underscores that cases involving termination of business contracts which may result in a loss of sales or customers (and for which damages can be easily discerned) are a poor fit for the termination of grant funding that allows Plaintiffs to provide services in their communities.  Plaintiff organizations are not for-profit businesses missing out on business opportunities or sales that can be made whole by an award of money damages.  And in that vein, it is unclear why OJP believes that Plaintiffs can "recover" their reputational losses in the Court of Federal Claims or how it would do so, as money damages are not available under the APA or the Constitution to remedy the deep reputational harms that OJP's terminations caused to Plaintiffs.  Indeed, OJP's analogy of this case to one that is akin to the loss of "business opportunities, market share, and customer goodwill," PI Opp'n at 35, only further underscores how a typical breach of contract claim brought by a business is not analogous to the facts of this case and cannot provide an adequate remedy for the harms Plaintiffs' have suffered.  The individuals and communities that Plaintiffs serve—who have been seriously impacted by the abrupt termination of Plaintiffs' funding— are not akin to "customers" or "retail consumers" or "independent market variables," and the damage to Plaintiffs, their staff, and the individuals that they serve simply cannot be completely remedied by money damages.

OJP's remaining arguments to the contrary are unpersuasive.  OJP characterizes the 30 days between its abrupt termination of nearly all 376 grants and the filing of this lawsuit as "unexplained delay."  PI Opp'n at 36.  But in seeking more than 21 days to respond to Plaintiffs' preliminary

injunction motion, OJP itself provided an explanation: that "the scope of the issues raised by Plaintiffs' motions and complexity of the filings," which include a putative class of 376 award recipients, "each of which have been granted an award or multiple awards." Joint Status Report at 4 (Dkt. 16). That Plaintiffs brought a class-action lawsuit within 30 days to challenge OJP's mass termination on this scale and with this level of "complexity," accompanied by a Complaint, a Motion for Provisional Class Certification, and a Motion for a Preliminary Injunction certainly does not undermine Plaintiffs' credible claims of irreparable harm.

The three cases on which OJP relies to argue that 30 days is too long a delay for Plaintiffs to seek injunctive relief are, too put it charitably, far afield from the facts of this case. *Dallas Safari Club v. Bernhardt*, 453 F. Supp. 3d 391, 403 (D.D.C. 2020), a case in which a plaintiff waited two years to bring suit to challenge the denial of a hunting license is not analogous to this case. *See* Joint Status Report at 2. Nor is *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975), a case in which a plaintiff sought a TRO 44 days after a Final Rule was issued and alleged that "the loss of one bird" was "sufficient" to demonstrate irreparable harm. Finally, in *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014), the plaintiff delayed 36 days before filing for preliminary injunctive relief, but crucially (as OJP leaves out), moved for a 95-day extension to delay the court's consideration of its request, which the court understandably determined implied a lack of urgency and irreparable harm.

Finally, OJP contends that Plaintiffs cannot show irreparable harm because they did not pursue an administrative appeal that is not required either by statute or regulation. OJP tellingly cites no case that supports this assertion. Plaintiffs are entitled to seek redress through a lawsuit in federal court for OJP's its *ultra vires* actions and its violations of the APA and the Constitution. As Plaintiffs explain *supra* at Section II.C, administrative exhaustion is not required, and it does not undermine Plaintiffs' credible claims of irreparable harm.

## V.    The balance of equities and public interest weigh heavily in plaintiffs' favor.

The balance of equities and the public interest strongly weigh in Plaintiffs' favor.  As Plaintiffs explained, PI Mem. at 39-40, granting preliminary injunctive relief is decidedly in the public interest because it will preserve critical services that Plaintiffs provide in their communities.  OJP's cuts impact "jurisdictions of diverse sizes, populations, and geographic regions, yet all face a substantial risk of serious direct and collateral harms—including greater risks to the public, more danger to law enforcement, and increased incidence of crime and violence."  Dkt. 30 at 8.  This includes services for disabled victims of crime presently being turned away from vital resources that allow them to communicate with law enforcement; violence intervention programs in hospitals around the country to help severely wounded individuals and their families and reduce the risk of retaliation upon discharge from the hospital; the provision of resources and necessary care to AAPI victims of hate crimes and violence; programs to serve young people at the highest risk of gun and gang violence that have successfully reduced fatal and non-fatal shootings. Without preliminary reinstatement of unlawfully terminated funding, individuals will not be able to access these services, individuals may lose their lives, and the communities that Plaintiffs serve will be less safe.  For much the same reason that Plaintiffs are likely to succeed on the merits and have amply demonstrated irreparable harm, equity and the public interest weigh heavily in Plaintiffs' favor.

