# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **HARRIS COUNTY, TEXAS**, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> **ROBERT F. KENNEDY, JR.**, in his official capacity as Secretary of the United States Department of Health and Human Services, *et al.*, <br><br> Defendants. | Case No. 25-cv-1275 (CRC) |

## <u>MEMORANDUM OPINION</u>

The COVID-19 pandemic prompted Congress to enact a series of sweeping bipartisan measures in response to the most devastating public-health crisis the nation had experienced in a century. The bulk of this legislation sought to ameliorate the immediate effects of the pandemic through, among other things, direct payments to taxpayers, extensions of unemployment benefits, financial assistance to businesses, states, and municipalities, and funding for COVID-19 testing and vaccine development. At the same time, Congress took a longer view toward mitigating the risks and consequences of future pandemics. It did so by authorizing billions of dollars for grants to state and local governments to modernize and improve their public-health systems. The Department of Health and Human Services ("HHS") and the Centers for Disease Control and Prevention ("CDC") proceeded to award these grants and make payments to the recipients during both the first Trump administration and the Biden administration. The grantees have put the money to good use, investing in vaccine research, infection control, medical infrastructure, patient outreach, and more.

But the new Trump administration recently announced that it was terminating all grants issued under these COVID-era laws "for cause."  Even though Congress clearly intended the funding to address future pandemics and public-health issues as well, the sole reason offered for the terminations was that the *COVID-19* pandemic is over.  The terminations cancelled about $11 billion in future payments to grantees nationwide, forcing state and local governments to lay off staff and suspend ongoing public-health programs.

The terminations included grants issued to four plaintiffs in this case: Harris County, Texas; Columbus, Ohio; Davidson County and Nashville, Tennessee; and Kansas City, Missouri. These jurisdictions sued, claiming that the rescissions violated not the terms of the individual grants but the Constitution, the statutes authorizing the grants, and applicable federal regulations. They are joined by the American Federation of State County and Municipal Employees, AFL-CIO, a union that represents many employees who were affected by the grant terminations.

Plaintiffs now move for a preliminary injunction reversing the terminations.  As explained below, the Court will grant plaintiffs' motion in certain respects and deny it in others. The resulting relief will run only to some of the grants held by the four local-government plaintiffs, not to all terminated grants nationwide.

## I.    Background

### A.  Legislative Background

The grants involved in this case were issued under five statutes passed during the COVID-19 pandemic.  The first three, which overlap significantly, are: (1) the Coronavirus Preparedness and Response Supplemental Appropriations Act of 2020 ("CPRSAA"), Pub. L. No. 116-123, 134 Stat. 146 (2020); (2) the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020); and (3) the Coronavirus Response

and Relief Supplemental Appropriations Act ("CRRSAA") of 2021, Pub. L. No. 116-260, div.

M., 134 Stat. 1182 (2020). All three laws, which were passed by overwhelming bipartisan

majorities,[1] appropriated billions of dollars "to prevent, prepare for, and respond to coronavirus,"

including about $7 billion that "shall be for grants to or cooperative agreements with" state and

local governments and other entities.[2] CPRSAA, 134 Stat. at 147; CARES Act, 134 Stat. at 554;

CRRSAA, 134 Stat. at 1911–12. All three define "coronavirus" as "SARS-CoV-2," which is the

virus that causes COVID-19, "or another coronavirus with pandemic potential." CPRSAA, 134

Stat. at 155; CARES Act, 134 Stat. at 614; CRRSAA, 134 Stat. at 1185.

The remaining two statutes are the Paycheck Protection Program and Health Care

Enhancement Act ("Paycheck Protection Act"), Pub. L. No. 116-139, 134 Stat. 620 (2020), and

the American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135 Stat. 4 (2021).[3] As relevant here,

these two laws also allocated federal funds for state and local entities to pursue a range of public-

---

[1] The CPRSAA passed by votes of 415–2 and 96–1 in the House and Senate respectively; the CARES Act passed 419–6 and 96–0; and the CRRSAA passed as part of the 2021 Consolidated Appropriations Act 327–85 and 92–6. H.R.6074 - Coronavirus Preparedness and Response Supplemental Appropriations Act, 2020, https://www.congress.gov/bill/116th-congress/house-bill/6074; H.R.748 - CARES Act, https://www.congress.gov/bill/116th-congress/house-bill/748; H.R.6074 - Coronavirus Preparedness and Response Supplemental Appropriations Act, 2020, https://www.congress.gov/bill/116th-congress/house-bill/6074.

[2] A cooperative agreement is a legal instrument by which the federal government enters a "relationship" with a recipient to provide support to the recipient in carrying out some public purpose. See 31 U.S.C. § 6305. Because the parties do not identify any relevant legal differences between grants and cooperative agreements, the Court will generally refer to the awards at issue here as "grants."

[3] The Paycheck Protection Act also enjoyed overwhelming bipartisan support, passing by unanimous consent in the Senate and by a vote of 388–5 in the House. H.R.266 - Paycheck Protection Program and Health Care Enhancement Act, https://www.congress.gov/bill/116th-congress/house-bill/266. The American Rescue Plan, however, was passed by a slim majority. H.R.1319 - American Rescue Plan Act of 2021, https://www.congress.gov/bill/117th-congress/house-bill/1319.

health initiatives.  The Paycheck Protection Act earmarked billions of dollars to state and local governments to "develop, purchase, administer, process, and analyze COVID-19 tests," and improve their testing infrastructure.  134 Stat. at 624.  The American Rescue Plan allocated billions more for state and local governments to distribute COVID-19 vaccines, "strengthen vaccine confidence in the United States," and "establish, expand, and sustain a public health workforce."  135 Stat. at 39, 41.  The relevant funding provisions were not expressly tied to the duration of the COVID-19 pandemic.  Congress made the funds available until they are expended.  American Rescue Plan Act, 135 Stat. at 38; Paycheck Protection Act, 134 Stat. at 623.

Using this spending authority, HHS and the CDC issued billions of dollars of grants to state and local governments to fund public-health projects.  In 2023, following the expiration of the COVID-19 emergency declaration, Congress, again in bipartisan fashion, rescinded some $27 billion in pandemic-era appropriations via the Fiscal Responsibility Act of 2023, Pub. L. No. 118-5, 137 Stat. 10 (2023).  Because the Act rescinded only unobligated appropriations, any grants that had already been issued were left undisturbed.  See id. at 23–30; 2d Decl. of Jamie Legier ("2d Legier Decl.") ¶¶ 18, 22.

B.  Factual Background and Procedural History

Plaintiffs include four local governments: Harris County, Texas; Columbus, Ohio; Davidson County and Nashville, Tennessee; and Kansas City, Missouri.  These jurisdictions received grants under the five pandemic-era funding laws discussed above.  They are joined by the American Federation of State, County and Municipal Employees, AFL-CIO ("AFSCME"), a union representing employees of local and state governments across the country that also received grants under those statutes.

The relevant grants were issued by HHS and the CDC.  They were intended for a wide range of public-health purposes beyond the COVID-19 emergency, including hiring staff for municipal public-health departments, launching vaccination drives in underserved communities, building labs to test for infectious diseases, modernizing recordkeeping systems, investing in infection surveillance, and more.  See PI Mot. at 9–11 (summarizing declarations in the record from grant recipients).  None of these grants was affected by Congress's subsequent recission of COVID-19-specific funding in the Fiscal Responsibility Act of 2023.

On March 24, 2025, the new Trump administration abruptly changed course.  It decided to terminate and cease payments on all the grants at issue.  HHS notified grantees via a template letter stating that the grants had been terminated "for cause" because "[t]he end of the pandemic provide[d] cause to terminate COVID-related grants and cooperative agreements."  See, e.g., Decl. of Brandon Maddox ("Maddox Decl."), Ex. A at 5 (sample termination letter).  For grants that went to state pass-through entities, state authorities informed the local recipients of HHS's decision and directed them to pause any spending of grant money.  See, e.g., Decl. of Edward Johnson ("Johnson Decl."), Ex. A. (sample notice email).  The four local-government plaintiffs had roughly $32.7 million in future grant payments due to them when the grants were terminated.  Pls.' Resp. Gov't Suppl. Decl. at 2.

Several states then sued HHS in the District of Rhode Island alleging that the rescissions violated the Constitution, various statutes, and agency regulations.  See Compl. ¶¶ 96–130, Colorado v. Dep't of Health & Human Servs., No. 1:25-cv-121-MSM-LDA (D.R.I. filed April 1, 2025).  That court issued a temporary restraining order and then a preliminary injunction against the government, enjoining the rescissions and barring HHS from withholding funds based on the terminations.  Colorado, 2025 WL 1426226, at *5, 24.  The order, however, was

limited to the plaintiff states, id. at *24, and none of the local-government plaintiffs here are in those states.  As a result, the local-government plaintiffs filed their own lawsuit in this Court and promptly moved for a preliminary injunction.  The Court heard argument on that motion, which is now ripe for the Court's consideration.

