**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **VERA INSTITUTE OF JUSTICE, et al.,** ) | |
| ) | |
| ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Case No. 25-cv-1643 (APM)** |
| ) | |
| **U.S. DEPARTMENT OF JUSTICE, et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

**<u>MEMORANDUM OPINION</u>**

## I.    INTRODUCTION

In April 2025, the Department of Justice's Office of Justice Programs, without warning, terminated more than 370 multi-year cooperative agreements and grants totaling more than $820 million.  In identical notices issued to the affected organizations, the Office of Justice Programs vaguely explained that the reason for the terminations was that the "awards no longer effectuate[] the program goals or agency priorities."  The notices instructed the grantees to stop work immediately and informed them that they would be reimbursed only up to the date of termination.

Plaintiffs are five organizations that had their awards terminated.  Asserting both constitutional and statutory claims, Plaintiffs seek a preliminary injunction that reverses the terminations and restores their awards.  They assert that their operational health and ability to fulfill their missions depend on the funds promised.  Plaintiffs also seek to certify a class comprised of the hundreds of other grantees whose awards were terminated and ask that their funding be reinstated, too.

The Office of Justice Programs' decision to terminate these awards was unquestionably arbitrary, at least in lay terms. The agency advised the grantees that it had "changed its priorities" to focus on, among other things, "more directly supporting certain law enforcement operations," "combatting violent crime," and "supporting American victims of trafficking and sexual assault." The monies awarded to these Plaintiffs, however, were for those very purposes. Lead Plaintiff Vera Institute for Justice used one of its awards to train law enforcement on investigating human trafficking of persons with disabilities. Plaintiff Children and Youth Justice Center received funds to prevent and reduce gun violence against youth in King County, Washington. Plaintiff FORCE Detroit put its grant towards community violence intervention in Detroit's Warrendale-Cody Rouge neighborhood. Plaintiff Heath Resources in Action used its funding to support violence prevention professionals and programs. And Plaintiff Chinese for Affirmative Action, which does business as Stop AAPI Hate, dedicated its grant towards, among other things, increasing safety on public transit systems. When asked at oral argument why these awards were no longer consistent with the agency's new priorities, Defendants' counsel had no answer. He simply shrugged his shoulders.

Defendants' rescinding of these awards is shameful. It is likely to harm communities and individuals vulnerable to crime and violence. No federal agency, especially the Department of Justice, should conduct itself in such manner.

But displeasure and sympathy are not enough in a court of law. The court's powers are limited. It cannot act without jurisdiction or in the absence of a valid cause of action. That is the nub here. The court cannot grant Plaintiffs relief because it lacks the power to hear their claims under the Administrative Procedure Act, and because Plaintiffs have failed to demonstrate a violation of any constitutional right or protection.

For those reasons, the court denies preliminary injunctive relief and grants Defendants' pending motion to dismiss. As the court denies preliminary relief and dismisses this action, it also denies the pending motion for class certification as moot.

## II.    BACKGROUND

### A.    Statutory and Regulatory Background

The Office of Justice Programs ("OJP") is the Department of Justice's ("DOJ's") largest grantmaking component and "advances DOJ's mission in part by making thousands of discretionary grant agreements to state and local law enforcement agencies, as well as to community-based and other non-governmental entities." *See* Defs.' Mot. to Dismiss & Opp'n to Pls.' Mot. for Prelim. Inj., ECF No. 27 [hereinafter Defs.' Mot. to Dismiss], Decl. of Maureen A. Henneberg, ECF No. 27-1 [hereinafter Henneberg Decl.], ¶ 4. According to Defendants, the funding for the vast majority of OJP awards is "no year" monies from Congress, meaning that they do not need to be spent within the fiscal year for which they are appropriated and they remain available until expended. *Id.* ¶ 17; *see, e.g.,* Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, 136 Stat. 49, 123–24; Bipartisan Safer Communities Act, Pub. L. No. 117-159, 136 Stat. 1313, 1338–39 (2022); *see also* 34 U.S.C. §§ 20101(c), 20103(c)(1)(A) (congressionally created Crime Victims Fund which is permanent and available for grants "without fiscal year limitation").

Congress earmarked these funds for certain broad purposes, but it did not mandate that the funds be awarded to any specific organization. *See, e.g.,* Consolidated Appropriations Act, 2024, Pub. L. No. 118-42, 138 Stat. 25, 149 (appropriating "$50,000,000 for a community violence intervention and prevention initiative"); Consolidated Appropriations Act, 2022, 136 Stat. at 125 (appropriating "$184,707,000 . . . for discretionary grants to improve the functioning of the

criminal justice system, to prevent or combat juvenile delinquency, and to assist victims of crime"). OJP makes discretionary awards from these appropriations.  Henneberg Decl. ¶¶ 4–5.

OJP grants are subject to the Office of Management and Budget's Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards ("Uniform Guidance").  *See* 2 C.F.R. § 2800.101 (DOJ adopting the Uniform Guidance).  Part of the Uniform Guidance addresses when a federal award may be terminated.  *See* 2 C.F.R. § 200.340.  It identifies four such circumstances, three of which are not at issue here: (1) "the recipient or subrecipient fails to comply with the terms and conditions" of the award; (2) the parties consent to termination; or (3) the recipient voluntarily terminates the award.  *Id.* § 200.340(a)(1)–(3).  The fourth, which is at the heart of this case, allows a federal agency to terminate a grant unilaterally "pursuant to the terms and conditions of the [] award, including, to the extent authorized by law, if an award no longer effectuates the program goals or agency priorities."  *Id.* § 200.340(a)(4).

Importantly, any basis for termination must be spelled out in the award itself.  The regulations provide that the agency "must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award."  *Id.* § 200.340(b).  An agency therefore must have a textual hook to terminate.  Thus, if OJP wishes to end an award under § 200.340(a)(4) based on its failure to effectuate agency priorities, it can do so only if that basis for termination is itself in the terms and conditions of the award.  *See Guidance for Federal Financial Assistance*, 89 Fed. Reg. 30,046, 30,089 (Apr. 22, 2024) (clarifying that terminations based on an award "no longer effectuat[ing]" agency priorities are allowed "[p]rovided that the language is included in the terms and conditions of the award").

**B.    Grant Terminations**

At the start of the new Trump administration, there were roughly 11,000 open OJP grant awards.  Henneberg Decl. ¶ 18.  In February 2025, DOJ leadership began a review of those awards, "focusing on the possibility of termination of particular OJP awards, grounded in consideration of whether (based on their individual project descriptions) they effectuated [DOJ's] priorities." *Id.* Defendants say that they conducted an "individualized review of open grant awards," which within weeks reduced "the number of awards under active focus . . . to approximately 2,200." *Id.*  Then throughout April 2025, "OJP was directed to terminate 376 individual, specifically identified discretionary grant awards (to 219 recipients), on the basis of the Department determination that they 'no longer effectuate[d] Department priorities.'" *Id.* ¶ 19.  Beyond this, Defendants have offered zero insight into what criteria they used to evaluate the project descriptions, reduce the number of awards under "active focus," and determine which of them would ultimately be terminated.