Amici have articulated additional and extensive harms to the broader public interest and stated that "[t]he magnitude of the cuts cannot be overstated."  Dkt. 30 at 1.  That is because "there are vital parts to a comprehensive public safety strategy that the states are just not equipped to address" and, as such, local governments must "rely on collaboration with an array of community and agency partners."  *Id.* at 3.  As local governments attested, OJP's funding cuts "will disrupt crime control and prevention strategies that have been in place for decades, increase burdens on and risks to law enforcement, harm victims and their families, and make deterring and responding to crimes more difficult."  Dkt. 30 at 2.  "Abruptly stripping funding does not merely threaten the services provided

by the individual Plaintiffs—it destabilizes the entire infrastructure that amici depend on to keep our communities and residents safe." *Id.* at 2. As they detail:

- The cuts have "gutted programs that complement traditional law enforcement efforts, provide services that state and local governments are ill equipped or unable to provide, and support victims as they recover from the worst days of their lives." Dkt. 20 at 1.

- "OJP's funding cuts impair public safety in our states by threatening programs aimed at violence reduction and prevention." Dkt. 20 at 3. This is because OJP terminated CVI programs "linked to reductions in gun injuries and shooting victimization" and on which "law enforcement agencies rely." *Id.* These CVI programs have "consistently driven down violence in some of the nation's most affected communities," including "reductions in gunshot injuries and gun deaths." Dkt. 30 at 9. This includes cuts to the sole organization providing CVI work in places like rural Louisiana. Dkt. 31.

- "One of the cancelled grants supported training and technical assistance to at least ten local law enforcement agencies to help rural communities identify and respond to violence." Dkt. 20 at 5. Another termination cut funding for an organization that "provides victim services, and responds to overdoses, or to community-based violence incidents based on a referral from a community member or law enforcement." *Id.* at 6.

- "OJP revoked approximately $137 million in funding to programs designed to protect and support children, including kids in foster care and those at risk of abuse and neglect." *Id.* at 9. "Other organizations that provide legal services and representation for victims and those that support child victims of abuse had their services suspended by OJP's cuts." Dkt. 30 at 16. This included funding cuts "to a senior center in Los Angeles to address the increasing concern of hate crimes targeting older adults." Dkt. 20 at 1.

- The grants terminated by OJP also funded "vital services to survivors of sexual assault." *Id.* at 12. This includes funding for "training to Sexual Assault Nurse Examiners," that "equips nurses across the country to provide medical care to victims of sexual and physical violence and collect evidence for law enforcement." *Id.* at 13. This specialized service can "improve the outcomes for sexual assault survivors and result in higher prosecution rates." *Id.* at 12-13. And in other rural jurisdictions, terminated funds went to "dedicating a prosecuting attorney to sexual assault, intimate partner, violence, and child abuse crimes." Dkt. 30 at 14.

- An organization that provides services for survivors of violence in New Orleans faced cuts that "directly affect the organization's ability to provide essential support and services that are often vital and foundational to survivor safety and recovery, such as temporary housing for individuals facing violence in their homes." Dkt. 31 at 6. Another program that at no-cost "offers an eight-month abuse intervention program for 50 men annually in New Orleans," focused on "perpetuators of domestic violence" that is "survivor-centered," lost one-third of its budget.

- Cuts of "$71.7 million to policing and prosecution programs, including those designed to provide technical assistance and specialized training to law enforcement, judges, and prosecutors, and to provide violent crime reduction resources." Dkt. 30 at 11.

- Cuts that "jeopardize" organizations' "very existence." Dkt. 31 at 7, 10 (entire staff furloughed and its Executive Director was forced to seek other employment). This includes cuts that forced an organization to "immediately lay off one quarter of its research staff and half of its administrative support positions; left it unable to pay its rent; and caused its Executive Director to retire early." *Id.* at 7. At another organization, the Executive Director "has been forced to personally cover programming expenses, which has resulted in the organization's financial and operational vulnerability." *Id.* at 9.

- Funding cuts that "have already negatively impacted rural law enforcement agencies that are attempting to tackle violent crime," including in more than 30 rural jurisdictions supporting local police and district attorneys' offices to reduce violent crime." Dkt. 30 at 14.