## II.   Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right."  Winter v. Nat. Res. Def. Council, 555 U.S. 7, 24 (2008).  A party seeking such relief must, "by a clear showing, carr[y] the burden of persuasion" and demonstrate "(1) a substantial likelihood of success on the merits, (2) that it would suffer irreparable injury if the injunction were not granted, (3) that an injunction would not substantially injure other interested parties, and (4) that the public interest would be furthered by the injunction."  Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006); see Winter, 555 U.S. at 20.  The last two factors merge when the government is a party.  Nken v. Holder, 556 U.S. 418, 435 (2009).

## III.   Analysis

The Court will begin with plaintiffs' standing before turning to the likelihood of success on the merits, irreparable harm, and the balance of equities.

### A.   Standing

All five plaintiffs have standing.  Begin with the local governments.  To establish standing, they must show "(1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision."  Susan B. Anthony List v. Driehaus, 573 U.S. 149, 157–58 (2014) (cleaned up).  Here, the government's termination of the grants deprived the jurisdictions of funding.

6

That injury could be redressed by an injunction vacating the termination decisions.  The government does not argue otherwise.

The government does challenge AFSCME's standing.  The Court will begin, and end, with associational standing.  An association has standing on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977).  Here, individual members of AFSCME have standing because they were employed by grant recipients and were let go because their employers lost grant funding.  E.g., Decl. of Heidi Heddings ("Heddings Decl.") ¶¶ 2, 5–7, 9 (AFSCME member notified that she would be laid off due to the loss of government funding); Decl. of Eva Hewitt Decl. ("Hewitt Decl.") ¶¶ 2, 7 (similar); see Summers v. Earth Island Inst., 555 U.S. 488, 498 (2009) (holding that an organization must provide "specific facts . . . that one or more of [its] members would be directly affected" by the challenged action (cleaned up)).  Those employees' interests in continued employment are plainly germane to AFSCME's purpose as a labor union advocating on its members' behalf.  Finally, individual participation by AFSCME members is not necessary here, as is typically the case "when an association seeks prospective or injunctive relief for its members[.]"  United Food & Com. Workers Union Local 751 v. Brown Grp., Inc., 517 U.S. 544, 546 (1996).  The government does not dispute that all the grants across the country were terminated wholesale for the same reason and in the same manner.  Determining whether those terminations were lawful therefore does not require participation by

individual AFSCME members because they were all affected by the same government action. AFSCME thus has associational standing.[4]

B.  Likelihood of Success on the Merits

To obtain a preliminary injunction, plaintiffs must make "a clear showing" that they have a "substantial likelihood of success on the merits" of their claims.  Chaplaincy, 454 F.3d at 297. Plaintiffs assert six claims.  They allege that the terminations (1) violate the separation of powers; (2) violate the Spending Clause; (3) are *ultra vires*; (4) violate the appropriations statutes that authorized the grants; (5) violate HHS regulations; and (6) are arbitrary and capricious.  See Compl. ¶¶ 133–72.  The Court concludes that, at this early stage in this case, plaintiffs have demonstrated a likelihood of partial success on the merits as to their separation of powers and *ultra vires* claims but not as to the remaining four claims.

   *1.  Separation of Powers*

      a.  Jurisdiction

Before reaching the merits of plaintiffs' separation-of-powers claim, the Court first must determine whether it has statutory jurisdiction to consider it or, as the government argues, the Tucker Act vests exclusive jurisdiction in the Court of Federal Claims.  The Court recently confronted the same question when it issued a preliminary injunction in American Bar Association v. Department of Justice, No. 25-cv-1263 (CRC), 2025 WL 1388891 (D.D.C. May 14, 2025).  That case involved a First Amendment retaliation challenge to DOJ's rescission of domestic-violence training grants issued to the American Bar Association.  Id. at *1.  As the

---

[4] Because the Court concludes that AFSCME has associational standing, it need not decide whether AFSCME also has organizational standing due to a concrete impairment of its organizational mission.  See FDA v. All. for Hippocratic Med., 602 U.S. 367, 393–94 (2024) (discussing organizational standing).

Court explained there, the Tucker Act deprives this Court of jurisdiction when a claim is "at its essence contractual[.]" Id. at *5; see Crowley Gov't Servs. v. GSA, 38 F.4th 1099, 1102 (D.C. Cir. 2022).  The "longstanding test" in this Circuit to determine whether a claim is essentially contractual examines "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought." ABA, 2025 WL 1388891, at *5 (quoting Crowley, 38 F.4th at 1106); see Megapulse, Inc. v. Lewis, 672 F.2d 959, 968 (D.C. Cir. 1982).

Beginning with the test's first prong, the source of the right plaintiffs seek to vindicate through their separation-of-powers claim is the Constitution.  The core principle underlying this claim is that the Constitution gives Congress, not the Executive Branch, exclusive power over spending.  See Dep't of Navy v. FLRA, 665 F.3d 1339, 1346 (D.C. Cir. 2012) (Kavanaugh, J.) (describing Congress's "exclusive power over the federal purse").  That principle in turn requires agencies to spend the money that Congress appropriates in a manner consistent with Congress's directions.  The Executive Branch, in other words, cannot decline to spend congressionally appropriated funds simply because it prefers not to spend them.  That is precisely what plaintiffs' separation-of-powers claim alleges here:  HHS refused to spend the money as Congress directed based on its own policy-driven assessment of what public-health spending is necessary following the end of the COVID-19 emergency.  They argue that HHS's refusal to spend is inconsistent with the broader, forward-looking goals Congress sought to achieve through the grants, as well as Congress's decision not to rescind the appropriations that funded those grants even after the emergency period had passed.  Thus, the thrust of plaintiffs' separation-of-powers claim is that

HHS has acted unconstitutionally by refusing to spend funds, not that HHS breached any individual grant's terms.[5]

To be sure, the spending that plaintiffs claim was unlawfully withheld is, in a sense, "contractual" in that the funds were obligated as part of grants to or cooperative agreements with state and local governments. But as the Court explained in ABA, and the D.C. Circuit has repeatedly held, the mere presence of a contract in relation to a claim is not enough to deprive this a district court of jurisdiction over the claim. 2025 WL 1388891, at *5; Crowley, 38 F.4th at 1106. What matters for purposes of plaintiffs' separation-of-powers claim is that the Executive Branch allegedly did not spend funds that it was required to spend, not that the funds were earmarked for contractual grant payments. Had the funds been earmarked to fund, say, public awareness campaigns by HHS itself rather than grants to state and local governments, the separation-of-powers analysis would be the same.

The government's assertion of a contractual defense—that the end of the COVID-19 pandemic was somehow "cause" for terminating the grants—does not change the analysis either, for similar reasons. In Megapulse, Inc. v. Lewis, 672 F.2d 959 (D.C. Cir. 1982), Megapulse, a federal contractor, alleged that the government impermissibly disclosed proprietary information that the company had produced to the government as part of its contractual duties. Id. at 961–62. The government argued in response that its contracts with Megapulse permitted the release of the information at issue and so the case belonged in the Court of Federal Claims. Id. at 969. The D.C. Circuit sided with Megapulse. Id. at 969–70. It held that "the mere existence of such

_____

[5] Of course, plaintiffs may well be wrong about what the separation of powers permits, but that goes to the merits of their claim, not the Court's jurisdiction. "[I]t is common practice for federal courts to evaluate their subject-matter jurisdiction (or lack thereof) . . . separate and apart from the merits of the plaintiff's claims." Cause of Action Inst. v. IRS, 390 F. Supp. 3d 94, 98 (D.D.C. 2019) (K.B. Jackson, J.).

contract-related issues" was not enough to "convert this action to one based on the contract." Id. at 969. Same here: The government's defense that HHS was entitled to cancel the grants under their "for cause" termination provision does not convert plaintiffs' affirmative separation-of-powers claim into a contractual one.

Nor does it matter to the jurisdictional analysis that plaintiffs sued only after their grants were terminated. While that fact may go to plaintiffs' injury for standing purposes, it does not define the source or nature of their constitutional claim. As the Supreme Court has made clear, standing is analytically distinct from the plaintiff's legal rights. TransUnion LLC v. Ramirez, 594 U.S. 413, 427–30 (2021). Plaintiffs must show that the alleged violation of their legal rights injured them in some concrete and particularized way. Id. Applying that framework here, plaintiffs' claim is that the Executive Branch violated their rights under the separation of powers by refusing to spend monies that Congress appropriated. So understood, plaintiffs' claim is that the Executive Branch is required to follow the law—not the law of contracts, but the law of the Constitution. That kind of claim is often difficult to bring because in many cases the plaintiff merely has "[a]n interest shared generally with the public at large in the proper application of the Constitution and laws," which "will not do." Arizonans for Off. Eng. v. Arizona, 520 U.S. 43, 64 (1997). These plaintiffs, by contrast, have a concrete and particularized interest because their grants were directly affected by the alleged noncompliance. The grants therefore supply the link required by Article III between plaintiffs and the Executive Branch's allegedly unlawful decision not to spend appropriated funds. The grants do not, however, transform a claim anchored in the Constitution into one "founded on a contract," Megapulse, 672 F.2d at 968.