The record includes the termination notices that OJP delivered to the five Plaintiff-organizations, all of which are identical.  *See* Pls.' Mot. for Prelim. Inj., ECF No. 3 [hereinafter Prelim. Inj. Mot.], Decl. of Rachel Sottile, ECF No. 3-3 [hereinafter Sottile Decl.,], Exs. 2, 4 (Center for Children & Youth Justice's termination letters); Prelim. Inj. Mot., Decl. of Cynthia Choi, ECF No. 3-4 [hereinafter Choi Decl.], Ex. 2 (Stop AAPI Hate's termination letter); Prelim. Inj. Mot., Decl. of Dujuan Kennedy, ECF No. 3-5 [hereinafter Kennedy Decl.], Ex. 2 (FORCE Detroit's termination letter); Prelim. Inj. Mot., Decl. of Steven Ridini, ECF No. 3-6 [hereinafter Ridini Decl.], Exs. 2, 4, 6 (Health Resources in Action's termination letters); Prelim. Inj. Mot., Decl. of Nicholas Turner, ECF No. 3-7 [hereinafter Turner Decl.], Ex. 6 (Vera Institute of Justice's

termination letter). Sent via email, the notices immediately ceased future funding. OJP offered the same boilerplate explanation to each grant recipient:

> This award is being terminated because it "no longer effectuates the program goals or agency priorities." 2 C.F.R. § 200.340(a)(4). The Department has changed its priorities with respect to discretionary grant funding to focus on, among other things, more directly supporting certain law enforcement operations, combatting violent crime, protecting American children, and supporting American victims of trafficking and sexual assault, and better coordinating law enforcement efforts at all levels of government. This award demonstrates that it no longer effectuates Department priorities.

*See, e.g.,* Sottile Decl., Ex. 2. The notices offered no explanation as to *why* the grantees' awards no longer effectuated agency priorities. *See generally id.*

The notices alerted recipients to an appeals process to dispute their terminations. *Id.* Consistent with 2 C.F.R. § 200.342, grant recipients had 30 days to submit a written appeal to the Assistant Attorney General for OJP. *Id.*

### C.    Procedural Background

Plaintiffs are five grantees who had their awards terminated in April 2025. *See* Compl., ECF No. 1 [hereinafter Compl.], ¶¶ 42–43.

- Vera Institute of Justice ("Vera") is a New York-based nonprofit that seeks "to pilot, test, and scale innovations that prevent crime and address its drivers, increase accountability, and rely less on incarceration and more on the programs and services that help individuals, families, and communities to thrive." Compl. ¶¶ 17, 39. OJP made five awards to Vera totaling $7.25 million running through September 30, 2027. *Id.* ¶ 40; Turner Decl. ¶¶ 19, 24, 31, 37, 45. OJP terminated the awards on April 4, 2025, with approximately $5.4 million in funds remaining. Turner Decl. ¶¶ 8–9.

- The Center for Children & Youth Justice ("CCYJ") is a Washington state-based nonprofit seeking "to create better lives for generations of children and youth by reforming the child welfare and juvenile justice systems." Compl. ¶ 13. OJP made two awards to CCYJ totaling $6 million for the fiscal years

ending September 30, 2025, and September 30, 2026. *Id.* ¶ 28; Sottile Decl. ¶¶ 19, 27. OJP terminated both awards on April 22, 2025, with roughly $4.1 million in funds remaining. *See* Sottile Decl., ¶¶ 9, 11.

- Chinese for Affirmative Action, doing business as Stop AAPI Hate, "is a U.S.-based non-partisan Civil Rights coalition dedicated to ending racism and discrimination against Asian Americans and Pacific Islanders (AAPIs)." Compl. ¶ 14. OJP made a $2 million grant to Stop AAPI Hate to run from October 1, 2024, through September 30, 2027. *Id.* ¶ 32; Choi Decl. ¶ 13. The agency terminated the award on April 22, 2025, after Stop AAPI Hate had withdrawn only $500,000. Choi Decl. ¶¶ 18–19.

- "FORCE (Faithfully Organizing for Community Empowerment) Detroit is a community violence intervention . . . organization dedicated to building a safer, freer Detroit, Michigan." Compl. ¶ 15. OJP awarded FORCE Detroit $1,999,998 for the period of October 1, 2024, through September 30, 2027. Kennedy Decl. ¶ 6. OJP terminated the award on April 22, 2025, with $1,945,998 in funds remaining. *Id.* ¶ 9.

- "Health Resources in Action ('HRiA') is a Massachusetts based non-profit organization working to improve and reimagine public health, with a vision of healthy people thriving in equitable and just communities." Compl. ¶ 16. OJP made three grant awards to HRiA totaling approximately $8.55 million to run through September 30, 2027. *Id.* ¶ 36; *see also* Ridini Decl., ¶¶ 28, 31; *id.*, Exs. 1, 3, 5. OJP terminated all three awards on April 22, 2025, with over $6.75 million in funds remaining. Ridini Decl. ¶¶ 11–12.

Plaintiffs filed suit on May 21, 2025, challenging the grant terminations. *See generally* Compl. They assert both statutory and constitutional claims. They allege that the grant terminations (1) were arbitrary and capricious, contrary to law, and contrary to a constitutional right under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 702, 706(2)(A) (Counts V and VI); (2) violated their right to due process under the Fifth Amendment, and were based on an unconstitutionally vague regulation (Counts I and II); and (3) violated the doctrine of the separation of powers, the Spending and Appropriations Clauses, and the Take Care Clause

(Count IV).  *See id.* ¶¶ 82–98, 104–34.  They also assert an equitable *ultra vires* claim against the individual Defendants, the Attorney General and the acting head of OJP (Count III).  *Id.* ¶¶ 99–103.

Plaintiffs also seek to proceed as representatives of a class.  They request certification of a class as follows:

> All entities in the United States issued awards by the U.S. Department of Justice (DOJ) Office of Justice Programs, whose grants DOJ terminated in April 2025 pursuant to 2 C.F.R. § 200.340(a)(4).

Compl. ¶ 74.

Plaintiffs demand various forms of relief.[1]  In sum, they ask the court (1) to declare unlawful, vacate, and set aside OJP's *en masse* terminations of the putative class members' grants; (2) to declare that the terminations violate the Fifth Amendment, the separation of powers, the Take Care Clause, and the Appropriations and Spending Clauses; (3) to declare that the terminations based on 2 C.F.R. § 200.340(a), and OJP's interpretation of that regulation, are unlawful; (4) to preliminarily and permanently enjoin Defendants from giving effect to the terminations and re-obligating those funds to other organizations; and (5) to "[e]nter an order in the exercise of the court's equitable powers that directs Defendants to take all steps necessary to ensure that OJP disburses funds to Plaintiffs in the customary manner and in customary timeframes[.]"  *Id.* at 29–31.

Plaintiffs simultaneously moved for preliminary injunctive relief and class certification.  *See* Class Cert. Mot., ECF No. 2; Prelim. Inj. Mot.  Defendants opposed such relief and moved to dismiss for lack of subject matter jurisdiction and for failure to state a claim.  *See* Defs.' Mot. to Dismiss.  The court held a hearing on the pending motions on June 26, 2025.

---

[1] The Complaint lists 17 separate forms of relief.  Compl. at 29–31.  The court has distilled them to five.

III.    **LEGAL STANDARDS**

A.    **Preliminary Injunction**

Preliminary injunctive relief is an "extraordinary and drastic remedy" that is "never awarded as [a matter] of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (internal quotation marks and citations omitted). A court may grant the "extraordinary remedy . . . [only] upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). The preliminary injunction factors are well established: plaintiffs must show that (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [their] favor"; and (4) "an injunction is in the public interest." *Id.* at 20 (citations omitted). Where the federal government is the opposing party, the balance of equities and public interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

Prior to the Supreme Court's decision in *Winter*, the D.C. Circuit "allowed . . . a strong showing on one factor" to "make up for a weaker showing on another." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). The D.C. Circuit has since repeatedly suggested that this "sliding scale" approach does not remain good law after *Winter*, but it has not squarely said so. *See, e.g., id.* at 392–93; *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292 (D.C. Cir. 2009); *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014); *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 726 (D.C. Cir. 2022); *Clevinger v. Advocacy Holdings, Inc.*, 134 F.4th 1230, 1235–36 (D.C. Cir. 2025). It has emphasized that "the first and most important" of these four factors is whether the movant "ha[s] established a likelihood of success on the merits." *Aamer*, 742 F.3d at 1038. If a plaintiff cannot show a likelihood of success on the merits, "there

is no need to consider the remaining factors." *Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urban Dev.*, 639 F.3d 1078, 1088 (D.C. Cir. 2011).  "[T]he 'merits' on which [a] plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction." *Obama v. Klayman*, 800 F.3d 559, 565 (D.C. Cir. 2015).