- Funding cuts to programs to support "people's successful reentry" into society after incarcerations, including to an organization that "worked for decades to interrupt violence and improve prison reentry outcomes," Dkt. 30 at 16-17, and another organization with a "proven record of reducing recidivism among youthful offenders" with recidivism rates dropping "to less than 15% from 75%." *Id.* at 17.

On the other side of the ledger, OJP argues that it would suffer harm because OJP's discretion about "how to spend" appropriated funds would be undermined. PI Opp'n at 37. As explained in Section I.A.i, whatever discretion OJP has to initially award grant funding does not extend to unfettered discretion to terminate funding in contravention of governing regulations. The government also argues that it faces "irreparable" harm because "Defendants would be 'unlikely to recover the grant funds once they are disbursed,'" *id.* (quoting *Dep't of Educ. v. California*, 145 S. Ct. 966, 969 (2025)). The applicability and precedential value of *California* to this case is questionable. *See Widakuswara*, 2025 WL 1288817, at *14 (Pillard, J.) (dissenting) ("To the extent that the Supreme Court's action on emergency stay orders influences how we apply binding precedent of that court and this one, it favors denying the stay here as in *AIDS Vaccine Advocacy Coalition*.").

Post-*California*, nearly every Court balancing the equities and public interest has rejected the government's argument that its alleged harms outweigh harms similar to the types of irreparable harm demonstrated by Plaintiffs in this case. As here, "when the Court weighs an agency's unreasoned, unsubstantiated, and likely unlawful determination that funding was 'no longer necessary,' against the

[Plaintiffs'] interest and reliance on the funds to safeguard their public health outcomes, the balance of the equities and public interest are undeniably in [Plaintiffs'] favor." *Colorado*, 2025 WL 1426226, at *23; *Aids Vaccine Advoc. Coal.*, 2025 WL 752378, at *21 ("In terms of the equities and the public interest, the Executive is equal to, not above, Congress and its laws" and "the scale tips in favor of Plaintiffs on these factors in light of their additional, unrebutted showing of enormous harm."); *Maryland*, 2025 WL 1585051, at *38 ("Any harm the defendants might face if the agency actions are enjoined pales in comparison to the concrete harms that [Plaintiffs] and the communities served by AmeriCorps programs have suffered and will continue to suffer.").

Unlike Plaintiffs, who submitted nearly 100 pages of uncontested declarations detailing the grave and irreparable harms they face, OJP has presented *no evidence* that it would, in fact, be irreparably harmed or that the risk of an erroneous injunction is high. OJP states repeatedly that it has "committed to re-obligating the terminated grant funds," meaning that OJP intends to spend the grant money that it previously promised to Plaintiffs. PI Opp'n at 38. In that sense, OJP cannot fairly claim that it faces hundreds of millions of dollars in irreparable harm when it intends to spend this money regardless. At its essence, the harm OJP claims sounds in policy—its wish to unlawfully redirect already-committed grant funding to different recipients—but given OJP's stated intention to re-obligate these funds, it faces "no monetary injury from the injunction." *Nat'l Council of Nonprofits v. OMB*, No. 1:25-cv-00239, 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025) ("*NCN II*"). Plaintiffs have submitted declarations detailing staff layoffs, termination of essential services, and deep harms to the individuals and communities they serve; OJP, on the other hand, has not made a similar showing of irreparable harm that without this money it will be forced to lay off its staff, terminate essential programming, or stop operating altogether. *See* PI Opp'n at 33-37 (arguing that irreparable harm requires "financial losses" that "threaten the very existence of the movant's business").

As one court recently concluded when faced with a similar argument by DOJ that it would be harmed by an injunction preventing it from obligating funds "that better serve its goals," where DOJ did not "explain why [Plaintiffs' grants] no longer advances" its goals, it was "impossible for the Court

to weigh this asserted interest." *ABA*, 2025 WL 1388891, at *9 (concluding that "[t]he same is true of the government's claims that injunctive relief would undermine its contractual rights"). Another court also recently rejected the government's claims of harm that "it bear[s] the risk of financial loss" where it "offer[d] no evidence," and where its claims of "theoretical harms" did "not outweigh the alleged concrete, irreparable harm in the form of programmatic closures and loss of funding that [Plaintiff] has already experienced." *S. Educ. Found.*, 2025 WL 1453047, at *17; *see also S.F. A.I.D.S. Found. v. Trump*, No. 4:25-cv-018241, 2025 WL 1621636, at *28 (N.D. Cal. June 9, 2025) (government's asserted harm was "speculative at this stage and does not outweigh the strong public interest in upholding the rule of law and Plaintiffs' constitutional rights"). OJP's asserted irreparable harm is not only speculative and unsupported but does not outweigh the significant evidence of harms that Plaintiffs presented.