Moving to the second prong of the D.C. Circuit's test for determining whether a claim is contractual (the type of relief sought), the injunctive, prospective relief plaintiffs seek also

supports district-court jurisdiction.  Plaintiffs "seek[] a declaration that Defendants acted unlawfully when they terminated the grants . . . and an injunction preventing Defendants from terminating the agreements on that basis."  ABA, 2025 WL 1388891, at *6.  Courts have long granted such injunctions to remedy "violations of federal law by federal officials."  Armstrong v. Exceptional Child Ctr., Inc., 575 U.S. 320, 327 (2015) (citing Am. Sch. of Magnetic Healing v. McAnnulty, 187 U.S. 94, 110 (1902)).  And while plaintiffs' requested remedy may "effectively result in the continuation of monetary grants payment by the federal government," ABA, 2025 WL 1388891, at *6, the Supreme Court has held that such an order "undo[ing]" agency action is not an order for "money damages[.]"  Bowen v. Massachusetts, 487 U.S. 879, 910 (1988).  As further evidence that plaintiffs are not seeking damages, they expressly disavowed any retroactive payments and request only vacatur of the allegedly unlawful terminations.  Oral Arg. Tr. at 17:1–7.

Accordingly, plaintiffs' separation-of-powers claim is not essentially contractual under the D.C. Circuit's two-part test.

The Supreme Court's recent order in Department of Education v. California, 145 S. Ct. 966 (2025), does not change the Court's conclusion.  The only claim before the Supreme Court in that case was that the government's mass termination of grants was arbitrary and capricious under the APA.  Id. at 968; see id. at 975–76 (Jackson, J., dissenting) (discussing plaintiffs' arbitrary-and-capricious challenge to the grant terminations).  The Supreme Court's order therefore says nothing about whether constitutional claims like this one must be funneled to the Court of Federal Claims simply because they implicate a contract.  See ABA, 2025 WL 1388891, at *6 (holding that the Court had jurisdiction over plaintiffs' First Amendment claim despite the Supreme Court's order in Department of Education).  The Court will elaborate on the

12

contours of <u>Department of Education</u> below in discussing plaintiffs' arbitrary-and-capricious claim.

Finally, the Court concludes that it likely has jurisdiction over plaintiffs' separation-of-powers claim because the Court of Federal Claims appears not to have jurisdiction and cannot grant the prospective relief that plaintiffs seek. The D.C. Circuit has "categorically reject[ed] the suggestion that a federal district court can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims." <u>Tootle v. Sec'y of Navy</u>, 446 F.3d 167, 176 (D.C. Cir. 2006). The Federal Circuit has in turn held that "the Due Process Clauses of the Fifth and Fourteenth Amendments, the Equal Protection Clause of the Fourteenth Amendment, and the doctrine of the separation of powers" do not provide "a sufficient basis for jurisdiction" in the Court of Federal Claims "because they do not mandate payment of money by the government." <u>LeBlanc v. United States</u>, 50 F.3d 1025, 1028 (Fed. Cir. 1995). The Supreme Court has also observed that "the Court of Federal Claims does not have the general equitable powers of a district court to grant prospective relief[.]" <u>Me. Cmty. Health Options v. United States</u>, 590 U.S. 296, 327 (2020) (quotation marks omitted). Tellingly, the government demurred at oral argument when asked whether the Court of Federal Claims would have jurisdiction over plaintiffs' claims in this case or could afford plaintiffs relief. <u>See</u> Oral Arg. Tr. 49:16–50:16.

The Court rejects the government's implicit suggestion that *no* court would have jurisdiction over constitutional claims that happen to involve a contract. If the government were right, then no court would have jurisdiction over a First Amendment retaliation claim like the one in <u>ABA</u>. And no court would have jurisdiction over a claim that the government rescinded contracts on the basis of protected traits like race, religion, or sex. Foreclosing judicial review entirely to such a broad class of constitutional claims cannot be reconciled with the "strong

13

presumption favoring judicial review of administrative action," Mach Mining, LLC v. EEOC, 575 U.S. 480, 486 (2015), and the "long history of judicial review of illegal executive action, tracing back to England," Armstrong, 575 U.S. at 327.  And to the extent the government is arguing that "[a] separation-of-powers claim should be treated differently than every other constitutional claim, it offers no reason and cites no authority why that might be so."  Free Enterprise Fund v. PCAOB, 561 U.S. 477, 491 n.2 (2010).

### b.  Congress's Spending Power

Before turning to the merits, the Court will take one more detour to provide some background on Congress's appropriations power.  The Constitution vests Congress with the power to pass spending laws and the President with the duty to "faithfully execute[]" those laws. U.S. Const. Art. I § 8 cl. 1; id. Art. II § 3.  That allocation of authority gives Congress the ability to set how the federal government spends its money.  So when Congress calls for money to be spent, the President generally must spend it.  In re Aiken Cnty., 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.); Train v. City of New York, 420 U.S. 35, 44 (1975) (holding that if Congress authorizes some amount, then the President must allot that amount for expenditure). The President can, with the consent of Congress, rescind certain appropriations by following procedures set forth in the Impoundment Act, 2 U.S.C. § 683.

When Congress appropriates funds for expenditure, it can specify that those funds will be available until a certain date or for certain purposes.  Gov't Accounting Off., 1 Principles of Federal Appropriations Law 5-3 (3d ed. 2004) (citing 13 Op. Att'y Gen. 288, 292 (1870) (recognizing that the Executive Branch should follow the limitations Congress sets on funding)). Such an appropriation might look something like this:  "There is hereby appropriated $5,000,000 to remain available until September 30, 2025, for office supplies."  That provision specifies the

amount the agency must spend ($5 million), the date by which the agency must spend it (September 30, 2025), and what the agency must spend it on (office supplies). The agency would then "obligate" those funds, perhaps by placing a rather large order of pens, and then spend the funds by paying the agency's chosen vendor. Once the September 30 deadline passes, however, federal law would generally prohibit the agency from further obligating or re-obligating that $5 million. 31 U.S.C. § 1502(a); 1 Principles of Federal Appropriations Law 5-80.

Appropriations for federal grants and cooperative agreements work much the same way. If Congress appropriates money for certain grants and specifies a deadline to obligate those funds, then the agency must issue grants up until that deadline. 31 U.S.C. § 1502(a). The grant periods may extend beyond the availability deadline. For example, agencies may issue a two-year grant using funds made available for only one year so long as the grant was issued prior to the one-year deadline. See 1 Principles of Federal Appropriations Law 5-48–50. But once the availability deadline passes, the agency cannot issue any new grants or re-obligate the funding.

Once Congress appropriates the funds, it ordinarily leaves agencies "significant discretion in administering the funds appropriated[.]" AIDS Vaccine Advoc. Coal. v. Dep't of State, No. 25-cv-400 (AHA), 2025 WL 752378, at *17 (D.D.C. March 10, 2025). When "Congress merely appropriates lump-sum amounts without statutorily restricting what can be done with those funds, a clear inference arises that it does not intend to impose legally binding restrictions[.]" Lincoln v. Vigil, 508 U.S. 182, 192 (1993). The upshot is that if Congress speaks, agencies must listen. If it does not, then agencies are left with broad discretion as to how to spend appropriated funds.

c.  Merits

Those principles in mind, the Court turns to the merits of plaintiffs' separation-of-powers claim and concludes that they are likely to succeed as to grants issued under statutes whose availability deadlines have passed.

Begin with the statutes whose funds are no longer available for obligation.  The appropriations under three of the five statutes at issue in this case—the CPRSAA, CARES Act, and CRRSAA—have expired.  See CPRSAA, 134 Stat. at 147 (funds "to remain available until September 30, 2022"); CARES Act, 134 Stat. at 554 ("September 30, 2024"); CRRSAA, 134 Stat. at 1911 ("September 30, 2024").  As a result, those funds are no longer available for new obligations or re-obligation.  So, by canceling the challenged grants at issue in this case, the Executive Branch has effectively said that it will *never* spend the funds that Congress appropriated—without invoking either the Impoundment Act or any other statute that might authorize the rescission of appropriated funds.

The Executive Branch does not have such broad power to refuse to spend appropriated funds.  As then-Judge Kavanaugh put it, "the President does not have unilateral authority to refuse to spend" funds that Congress has appropriated simply because of "policy reasons[.]"  In re Aiken Cnty., 725 F.3d at 261 n.1.  Or, as former Chief Justice Rehnquist put it while serving in the Executive Branch:  "With respect to the suggestion that the President has a constitutional power to decline to spend appropriated funds, we must conclude that existence of such a broad power is supported by neither reason nor precedent."  Id. (quoting Memorandum from William H. Rehnquist, Assistant Attorney General, Office of Legal Counsel, to Edward L. Morgan, Deputy Counsel to the President (Dec. 1, 1969), reprinted in Executive Impoundment of

<u>Appropriated Funds: Hearings Before the Subcomm. on Separation of Powers of the S. Comm.</u>
<u>on the Judiciary</u>, 92d Cong. 279, 282 (1971)).