> **B.     Motion to Dismiss**

> > *1.     Rule 12(b)(1)*

The court must dismiss a claim as to which it lacks subject matter jurisdiction. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 506 (2006); *see* Fed. R. Civ. P. 12(b)(1), 12(h)(3).  The plaintiff bears the burden of establishing the court's subject-matter jurisdiction.  *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  The court must accept all well-pleaded factual allegations in the complaint as true.  *See Jerome Stevens Pharm., Inc. v. Food & Drug Admin.*, 402 F.3d 1249, 1253–54 (D.C. Cir. 2005) (citation omitted).   "[W]here necessary, the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts" when resolving a motion under Rule 12(b)(1).  *Coal. for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003) (quoting *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992)).

> > *2.     Rule 12(b)(6)*

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face."  *Sickle v. Torres Advanced Enter. Sols., LLC*, 884 F.3d 338, 344–45 (D.C. Cir. 2018) (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  A claim satisfies the plausibility standard "when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted).

## IV.    JURISDICTION

Defendants first argue that Plaintiffs' claims—all of them—must be dismissed because they "stem from grant agreements with the government and seek relief that is quintessentially contractual." Defs.' Mot. to Dismiss at 1. "[T]his suit belongs in the Court of Federal Claims," they say. *Id.* In so arguing, Defendants require this court to wade into the ongoing controversy over whether federal grant termination cases belong in federal district courts or in the Court of Federal Claims. *See, e.g., Harris Cnty. v. Kennedy*, --- F. Supp. 3d ---, 2025 WL 1707665, at *14 (D.D.C. 2025) (citing cases with various approaches to the issue in this District).

"The United States and its agencies are generally immune from suit in federal court absent a clear and unequivocal waiver of sovereign immunity." *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1105 (D.C. Cir. 2022) (citing *Kalodner v. Abraham*, 310 F.3d 767, 769 (D.C. Cir. 2002)). Under the APA, Congress has waived sovereign immunity on a limited basis for lawsuits by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, . . . [and] seeking relief other than money damages." 5 U.S.C. § 702; *see Crowley*, 38 F.4th at 1105–06. The waiver does not apply, however, "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." *Crowley*, 38 F.4th at 1106 (quoting *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 618 (D.C. Cir. 2017) (quoting 5 U.S.C. § 702)).

According to Defendants, the "other statute" that forecloses this court's jurisdiction in this case is the Tucker Act. That law "confer[s] exclusive jurisdiction over breach of contract claims against the United States seeking more than $10,000 in damages on the Court of Federal Claims."

*Id.* at 1106 (quoting *Hammer v. Untied States*, 589 F.3d 1, 2 (D.C. Cir. 2021) (citations omitted)). The D.C. Circuit has interpreted the Tucker Act as "impliedly forbid[ding] contract claims against the Government from being brought in district court under the waiver in the APA." *Id.* (internal quotation marks omitted) (quoting *Perry Cap.*, 84 F.3d at 618–19).

### A.    Constitutional and *Ultra Vires* Claims

Subject matter jurisdiction cannot be evaluated on a case-wide basis. "To resolve the sovereign immunity and jurisdiction questions, [the court] must consider [Plaintiffs'] claims individually[.]" *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992). Though Defendants in their opposition brief failed to appreciate this nuance, their counsel acknowledged at argument that jurisdiction may lie for certain claims and not for others. *See* Hr'g Tr. 6/26/25, ECF No. 46 [hereinafter Tr.], 74:2-4 ("[I]nsofar as they have truly independent constitutional claims, this [c]ourt has jurisdiction.").

That concession was wise. Where the "source of the rights upon which the plaintiff bases its claims," *Megapulse v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982), is constitutional or statutory, the D.C. Circuit has said that such claims belong in federal district court, *see Transohio*, 967 F.2d at 609–10 ("[L]itigants may bring statutory and constitutional claims in federal district court even when the claims depend on the existence and terms of a contract with the government."). Further, the fact that a favorable outcome might require the payment of money is no impediment to jurisdiction. "[A] federal district court may accept jurisdiction over a statutory or constitutional claim for injunctive relief even where the relief sought is an order forcing the government to obey the terms of a contract—that is, specific performance." *Id.* at 610.

The D.C. Circuit's decisions in *Transohio* and *Sharp v. Weinberger* are illustrative. In both cases, the court held that the APA waived sovereign immunity for the plaintiffs' due process claims,

12

where they had asserted that government "contracts gave them a property interest, the denial of which the Constitution prohibits." *Transohio*, 967 F.2d at 610; *see Sharp v. Weinberger*, 798 F.2d 1521, 1523–24 (D.C. Cir. 1986). The plaintiffs in both cases also sought injunctive and declaratory relief. *See Transohio*, 967 F.2d at 610; *Sharp*, 798 F.2d at 1523.

*Transohio* and *Sharp* establish this court's jurisdiction to hear Plaintiffs' due process claims (Counts I and II). Like those cases, Plaintiffs here contend that their grant awards gave them "a protected property interest," which OJP stripped "without the procedural due process rights to which they are entitled." Compl. ¶¶ 85, 87. Plaintiffs further assert that OJP deprived them of their property rights based on an unconstitutionally vague application of § 200.340(a)(4). *Id.* ¶¶ 94–95. They seek injunctive and declaratory relief that would compel OJP to pay in full the remaining grant funds. The APA therefore waives the United States' sovereign immunity as to these claims. *See Transohio*, 967 F.2d at 610.

The same result obtains for Plaintiffs' other constitutional claims. "The core principle underlying" Plaintiffs' separation of powers, Spending and Appropriation Clauses, and Take Care Clause claims (Count IV) "is that the Constitution gives Congress, not the Executive Branch, exclusive power over spending." *Harris Cnty.*, 2025 WL 1707665, at *4 (citing *Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1346 (D.C. Cir. 2012)); *see also In re Aiken Cnty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (stating that the Executive Branch must follow statutory mandates where appropriated funds remain available). The source of these claimed rights is thus the Constitution, not any grant award. The court therefore can hear those claims. *See Harris Cnty.*, 2025 WL 1707665, at *4–6.

So, too, as to Plaintiffs' equitable *ultra vires* cause of action (Count III). The rights sought to be vindicated through that claim are those same constitutional and statutory principles regarding

Congress's power of the purse. *See, e.g., Harris Cnty.*, 2025 WL 1707655, at *16; *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *10 (D.C. Cir. May 3, 2025) (Pillard, J., dissenting) [hereinafter *Widakuswara I*], *on reconsideration en banc*, No. 25-5144, 2025 WL 1521355, at *1 (D.C. Cir. May 28, 2025) (vacating the panel's decision for "substantially . . . the reasons explained by Judge Pillard"). Plaintiffs' position as to the *ultra vires* claim "is ultimately based, not on breach of contract, but on an alleged governmental . . . violation of" constitutional principles and the relevant appropriations statutes. *Megapulse*, 672 F.2d at 969.

### B.    APA Claims

Whether the court has jurisdiction over the APA claims (Counts V and VI) is more complicated. The D.C. Circuit has "interpreted the Tucker Act as providing the *exclusive* remedy for contract claims against the government, at least *vis a vis* the APA." *Transohio*, 967 F.2d at 609. "[A]n action against the United States which is *at its essence* a contract claim lies within the Tucker Act and . . . a district court has no power to grant injunctive relief." *Megapulse*, 672 F.2d at 967 (emphasis added). The "longstanding test" in this Circuit "for determining whether a claim falls within the exclusive jurisdiction of the Claims Court pursuant to the Tucker Act" turns on two factors: "the source of the rights upon which the plaintiff bases its claims," and "the type of relief sought (or appropriate)." *Crowley*, 38 F.4th at 1106 (quoting *Megapulse*, 672 F.2d at 968). In assessing those factors, the court must be careful to guard against "a disguised contract action," *Megapulse*, 672 F.2d at 968, that seeks to avoid the Tucker Act "merely by alleging violations of regulatory or statutory provisions rather than breach of contract," *Ingersoll-Rand Co. v. United States*, 780 F.2d 74, 77 (D.C. Cir. 1985).