## VI.    The Court should neither require a bond nor stay its decision pending appeal.

Federal Rule of Civil Procedure 65(c) "vest[s] broad discretion in the district court" to "determine the appropriate amount of an injunction bond," *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999), including the discretion "to require no bond at all," *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020).

OJP points to the D.C. Circuit's recent *per curiam* order granting an emergency stay in which it observed in a footnote "that injunction bonds are generally required." *Nat'l Treasury Emps. Union v. Trump*, No. 25-5157, 2025 WL 1441563, at *3 n.4 (D.C. Cir. May 16, 2025). General does not mean always, and this non-precedential opinion that bonds are "generally" required does not disturb long-standing D.C. Circuit precedent that a district court continues to possess broad discretion to determine the appropriate amount of an injunction bond. The Court should exercise that discretion here, where Defendants are unlawfully withholding "previously committed funds," "will personally face no monetary injury from the injunction," and a bond would merely "hold Plaintiffs hostage" for the harm from OJP's unlawful actions. *NCN II*, 2025 WL 597959, at *19.

Here, OJP does not, in fact, face the monetary harm that it claims much less require a "bond in the amount of the unobligated award funds that [Plaintiffs] expect to obtain under the grant agreements prior to final judgment in this case." PI Opp'n at 39. As explained above, because OJP has committed to re-obligating the funding, there is "no monetary injury from the injunction." *NCN II*, 2025 WL 597959, at *19. "In a case where the government is alleged to have unlawfully withheld trillions of dollars of previously committed funds to countless recipients, it would defy logic—and contravene the very basis of this opinion—to hold Plaintiffs hostage for the resulting harm." *Id.* And unlike Plaintiffs, who have submitted declarations detailing staff layoffs, termination of essential services, and significant harms to the individuals and communities they serve, OJP has not made a similar showing of harm that without this money it will be forced to lay off its staff, stop essential programming, or stop operating altogether.

If this Court requires a bond, only a nominal bond would be warranted. "The purpose of the security given under Rule 65(c) is to cover the costs and damages suffered by the party wrongfully enjoined." *Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 169 (D.D.C. 1971). Where the harm to "the public interest will be far more gravely damaged" than any harm that could possibly result to OJP, the requirement of a nominal bond suffices. *Id.* OJP's unlawful actions not only harm Plaintiffs; they also harm Plaintiffs' partners, and the communities and individuals that rely on and benefit from Plaintiffs' work. OJP on the other hand, faces no harm from disbursing previously obligated funds to projects that benefit the public interest that it has committed to re-obligating.

Nor should the Court stay its decision pending appeal. There is no basis—and OJP cites none—to issue a preemptive stay of the Court's order in this case. Any such order would be issued only after finding that Plaintiffs suffer irreparable harm, negating the utility of a stay.

## **CONCLUSION**

For these reasons, the Court should grant Plaintiffs' motion for a preliminary injunction and deny Defendants' motion to dismiss.

45

Dated: June 16, 2025                    Respectfully submitted,

                                        /s/ Lisa Newman
                                        LISA NEWMAN[+] (ADMITTED PRO HAC VICE)
                                        JENNIFER FOUNTAIN CONNOLLY (D.C. BAR NO. 1019148)
                                        CORTNEY ROBINSON (D.C. BAR NO. 1656074)
                                        SOMIL TRIVEDI (D.C. BAR NO. 1617967)
                                        BRIAN D. NETTER (D.C. BAR NO. 979362)
                                        SKYE L. PERRYMAN (D.C. BAR NO. 984573)
                                        DEMOCRACY FORWARD FOUNDATION
                                        P.O. Box 34553
                                        Washington, D.C. 20043
                                        (202) 448-9090
                                        lnewman@democracyforward.org

                                        JOSHUA PERRY*
                                        JOSHUA STANTON (D.C. Bar No. 90010653)
                                        E. DANYA PERRY*[+]
                                        PERRY LAW
                                        445 Park Avenue, 7th Floor
                                        New York, NY 10022
                                        (212) 251-2619
                                        jperry@danyaperrylaw.com

                                        Counsel for Plaintiffs

                                        [+]Full admission to the bar of this court pending
                                        *Motion for admission pro hac vice forthcoming

46