The question, then, is whether it appears likely that HHS refused to spend congressionally appropriated funds here for policy reasons. The template grant termination letters explained that "[n]ow that the pandemic is over, the grants and cooperative agreements are no longer necessary as their limited purpose has run out." Maddox Decl. Ex. A at 5. On its face, that explanation sounds in the affirmative contract defense of frustration of purpose, which might in some circumstances relieve the government from fulfilling its payment obligations under the grants.

But Congress has expressly rejected HHS's position not just once but twice when it made clear that augmenting municipal public-health spending is necessary separate from the COVID-19 emergency. When Congress passed these three statutes, it specified that the funds were intended to fight "coronavirus" generally, which includes both the virus that causes COVID-19 *and* "another coronavirus with pandemic potential." CPRSAA, 134 Stat. at 147, 155; CARES Act, 134 Stat. at 554, 614; CRRSAA, 134 Stat. at 1185, 1911–12. Congress thus expressed its judgment that spending was needed for both the immediate term and after the pandemic had run its course. Congress made its goals even more explicit when it passed the Fiscal Responsibility Act of 2023 after the pandemic had ended. A large bipartisan majority of Congress rescinded some pandemic-era funds but left the funds at issue here untouched, doubling down on Congress's view that spending to combat coronavirus in general should continue even after the pandemic ended.

Against this backdrop, HHS's refusal to spend the appropriated grant funds is revealed as a quintessential policy choice by the Executive Branch: We no longer think it necessary to spend

federal funds on helping local governments prevent and mitigate future pandemics because the latest one has ended. That may be a defensible policy determination, but it cannot be squared with Congress's contrary legislative choices. When such a conflict arises, controlling law is clear: Congress's laws trump the President's preferences. In re Aiken Cnty., 725 F.3d at 261 n.1.

The government responds that it satisfied any statutory duties Congress imposed. It points out that it *obligated* sufficient funds by issuing grants whose total value exceeded the minimum amount Congress allocated for grants under the relevant statutes. See 2d Legier Decl. Ex. 1. And, as to the CPRSAA and CARES Act, it says, it actually *spent* the minimum amount that Congress authorized for state and local government grants. Id. Both arguments come up short.

The government cites no authority for its contention that appropriations statutes require agencies merely to obligate, rather than spend, appropriated funds. See Gov't Opp'n at 28. Nor could it, given that the D.C. Circuit has made clear that "the President does not have unilateral authority to refuse to *spend*" based solely on policy reasons. In re Aiken Cnty., 725 F.3d at 261 n.1 (emphasis added); see also AIDS Vaccine Advoc. Coal., 2025 WL 752378, at *17 ("[A]ppropriations laws reflect an exercise of Congress's own, core constitutional power to determine whether and how much money is spent."). In any case, even if the government were correct, HHS has now *de*-obligated these funds. It would make a mockery of Congress's spending power if the Executive Branch could fulfill its constitutional and statutory duties through the sleight of hand of obligating funds and later de-obligating them.

Nor has the government established that HHS satisfied its spending requirements by disbursing the minimum amount of money required by Congress to state and local governments

for grants under two of the statutes. The relevant appropriations bills set both a top-line spend number *and* a minimum amount that must be used for grants. For example, the CARES Act appropriated $4.3 billion "to prevent, prepare for, and respond to coronavirus," and allocated "not less than" $1.5 billion for grants and cooperative agreements. 134 Stat. at 554. The fact that HHS has paid out more than $1.5 billion in grant money under the CARES Act does not satisfy the separate requirement that HHS spend $4.3 billion in total. To be sure, Congress did not require HHS to spend more than $1.5 billion in grants. But HHS nevertheless obligated more than $1.5 billion in grants from the $4.3 billion Congress appropriated. And because the funds that were obligated have expired and are no longer available for new obligations, HHS's decision to de-obligate funds by terminating grants under the CARES Act amounts to a refusal to spend the total amount that Congress appropriated.[6]

To be clear, the Court does not mean to say that the Executive Branch must spend every single penny of every single appropriation that Congress passes. The Court does not, for example, think it unconstitutional for an agency project to come in under budget. There may also be circumstances where agencies terminate grants for bona fide reasons such as misconduct by the grantee and do not re-obligate the funds due to practicality reasons or administrative oversight. In such circumstances, the Court doubts that leaving spare change in the couch cushions violates the separation of powers. The D.C. Circuit also has acknowledged that the President may be able to decline to spend funds on activities he independently believes would be unlawful. See In re Aiken Cnty., 725 F.3d at 262 n.3. But none of those scenarios fit what HHS

---

[6] The above does not change the source of plaintiffs' right for jurisdictional purposes. Again, the mere fact that the spending at issue is in some sense "contractual" in nature is immaterial to this analysis. The same result would follow even if the cancelled spending had not been in the form of grant agreements.

has done here.  HHS appears instead to have willfully decided not to spend funds based on policy objections to Congress's enactments, objections that Congress has overruled not once but twice. In doing so, the agency likely violated the separation of powers.  Id. at 261 n.1.

The two remaining appropriations bills, the American Rescue Plan Act and the Paycheck Protection Act, are different.  Those two statutes made funds "available until expended[.]" American Rescue Plan Act, 135 Stat. at 38; Paycheck Protection Act, 134 Stat. at 623.  Those open-ended appropriations mean that HHS can re-obligate any money freed up by the termination of plaintiffs' grants.  In other words, HHS has not refused to spend these funds; it has declined to spend them in a certain way.

So if plaintiffs are to show a likelihood of success on their separation-of-powers claim as to grants issued under these statutes, they must demonstrate that Congress specified the manner in which these funds would be spent.  To do so, plaintiffs rely again on Congress's rescission of COVID-19-specific grants through the Fiscal Responsibility Act of 2023.  Congress's forbearance as to other grants, plaintiffs argue, reveals that "HHS had no authority to cancel any grants that Congress left in place" in 2023.  Oral Arg. Tr. at 7:21–25.

Plaintiffs place too much weight on congressional silence.  The default presumption when Congress does not specify restrictions on how a lump-sum appropriation must be used is that it meant to "leave[] it to the recipient agency . . . to distribute the funds among some or all of the permissible objects as it sees fit[.]"  Lincoln, 508 U.S. at 192 (quoting Int'l Union, United Auto., Aerospace & Ag. Implement Workers of Am. v. Donovan, 746 F.2d 855, 861 (D.C. Cir. 1984)).  Here, nothing in the Fiscal Responsibility Act of 2023 purports to limit agency discretion over how to spend appropriated funds.  All the relevant part of the bill does is march through a long list of dozens of appropriations and either rescind them or reduce their amount.

See Fiscal Responsibility Act of 2023, 137 Stat. at 23–30.  Had Congress meant to forbid HHS from canceling the grants at issue, it could have easily said as much.  But it did not.  So the "clear inference" from Congress's decision to leave well enough alone is that it did not intend to limit further what HHS could do with funds appropriated under the American Rescue Plan Act and the Paycheck Protection Act.  Lincoln, 508 U.S. at 192.

To be sure, as discussed above, Congress's decision to maintain appropriations under the American Rescue Plan Act and Paycheck Protection Act makes clear that Congress wanted those funds to be spent.  But the Executive Branch can still fulfill that statutory mandate by reallocating the cancelled grant money.  While the odds of that might appear slim given the current administration's posture towards public-health spending, plaintiffs have presented no evidence that this administration (or for that matter, a future administration) cannot, or will not, do so.  They have therefore failed, at this early stage, to demonstrate that they are likely to succeed on their claim that the Executive Branch violated the separation of powers by terminating grants issued under the American Rescue Plan Act or the Paycheck Protection Act.

### 2. Spending Clause

Next, plaintiffs argue that the grant terminations violate the Spending Clause.  Because this claim could potentially afford plaintiffs relief as to grants issued under the American Rescue Plan Act and the Paycheck Protection Act, the Court will assess whether plaintiffs have established a likelihood of success on the merits of this claim.

To begin, the Court likely has jurisdiction over this claim for the same reason it has jurisdiction over plaintiffs' separation-of-powers claim:  This claim is constitutional, not contractual.  But plaintiffs have not otherwise demonstrated a likelihood of success on the merits.

The Spending Clause permits Congress to spend money to "provide for the common Defence and general Welfare of the United States[.]"  U.S. Const. Art. I § 8 cl. 1.  That grant of authority, while broad, is not unlimited.  As relevant here, when Congress chooses to attach strings or conditions to grant funding, it must do so "unambiguously" such that the recipient knowingly accepts those terms.  South Dakota v. Dole, 483 U.S. 203, 208 (1987); see Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 17 (1981).  As a corollary to that requirement, Congress may not "surpris[e]" grantees with "post acceptance or 'retroactive' conditions." Pennhurst, 451 U.S. at 25.  Here, plaintiffs argue that terminating the grants at issue on the grounds that the COVID-19 emergency has ended violated these constitutional principles by adding a retroactive condition to the grants.