Plaintiffs make two APA claims. First, they assert that "OJP's *en masse* termination of an estimated 373 grants, on the same day, using the same cursory and unspecific rationale" was

arbitrary and capricious agency action.  Prelim. Inj. Mot., Mem. in Supp., ECF No. 3-1 [hereinafter Prelim Inj. Mem.], at 19; *see* 5 U.S.C. § 706(2)(A).  Second, Plaintiffs contend that the terminations violated § 200.340(a)(4), and are thus contrary to law, insofar as none of their award documents contained a provision that would permit OJP to terminate awards based on changed agency priorities.  Compl. ¶ 120; *see* 5 U.S.C. § 706(2)(A).

The court holds that both APA claims are essentially contractual in nature and belong in the Court of Federal Claims.

### 1.    *Department of Education v. California*

The Supreme Court's recent decision in *Department of Education v. California* frames the jurisdictional inquiry.  145 S. Ct. 966, 968 (2025) [hereinafter *California III*].  Some detail about the lower court proceedings is helpful to put the Supreme Court's decision in context.

Various states filed suit against the Secretary of Education for terminating "all grants previously awarded" under congressionally funded programs that provided grants to help teachers in underserved areas.  *California v. Dep't of Educ.*, 769 F. Supp. 3d 72, 75 (D. Mass. 2025) [hereinafter *California I*].  The plaintiffs asserted that the terminations were both arbitrary and capricious and contrary to law under the APA; they did not, however, assert any constitutional or *ultra vires* claims.  *See* Compl., ECF No. 1, ¶¶ 161–86, *California v. Dep't of Educ.*, No. 25-cv-10548-AK (D. Mass.).

Their APA claims were identical to those asserted here.  The plaintiffs in *California I* insisted that the grant terminations were arbitrary and capricious because the defendants did not engage in reasoned decisionmaking, did not conduct an individual analysis of each termination, and failed to consider the reliance interests of the grant recipients.  *Id.* ¶ 13.  As to the contrary-to-law claim, the plaintiffs maintained that "because the authority on which Defendants rely," 2 C.F.R.

§ 200.340(a)(4), "does not authorize termination on the independent grounds of 'Department priorities,'" the agency had to "'clearly and unambiguously specify all termination provisions in the terms and conditions of the federal award.'" *Id.* ¶ 14 (quoting 2 C.F.R. § 200.340(b)). Because "the terms and conditions of the . . . grant awards [did] not authorize termination on these grounds," the terminations were not "authorized by law." *Id.* As relief, the plaintiffs requested that the court "vacate and set aside [the defendants'] termination of all previously-awarded" grants and "restore recipients . . . to the pre-existing status quo prior to the termination." *See id.* at 51–52.

The district court granted the requested temporary restraining order ("TRO"). *See California I*, 769 F. Supp. 3d at 75. In doing so, it rejected the same jurisdictional argument Defendants make here. The court ruled that the case did not belong in the Court of Federal Claims because "the 'essence' of the action was not contractual in nature," as the plaintiffs did not allege "claims for past pecuniary harms" and "the dispute [did] not hinge on the terms of a contract between the parties, but rather 'federal statute and regulations put in place by Congress and the [Department of Education].'" *Id.* at 76 (quoting *Massachusetts v. Nat'l Insts. of Health*, 770 F. Supp. 3d 277, 293 (D. Mass. 2025)). On the merits, the court held that the grant terminations were arbitrary and capricious because the Department of Education had failed to conduct individualized analysis or offer a reasoned explanation for its *en masse* terminations. *Id.* at 76–78. The court did not reach the contrary-to-law claim. *Id.* at 78 n.3. As relief, the district court ordered the defendants to "immediately restore Plaintiff States to the pre-existing status quo prior to the termination under all previously awarded . . . grants for recipients in Plaintiff States," among others. *Id.* at 80.

The defendants appealed and moved for a stay, which the First Circuit denied. *California v. U.S. Dep't of Educ.*, 132 F.4th 92, 96–97 (1st Cir. 2025) [hereinafter *California II*]. The appellate

court held that jurisdiction was proper because, "although the terms and conditions of each individual grant award are at issue, the 'essence' . . . of the claims is not contractual" as "the States challenge the Department's actions as insufficiently explained, insufficiently reasoned, and otherwise contrary to law—arguments derived from the [APA]." *Id.* at 96–97. "Simply put, if the Department breached any contract, it did so by violating the APA." *Id.* at 97. The court further reasoned that, because the plaintiffs sought equitable relief by requiring the Department to continue paying out appropriated funds, "[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Id.* (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988)).

The Supreme Court reversed and granted the defendants a stay. *California III*, 145 S. Ct. at 968–69. It held that "the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." *Id.* at 968. The Court recognized that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds," *id.* (quoting *Bowen*, 487 U.S. at 910), but distinguished *Bowen* insofar as "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered here," *id.* (quoting *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)).

The Supreme Court's sparse reasoning in *California III* has sown confusion in this jurisdiction. Several judges on the D.C. Circuit "appear to have suggested that [*California III*] forecloses district-court jurisdiction in grant-termination cases altogether." *Harris Cnty.*, 2025 WL 1707665, at *14 (citing *Widakuswara v. Lake*, No. 25-5150, 2025 WL 1521355, at *2 (D.C. Cir. May 28, 2025) (Katsas, J., dissenting, joined by Henderson, Rao, and Walker, JJ.) [hereinafter

*Widakuswara II*]).  Another D.C. Circuit judge did not go as far.  She instead distinguished between "entities created by statute and designated by Congress to receive specified sums" and entities whose "only claim was to sums awarded to them in previously awarded discretionary grants," with jurisdiction proper in federal district court in the former but not the latter.  *Widakuswara I*, 2025 WL 1288817, at *13 (Pillard, J., dissenting); *see also Widakuswara II*, 2025 WL 1521355, at *1 (granting motion for *en banc* reconsideration and vacatur of government's stay pending appeal for "substantially" the same "reasons explained by Judge Pillard").

Nor have judges in this District been uniform in their application of *California III*. *See Harris Cnty.*, 2025 WL 1707665, at *4–6, 14–15 (allowing constitutional claims to proceed, declining to rule on APA contrary-to-statute and contrary-to-regulation claims, and finding that an APA arbitrary-and-capricious claim is subject to *California III*'s bar); *S. Educ. Found. v. U.S. Dep't of Educ.*, --- F. Supp. 3d ---, 2025 WL 1453047, at *6–11 (D.D.C. 2025) (allowing an APA arbitrary-and-capricious claim to proceed, reasoning that *California III* "does not displace governing law"); *Am. Ctr. for Int'l Labor Solidarity v. Chavez-Deremer*, No. 25-cv-1128 (BAH), 2025 WL 1795090, at *12–20 (D.D.C. June 30, 2025) (explaining that exclusive Tucker Act jurisdiction does not apply to claims that "seek[] relief based only on an alleged statutory or constitutional violation," and finding jurisdiction because the cooperative agreements at issue did not resemble contracts); *Climate United Fund v. Citibank, N.A.*, --- F. Supp. 3d ---, 2025 WL 1131412, at *9–12 (D.D.C. 2025) (allowing APA, statutory, and constitutional claims to proceed); *U.S. Conf. of Cath. Bishops v. U.S. Dep't of State*, 770 F. Supp. 3d 155, 163 (D.D.C. 2025) (holding that APA-styled claims belonged in the Court of Federal Claims where the plaintiff wanted the court "to order the Government to stop withholding the money due under the Cooperative Agreements").