At the outset, it is unclear that this limitation on Congress's spending power applies to the Executive Branch.  The Spending Clause grants authority to Congress in Article I.  It does not, on its face, purport to limit what the Executive Branch may do under Article II.  And the Court is not aware of any cases that have extended Spending Clause doctrines to the Executive Branch. (Presumably, the argument for extending those cases would be that if Congress cannot do something, then the Executive Branch cannot do it either when executing the laws that Congress has passed.)  But because the government did not dispute that this limit on Congress's authority also extends to the Executive Branch, see Gov't Opp'n at 32, the Court will assume without deciding for the purposes of this motion that the Spending Clause also prohibits the Executive Branch from imposing retroactive conditions on grant awards.[7]

---

[7] The APA, which prohibits arbitrary and capricious agency action and requires agencies to explain themselves when they change course, may separately limit the government's ability to impose retroactive conditions on grant awards.  Cf. FDA v. Wages & White Lion Investments, LLC, 145 S. Ct. 898, 918–19 (2025) (describing the change-in-position doctrine and noting its overlap with constitutional due process protections).

The government instead argues that any conditions on the grants were adequately communicated to plaintiffs in advance because the relevant award documents expressly permit the agency to terminate the grants for cause.  See Gov't Opp'n at 32; id. Ex. F at 42 (grant award to Harris County providing for for-cause termination).  HHS regulations—which plaintiffs are presumed to have been aware of when they accepted the funds—also permit HHS to terminate a grant award "for cause[.]"  45 C.F.R. § 75.372(a)(2); see Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc., 467 U.S. 51, 63 (1984) ("[T]hose who deal with the Government are expected to know the law[.]").  As a result, the key issue here is what constitutes "cause" for termination.[8]  Plaintiffs primarily argue that "cause" for termination refers to when a grantee fails to comply with the terms of the grant.  See PI Mot. at 25; PI Reply at 16–17.  That argument, while plausible, is not entirely persuasive.

In support of their position, plaintiffs rely mainly on past HHS adjudicatory decisions, including one in which the agency opined:  "'For cause' means a grantee has materially failed to comply with the terms of the grant.'"  Child Care Ass'n of Wichita/Sedgwick County, 1982 WL 189587, at *2 (H.H.S. June 8, 1982); see also Kisor v. Wilkie, 588 U.S. 558, 573 (2019) (noting that courts may rely on agency interpretations to the extent they have the "power to persuade").  Plaintiffs also point out that the relevant HHS regulation is housed under a subpart of the Code of Federal Regulations titled "Remedies for Noncompliance."  45 C.F.R. Part 75 Subpart D.

On the other hand, strong textual evidence suggests that "cause" is not so limited.  Courts ordinarily, though not always, read statutes and regulations to avoid surplusage.  See Newman v. FERC, 27 F.4th 690, 698–99 (D.C. Cir. 2022).  Plaintiffs' definition of "cause" runs headlong

---

[8] The government seems to assume, and plaintiffs do not appear to dispute, that "cause" means the same thing under both the grant awards and the relevant HHS regulations.  See Gov't Opp'n at 28–29; PI Reply at 12–13, 16–17.

into this presumption.  The relevant HHS regulation provides that a grant "may be terminated in whole or in part as follows: (1) . . . if the non-Federal entity fails to comply with the terms and conditions of the award; [or] (2) . . . for cause[.]"  45 C.F.R. § 75.372(a)(1)–(2).  If, as plaintiffs argue, "cause" merely refers to noncompliance, then part (2) would be entirely duplicative of part (1).

At oral argument, plaintiffs raised the possibility that "cause" refers to more general "wrongdoing" by the grantee.  Oral Arg. Tr. at 15:17–19.  That argument might solve the surplusage problem.  But it is underdeveloped at this early juncture.  It was not raised in plaintiffs' briefing and plaintiffs do not cite any evidence or authority in support of that interpretation.  Contrast Pierre-Noel ex rel. K.N. v. Bridges Public Charter Sch., 113 F.4th 970, 980–82 (D.C. Cir. 2024) (relying on dictionaries and the statute's terms, scheme, and purpose" to analyze the scope of a funding condition); see also Kisor, 588 U.S. at 575 (holding that courts must "exhaust all the traditional tools of construction" when analyzing agency regulations).  Plaintiffs' cursory treatment of this argument is insufficient to establish a likelihood of success on the merits as to this claim.  Cf. Allaithi v. Rumsfeld, 753 F.3d 1327, 1334 (D.C. Cir. 2014) ("In this circuit, it is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work[.]").

To sum up, plaintiffs' claim that the terminations are unconstitutional because HHS retroactively conditioned the grant awards lacks clear constitutional underpinning and is otherwise underdeveloped.  Again, the burden rests on plaintiffs to make a "clear showing" on the merits.  Chaplaincy, 454 F.3d at 297.  The Court thus concludes that plaintiffs have not at this early stage made a sufficiently compelling showing to warrant preliminary relief on their Spending Clause claim.

3.  *APA*

Plaintiffs additionally assert three claims under the APA, alleging that the termination decisions are contrary to statute, contrary to agency regulations, and arbitrary and capricious. Unlike plaintiffs' constitutional claims, these three APA claims squarely implicate the Supreme Court's recent decision in Department of Education v. California because, as noted earlier, that case exclusively involved claims under the APA.  See 145 S. Ct. at 968.  The Court therefore must determine how, if at all, that decision changed the legal landscape surrounding plaintiffs' APA claims.

The Court will take it from the top.  The APA generally permits a plaintiff to sue the United States to challenge agency action to obtain "relief other than money damages."  5 U.S.C. § 702.  There is, however, an exception to that broad waiver of sovereign immunity: "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought."  Id. The D.C. Circuit has long held that the Tucker Act is one such statute.  Sharp v. Weinberger, 798 F.2d 1521, 1523 (D.C. Cir. 1986).  The Tucker Act, as discussed above, waives the federal government's sovereign immunity as to claims founded on contracts with the government.  28 U.S.C. § 1491.  Based on the Tucker Act's separate consent to suit, the D.C. Circuit has held that the APA's waiver of sovereign immunity does not permit district courts to hear a case that is essentially contractual under the two-part test previously described that examines the source of the right and the nature of the remedy sought.  See Crowley, 38 F.4th at 1106.

The Supreme Court, however, has not adopted this two-part test.  Nor has it held that the Tucker Act requires that all contract claims go to the Court of Federal Claims regardless of the type of relief sought.  As the D.C. Circuit has recognized, Supreme Court case law—and the text of both the APA and the Tucker Act themselves—might best be read to suggest that district

courts can grant equitable relief as to contract claims, while damages claims based on a contract must go to the Court of Federal Claims. See Transohio Savings Bank v. Director, Off. of Thrift Supervision, 967 F.2d 598, 611–13 (D.C. Cir. 1992), abrogated on other grounds as recognized in Perry Cap. LLC v. Mnuchin, 864 F.3d 591, 621 (D.C. Cir. 2017); id. at 613 ("Nothing in the language of either the Tucker Act or the APA requires special treatment for contract claims.").

What the Supreme Court has addressed is how to distinguish between money damages and equitable relief. Bowen v. Massachusetts, 487 U.S. 879 (1988), involved a dispute between Massachusetts and the federal government over a Medicaid reimbursement. Medicaid, of course, is a cooperative federal program in which states agree to provide healthcare services to low-income individuals and families. Id. at 883. In exchange, the federal government reimburses states for approved healthcare expenses. Id. at 883–84. One year, HHS disallowed certain expenses claimed by Massachusetts, finding them ineligible for reimbursement under an HHS regulation. Id. at 886–87. Believing it had been short-changed, Massachusetts sued HHS under the APA, arguing that HHS had violated the Medicaid statute and HHS regulations. Id. at 887. The district court sided with Massachusetts. Id. at 888. It exercised jurisdiction and entered an order setting aside HHS's denial of reimbursement without directing payment of any specific amount of funds. Id. The federal government argued before the Supreme Court that, because vacating HHS's denial would lead to funds being paid to Massachusetts, Massachusetts was really seeking money damages and therefore had to go to the Court of Federal Claims. Id. at 891.

The Supreme Court disagreed for two independent reasons. Bowen, 487 U.S. at 909. The Court first held that an order setting aside a disallowance decision is not an order for a "money judgment." Id. Of course, vacating a decision to withhold funds will likely lead the

government to pay up.  But to the extent that a court's vacatur order does so, the payment of

funds "is a mere byproduct of that court's primary function of reviewing the Secretary[ of Health

and Human Services]'s interpretation of federal law."  Id. at 910.  Next, the Court held that even

if the district court had ordered payment of money, "such payments are not 'money damages[.]'"