2.    *Application*

a.    <u>Arbitrary and capricious</u>

Against this unsettled terrain, this court agrees with *Harris County*'s approach and finds that it lacks jurisdiction over Plaintiffs' arbitrary-and-capricious claim under *California III*. As in *Harris County*, the arbitrary-and-capricious claim here "appears in all material respects identical" to that of *California III*. *Harris Cnty.*, 2025 WL 1707665, at *15. That is: (1) Plaintiffs' challenge "involve[s] a statute that required the Executive Branch to issue grants . . . for specified purposes"; (2) "the Executive Branch terminated [the] grants en masse with a boilerplate, one-paragraph explanation"; and (3) "the plaintiffs challenged that explanation under the APA on the ground that one paragraph does not cut it." *Id.* (citing *California III*, 145 S. Ct. at 970–71, 975); *see also* Prelim. Inj. Mem. at 18–22.

Plaintiffs respond that *California III* does not control because (1) the grants and cooperative agreements at issue are not the type of contract that can give rise to Tucker Act jurisdiction, *see* Prelim. Inj. Mem. at 31–33, and (2) *California III*'s precedential value is questionable, *see id.* at 36. Plaintiffs, however, fail to explain how the grant agreements in this case differ from those in *California III*, which the Supreme Court treated as contracts implicating Tucker Act jurisdiction. *See California III*, 145 S. Ct. at 968. Plaintiffs instead argue that the Supreme Court "had no occasion whether to consider the grant agreements there were the type of contract that can give rise to Tucker Act jurisdiction because no party raised that issue." Prelim. Inj. Mem. at 36. That is doubtful. After all, the Court held that the plaintiff's arbitrary-and-capricious claim was essentially contractual. It would be foolhardy to assume that the Supreme Court did not at least implicitly consider whether the grants at issue were contracts in the first place.

In any event, Plaintiffs' position is at odds with authorities from the Federal Circuit, which has developed robust caselaw as to what constitutes a contract for purposes of the Tucker Act. Where there is "(1) mutuality of intent to contract; (2) offer and acceptance; (3) consideration; and (4) a government representative having actual authority to bind the United States," there is an enforceable contract for purposes of the Tucker Act. *Columbus Reg'l Hosp. v. United* States, 990 F.3d 1330, 1339 (Fed. Cir. 2021). The Federal Circuit "treat[s] federal grant agreements as contracts when the standard conditions for a contract are satisfied, including that the federal entity agrees to be bound." *Id.* at 1338.

Plaintiffs argue that the grant and cooperative agreements at issue "are not contracts at all" because they lack consideration, that is, a "'direct, tangible'" benefit to the government. Prelim. Inj. Mem. at 31 (quoting *Am. Near E. Refugee Aid v. U.S. Agency for Int'l Dev.*, 703 F. Supp. 3d 126, 133 (D.D.C. 2023)). But the Federal Circuit has ruled otherwise. In *Columbus Regional*, the court held that there was consideration in a disaster grant agreement, where the grant recipient "agreed to comply with an array of requirements attached to the receipt, use, and distribution of the grant money." *Columbus Reg'l*, 990 F.3d at 1340; *see id.* ("[C]onsideraton may consist of performance or a return promise to perform, and performance 'may be a specified act of forbearance, or any one of several specified acts or forbearances of which the offeree is given the choice, or such conduct as will produce a specified result.'") (quoting Restatement (Second of Contracts) § 71 cmt. d (1981)). And further "at least some of the conditions imposed on [the recipient] confer[red] a benefit on the government, such as [the recipient's] promises to serve as a collector or reimburser of funds procured by fraud and to report employees who have committed drug offenses." *Id.* Similarly, in *State of Texas v. United States*, the predecessor Court of Claims concluded that "defendant's valid execution of a document, which it prepared and titled 'Federal-

State Disaster Assistance Agreement,' specifying that 'Federal assistance will be made available in accordance with (various specified laws, Executive Orders and regulations)' obligates defendant to provide such assistance as called for by the parties' agreement." 537 F.2d 466, 468–69 (Ct. Cl. 1976).

As in those cases, Plaintiffs here "agreed to comply with an array of requirements attached to the receipt, use, and distribution of the grant money." *Columbus Reg'l*, 990 F.3d at 1340; *see also Henneberg* Decl. ¶¶ 11–12. The grantees accepted the awards from OJP subject to dozens of "Conditions." *See, e.g.,* Defs.' Mot. to Dismiss, Exs. 2, 3, ECF Nos. 27-2 [hereinafter CYJC Award], 26-3 (CYJC award containing 52 conditions). The government also received some direct benefit from the agreements, such as a promise by the recipient to collect, maintain, and provide data to OJP about program performance and effectiveness, *see* CYJC Award at 10 (Condition 13), and to report any fraud, waste, and abuse, *id.* at 15 (Condition 29).

Plaintiffs also argue that "even if the grant agreements here qualified as contracts, they are not the type of contract over which the Court of Federal Claims has jurisdiction" because they contain no "affirmative indication that the agreement[s] create[] a right to money damages." Prelim. Inj. Mem. at 31, 32; *see Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d 1338, 1343 (Fed. Cir. 2008) (holding that a cooperative agreement did "not provide a substantive right to recover money-damages"). But "[n]ormally contracts do not contain provisions specifying the basis for the award of damages in case of breach," and "[t]he fact that this contract covers government financial grants does not warrant a different standard"—"[i]f the government has breached the Agreement, [Plaintiffs are] entitled to seek whatever damages [they are] entitled to receive." *San Juan City Coll. v. United States*, 391 F.3d 1357, 1361 (Fed. Cir. 2004).

Plaintiffs acknowledge this principle but point to the Court of Federal Claims' decision in *St. Bernard Parish Government v. United States* for the proposition that money damages are not available under a cooperative agreement where "no 'specific provision in the agreement contemplate[s] money damages for breach'" by the federal agency. *See* Prelim. Inj. Mem. at 33 (quoting 134 Fed. Cl. 730, 735 (2017)). But this position is at odds with the Federal Circuit's decision in *San Juan City College*, which, as here, involved a federal grant agreement that did not contain a specific provision for money damages. *See also San Antonio Hous. Auth. v. United States*, 143 Fed. Cl. 425, 462–63 (2019) (disagreeing with *St. Bernard Parish* that cooperative agreements are not afforded a presumption of monetary damages). The trial-level decision in *St. Bernard Parish* therefore is not persuasive.

Ultimately, the Supreme Court's ruling in *California III* forecloses the exercise of jurisdiction over Plaintiffs' arbitrary-and-capricious claim. Although *California III* does not displace other Supreme Court and D.C. Circuit precedent, *see Am. Ctr. for Int'l Labor Solidarity*, 2025 WL 1795090, at *20; *S. Educ. Found.*, 2025 WL 1453047, at *9, the Court has spoken in a case substantially the same as this one. This court must listen. *See Harris Cnty.*, 2025 WL 1707665, at *15; *cf. Trump v. CASA, Inc.*, --- S. Ct. ---, 2025 WL 1773631, at *22 (June 27, 2025) (Kavanaugh, J., concurring) ("[W]hen this Court makes a decision on the interim legal status of a major new federal statute or executive action—that decision will often constitute a form of precedent (*de jure* or *de facto*) that provides guidance throughout the United States during the years-long interim period until a final decision on the merits.").

The court holds that Plaintiffs have not established this court's jurisdiction over their arbitrary-and-capricious APA claim, and therefore both denies injunctive relief and grants dismissal as to that claim. *See Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 895 (D.C.