Bowen, 487 U.S. at 910.  It explained that the district court's order afforded "specific relief" in

that it "und[id] the Secretary's refusal to reimburse the State[.]"  Id.  Money damages, on the

other hand, "provide relief that substitutes for that which ought to have been done[.]"  Id.

The upshot of the Supreme Court's twin holdings in Bowen is this:  The Tucker Act does

not bar district courts from vacating the government's decision not to pay funds just because the

district court's order would result in, or even direct, the payment of money by the federal

government to the plaintiff.

Courts in this district and elsewhere have grappled with whether the Tucker Act divests

district courts of jurisdiction in a raft of grant-termination cases that have been filed since

President Trump returned to office.  One of the first of these cases was AIDS Vaccine Advocacy

Coalition v. Department of State, No. 25-cv-400 (AHA) (D.D.C. filed Feb. 10, 2025), which

challenged President Trump's decision to suspend federal grants for foreign-aid projects.  2025

WL 752378, at *3.  By statute, the federal government is required to issue grants for public-

health projects in foreign countries.  Id. at *2.  After President Trump paused all foreign-aid

spending, grant recipients sued the government, alleging that the funding pause violated the APA

and constitutional separation-of-powers principles.  Id. at *3, 7.  The district court granted a

temporary restraining order enjoining the government from enforcing the pause in foreign-aid

grants and, after concerns about the government's compliance arose, ordered the government to

"unfreeze funds for work completed prior to the TRO[.]"  Id. at *4.

The government sought a stay of that order—though not the underlying TRO itself—from the D.C. Circuit and then the Supreme Court. The Supreme Court, over the dissent of four justices, denied the stay request, explaining that because the district court's compliance deadline had passed, the district court "should clarify what obligations the Government must fulfill to ensure compliance with the temporary restraining order[.]" Dep't of State v. AIDS Vaccine Advoc. Coal., 145 S. Ct. 753, 753 (2025). The Court did not otherwise address the stay factors, including whether the government was likely to succeed on the merits. See id. In dissent, Justice Alito opined that the district court likely lacked jurisdiction to issue the underlying TRO. Id. at 753 (Alito, J., dissenting).

The Supreme Court's decision not to stay the district court's order in AIDS Vaccine Advocacy Coalition, together with Bowen, might suggest that a majority of the Court did not agree with Justice Alito on whether district courts have jurisdiction to vacate grant revocations or pauses. See, e.g., Widakuswara v. Lake, No. 25-5144, 2025 WL 1288817, at *10–14 (D.C. Cir. May 3, 2025) (Pillard, J., dissenting) (discussing Bowen and AIDS Vaccine Advocacy Coalition in another grant-rescission case). Whatever the case, AIDS Vaccine Advocacy Coalition is not the Supreme Court's most recent word in this area. That would be Department of Education v. California.

That case involved congressional statutes providing for grants to states for hiring, training, and supporting teachers in underserved areas. Dep't of Educ., 145 S. Ct. at 970 (Jackson, J., dissenting). In February, the administration terminated over 100 grants issued under those laws. Id. at 970–71. It offered grant recipients a single paragraph of explanation that said, in essence, that the grants were no longer consistent with the administration's priorities regarding "DEI initiatives." Id. at 971. States then sued to challenge the rescissions. The district court

granted a TRO, finding that the states were likely to succeed on their claim that the rescissions were arbitrary and capricious because the one-paragraph explanation was too conclusory to satisfy the APA.  California v. Dep't of Educ., No. 25-cv-10548 (MJJ), 2025 WL 760825, at *3 (D. Mass. Mar. 10, 2025).  The TRO required the government to restore the plaintiffs to the pre-termination status quo and enjoined the government from enforcing the terminations.  Id. at *5.

The Supreme Court stayed the TRO.  Dep't of Educ., 145 S. Ct. at 969.  In a brief order, the Court explained that the APA's waiver of sovereign immunity does not extend to "orders to enforce a contractual obligation to pay money along the lines of what the District Court ordered here."  Id. (quotation marks omitted).  It also explained that the APA's waiver does not apply when another statute gives the government's consent to suit and pointed out that the Tucker Act vests the Court of Federal Claims with jurisdiction over contract suits.  Id.

The Supreme Court's brief foray into the jurisdictional issue left many questions unanswered.  For one, it did not explain what distinguished this case from AIDS Vaccine Advocacy Coalition.  It would seem that the jurisdictional barrier identified by the Court in Department of Education would also be present in that earlier case and should have required the Court to grant the stay the government sought.  Justice Alito and three other justices thought as much at the time.  For another, the order did not identify what specifically was wrong with the district court's order or explain how the district court had impermissibly enforced a contractual obligation to pay money.  After all, the district court did not order payment of funds; it merely ordered a return to the status quo and vacated a termination of funds.  And under Bowen, to the extent vacatur leads to payment of funds, that is merely a permissible byproduct of the court's ordinary judicial review.  See 487 U.S. at 910.  So perhaps the Court found dispositive the fact that the states were suing over grants.  But as mentioned above, the Supreme Court has never

adopted a test for identifying contractual claims or held that contract claims against the federal government, even for prospective equitable relief, all must go to the Court of Federal Claims.  If the Court meant to hold as much, it did not say so.  Finally, the Court did not address the fact that the Court of Federal Claims cannot grant prospective equitable relief.  If grant recipients seek an order barring the administration from enforcing the grant rescissions going forward, are they simply out of luck?  The Court gave no answer.

Perhaps because of these unanswered questions, different judges have applied Department of Education in different ways.  At least one district court has denied preliminary relief where a plaintiff failed to distinguish the case.  See Pippenger v. U.S. DOGE Serv., No. 25-cv-1090 (BAH), 2025 WL 1148345, at *5 (D.D.C. Apr. 17, 2025).  At least four judges on the D.C. Circuit appear to have suggested that Department of Education forecloses district-court jurisdiction in grant-termination cases altogether.  See Widakuswara v. Lake, No. 25-5150, 2025 WL 1521355, at *2 (D.C. Cir. May 28, 2025) (Katsas, J., dissenting, joined by Henderson, Rao, Walker, JJ.).  Other courts, by contrast, have distinguished Department of Education in some respect.  Some have differentiated between the types of claims at issue.  As mentioned before, in ABA, this Court explained that Department of Education did not discuss claims where the plaintiff's asserted right comes from the Constitution.  2025 WL 1388891, at *6.  And in Widakuswara v. Lake, No. 25-cv-1015 (RCL), 2025 WL 1166400 (D.D.C. April 22, 2025), the district court distinguished Department of Education on the ground that the Widakuswara plaintiffs' rights came from a statute that expressly directed that funds be given as grants to specific recipients.  Id. at *9.  A circuit judge drew a similar distinction, which the en banc D.C. Circuit later endorsed.  Widakuswara v. Lake, No. 25-5150, 2025 WL 1288817, at *13 (Pillard, J., dissenting); Widakuswara, 2025 WL 1521355, at *1 (en banc) (per curiam) (agreeing with

30

Judge Pillard "substantially").  And finally, other district courts have declined to follow Department of Education even as to APA claims, reasoning that the Supreme Court's unpublished order did not displace Bowen and governing D.C. Circuit law.  See, e.g., S. Educ. Found. v. Dep't of Educ., No. 25-cv-1079 (PLF), 2025 WL 1453047, at *9 (D.D.C. May 21, 2025).

        To be clear, uncertainty over where to draw the jurisdictional line between the APA and the Tucker Act is not solely a result of Department of Education.  Even before the Supreme Court's order, the test for whether a claim is essentially contractual was somewhat imprecise.  For one, what should courts do when the source of the plaintiff's right is part contractual and part statutory or constitutional?  The D.C. Circuit has suggested, though not clearly held, that such claims might be permitted to proceed in district court.  Transohio, 967 F.2d at 609 ("The answer to the sovereign immunity and jurisdiction questions depends on . . . [whether] plaintiffs' claims are founded *only* on a contract." (emphasis added)).  For another, what is the difference between ordering the government to perform its contractual obligations and vacating the government's rescission of a contract?  The former is generally not permitted, while the latter is a classic function of judicial review.  See Ingersoll-Rand Co. v. United States, 780 F.2d 74, 79–80 (D.C. Cir. 1985) (discussing limitations on specific performance in cases involving government contracts).  Moreover, as far as the Court is aware, the D.C. Circuit has not expressly addressed whether the D.C. Circuit's two-part test is meant to be conjunctive or disjunctive—that is, whether the source of the right and the relief sought *both* must be contractual to deprive district courts of jurisdiction, or if just one of the two does the trick.  Compare Crowley, 38 F.4th at 1113 (claim belongs in the Court of Federal Claims if the "asserted right is based in contract *and* [the plaintiff] seeks . . . monetary relief" (emphasis added)) and ABA, 2025 WL 1388891, at *6

(contractual relief alone "is not enough"), with U.S. Conf. of Catholic Bishops v. Dep't of State, No. 25-cv-456 (TNM), 2025 WL 763738, at *5 (D.D.C. March 11, 2025) (the type of remedy alone "is dispositive").