Cir. 1985) (affirming dismissal where the matter was determined to be within the Court of Federal Claims' jurisdiction).

b.    Contrary to law

Though the arbitrary-and-capricious claim is governed by *California III*, Plaintiffs' contrary-to-law claim arguably stands on a different footing.[2]   Recall, the Supreme Court in *California III* had no occasion to consider jurisdiction over a contrary-to-law claim, because the district court did not reach it when granting the TRO.  *See California I*, 769 F. Supp. 3d at 78 n.3. Still, Plaintiffs' contrary-to-law claim runs aground for a different reason: D.C. Circuit precedent requires dismissal for lack of jurisdiction.  *See Spectrum Leasing Corp.*, 764 F.2d 891; *Ingersoll-Rand*, 780 F.2d 74.

At issue in *Spectrum Leasing* was a contract awarded to Spectrum by the General Services Administration ("GSA") to develop a data communications network.  764 F.2d at 892.  The government eventually terminated the contract by invoking its liquidated damages clause, after which Spectrum sued, claiming that GSA violated the procedures set forth in the Debt Collection Act, 31 U.S.C. §§ 3701 *et seq. Id.*  Spectrum sought (1) a declaration that GSA violated Spectrum's rights under the Debt Collection Act and (2) "an injunction compelling the GSA to cease withholding hardware and maintenance payments under the contract."  *Id.*  The D.C. Circuit found that Spectrum's suit belonged in the Court of Federal Claims because it sought "an injunction requiring the government to pay monies owed for computer hardware," and "[t]he right to these payments is created in the first instance by the contract, not by the Debt Collection Act."  *Id.* at 894.  That is, "[t]he [Debt Collection Act], even if it applied, confers no such right in the absence

---

[2] Plaintiffs also assert an APA claim that Defendants' terminations are "contrary to constitutional right, power, privilege, or immunity."  5 U.S.C. § 706(2)(B); *see* Prelim. Inj. Mem. at 18; Compl. at 26 (Count V).  The court allows this portion of the APA claim to proceed for the same reasons described in Section III.A, *supra*.

of the contract itself"—though the Act "might impose procedural requirements on the government having some impact on the contract, the Act in no way creates the substantive right to the remedy Spectrum seeks." *Id.* The Circuit also looked to the type of relief sought, noting that "Spectrum seeks an order compelling the government to pay money owed in exchange for goods procured under an executory contract," which it likened to "the classic contractual remedy of specific performance." *Id.* Based on "the source of the rights" and "the type of relief sought," the D.C. Circuit concluded that Spectrum's claims were not properly in the jurisdiction of the federal district court. *Spectrum Leasing*, 764 F.2d at 893, 895 (quoting *Megapulse*, 672 F.2d at 968).

Then there is *Ingersoll-Rand*. In that case, the plaintiff challenged the Air Force's decision to terminate its contract for convenience pursuant to Federal Acquisition Regulation 52.249-2(a), which was incorporated into the contract. 780 F.2d at 75. The essence of Ingersoll-Rand's argument was that the termination of the contract violated two other federal regulations and thus was arbitrary and capricious under the APA. *Id.* at 77. Applying the *Megapulse* test, the D.C. Circuit found that "the essential rights at stake . . . are contractual" and that "the essence of [Ingersoll-Rand's] claim is a request for specific performance of the original contract." *Id.* at 77, 79. As to the source of the rights, the court found that it was "possible to conceive of this dispute as entirely contained within the terms of the contract" since the issue was really whether the text of the contract forbids termination under the challenged conditions. *Id.* at 78. "That the termination also arguably violates certain other regulations does not transform the action into one based solely on those regulations. Nor does plaintiff's decision to allege only a violation of the regulations change the essential character of the action." *Id.* And, as to the remedy, since Ingersoll-Rand "requested an order reinstating the original award of the contract," it in essence requested

specific performance, and it could not sidestep Tucker Act jurisdictional limitations merely by seeking "a declaratory and injunctive order." *Id.* at 79–80.

Plaintiffs' contrary-to-law claim is on par with *Spectrum Leasing* and *Ingersoll-Rand*. First, as to the source of the right, "it is possible to conceive of this dispute as entirely contained within the terms of the contract." *Ingersoll-Rand*, 780 F.2d at 78. The regulation that Defendants allegedly violated requires that the basis for termination be spelled out in "the terms and conditions of the Federal award." 2 C.F.R. § 200.340(a)(4); *see also id.* § 200.340(b). Thus, to determine whether OJP violated § 200.340(a)(4), the court must look back to the awards themselves. It must ask: Do the agreements contain a term permitting OJP to terminate the award for no longer effectuating agency priorities, or is such provision absent? That is a classic contract question. Although § 200.340(a) "might impose procedural requirements on the government having some impact on the contract," it "in no way creates the substantive right to the remedy [Plaintiffs] seek[]." *Spectrum Leasing*, 764 F.2d at 895. Put differently, Plaintiffs "right to the [ ] payments arose only upon creation and satisfaction of its [grant award from] the government; in no sense did it exist independently of that [award]." *Id.* at 894.

The remedy sought also marks the claim as essentially contractual. Plaintiffs seek continued payment of the grants—in other words, specific performance. "A request for specific performance must be resolved by the Claims Court" when, as here, the source of right is contractual. *Ingersoll-Rand*, 780 F.2d at 80; *Spectrum Leasing*, 764 F.2d at 894 ("Spectrum seeks the classic contractual remedy of specific performance."); *see also Transohio*, 967 F.2d at 613 (explaining that the Supreme Court's decision in *Bowen* did not overrule the D.C. Circuit's "very specific holdings that the APA does *not* waive sovereign immunity for contract claims seeking specific relief"); *U.S. Conf. of Catholic Bishops*, 770 F. Supp. 3d at 162–64 (holding that claims

belonged in the Court of Federal Claims where the plaintiffs asked "to cancel the termination, pay money due, and reinstate the contracts").

Plaintiffs fail to grapple with *Spectrum Leasing* and *Ingersoll-Rand*. *See, e.g.,* Tr. at 12:4–17:5. Indeed, their papers nowhere cite, let alone seek to distinguish, those cases. Their leading argument goes to the remedy prong of the inquiry, which is that they seek additional "non-monetary relief that has 'considerable value' independent of any future potential for monetary relief." Pls.' Reply in Supp. of Prelim. Inj. Mot. and Opp'n to Defs.' Mot. to Dismiss, ECF No. 37 [hereinafter Pls.' Reply & Opp'n], at 30 (quoting *Kidwell v. Dep't of Army*, 56 F.3d 279, 284 (D.C. Cir. 1995) and citing *Crowley*, 38 F.4th at 1107–08). But this case bears no resemblance to *Crowley* and fails the *Kidwell* "considerable value" test.

*Crowley* involved audits by GSA of a contract between the plaintiff and the Department of Defense, which resulted in notices of overcharge. *Crowley*, 38 F.4th at 1102–03. Crowley sought a judgment (1) declaring GSA did not have statutory audit authority over the contract, (2) declaring that the notices of overcharge were contrary to statute, and (3) enjoining GSA from additional audits and issuing further notices. *Id.* at 1104. The D.C. Circuit found that there was considerable independent value in preventing GSA from interfering with the contract. *Id.* at 1111. Furthermore, it did not matter that money might flow from the government fisc from such a judgment. "Any monetary recovery Crowley might be entitled to in the future, including in Claims Court, would be entirely separate from the district court's exercise of jurisdiction and award of the requested declaratory and injunctive relief." *Id.* (internal quotation marks and alterations omitted).