Given all this legal uncertainty, less is more. The Court declines at this time to address plaintiffs' contrary-to-statute and contrary-to-regulation claims under the APA because they are largely duplicative of plaintiffs' constitutional claims and are potentially foreclosed by Department of Education. Those APA claims turn on what the underlying appropriations statutes and regulations mean, issues the Court has already addressed when analyzing whether plaintiffs have demonstrated a likelihood of success on the merits on their constitutional claims. So even if the Court were to reach the merits of these two APA claims, plaintiffs would not obtain any additional relief. Untangling the competing strands of jurisdictional case law now, on a limited preliminary-injunction record and when the governing law may well change in the months, weeks, or even days ahead, would therefore not be an efficient use of judicial resources. Cf. ABA, 2025 WL 1388891, at *4 (addressing only one of six claims where plaintiffs could obtain full relief based solely on that claim); Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget, 763 F. Supp. 3d 36, 52–53 (D.D.C. 2025) (similar).[9]

Plaintiffs' arbitrary-and-capricious claim, however, is a different story. The theory underlying that claim is that terminating all the affected grants with a boilerplate, one-paragraph explanation flubs the APA's requirement that agencies adequately explain their decisions by addressing reliance interests, accounting for any changes in agency position, and weighing

---

[9] The Court began its analysis of plaintiffs' likelihood of success on their constitutional claims for similar reasons. Should the case proceed to summary judgment, the Court will not have that luxury. See Camreta v. Greene, 563 U.S. 692, 705 (2011) ("[A] longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." (quotation marks omitted)).

alternative options.  See PI Mot. at 24–29.  Because the same explanation was offered as to all

the termination decisions, a finding by the Court that the government's explanation was

inadequate would apply across the board as to all the grant rescissions, including rescissions

under the American Rescue Plan Act and the Paycheck Protection Act, which the Court found

likely did not violate the separation of powers.  Accordingly, the Court must consider the merits

of this claim to determine whether to grant plaintiffs the relief they seek, and therefore must also

decide whether it likely has jurisdiction over the claim.

  Plaintiffs have not shown a sufficient likelihood that the Court has jurisdiction over

plaintiffs' arbitrary-and-capricious claim in light of Department of Education.  Like this case,

Department of Education involved a statute that required the Executive Branch to issue grants to

state and local government entities for specified purposes.  145 S. Ct. at 970 (Jackson, J.,

dissenting) (describing the statutes authorizing the grants at issue).  Like this case, the Executive

Branch terminated all those grants en masse with a boilerplate, one-paragraph explanation.  Id. at

971 (reproducing the "single paragraph regarding the [agency's] justification for the grant

termination").  And like this case, the plaintiffs challenged that explanation under the APA on

the ground that one paragraph does not cut it.  Id. at 971, 975.  It was this claim that the Supreme

Court held likely belonged in the Court of Federal Claims:  A claim that appears in all material

respects identical to the one that plaintiffs press here.  Contrary to the government's arguments,

Department of Education is not binding authority.  See Lunding v. N.Y. Tax Appeals Tribunal,

522 U.S. 287, 307 (1998) (explaining that summary actions "do not have the same precedential

value as does an opinion of [the Supreme] Court after briefing and oral argument on the merits"

(cleaned up)).  But when the highest court in the land answers the same question now before this

Court, in a similar preliminary posture and on facts materially identical to those in this case, this Court cannot but listen.

One final point.  In the Colorado case proceeding parallel to this one, the District of Rhode Island eschewed Department of Education and relied instead on Bowen to find jurisdiction over APA arbitrary-and-capricious claims.  See Colorado, 2025 WL 1426226, at *9.  This Court respectfully disagrees.  While this case is similar to Bowen in many respects, it differs in that Bowen was not a contract case.  Bowen involved a statutory grant of Medicaid funds made by Congress, rather than grant agreements made with executive-branch agencies like the ones at issue in this case.  See 487 U.S. at 882–84 (describing the statutory payments at issue).  Perhaps that distinction should not be legally significant.  After all, the Supreme Court has "repeatedly characterized . . . Spending Clause legislation" like Medicaid as "'much in the nature of a *contract*.'"  Nat'l Fed'n of Indep. Bus. v. Sebelius, 567 U.S. 519, 576–77 (2012) (emphasis in NFIB) (quoting Barnes v. Gorman, 536 U.S. 181, 186 (2002)); Pennhurst, 451 U.S. at 17 (same); see also Bowen, 487 U.S. at 923 (Scalia, J., dissenting) ("The Medicaid Act itself can be analogized to a unilateral offer for a contract—offering to pay specified sums in return for the performance of specified services[.]").  Still, the fact remains that Department of Education is the case that speaks, however tersely, most directly to the issues and facts underlying plaintiffs' arbitrary-and-capricious APA claim.  Without further guidance from the Supreme Court or the D.C. Circuit or a meaningful distinction between plaintiffs' arbitrary-and-capricious claim and the one in Department of Education, the Court concludes that plaintiffs have not presently shown a likelihood of success on this claim.

* * *

34

Plaintiffs have demonstrated a likelihood of success on their separation-of-powers claim only as to grants issued under the CPRSAA, CARES Act, and CRRSAA. They therefore have also demonstrated a likelihood of success on their *ultra vires* claim as to those three statutes. Plaintiffs have not demonstrated a likelihood of success on their other claims. The Court stresses, however, that its decision is "necessarily preliminary," and based solely on the "limited record" currently before the Court. Alpine Sec. Corp. v. FINRA, 121 F.4th 1314, 1330 (D.C. Cir. 2024) (emphasis in original). The Court leaves open the possibility that further development of the issues and the record in this case, on a less compressed timeline, might (or might not) improve plaintiffs' prospects.

C. Irreparable Harm

Next, plaintiffs have established irreparable harm because the local governments will be forced to end public-health programming without grant funding and AFSCME's members are being terminated without any means of compensation.

*1. Local-Government Plaintiffs*

Begin with the local-government plaintiffs. As courts in this district have held, a loss of federal funding can cause irreparable harm when it "threatens the very existence of the [recipient's] operations." ABA, 2025 WL 1388891, at *8 (cleaned up); see Climate United Fund v. Citibank, N.A., No. 25-cv-698 (TSC), 2025 WL 1131412, at *17 (D.D.C. Apr. 16, 2025) ("Obviously, when an organization is created to fulfill the objectives of a grant and its existence relies on grant money, harm is certain once the grant funds are withdrawn."). Here, the local-government plaintiffs have filed declarations explaining why the loss of federal funding continues to force them to lay off employees, cut public-health programming, and suspend other operations that the grants were intended to promote. See Decl. of Jennifer Kiger ¶ 11 (Harris

County forced to cancel its wastewater surveillance program for disease detection); Decl. of Marvia Jones ¶¶ 7, 10 ("Kansas City cannot presently afford to purchase the lab equipment" needed to test for COVID-19, influenza, measles, sexually transmitted diseases, and other infectious diseases); Decl. of Thomas Sharp ¶ 20 (Nashville was forced to suspend child vaccination outreach in private schools). Those cuts will in turn make it harder for these plaintiffs to investigate, monitor, and respond to public-health threats.

For example, Columbus, Ohio's Department of Public Health had to lay off 11 public-health employees "charged with infectious disease tracing, investigations, and community response coordination" who were "preparing to investigate and address the current measles outbreak in Ohio" when the grants were terminated. Johnson Decl. ¶ 17. Following these layoffs, Columbus Public Health "is operating at about twenty-five percent capacity for [its] disease tracing and investigation work." Id. ¶ 19. Furthermore, the loss of funding has prevented Columbus Public Health from upgrading its "out of date" data infrastructure system to one used in "[m]ost hospitals and federally qualified health centers . . . to store patient records[.]" Id. ¶ 22. Without the upgrade, Columbus Public Health will have a harder time accessing medical records from other providers when treating patients in city-run clinics. Id. Losing the grant funding has also forced Columbus Public Health to redirect resources from other priorities to compensate. It has redeployed some nursing staff away from direct services to focus on investigating infectious diseases. Id. ¶ 19. And it has been forced to draw upon general funds to cover salaries for other employees funded by the now-cancelled grants, money that could be used for other programs. Id. ¶ 21.

Similar costs and challenges now face all the local-government plaintiffs. These burdens cannot be easily undone. Even restoring all funding at a later date cannot make up for lost time

that would have been spent fulfilling plaintiffs' public-health departments' missions of preventing infectious disease.  See League of Women Voters of U.S. v. Newby, 838 F.3d 1, 9 (D.C. Cir. 2016) (finding irreparable injury where government action "ma[d]e it more difficult" for organizations to "accomplish their primary mission of registering voters" and there was no possibility of a "do over").