The same cannot be said here. The non-monetary relief that Plaintiffs seek does not have "considerable value" apart from the "future potential for monetary gain." *Kidwell*, 56 F.3d at 284 (internal quotation marks omitted). Plaintiffs ask the court (1) to "[d]eclare that OJP's terminations

on the basis of Section 200.340(a)(4) are unlawful, including its interpretation that 2 C.F.R. § 200.340(a)(4) allows OJP to terminate a grant based on a 'change' in agency priorities," and (2) to "[p]reliminarily and permanently enjoin Defendants . . . from terminating grants under 2 C.F.R. § 200.340(a)(4) on the basis of a 'change' in agency priorities."  Compl. at 29–30.  But that non-monetary relief has little, if any, independent value from the future potential of monetary recovery.  Plaintiffs conceded as much at oral argument.  They acknowledged that the value of the non-monetary relief was the avoidance of future grant terminations that violate § 200.340(a)(4).  Tr. at 13:8-11 (stating that declaratory relief is necessary because if "the grants are reinstated and the government does the exact same thing as it did before and terminates the grants, we're back in the same position moving forward").  That is not "considerable value" independent of the monetary relief sought; it merely ensures that the monetary relief will continue.

In sum, because the source of the right and the relief requested for Plaintiffs' contrary-to-law APA claim is "at its essence" contractual, Plaintiffs have failed to establish this court's jurisdiction over this claim.  Denial of preliminary injunctive relief and dismissal must follow.

## V.    THE MERITS

The court turns now to the merits of those claims over which it does have jurisdiction, namely, Plaintiffs' constitutional and ultra vires claims.  To secure preliminary injunctive relief, Plaintiffs must establish a "likelihood of success on the merits."  *Aamer*, 742 F.3d at 1038.  To defeat a motion to dismiss, the burden is lower.  Plaintiffs need only state a claim for relief that is "plausible on its face."  *Sickle*, 884 F.3d at 344–45 (quoting *Iqbal*, 556 U.S. at 678).  The court

keeps these different standards in mind when evaluating the pending motions. *Cf. Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015).[3]

### A.    Fifth Amendment Claims

Plaintiffs assert two Fifth Amendment claims. First, they contend that they "have a constitutionally protected property interest in the funding they applied for, were awarded, and currently rely on," entitling them to due process before Defendants summarily terminated their grants. Prelim. Inj. Mem. at 23; Compl. ¶¶ 84–85. To assert a claim pursuant to the Fifth Amendment's Due Process Clause, "a plaintiff must show (i) deprivation of a protected liberty or property interest; (ii) by the government; (iii) without the process that is 'due' under the Fifth Amendment." *NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 41 (D.C. Cir. 2015) (internal citations omitted). Second, they contend that Defendants "violated the Due Process Clause by terminating [their] grants in an unconstitutionally vague manner." Prelim. Inj. Mem. at 24. They argue that "OJP's use of Section 20.340(a)(4) to allow for the termination anytime it 'changes' agency priorities invites the very sort of arbitrary terminations that are at issue in this case." *Id.* at 25.

"The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in 'liberty' or 'property,'" so the court begins there. *See NB ex rel. Peacock*, 794 F.3d at 41 (quoting *Gen. Elec. Co. v. Jackson*, 610 F.3d 110, 117 (D.C. Cir. 2010)). "[T]he range of interests protected by procedural due process is not infinite." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 570 (1972). As the D.C. Circuit has explained:

> Whether a given statutory scheme gives rise to a protected interest
> depends on whether the authority promulgating the statute or

---

[3] The court rejects Plaintiffs' assertion that Defendants have somehow forfeited Rule 12(b)(6) arguments as to any claim. *See* Pls.' Reply & Opp'n at 28 n.6. Defendants' Rule 12(b)(6) arguments in opposition to injunctive relief are the same as those supporting dismissal. *See* Defs.' Mot. to Dismiss at 2 (arguing that "each claim fails on its own terms and should be dismissed.").

> regulation has placed *substantive* limits on official discretion. Addressing the limitations necessary to support such an entitlement, the Court has stated that 'the regulations [must] contain 'explicitly mandatory language,' *i.e.*, specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow."

*Tarpeh-Doe v. United States*, 904 F.2d 719, 722–23 (D.C. Cir. 1990) (quoting *Ky. Dep't of Corrections v. Thompson*, 490 U.S. 454, 463 (1989)) (internal citation omitted).

Within the government contracting space, the D.C. Circuit has found that total debarment from government contracting implicates a protected *liberty* interest, but it has never held that a contractor has a property interest in expected payments. *See, e.g., Conset Corp. v. Cmty. Servs. Admin.*, 655 F.2d 1291, 1296 (D.C. Cir. 1981); *Reeve Aleutian Airways, Inc. v. United States*, 982 F.2d 594, 598 (D.C. Cir. 1993); *Com. Drapery Contractors, Inc. v. United States*, 133 F.3d 1, 6 (D.C. Cir. 1998); *see also Loc. 342, Long Island Pub. Serv. Emps., UMD, ILA, AFL-CIO v. Town Bd. of Town of Huntington*, 31 F.3d 1191, 1195 (2d Cir. 1994) (holding there is no protected property interest where there is "nothing more than a simple contractual right to receive . . . payments"). Indeed, "[o]utside of the employment context, courts have resisted application of due-process principles to government contracts because with scores of millions of government contracts in effect at any point in time, it is unimaginable that all government agencies would be required to provide a hearing before they take any action that is arguably inconsistent with a contract." *New Vision Photography Program, Inc. v. District of Columbia*, 54 F. Supp. 3d 12, 29 (D.D.C. 2014) (internal quotation marks, alteration, and citation omitted).

The crux of Plaintiffs' claimed property interest is that federal regulations "place substantive limitations on" Defendants' ability to terminate the grant funds, thereby affording Plaintiffs "a legitimate claim of entitlement, as to which the Due Process Clause affords protection." Prelim. Inj. Mem. at 23 (quoting *NB ex rel. Peacock*, 794 F.3d at 41–42); *see also*

Pls.' Reply & Opp'n at 20. More specifically, they say that "2 C.F.R. § 200.340(a)—the governing regulation specific to grant terminations—places substantive limitations on OJP's discretion to terminate the grants at issue." Pls.' Reply & Opp'n at 20.

But the regulation does no such thing. Section 200.340(a) simply lists four circumstances in which a government agency "may" terminate a federal award. The regulation's text is thus permissive; it does not contain "explicitly mandatory language" that dictates an outcome if "substantive predicates are present." *Tarpeh-Doe*, 904 F.2d at 722–23 (quoting *Ky. Dep't of Corrections*, 490 U.S. at 463). Further, the regulation itself is inert unless the agreement contains the relevant termination provision. 2 C.F.R. § 200.340(b) ("The Federal agency . . . must clearly and unambiguously specify all termination provisions in the terms and conditions of the Federal award."). To the extent OJP was restricted in its ability to terminate grants, the source of such constraint is the grant agreements themselves, not § 200.340(a). In that sense, Plaintiffs' due process claim "is substantively indistinguishable from a breach of contract claim." *Suburban Mortg. Assocs. v. Dep't of Housing & Urban Dev.*, 480 F.3d 1116, 1128 (Fed. Cir. 2007) ("[A] claim that a government agency has violated a party's right to due process by refusing performance under a contract is substantively indistinguishable from a breach of contract claim.").

Finally, the court agrees with the conclusion of another judge in this District who found no property interest in a grant termination case because "Plaintiffs offer[ed] no reason to think their contracts and grants . . . are different from the 'millions of government contracts in effect at any point in time' to which courts seldom apply 'due-process principles.'" *Nat'l Urban League v.*

*Trump*, --- F. Supp. 3d ----, 2025 WL 1275613, at \*18 (D.D.C. 2025) (quoting *New Vision Photography*, 54 F. Supp. 3d at 29 (citation omitted)).[4]

Having failed to establish even a plausible property interest in the grant awards, Plaintiffs' Fifth Amendment claims must be dismissed. *See Hettinga v. United States*, 677 F.3d 471, 479–80 (D.C. Cir. 2012) (identifying a "cognizable liberty or property interest" as "the threshold requirement of a due process claim"); *Nat'l Urban League*, 2025 WL 1275613, at \*17 (observing that "[a] void for vagueness challenge is, at bottom, a due-process claim, so Plaintiffs must show that they were deprived of a constitutionally-protected property or liberty interest") (internal quotation marks and citation omitted).