### 2. AFSCME

AFSCME also faces irreparable harm because its declarations confirm that many AFSCME employees have already lost their jobs, with hundreds more at risk of job loss due to the termination of federal funding to state and local governments.  See Heddings Decl. ¶ 9 (AFSCME member in Alaska terminated because of loss of grant funding); Hewitt Decl. ¶ 8 (16 AFSCME members in Alaska lost jobs following grant termination); Decl. of Amy Spiegel ¶ 11d (AFSCME in Washington State learned that 265 members were at risk of losing their jobs because of lost funding); Decl. of Shaun O'Brien ("O'Brien Decl.") ¶ 7 ("Numerous individuals who lost their jobs because HHS and the CDC swiftly and abruptly pulled promised funding are AFSCME members."); Decl. of John Henry, Jr. ¶ 9 (Ohio informed eleven members of a AFSCME bargaining unit (at least some of which are also dues-paying members) that they would be terminated).

To be sure, loss of employment is typically not considered irreparable harm because a wrongfully terminated employee often can obtain retroactive relief such as backpay.  See Farris v. Rice, 453 F. Supp. 2d 76, 79–80 (D.D.C. 2006).  But job loss can be an irreparable harm where such remedies may be unavailable.  See, e.g., Am. Fed'n of Gov't Emps., AFL-CIO v. United States, 104 F. Supp. 2d 58, 76 (D.D.C. 2000) (finding irreparable harm where plaintiffs "might be precluded from suing the federal government to recoup pay and benefits they lost" due

to an allegedly unlawful termination).  Here, AFSCME members who lose their jobs due to

federal-funding cuts likely cannot sue the federal government to recover backpay or any other

remedies.  That is because they are employed not by the federal government but by state and

local governments, so any suit against the federal government for backpay or other damages

would likely be barred by sovereign immunity.  See Clark v. Lib. of Cong., 750 F.2d 89, 103

(D.C. Cir. 1984).  Nor does the government point to any other remedies that might be available

to a terminated AFSCME member.  Accordingly, the Court concludes that AFSCME members

would suffer irreparable harm absent a preliminary injunction.

     D.   Balance of Equities and the Public Interest

As for the remaining preliminary-injunction factors, the central question is what, if any,

relief would be appropriate in light of the burdens upon others and the public interest.  The Court

must consider "what is necessary, what is fair, and what is workable[.]"  North Carolina v.

Covington, 581 U.S. 486, 488 (2017) (quoting New York v. Cathedral Acad., 434 U.S. 125, 129

(1977)).  The Court will begin with the four local-government plaintiffs before considering the

wisdom of the broader nationwide relief plaintiffs seek.

     *1.  Local-Government Plaintiffs*

The equities and public interest favor an injunction as to the four local-government

plaintiffs.  One factor that weighs heavily in plaintiffs' favor is that these funds were earmarked

for programs that promote the public health.  Such programs benefit not only those who live in

plaintiffs' jurisdictions but also those in surrounding areas.  For example, infectious diseases

obviously can spread across county lines.  So the public has an interest in funding activities

aimed at minimizing the spread of such diseases.  See Banzhaf v. FCC, 405 F.2d 1082, 1096

(D.C. Cir. 1968) ("Whatever else it may mean, however, we think the public interest

indisputably includes the public health."); Nat'l Immigr. Proj. of Nat'l Laws.' Guild v. Exec. Off. of Immigr. Rev., 456 F. Supp. 3d 16,34 (D.D.C. 2020) ("It goes almost without saying, of course, that promoting public health—especially during a pandemic—is in the public interest.").

On the other hand, the federal government is rightly concerned about the potentially irrevocable loss of taxpayer dollars.  If plaintiffs are awarded preliminary injunctive relief, then the government may be required to resume payments on plaintiffs' grants.  But if plaintiffs were later to lose on the merits or on appeal, then the federal government would be hard-pressed to get those funds back.  See Dep't of Educ., 145 S. Ct. at 968–69 (noting that the funding recipients "have not refuted the Government's representation that it is unlikely to recover the grant funds once they are disbursed.").  Plaintiffs gesture at the possibility that HHS regulations might permit the agency to offset any wrongfully paid out funds against other HHS grants plaintiffs hold.  See PI Mot. at 40.  But that possibility is too uncertain on this record to warrant much weight.  See Oral Arg. Tr. at 41:4–10 (plaintiffs refusing to "commit to setting off any monies if ultimately the government were to prevail on the merits").

Even so, the Court finds that the potential burden on the public fisc is not sufficiently great here to deny the local-government plaintiffs preliminary relief.  At the time of the grant terminations, these four plaintiffs had approximately $32.7 million left on grants awarded either directly to them or via state pass-through entities.  Pls.' Resp. Gov't Suppl. Decl. at 2.  Plaintiffs did not specify which statutes funded those grants.  See id.  But even assuming that all $32.7 million came from now-expired funds, that amount of money, while substantial, would be a relatively small outlay for the federal government.  HHS was appropriated tens of billions of dollars to spend under the relevant appropriations laws and cancelled some $11 billion in outstanding grants.  Colorado, 2025 WL 1426226, at *1.  The amount of money allegedly owed

to plaintiffs is less than 0.5% of the amount of money cancelled.  And it is uncertain in any event that the full $32.7 million would be paid out while the merits of this case are fully litigated.  As plaintiffs' counsel represented at argument, these grants work on a reimbursement model, so plaintiffs would draw from them as they incur expenses.  Oral Arg. Tr. at 16:22–24.

Given the irreparable harm to the local-government plaintiffs, the significant public interest in promoting the public health, and the relatively small financial burden on the federal government, the Court finds that the equities favor granting a preliminary injunction to the four local-government plaintiffs as to any grants issued directly or indirectly to them under statutes whose funding authorizations have now expired.

The Court also exercises its broad discretion under Federal Rule of Civil Procedure 65(c) to decline to impose any bond for similar reasons.  What is a light burden to the federal government would be a much heavier one to the cash-strapped local governments.  Requiring a bond to cover any wrongfully paid out grant funds therefore would largely undo the relief that the Court finds is appropriate.  See Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget, No. 25-cv-239 (LLA), 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025).

### 2.  Nationwide Relief

Plaintiffs also seek nationwide relief, primarily based on the theory that AFSCME has members all over the country who are affected by the grant terminations.  See PI Reply at 22–23.  The Court finds that the equities and public interest do not support such a sweeping remedy.

At the outset, the Court notes that the District of Rhode Island issued injunctive relief as to 23 states and the District of Columbia.  See Colorado, 2025 WL 1426226, at *24.  Any further injunction from this Court is therefore unnecessary as to those states.

Next, AFSCME's declarations fail to establish the kind of diffuse, nationwide effects necessary to justify such sweeping injunctive relief. AFSCME submitted six declarations that discuss funding cuts in four places: Alaska, Washington State, Jackson County, Ohio, and Columbus, Ohio. Of those locales, two are or will soon be covered by more tailored injunctions: Washington State was a plaintiff in the Colorado case, while Columbus, Ohio is a plaintiff here. Accordingly, the effects of the grant cancellations in those two places do not provide any reason for the Court to expand the scope of its injunction. The remaining two jurisdictions are not enough either. AFSCME reports that 23 members in Alaska and three members in Jackson County were laid off due to the funding terminations. O'Brien Decl. ¶ 6a–b. 26 AFSCME members, almost all of whom are located in just one state, are not enough to warrant an injunction as to 27 states and hundreds of municipalities across the country.

The government's side of the ledger further counsels against broad nationwide relief. According to plaintiffs, the government cancelled $11 *billion* in grant money nationwide. While a substantial portion of that is presumably subject to the Colorado injunction, the relief plaintiffs seek here could end up requiring the Executive Branch to disburse billions of dollars more. To be sure, HHS may well be required by statute to disburse those funds. But that issue has not yet been finally resolved and is shrouded in considerable legal uncertainty, as explained above. Should it turn out that the government is not required to pay out these grants, then the government would likely be left without any means of recovering large sums of taxpayer money. That potential for irreversible error of such a large magnitude strongly counsels in favor of a limited injunction that focuses only on the comparatively small amount potentially due to the local-government plaintiffs.

41

The Court also will not cover Alaska or Jackson County, Ohio individually either. Neither jurisdiction sued to recoup these funds, a decision that their elected officials were entitled to make for themselves and their constituents. The Court will not override that decision lightly, especially given the uncertainty over the jurisdictional issues discussed above. Should the Court eventually hold the blanket grant rescissions unlawful, then the appropriate course may well be for the Court to vacate those rescissions as to all grant recipients. The APA, after all, requires courts to "set aside" agency action found to violate it. 5 U.S.C. § 706(2). But neither the APA nor the equities require the extraordinary remedy of a hastily issued order that could lead the federal government to pay money to entities that have not asked for it.

The Court therefore will deny plaintiffs' motion to the extent it seeks relief beyond the four local-government plaintiffs.

## IV.  Conclusion

For these reasons, the Court grants plaintiffs' motion for a preliminary injunction in part and denies it in part. A separate Order follows.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date: June 17, 2025