## B.    Other Constitutional Claims

Plaintiffs' remaining constitutional claim rests on "Congress's 'exclusive power over the federal purse.'" *Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d at 1346 (quoting *Rochester Pure Waters Dist. v. EPA*, 960 F.2d 180, 185 (D.C. Cir. 1992)). According to Plaintiffs, the grant terminations violated the separation of powers, the Spending and Appropriations Clauses, and the Take Care Clause.[5] Compl. ¶¶ 104–15.

"Under Article II of the Constitution . . . , the President must follow statutory *mandates* so long as there is appropriated money available and the President has no constitutional objection to

---

[4] The court respectfully disagrees with the few cases that have found that federal grantees "have a legitimate property interest in federal funds that Congress has already appropriated and that the [grantees] have accepted." *Cnty. of Santa Clara v. Trump*, 275 F. Supp. 3d 1196, 1218 (N.D. Cal. 2017), *aff'd in part, vacated in part, remanded sub. nom. City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018); *see also Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243, 280 n. 10 (D. Md. 2025). In both cases, the courts relied on summary citations to *Roth* and other foundational Supreme Court precedent. Indeed, *National Association of Diversity Officers* made this observation in a footnote and merely accepted the plaintiffs' arguments. *See* 767 F. Supp. 3d at 280 n.10. The order in that case was subsequently stayed by the Fourth Circuit. *See* Order, Doc. No. 29, *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-1189 (4th Cir. March 14, 2025).

[5] At argument, Plaintiffs represented that its Spending and Appropriations Clauses and Take Care Clause claims are co-extensive with its separation of powers claim. *See* Tr. 47:11-23. The court thus considers these claims together. *See* Prelim. Inj. Mem. at 26–28.

the statute." *In re Aiken Cnty.*, 725 F.3d at 259; *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring) ("When the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb[.]"). Thus, when Congress appropriates sums of money for certain purposes, the Executive must spend it. *See Train v. City of New York*, 420 U.S. 35, 42–44 (1975); Anti-Deficiency Act, Pub. L. No. 97-258, 96 Stat. 929 (1982) (codified at 31 U.S.C. § 1512) (prohibiting executive officers from holding appropriated funds in reserve except in certain circumstances). The President cannot refuse to spend appropriated funds based on policy reasons alone, unless Congress explicitly approves their recission. *In re Aiken Cnty.*, 725 F.3d at 259, 261 n.1; *see also* Impoundment Control Act, Pub. L. No. 93-344, 88 Stat. 297 (1974) (appropriated funds "shall be made available for obligation" absent congressional recission).

According to Plaintiffs, Defendants' termination of hundreds of grants to the tune of $820 million constituted a "blanket refusal to spend appropriations." *See* Prelim. Inj. Mem. at 26; Compl. ¶¶ 110–15. But that is not the evidence before the court. Defendants are not refusing to spend the $820 million in terminated grant awards; rather, they intend to re-obligate those funds to other grantees. *See* Henneberg Decl. ¶ 26. Further, the awards are sourced to "no year" appropriations, meaning Defendants are not required to expend the funds by the end of a fiscal year. *Id.* ¶ 17; Consolidated Appropriations Act, 2024, 138 Stat. at 145; Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 4459, 4534 (2023); Bipartisan Safer Communities Act, 136 Stat. at 1338–39; Consolidated Appropriations Act, 2022, 136 Stat. at 123–24; *see also* 34 U.S.C. §§ 20101(c), 20103(c)(1)(A) (congressionally created Crime Victims Fund which is permanent and available for grants "without fiscal year limitation"). Defendants therefore face no congressionally mandated deadline to identify and pay new grantees.

Plaintiffs push back against none of this. *See* Tr. at 32:8-21 (conceding the grant monies are "no year" funds). For that reason alone, they have failed to establish a likelihood of success on their separation-of-powers and related claims. *See Harris Cnty.*, 2025 WL 1707665, at *9–10 (holding that the plaintiffs had failed to establish a likelihood of success on their separation of powers claim where the congressional appropriation did not "limit agency discretion over how to spend appropriated funds" and "plaintiffs have presented no evidence that this administration (or for that matter, a future administration)" will not re-obligate the terminated grant funds).

Whether to dismiss these claims is trickier. Defendants rightly concede that they cannot rely on the Henneberg Declaration on their Rule 12(b)(6) motion. Tr. at 82:22-24. So, OJP's stated intention to re-obligate the funds cannot be the basis for dismissal. That said, Plaintiffs still bear the burden of pleading a plausible claim. And, in this context, the court thinks it is important that, to survive a motion to dismiss, Plaintiffs must plead some *facts* that plausibly establish that OJP will *not* reissue the awards to new grantees or that they will do so in a way inconsistent with the appropriations statutes.

The complaint does not do so. The closest Plaintiffs come is an assertion contained in paragraph 111. There, after recounting facts about one Plaintiff's terminated funding, Plaintiffs write: "But Congress' command did not change, and Congress' command left Defendants no leeway to simply pocket the money." Compl. ¶ 111. That statement, however, is a "bare assertion[]" of fact and is "not entitled to be assumed true." *Iqbal*, 556 U.S. at 681. Nowhere else does the complaint provide the "factual enhancement" necessary to support Plaintiffs' spending-related constitutional claims. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). Accordingly, the court will dismiss them.

### C.    Equitable *Ultra Vires*

That leaves Plaintiffs' *ultra vires* claim.  The court disposes of it quickly.

*Ultra vires* review is a type of nonstatutory review and is available where "an agency has taken action entirely 'in excess of its delegated powers and contrary to a *specific prohibition*' in a statute."  *Nuclear Regul. Comm'n v. Texas*, 145 S. Ct. 1762, 1776 (2025) (quoting *Railway Clerks v. Ass'n for Benefit of Non-contract Employees*, 380 U.S. 650, 660 (1965)).  Additionally, *ultra vires* review is "unavailable if . . . a statutory review scheme provides aggrieved persons 'with meaningful and adequate opportunity for judicial review,' or if a statutory review scheme forecloses all other forms of judicial review."  *Id.* (quoting *Board of Governors, FRS v. McCorp Financial, Inc.*, 502 U.S. 32, 43 (1991)).

Plaintiffs' *ultra vires* claim fails at these thresholds.  They do not allege that Defendants acted "entirely in excess of" their delegated powers and contrary to a specific prohibition in any appropriations statute.  *See Fed. Express Corp. v. United States Dep't of Com.*, 39 F.4th 756, 765 (D.C. Cir. 2022) ("[*U*]*ltra vires* claimants must demonstrate that the agency has plainly and openly crossed a congressionally drawn line in the sand.").  Further, the *ultra vires* claim is simply a variant of their other claims, for which there are adequate forms of judicial review both in this court and the Court of Federal Claims.  *See* Compl. ¶ 102 (alleging that Defendants "lacked constitutional, statutory, and regulatory authority to issue or implement the *en masse* termination of the Plaintiffs' and putative class members' grant awards").  Accordingly, their *ultra vires* claim is dismissed.

## VI.    CONCLUSION

There is no doubt in the court's mind that OJP's award terminations were unfair and indiscriminate.  When a government agency, especially the Department of Justice, agrees to fund

private organizations to carry out a public purpose, such organizations expect regularity and respectful treatment. That is not what occurred here. The court laments that the limits of its own power prevent it from helping Plaintiffs and similarly situated grantees. But the court cannot cure an injustice by exceeding its own authority.

Accordingly, Plaintiffs' Motion for Preliminary Injunction, ECF No. 3, is denied, and Defendants' Motion to Dismiss, ECF No. 27, is granted. Plaintiffs' Motion for Class Certification, ECF No. 2, is denied as moot. A final, appealable order accompanies this opinion.

Dated: July 7, 2025

Amit P. Mehta
United States District Judge